## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

THE STATE OF ALABAMA; ROBERT
ADERHOLT, Representative for Alabama's
4th Congressional District, in his official and
individual capacities; WILLIAM GREEN;
and CAMARAN WILLIAMS,

                        Plaintiffs,

                    v.

UNITED STATES DEPARTMENT OF
COMMERCE; GINA RAIMONDO, in her
official capacity as Secretary of Commerce;
UNITED STATES BUREAU OF THE
CENSUS, an agency within the United States
Department of Commerce; and RON
JARMIN, in his official capacity as Acting
Director of the U.S. Census Bureau,

                        Defendants.

CIVIL ACTION NO. _3:21-cv-211-RAH_

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF

**THREE-JUDGE COURT REQUESTED
PURSUANT TO 28 U.S.C. § 2284**

## INTRODUCTION

1.     This suit challenges two unlawful actions by the U.S. Commerce Department and

Census Bureau in relation to the 2020 decennial census—(1) Defendants' decision to produce ma-

nipulated redistricting data to the States, and (2) Defendants' refusal to produce redistricting data

on time.

2.     First, the skewed numbers. Congress has ordered the Secretary of Commerce to

work with the States to learn what they need for redistricting and then report to each State accurate

"[t]abulations of population" for subparts of each State for purposes of "legislative apportionment

or districting of such State." 13 U.S.C. § 141(c). But the Secretary, through the Census Bureau,

has announced that she will instead provide the States purposefully flawed population tabulations.

The Bureau intends to use a novel statistical method called differential privacy to intentionally skew the population tabulations provided to States to use for redistricting. Thus, while the Bureau touts its mission "to count everyone once, only once, and in the right place,"[1] it will force Alabama to redistrict using results that purposefully count people in the wrong place.

3.      Indeed, the *only* counts that will be unaltered by differential privacy will be the total population of each State, the total housing units at the census block level, and the number of group quarters facilities by type at the census block level. *All other tabulations*—such as how many people live in a census block, or how many of those people identify as a certain race or ethnicity—will be intentionally skewed.

4.      Census Bureau officials have suggested that the privacy requirements of 13 U.S.C. § 9 require the use of differential privacy to protect the personal information of census respondents. But that's not true. The Census Bureau has not shown that other disclosure avoidance methods would not satisfy the privacy requirements of § 9 while also meeting the Secretary's statutory obligation to deliver true—and usable—population tabulations to the States. Indeed, the privacy safeguards that the Census Bureau used for the 2010 decennial census and redistricting data appear to have worked extremely well. There have been no reports that anyone outside the Bureau has gained access to the responses of a particular identified person from the released 2010 data. While the Bureau is free to build on its past privacy successes, it cannot do so by providing States false "[t]abulations of population."

5.      The application of differential privacy will bring significant harm to Alabama, Representative Aderholt, William Green, and Camaran Williams.

---

[1] *See* U.S. Census Bureau, *2020: Census: Our Mission to Count Everyone* (Dec. 2020), https://perma.cc/43R7-LNAL.

6. Alabama has a congressionally created right to receive lawfully composed "[t]abulations of population" at the sub-state level to use for redistricting, and Defendants plan to deprive Alabama of this right by providing the State altered and deliberately inaccurate population tabulations. That in turn harms the State's sovereign interest in drawing districts that provide its residents fair representation. And the errors the Bureau intends to inject into the redistricting data increase the chance that the State will face litigation over its redistricting decisions.

7. Relatedly, Representative Aderholt, William Green, Camaran Williams, and others across the State face the very real risk that their voting power will be diluted when the Bureau purposefully misreports the number of people living in different areas of the State. That is why Congress has extended the States' rights to receive accurate "[t]abulations of population" to "any Representative or Senator in Congress" or "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method" when use of such method violates federal law and is "in connection with the ... decennial census[] to determine the population for purposes of the ... redistricting of Members in Congress." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act of 1998, Pub. L. No. 105-119, § 209(d)(2), (b), 111 Stat. 2440 (codified at 13 U.S.C. § 141 note). Congress has determined that violations of 13 U.S.C. § 141(c) due to unlawful statistical methods harm representatives and the people whose representation could be affected. *Id.* § 209(d).

8. Not only does the Bureau intend to produce false redistricting numbers, it intends to produce numbers half a year behind schedule. Congress required the Bureau to engage in a five-year collaborative process with the States to ensure delivery of redistricting data by no later than March 31, 2021. *See* 13 U.S.C. § 141(c). Alabama upheld its end of the deal, but the Bureau has decided—unilaterally—that it will instead submit data to the States by September 30, 2021. The

Bureau has no authority to grant itself this sizeable extension and deprive Alabama of information to which it is entitled. That is especially so because the Bureau's delay imposes substantial costs on Alabama as the State seeks to meet its constitutional obligations and run its 2022 statewide elections effectively and in accordance with State law.

9. Plaintiffs seek relief from these harms *now*—before the population tabulations are published using the differential privacy method, and before the delay extends beyond the statutory deadline. There is cause for haste. As soon as the faulty numbers are released, States will rely on them to redistrict. Defendants will not then be able to release a second, accurate set of population tabulations without causing immense harm. States that are already facing time pressures because of Defendants' delay will be forced to start the redistricting process over or face a barrage of lawsuits for using second-rate redistricting data. There could also be significant privacy risks with releasing a second set of tabulations.

10. For this reason, Congress has encouraged litigants to seek relief *before* the census numbers are released. As Congress explained: "[T]he decennial enumeration of the population is a complex and vast undertaking, and if such enumeration is conducted in a manner that does not comply with the requirements of the Constitution or laws of the United States, it would be impracticable for the States to obtain, and the courts of the United States to provide, meaningful relief after such enumeration has been conducted." Pub. L. No. 105-119, § 209(a)(8).

11. Accordingly, Plaintiffs thus seek declaratory and injunctive relief now. Plaintiffs ask the Court to declare that Defendants' actions are unlawful, enjoin Defendants from using differential privacy in connection with the 2020 census, and enjoin Defendants from delaying the release of the redistricting data to the States. In the alternative, Plaintiffs seek a writ of mandamus requiring Defendants to meet the statutory March 31 deadline.

4

## JURISDICTION AND VENUE

12.    The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201(a), and Public Law No. 105-119, § 209(b). Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

13.    Declaratory and injunctive relief is sought as authorized in 28 U.S.C. §§ 2201 and 2202.

14.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs the State of Alabama and William Green are residents of this judicial district, and a substantial part of the events or omissions giving rise to this Complaint occurred and are continuing to occur within the Middle District of Alabama.

## THREE-JUDGE COURT REQUESTED

15.    Plaintiffs bring claims under Section 141 of the Census Act, 13 U.S.C. § 141; Section 209 of Public Law No. 105-119, which is codified in a note to 13 U.S.C. § 141; and 28 U.S.C. § 2284(a), as this case involves a challenge to a statistical method used to provide "[t]abulations of population" for States to use in drawing congressional districts. *See* 13 U.S.C. § 141(c)

16.    Section 209 provides for a three-judge court to hear such challenges. "Any person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law ... in connection with the ... decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method," Pub. L. No. 105-119 § 209(b). And "[a]ny action brought under this section shall be heard and determined by a district court of three judges in accordance with section 2284 of title 28, United States Code." *Id.* § 209(e)(1). Moreover, "[i]t shall be the duty of a United States district court hearing an action

5

brought under this section and the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any such matter." *Id.* § 209(e)(2).

17.     Plaintiffs are "aggrieved persons." An "aggrieved person … includes": (1) "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method challenged in the civil action; (2) any Representative or Senator in Congress; and (3) either House of Congress." Pub. L. No. 105-119 § 209(d) (emphasis added). The individual Plaintiffs are "aggrieved persons" because Representative Aderholt is a "Representative … in Congress" and each individual Plaintiff is a "resident of" Alabama "whose representation or district could be changed as a result of the use of a statistical method...." *Id.*

18.     The State is also an "aggrieved person." Section 209(d)'s list of aggrieved persons is not exhaustive. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 132-33 (2012) (collecting cases for proposition that "[t]he verb *to include* introduces examples, not an exhaustive list"). Because, by its text, Congress created the guarantee of accurate "[t]abulations of population" for *States* to use in their redistricting process, Defendants' violation of Section 141(c) by use of a statistical method confirms that Alabama is also an "aggrieved person" within the meaning of Section 209. *See* Pub. L. No. 105-119 § 209(a)(8) (noting that Congress created Section 209(b)'s cause of action because "it would be impracticable *for the States* to obtain … meaningful relief after such enumeration has been conducted" (emphasis added)).

19.     Defendants' use of differential privacy for the 2020 decennial census is a statistical method that violates Plaintiffs' rights under 13 U.S.C. § 141(c). Moreover, Defendants' delay in producing redistricting data is caused at least in part by Defendants' decision to implement differential privacy, as Defendants have struggled to apply this novel (and unlawful) approach to the

6

2020 census. Thus, Defendants' use of a statistical method in violation of Section 141(c) is causing a delay that harms Alabama and Representative Aderholt.

20.     Therefore, this action "shall be heard and determined by a district court of three judges in accordance with section 2284 of title 28, United States Code." Pub. L. No. 105-119 § 209(e)(1).

21.     In accordance with this Court's Local Rule 9.3(a), Plaintiffs have also attached to this Complaint a brief statement setting forth in more detail the basis for this request.

## PARTIES

22.     Plaintiff the State of Alabama, by and through its Attorney General, is a sovereign State of these United States of America. The State is tasked with creating federal congressional districts after each decennial census. *See* U.S. Const. art. I, § 4, cl. 2. The State is also tasked with using the census data to redistrict and reapportion its State House of Representatives and State Senate seats. *See* Ala. Const. art. IX, §§ 198, 199, 200. The State brings this action to redress harms to its proprietary and sovereign interests.

23.     Plaintiff Robert Aderholt is United States Representative for Alabama's 4th Congressional District. He resides in Haleyville, Alabama. He regularly votes in local, state, and federal elections. Representative Aderholt also works regularly to ensure that Alabama and his congressional district receive all appropriate aid under federal formulas that depend on accurate census data.

24.     Plaintiff William Green resides in Montgomery, Alabama. He regularly votes in local, state, and federal elections in Alabama, served on Montgomery City Council for four years, and has been a candidate for state legislative office.

25.     Plaintiff Camaran Williams resides in Pell City, Alabama. He regularly votes in local, state, and federal elections in Alabama. For the last four years, Mr. Williams has served on

the Pell City planning commission, where he regularly uses census data to carry out the analyses necessary to make many of the decisions that come before him in this public role.

26.    Defendant the United States Department of Commerce is a cabinet-level agency within the executive branch of the United States. The Department of Commerce is an agency within the meaning of 5 U.S.C. § 552(f). The Commerce Department is responsible for planning, designing, and implementing the 2020 census. 13 U.S.C. § 4.

27.    Defendant Gina Raimondo is the Secretary of Commerce. She is responsible for conducting the decennial census of the population and overseeing the Census Bureau. She is sued in her official capacity.

28.    Defendant the United States Bureau of the Census is an agency within, and under the jurisdiction of, the Department of Commerce. 13 U.S.C. § 2. The Census Bureau is the agency responsible for planning and administering the decennial census.

29.    Defendant Ron S. Jarmin is the Acting Director of the Census Bureau and is performing the non-exclusive functions and duties therein. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**I.    The Census Bureau's Core Mandate Is To Conduct The Decennial Census So Congress Can Apportion House Seats Among States And States Can Redistrict.**

**A.    The Constitution Requires an "Actual Enumeration" for Apportionment of Representatives Between the States and to Redistrict Within Each State.**

30.    Under the U.S. Constitution, representation in the House of Representatives is "apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed." U.S. Const. amend XIV, § 2.

31.    To determine the "whole number of persons in each State," an "actual Enumeration" is required every ten years, "in such Manner as [Congress] shall by Law direct." U.S. Const. art I, § 2, cl. 3. This "actual Enumeration" is called the decennial census.

32.     The "actual Enumeration" is thus required for apportionment.

33.     The necessity of an "actual Enumeration" is embodied in the self-described mission of the Census Bureau "to count everyone once, only once, and *in the right place*."[2]

34.     There are two main components of apportionment. The first is the division of congressional seats among the 50 States. The second is the redistricting process within each State that follows that division. *See U.S. House of Representatives*, 525 U.S. at 328-34 (majority opinion) (discussing the "purposes" of apportionment).

35.     Congress enacted the Census Act to direct the "Manner" in which the decennial census occurs. *See generally* 13 U.S.C. § 1 *et seq.* Under the Act, the Secretary of Commerce is required to, "in the year 1980 and every 10 years thereafter, take a decennial census of population as of the first day of April of such year." 13 U.S.C. § 141(a).

36.     The Secretary of Commerce oversees the U.S. Census Bureau.

37.     Following the census, the Secretary has two primary sets of population tabulations she must report. First, within 9 months of the census date, the Secretary is required to provide the President "[t]he tabulation of total population by States" for use in "the apportionment of Representatives in Congress among the several States." 13 U.S.C. § 141(b).

38.     Second, the Secretary must report population tabulations to the States to use for redistricting. *Id.* § 141(c). This is the last step of a multi-year collaborative process between the Secretary and the States.

39.     The first step in providing the redistricting data to the States is for the Secretary to, "not later than April 1 of the fourth year preceding the decennial census date," establish criteria

---

[2] *See* U.S. Census Bureau, *2020: Census: Our Mission to Count Everyone* (Dec. 2020), https://perma.cc/43R7-LNAL (emphasis added).

9

for States' "plan[s] identifying the geographic areas for which specific tabulations of population are desired." *Id.* "Such criteria shall include requirements which assure that such plan shall be developed in a nonpartisan manner." *Id.*

40. Then, "not later than 3 years before the decennial census date," the "officers or public bodies having initial responsibility for the legislative apportionment or districting of each State may ... submit to the Secretary a plan identifying the geographic areas for which specific tabulations of population are desired." *Id.* These plans must meet the criteria set by the Secretary. If they do not, the Secretary "shall consult to the extent necessary with such officers or public bodies" to bring the plan into compliance. *Id.*

41. By April 1, 2017, Alabama submitted to the Secretary a plan identifying the geographic areas for which tabulations of population are desired for the 2020 census.

42. The Secretary approved Alabama's plan.

43. After plans are finalized and approved, "[t]abulations of populations for the areas identified in any plan approved by the Secretary shall be completed by him as expeditiously as possible after the decennial census date and reported to the Governor of the State involved and to the officers or public bodies having responsibility for legislative apportionment or districting of such State." *Id.* The "tabulations of population of each State requesting a tabulation plan, and basic tabulations of population of each other State, shall, in any event, be completed, reported, and transmitted to each respective State within one year after the decennial census date." *Id.*

44. The population tabulations under subsections (b) and (c) are similar in nature in that they are both required for apportionment purposes. The first is used to apportion Representatives in Congress among the States, while the second is used for legislative apportionment and

redistricting within each State. But both sets of tabulations must be accurate and in accord with the statutory and constitutional requirements of an "actual Enumeration."

**B.      The Census Bureau Must Report Apportionment Data Within Nine Months and Redistricting Data Within One Year of the Census Date.**

45.      As noted, Section 141 of the Census Act codifies two of the Secretary's most important census-related duties: providing "tabulation of total population by States ... as required for the apportionment of Representatives in Congress," and providing to the States "tabulations of population" which allow the States to draw their legislative districts. 13 U.S.C. § 141(b)-(c).

46.      The Act expressly requires that "[t]he tabulation of total population ... shall be completed within 9 months after the census date." 13 U.S.C. § 141(b).

47.      The Act also requires that the redistricting data required under Public Law No. 94-171, "shall be completed by [the Secretary] as expeditiously as possible ... [and] shall, in any event, be completed, reported, and transmitted to each respective State within one year after the decennial census date." *Id.* § 141(c).

48.      The Act defines "decennial census date" as April 1 of the year in which the decennial census takes place. *Id.* § 141(a). Apportionment data's nine-month window means that "tabulation of total population" is due by December 31 of the year the census takes place. And the one-year window from April 1 closes March 31 of the following year, which is therefore the statutory deadline for delivery of redistricting data to States.

49.      The deadlines are not discretionary. As noted above, the Act declares the Secretary "shall"—*not* "may"—complete, report, and transmit redistricting data to the States by March 31. *Id.* § 141(c). By using such mandatory language, the Act "impose[s] [a] discretionless obligation[]" rather than an optional one. *Lopez v. Davis*, 531 U.S. 230, 241 (2001).

**C.** **The Census Bureau Can Protect Census Respondents' Privacy While Still Providing True Redistricting Data to States.**

50.     Congress has charged the Census Bureau with protecting the private information of those who participate in the decennial census. *See* 13 U.S.C. § 9.

51.     In particular, the Bureau may not "make any publication whereby the data furnished by any particular establishment or individual … can be identified." *Id.* § 9(a)(2).

52.     The Bureau has used a number of disclosure avoidance methods to successfully protect the identity of census respondents in recent censuses.[3]

53.     For example, in the 2010 census, first, and most basically, before releasing any files with data at the respondent level ("microdata"), the Bureau removed the direct identifiers of the respondents—their names, addresses, telephone numbers, and the like. *Id.* at 4.

54.     Second, the Bureau used topcoding and bottom-coding to mask outliers in data involving continuous variables, "such as age and dollar amounts." *Id.* "When topcoding, the top 0.5 percent of all values or the top 3.0 percent of all nonzero values (whichever [a]ffects the least amount of records) are cut off" and replaced with the topcode cut-off value "or the mean or interpolated median of all topcoded values." *Id.* So, for example, someone whose age is 95 may have his age instead recorded as 90 to ensure that the respondent does not stick out in an uncrowded census block. Bottom-coding works the same way, just on the other end of the distribution. *Id.*

55.     Third, the Bureau set minimal weighted-population thresholds that needed to be met before it released data regarding that population. For example, categorical variables needed to "have at least 10,000 people nationwide in each published category." Amy Lauger et al., U.S. Census Bureau, *Disclosure Avoidance Techniques at the U.S. Census Bureau: Current Practices*

---

[3] *See generally* Laura McKenna, U.S. Census Bureau, *Research & Methodology Directorate: Disclosure Avoidance Techniques Used for the 1960 Through 2010 Decennial Census of Population and Housing Public Use Microdata Samples* (Apr. 2019), https://perma.cc/9LBN-5BWV.

*and Research* 2 (Sept. 26, 2014), https://perma.cc/2UXQ-SAFL. If the threshold was not met for a certain category, the category would be combined with another one (or ones) until it was. The categories would then be recoded as a broader interval and published that way. *Id.* The Bureau also recoded or rounded the numbers for certain "categorical and continuous variables," such as property taxes and responses involving certain dollar amounts. *See* McKenna, *supra*, at 4.

56.     Fourth, and most significantly, the Bureau used data swapping of household data in the 2000 and 2010 censuses to protect the identity of records with a high risk of disclosure. *See* Nat'l Conf. of State Legislatures, *Differential Privacy for Census Data Explained* (Feb. 1, 2021), https://perma.cc/DA93-36GA.

57.     Data swapping works like this: "Consider a census block with just 20 people in it, including one Filipino American. Without any disclosure avoidance effort, it might be possible to figure out the identity of that individual. With data swapping, the Filipino American's data might be swapped with that of an Anglo American from a nearby census block—a census block where other Filipino Americans reside. The details for the person would be aggregated with others, and therefore not identifiable, and yet the total population in both census blocks would remain accurate." *Id.*

58.     Data swapping was the "primary way of protecting Census 2010 ... tabular data products." Laura Zayatz et al., U.S. Census Bureau, *Disclosure Avoidance for Census 2010 and American Community Survey Five-year Tabular Data Products* 11 (Nov. 23, 2009), https://perma.cc/GF4V-QTVA.

59.     Notably, not all data are swapped between households when this technique is used. Rather, "[o]nly records which [a]re unique in their block based on a set of key demographic

variables" are swapped. *Id.* at 4. All other variables—most importantly, the population numbers—are left undisturbed.

60.     Additionally, because the swaps typically occur within the same general geographic area—"for example, across [census] tracts but within the same county," McKenna, *supra*, at 5—the error rate for characteristic data is reduced as census data are viewed at higher levels of geographic scope. In this way, race data, for instance, can remain relatively "true" for a congressional district, even if the household records within that district are swapped with those in nearby census blocks. Errors are pushed to the geographic boundaries.

61.     Fifth, the Bureau has also used partially synthetic data to protect records at group quarters for which data swapping is not an option. (Records from a nursing home group quarters, for example, cannot be swapped for those at a nearby college dorm.) *See id.* To create partially synthetic data, the data are modeled according to a general linearized model and records that may cause a disclosure risk are flagged. "Th[e] variable values that are causing the disclosure risk problem in a given unique record are then blanked and replaced with values generated from the model." *Id.* Importantly, "[g]eography and type of [group quarters] are never altered, and the numbers of people of less than age 18 and age 18 or more are never changed." *Id.* Thus, States are still given an accurate picture of how many people are present and whether they are of voting age.

62.     These protections have worked "extremely well." Steven Ruggles et al., *Differential Privacy and Census Data: Implications for Social and Economic Research*, 109 AEA PAPERS AND PROCEEDINGS 404 (May 2019), https://perma.cc/GW29-GNAV. "Indeed, there is not a single documented case of anyone outside the Census Bureau revealing the responses of a particular identified person in public use decennial census or [American Community Survey] data." *Id.*

63.    In addition to protecting the privacy of respondents, these techniques also resulted in census data that was accurate and reliable for States to use in their redistricting processes.

## II.    Alabama Relies On Census Data Being Accurately And Timely Reported.

64.    Article I of the U.S. Constitution grants States the ability to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. This language confers upon States the "authority to provide a complete code for congressional elections ...; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved." *Smiley v. Holm*, 285 U.S. 355, 366 (1932).

65.    Federal law informs Alabama's State-law reapportionment and redistricting requirements. Pursuant to the U.S. Constitution, States must draw congressional districts equal in number to the number of seats States are apportioned based on their populations. *See* U.S. Const., art. I, § 2, cl. 3. Additionally, the one-person-one-vote principle requires that States draw legislative districts that are nearly equivalent in population. *See Evenwel v. Abbott*, 136 S. Ct. 1120, 1123-24 (2016).

66.    To abide by these principles, States like Alabama rely on the Census Act's guarantee that the Bureau will provide timely and accurate reapportionment and redistricting data. *See* 13 U.S.C. § 141(c). Alabama relies on these data for various functions, including legislative and congressional apportionment. The reapportionment and redistricting data required under the Census Act thus further Alabama's sovereign interest in ensuring its districts are sufficiently equal in population to meet the Constitution's requirements.

67.    Pursuant to their authority under and obligations to the U.S. Constitution, many States—Alabama among them—have expressly tied their redistricting processes to the Bureau's decennial census numbers. *See, e.g.*, Ala. Const. art. IX, §§ 197-200; Cal. Const. art. XXI, § 1;

Ohio Const., art. XI, §3(A); art. XIX, § 2(A)(2); *see also, e.g., Census Data Snafu Upends 2022 Elections*, Politico (Mar. 1, 2021), https://perma.cc/DZ5N-275Y ("At least nine states" including Alabama "have constitutional or statutory deadlines to redraw their maps, according to the National Conference of State Legislatures, ...."). Any action the Bureau takes to alter the delivery of redistricting data therefore has immediate, foreseeable effects on States and related parties.

68.     Alabama and its local governments rely upon timely and accurate census data to conduct elections, receive fair allocations of federal and state funds, and conduct fair redistricting.

69.     Alabama's citizens, including Plaintiffs, rely upon timely and accurate census data so that their votes are not diluted.

**A.     Alabama Relies on Timely and Accurate Census Data to Redistrict.**

70.     Like the citizens of many other States, Alabamians have enshrined in their State Constitution redistricting and reapportionment calculations, which expressly rely on the Bureau's decennial census. For example, the Alabama Constitution provides that "members of the House of Representatives shall be apportioned by the legislature among the several counties of the state, according to the number of inhabitants in them, respectively, as ascertained by the decennial census of the United States ...." Ala. Const. art. IX, § 198.

71.     The people of Alabama have also constitutionalized redistricting and reapportionment procedures with direct reference to the census. The Alabama Constitution expressly requires the State Legislature to conduct legislative redistricting "at its first session after taking the decennial census of the United States." Ala. Const. art. IX, §§ 199-200. The Alabama Legislature's "first session after taking the decennial census of the United States" began February 2, 2021, and will adjourn May 30.

72.     As a practical matter, the Alabama Legislature cannot conduct this constitutionally required redistricting without the decennial census's redistricting data.

16

**B.      Alabama Relies on Timely and Accurate Census Data to Conduct Elections.**

73.      Redistricting is not the only election-related process in Alabama tied to the arrival of new census data. Following the redistricting process, each Alabama county's Board of Registrars, in conjunction with each county commission, must reassign Alabama's more than three million registered voters to their correct precincts and districts. This process is no small feat, and in most of Alabama's counties it requires officials to engage in a manual process that can take six months to complete.

74.      Alabama's various county Boards of Registrars must complete this process by the time absentee voting begins, which is set by statute to commence 55 days prior to the primary election. Ala. Code §§ 17-11-5(b); 17-11-12. For Alabama's statewide 2022 elections, absentee voting will thus begin March 30, 2022.

75.      If the Bureau were to heed its statutory obligation and deliver the redistricting data no later than March 31, 2021, Alabama's Boards of Registrars would have no problem reassigning Alabama's registered voters to their correct precincts and districts prior to the opening of absentee voting. But if the Bureau delays delivering the data, then the Legislature will delay redistricting, and Boards of Registrars will be left with precious little time to assign voters to their new voting districts before voting begins.

76.      The candidates who run in Alabama's elections also rely on timely and accurate census data. By statute, candidates intending to participate in the 2022 primary election may begin soliciting and accepting contributions on May 24, 2021. Ala. Code § 17-5-7(b)(2). But in order to solicit funding and effectively campaign, candidates must know which districts they may represent and from whom they ought to solicit support.

77.     Delayed redistricting data places additional burdens on independent candidates who must garner a statutorily required number of signatures to appear on the ballot. *See* Ala. Code § 17-6-22. These candidates will face difficulties collecting ballot-access signatures until they know who they are hoping to represent.

78.     Moreover, because many elected positions in Alabama state government have residency requirements for candidates, *see, e.g.*, Ala. Const. art. IV, § 47, it is particularly important for these candidates to know where district lines will fall as early as possible.

## III.     Defendants Are Using a Statistical Method to Deliberately Skew Census Data To Report Inaccurate Tabulations Of Population To The States.

79.     In September 2017, the U.S. Census Bureau announced at its Scientific Advisory Committee meeting that it would be using a disclosure avoidance method called "differential privacy" for the 2020 census.[4] John M. Abowd, the Chief Scientist and Associate Director for Research Methodology at the Census Bureau, publicly announced the decision the following August at the Association of Computing Machinery's Special Interest Group on Knowledge, Discovery, and Data Mining's annual conference in London.[5] Three months after that, differential privacy was added to the fourth version of the Bureau's 2020 Census Operational Plan.[6]

80.     This represents final agency action in the implementation of differential privacy.

---

[4] *See* Simson L. Garfinkel, U.S. Census Bureau, *Modernizing Disclosure Avoidance: Report on the 2020 Disclosure Avoidance Subsystem as Implemented for the 2018 End-to-End Test* (Sept. 15, 2017), https://perma.cc/4J8B-ZEXM.
[5] *See* John M. Abowd, U.S. Census Bureau, Presentation to the 24th ACM SIGKDD Conference on Knowledge Discovery and Data Mining, *The U.S. Census Bureau Adopts Differential Privacy* (Aug. 23, 2018), https://perma.cc/USZ6-ZPLC.
[6] *See* U.S. Census Bureau, *2020 Census Operational Plan: A New Design for the 21st Century* v.4 (Dec. 2018), https://perma.cc/6XCD-38R4.

81.     Differential privacy is a "formal privacy" method that "inject[s] a precisely cali-brated amount of noise"—i.e., intentional error—"into the data to control the privacy risk of any calculation or statistic."[7]

82.     "[T]he goal of differential privacy is to obscure the presence or absence of any individual, or small group of individuals," from the dataset.[8]

83.     Data "is said to be differentially private if by looking at the output, one cannot tell whether any individual's data was included in the original dataset or not."[9]

84.     To accomplish this goal, the accuracy of the data is intentionally skewed by a sta-tistical method. Privacy is the result of mathematical manipulation of the true numbers—"perfect privacy would result in completely useless data," while "perfect accuracy would result in releasing the data in fully identifiable form."[10]

85.     The chosen blend of accuracy and privacy results in a measure called the "privacy-loss budget" or "epsilon" ($\varepsilon$). An epsilon of zero results in perfect privacy but useless data, whereas an epsilon of infinity results in perfect accuracy but theoretically imperfect privacy.

86.     The Bureau did not provide notice in the Federal Register of its decision to adopt differential privacy for the 2020 census. Nor did it otherwise seek public comment before the de-cision was made. The closest it came was a July 2018 solicitation of feedback "to understand how the public uses decennial census data products"—but that solicitation occurred *after* the Bureau

---

[7] Michael Hawes, U.S. Census Bureau, *Title 13, Differential Privacy, and the 2020 Decennial Census* 22 (Nov. 13, 2019), https://perma.cc/MRQ2-67WG; *see also* JASON, *Formal Privacy Methods for the 2020 Census* (Apr. 2020), https://perma.cc/G8ZM-YNN6.

[8] *See* Cynthia Dwork, *Differential Privacy: A Cryptographic Approach to Private Data Analysis*, *in* PRIVACY, BIG DATA AND THE PUBLIC GOOD 302-03 (Julia Lane et al., eds., 2014).

[9] Harvard University Privacy Tools Project, *Differential Privacy*, https://perma.cc/T7NJ-N397 (last visited Mar. 2, 2021).

[10] Hawes, *Title 13, Differential Privacy, and the 2020 Decennial Census*, *supra*, at 22 (cleaned up).

had already determined that it would be using the new method for the 2020 census. *See* Soliciting Feedback From Users on 2020 Census Data Products, 83 Fed. Reg. 34,111 (July 19, 2018). Nor did that solicitation explicitly mention differential privacy or disclosure avoidance methods in any case. *Id.*

87.     The global privacy-loss budget for the 2020 census has still not been set, nor has there been a formal mechanism for outside political input or participation in that decision—even though "[t]he proponents of differential privacy … have always maintained that the setting of [the privacy-loss budget] is a policy question, not a technical one."[11] Instead, the Census Bureau's Data Stewardship Executive Policy Committee is expected to set the global privacy-loss budget in early June 2021.[12]

88.     Thus, the Bureau's continuing adjustments to its novel differential privacy scheme will significantly lengthen the Bureau's delay in producing the redistricting data that is due on March 31, 2021.

89.     The Bureau has already set the "invariants"—i.e., unaltered numbers—that States will receive from the 2020 census. They will be: (1) the total population of each State, (2) the total housing units at the census block level, and (3) the number of group quarters facilities by type at the census block level.[13] All other tabulations—such as how many people live in a census block, or how many of those people identify as a certain race or ethnicity—will be skewed intentionally.

---

[11] Simson L. Garfinkel, John M. Abowd, & Sarah Powazek, *Issues Encountered Deploying Differential Privacy* 3 (Sept. 6, 2018), https://perma.cc/7TZQ-AFTD.

[12] *See* U.S. Census Bureau, 2020 Disclosure Avoidance System Updates (Feb. 23, 2021), https://perma.cc/D6VJ-N5Z3.

[13] *See* U.S. Census Bureau, *2020 Census State Redistricting Data (Public Law 94-171) Summary File* 7-3 (Feb. 2021), https://perma.cc/9HWC-492T.

90.     Not only that, but the variant tabulations will be skewed in a way that affects different populations differently. "Rural areas will see a greater variance from the raw data than urban areas."[14] "Smaller subpopulations, such as specific racial groups, will be affected more than larger racial or ethnic groups." *Id.* And "[t]he impact on states will vary, depending on their overall demographics."[15]

91.     The Bureau's adoption of differential privacy will cause the Bureau, for the first time ever, to purposefully report incorrect population counts to the States to use for redistricting. It will do so based on a statistical method that (A) is unnecessary and unproven for apportionment purposes; (B) will prevent redistricting from reflecting accurate population and demographic counts; and (C) is illegal for apportionment purposes.

### A.     Differential Privacy is Unnecessary and Unproven for Apportionment Purposes.

92.     The Census Bureau's purported reason for using differential privacy is a concern that the rise in computer power, coupled with the proliferation of databases containing individuals' personal information, creates a risk that someone could use outside data sources along with information from the census tabulations to recreate individual level data. *See* Hawes, *Title 13, Differential Privacy, and the 2020 Decennial Census*, *supra*, at 13.

93.     The Census Bureau conducted an internal database reconstruction experiment "that sought to identify the age, sex, race, and Hispanic origin for the population of each of the 6.3 million inhabited census blocks in the 2010 census" from the publicly released tabular data. Ruggles et al., *supra*, at 404; *see* Hawes, *Title 13, Differential Privacy, and the 2020 Decennial Census*, *supra*, at 17-18. The analysts were purportedly able to reconstruct individual-level microdata with

---

[14] Nat'l Conf. of State Legislatures, *supra*.
[15] *Id.*

the block, sex, age, race, and ethnicity characteristics for 46% of the population—meaning that the analysts were able to group those characteristics together correctly, but without personal identifying information like a name or address to match. Hawes, *Title 13, Differential Privacy, and the 2020 Decennial Census, supra*, at 18.

94.    The analysts then purportedly linked the block, sex, and age characteristics they had reconstructed to commercial databases, which provided possible re-identification matches for 45% of the population. *Id.* The name, block, sex, age, race, and ethnicity characteristics from the commercial data—the putative matches—were then compared to the confidential census data to see if they had in fact been positive re-identifications. A little over a third of that subset were matches—the race and ethnicity for those characteristic sets had been "learned exactly, not statistically." John M. Abowd, U.S. Census Bureau, Presentation to the Am. Ass'n for the Advancement of Science, *Staring Down the Database Reconstruction Theorem* (Feb. 16, 2019), https://perma.cc/P3YV-FXPG.

95.    Notably, the experiment did not prove that someone *without* the Census's confidential database—called the Hundred-percent Detail File—could match the characteristics learned from the published tabular datasets with personal identifying information such as names or Social Security numbers from external databases with any degree of reliability or certainty. In other words, no person engaging in reconstruction can know if her "reconstructed" dataset bears any similarity to the true dataset unless she can cross-reference it with the unredacted Hundred-percent Detail File. But no one outside of the Census Bureau can do that—which is also why no one can run the same experiment the Census did, and why details of the experiment have not been published.

96.     That is also why Abowd and the other Census analysts concluded that "the risk of re-identification is small." Abowd, *The U.S. Census Bureau Adopts Differential Privacy, supra*, at 15.

97.     Indeed, as experts outside of the Census Bureau explained, the test showed that "the system worked as designed: because of the combination of swapping, imputation and editing, reporting error in the census, error in the identified credit agency file, and errors introduced in the microdata reconstruction, there [wa]s sufficient uncertainty in the data to make positive identification by an outsider impossible." Ruggles et al., *supra*, at 405. The existing protections "worked extremely well to" prevent an outside adversary from being able to "positively identify which person provided a particular response." *Id.* at 404.

98.     To date, there has not been "a single documented case of anyone outside the Census Bureau revealing the responses of a particular identified person in public use decennial census or [American Community Survey] data." *Id.*

99.     Moreover, even assuming that swapping and past disclosure avoidance methods present some privacy risk, the Bureau has not explained how the privacy risk under differential privacy will compare. In other words, the Bureau has not shown that differential privacy works better than the disclosure avoidance methods used in 2010.

100.     And even if the Bureau did show that differential privacy works better than traditional disclosure avoidance methods, differential privacy cannot eliminate all risks to privacy. Thus, differential privacy and past practices are simply in different places on the same sliding scale of privacy protection under 13 U.S.C. § 9. What is clear, though, is that past methods do not violate the Secretary's obligations to report accurate "[t]abulations of population" under § 141(c), whereas differential privacy will result in such a violation.

101.    In addition to being unnecessary, differential privacy is unproven in the apportion-

ment context. As Census Bureau officials have noted, "[d]ifferential privacy is less than 15 years

old, and most existing mechanisms were created for computer science applications, not the needs

of official statistical agencies." Garfinkel et al., *Issues Encountered Deploying Differential Pri-*

*vacy*, *supra*, at 3.1.

102.    Unsurprisingly, the Bureau has faced numerous challenges in its drive to impose

the still-developing theory onto the decennial census. For example, the Bureau has "lacked subject

matter experts skilled in the theory and practice of differential privacy," as well as "toolkits for

performing differential privacy calculations for verifying the correctness of specific implementa-

tions." *Id.*

### B.    Differential Privacy Forces States to Redistrict Using Inaccurate Numbers.

103.    Though Congress has specifically charged the Bureau with producing accurate

numbers for redistricting, differential privacy intentionally skews all population numbers save for

the total population of each State, which threatens to create problems at every stage of redistricting.

104.    In October 2019, the Census Bureau released a set of demonstration data for various

census stakeholders to review.[16] The Bureau also released additional demonstration data in May,

September, and November of 2020.[17] This dataset applied differential privacy to the 2010 census

data for certain States as a means of testing this novel approach to disclosure avoidance.

105.    The demonstration data has shown that differential privacy, no matter where the

epsilon value (the intended error rate) is set, inhibits a State's right to draw fair lines. Simply put,

---

[16] *See* U.S. Census Bureau, 2010 Demonstration Data Products (rev. Apr. 16, 2020), https://perma.cc/KK5M-KLRL.

[17] *See* U.S. Census Bureau, 2020 Disclosure Avoidance System Updates (Feb. 23, 2021), https://perma.cc/D6VJ-N5Z3.

differential privacy forces States to draw districts using false numbers about how many and what type of people reside in a census block, block group, tract, or county.

106.   This level of falsity is unlike past disclosure avoidance methods in significant ways—both in kind and in degree.

107.   First, and most important, with data swapping the Bureau still reported actual population counts, whereas with differential privacy, those counts are skewed. When data swapping was used to protect small populations, the "total population, voting age population, total housing units, occupancy status, group quarters count and group quarters type were all held invariant" at the census-block level.[18] Not so for differential privacy, where the population numbers themselves are manipulated (save for the statewide level). This is a radical break in kind from past practice. *See infra* Part III.C.

108.   Moreover, as explained above, whereas the errors caused by swapping between adjacent census blocks are largely cancelled out as one looks at higher census geographies[19] because the adjacent blocks are combined together, the same is not true for the errors caused by differential privacy. Those errors can compound as census blocks are combined to form larger census geographies because the population totals and characteristics in adjacent blocks are skewed at random.

109.   Thus, unlike in years past, "[d]ifferential privacy will mean that, except at the state level, population and voting age population will not be reported as enumerated. And race and

---

[18] Nat'l Conf. of State Legislatures, *supra*.

[19] Census data are broken up into ever smaller levels of geographic areas called "census geographies." There are two different classifications of census geography— "on the spine" and "off the spine." The "on the spine" geographies are, from largest to smallest: Nation, Regions, Divisions, States, Counties, Census Tracts, Block Groups, and Blocks. "Off the spine" geographies are designations for defining other areas of geography for various statistical or other purposes. Some examples of "off the spine" census geographies are: Zip Codes, School Districts, Congressional Districts, Economic Places, Voting Districts, Urban Areas, and Metropolitan Areas.

ethnicity data are likely to be farther from the 'as enumerated' data than in past decades, when data swapping was used to protect small populations."[20]

110.    Examples from the demonstration data prove this point. In Washington, for instance, application of differential privacy "displaced nearly 18% of Washington's population at the census block level."[21]

111.    When applied to smaller census geographies, the problems became worse. Census blocks with a small number of housing units had much higher populations than were reported by the true 2010 numbers, while blocks with more than 20 housing units had lower populations than they should have had. "In terms of household population, census blocks with only one housing unit had collectively 64,195 more people after applying [differential privacy]. There were also 15,253 people in census blocks that had housing but no population in the original 2010 data. Together, these numbers represent 79,448 people."[22] Remarkably, there were "401 census blocks where *all* of the population [was reported to be] over 85 years of age and 3,353 census blocks where *all* of the population [was reported to be] 14 years old or younger (i.e., 16,775 youth apparently lived in households without adults present)." [23]

112.    Nor are the falsities that are introduced by differential privacy evenly distributed across populations. Rather, the algorithm alters certain characteristics more than it does others. An extreme example is the census block that contains Washington's Correction Center for Women. In the original 2010 census, the census block was, understandably, approximately 99% female. After

---

[20] Nat'l Conf. of State Legislatures, *supra*.

[21] Mike Mohrman, *The Challenge of Differential Privacy: Confidentiality vs. Usability* (Sept. 15, 2020), https://perma.cc/4FA7-G4EF.

[22] *Id.*

[23] *Id.*

the application of differential privacy, the same census block was reported to be only 25% female.[24]

113.    Data concerning racial characteristics are similarly skewed. As the National Redistricting Foundation has noted, "initial analyses suggest that the Bureau's differential privacy proposal can produce inaccurate counts for minority communities by reallocating population from larger minority groups to smaller ones and by geographically dispersing concentrated minority populations—precisely the kinds of inaccuracies that would work against the viability of majority-minority districts."[25]

114.    For instance, under the differential privacy demonstration data, 60 Alabama "census places"[26] lost *all* of their black voting age population, 68 "census places" lost *all* of their black minor population, approximately 100 "census places" lost *all* of their Hispanic minor population, and approximately 100 "census places" lost *all* of their Hispanic voting age population.

115.    As it did in Washington, the demonstration data for Alabama also reported the (thankfully false) phenomenon of significant numbers of unaccompanied children living in census blocks with no adults. While there were five such blocks in the 2010 census data, the demonstration data report more than 13,000 blocks containing children but no adults.

---

[24] *See* Mike Mohrman, Letter to Steve Dillingham, Director, U.S. Census Bureau (Feb. 6, 2020), https://perma.cc/MC3G-62PT.

[25] Nat'l Redistricting Foundation, Letter to Steven Dillingham, Director, U.S. Census Bureau (Apr. 24, 2020), https://perma.cc/3QK8-65VN.

[26] "Census designated places (CDPs) are statistical geographical entities representing closely settled, unincorporated communities that are locally recognized and identified by name. They are the statistical equivalents of incorporated places, with the primary differences being the lack of a legally defined boundary and an active, functioning governmental structure, chartered by the state and administered by elected officials." *See* Census Designated Places (CDPs) for the 2020 Census—Final Criteria, 83 Fed. Reg. 56,290, 56,920 (Nov. 13, 2018). "According to the 2010 Census, more than 38.7 million people in the United States, Puerto Rico, and the Island Areas lived in CDPs." *Id.* at 56,291.

116.    Even at the higher census geography of Alabama's Congressional districts, the No-
vember 2020 demonstration data indicated that the differential privacy algorithm skewed the data
enough to create population deviation on a level that courts have found, in other contexts, to violate
the Supreme Court's equal population jurisprudence:[27]

| Congressional District | 2010 Actual Population | 2010 Actual Population Deviation | Differential Privacy Population (Demonstration Data) | Differential Privacy Deviation (Demonstration Data) |
|---|---|---|---|---|
| 1 | 682820 | +1 | 682747 | -73 |
| 2 | 682820 | +1 | 682791 | -29 |
| 3 | 682819 | -1 | 682844 | +25 |
| 4 | 682819 | -1 | 682820 | +1 |
| 5 | 682819 | -1 | 682820 | +1 |
| 6 | 682819 | -1 | 682688 | -131 |
| 7 | 682820 | +1 | 683026 | +206 |

117.    Notably, the only reason that these errors are knowable is because the Census Bu-
reau provided both the differential privacy data and the actual Census data.

118.    Because the Bureau will *not* provide the actual data for the 2020 census, if the ap-
plication of differential privacy to the 2020 census data is not stopped, these differences from
reality will never be discernable from the official federal government data.

119.    Nor will the Bureau simply be able to provide the true numbers (with the 2010
disclosure avoidance methods in place) at a later time if turns out that the differential privacy
numbers cannot be used. Doing so would throw a wrench in the redistricting process, forcing States

---

[27] *See, e.g.*, *Vieth v. Pennsylvania*, 195 F. Supp. 2d 672 (M.D. Pa. 2002) (three-judge court).

to scrap the plans they drew from the skewed numbers and begin anew or else face certain litigation over their use of second-rate data. Releasing the two datasets could also result in significant privacy concerns because the two datasets could be compared, increasing the risk that privacy could be compromised.

120.    For these reasons, many States have written to the Census Bureau and other officials to ask that differential privacy not be implemented this census cycle. *See* Nat'l Conf. of State Legislatures, *supra* (collecting letters from Utah, Washington, Maine, Virginia, and Colorado).

121.    For example, as the California legislature noted in its recent letter to the White House: "[U]sing the differential privacy adjustment ... will enshrine an unnecessary inaccuracy in the 2020 Census data. Test runs have clearly demonstrated these flaws. Differential privacy as now envisioned will undercut the goals of the Voting Rights Act, potentially shift funds away from low-income communities of color, and make fair line drawing more challenging at both the state and local level." Toni G. Atkins & Anthony Rendon, Letter to Chief of Staff Ronald Klain (Feb. 1, 2021), https://perma.cc/5ZDS-YRUM.

### C.    Differential Privacy is Illegal for Redistricting Purposes.

122.    Implementing differential privacy for the 2020 census is illegal because it will skew the numbers given to States for redistricting.

123.    Defendants' refusal to provide this information violates 13 U.S.C. § 141(c) in at least two ways. First, the numbers Defendants will give Alabama are not the "[t]abulations of population" Defendants are obligated to provide. While Defendants may count the number of persons residing in various census blocks throughout Alabama, they will not enter those numbers into the tables. Rather, they will enter alternative numbers generated by the Bureau's confidential algorithm. But Congress did not give the Bureau authority to report estimates or values that merely

bear some relation to sub-state population counts. Congress required that the actual numbers be reported.

124.    Second, even if the numbers Defendants will report constitute "[t]abulations of population," Section 141(c) requires accurate, not deliberately inaccurate, numbers to be provided. If Defendants assigned every Alabamian to Birmingham, that would violate Section 141(c). And while Defendants' final manipulation of the population counts might not be so ambitious, it will be similarly illegal.

125.    This follows from the structure of Section 141(c) as well. "The officers or public bodies having initial responsibility for the legislative apportionment or districting of each State may, not later than 3 years before the decennial census date, submit to the Secretary a plan identifying the geographic areas for which the specific tabulations of population are desired."

126.    If the submitted plan is approved by the Secretary, then the "[t]abulations of population for the areas identified" in the plan "shall be completed by [the Secretary] as expeditiously as possible after the decennial census date and reported to the Governor of the State involved and to the officers or public bodies having responsibility for legislative apportionment or districting of such State, except that such tabulations of population of each State requesting a tabulation plan, and basic tabulations of population of each other State, shall, in any event, be completed, reported, and transmitted to each respective State within one year after the decennial census date." *Id.*

127.    By statute, then, Congress has given States a right to accurate "[t]abulations of population" for geographic areas specific enough to allow for redistricting. States like Alabama have long relied on the Census Bureau to provide just this information.

128.    And as Census officials have recognized, "[i]n the redistricting application, the fitness-for-use" of the census data is based on (1) "Supreme Court one-person one-vote"

30

jurisprudence, and (2) the Voting Rights Act's requirement that the voting rights of a minority racial group not be diluted.[28]

129.   Normally, "because the census count represents the 'best population data available,' it is the only basis for good-faith attempts to achieve population equality." *Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (citation omitted).

130.   Here, census data will be manipulated by the application of differential privacy to be "second-best" data, thereby infringing on Alabama's right to allocate political power as equally as the State could if Defendants provided accurate tabulations of population.

131.   Moreover, the reason the redistricting data will be skewed is because of the application of a statistical method, which Congress defines as "an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference." Pub. L. No. 105-119, § 209(h)(1). Accordingly, Congress has removed the prudential standing requirements for a person aggrieved by this application to seek relief. *See id.* § 209(b).

132.   Third, the implementation of differential privacy also raises the specter of data manipulation for partisan or other improper purposes. *Cf. Utah v. Evans*, 536 U.S. 452, 471-71 (2002); *U.S. House of Representatives*, 525 U.S. at 348-49 (Scalia, J., concurring in part). And because "we will *never* be able to assess the relative accuracy of the [differential privacy] system used for the 20[20] census by comparing it to the results of a headcount," *id.* at 349, citizens will have no way to determine whether the numbers were skewed for improper purposes or skewed only with the purest of intents. They will know only that the numbers were skewed.

---

[28] *See* Abowd, *The U.S. Census Bureau Adopts Differential Privacy*, *supra*, at 37.

31

IV.    **Plaintiffs Will Be Harmed By The Inaccurate Census Data.**

A.    **Alabama Will Be Harmed By The Inaccurate Census Data.**

133.    Alabama has a legal right to accurate census data to use for redistricting. *See* 13 U.S.C. § 141(c). It uses that data to redistrict its congressional, legislative, and State Board of Education districts, in accord with the U.S. Constitution, federal law, and State law.

134.    Yet by using differential privacy, the Census Bureau will not provide data that is fit for use in redistricting.

135.    That violates Plaintiffs' statutory rights, harms their reliance interests, and deprives them of information they are entitled to have to perform their mandatory legal duties. *See U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 85 (D.D.C. 1998) (finding that the House of Representatives suffered an informational injury by the Census Bureau's use of statistical sampling); *see also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-25 (1998).

136.    A number of federal laws regulate the composition of representative districts. The four primary mechanisms for regulating or challenging the districting process are Article I, Section 2; the First Amendment; the Fourteenth Amendment; and Section 2 of the Voting Rights Act.

137.    The Alabama Legislature has relied on the Census Bureau for decades to provide accurate information for redistricting.

138.    Yet under differential privacy, the Alabama Legislature will not know the actual number of people, or relevant demographic makeup, in any census geography below the level of the State as a whole. The State will thus be forced to redistrict with data that has been deliberately manipulated to be less reflective of the actual population and demographic makeup of any substate geographic area than the Census Bureau could provide. Forcing the State to redistrict with intentionally flawed data will impede Alabama's ability to draw representative districts with near-equal populations, which is what the Constitution and one-person, one-vote jurisprudence require. This

will also impede Alabama's ability to draw districts to protect minority voting rights as required by the Voting Rights Act.

139.    The State, which has worked with Defendants for years to obtain accurate tabulations of population, will have its reliance interests damaged.

140.    Moreover, by withholding information—the accurate tabulations of population—that the State is entitled to receive, Defendants will deprive the State of its right "to receive information which [it] is entitled to by law." *U.S. House of Representatives*, 11 F. Supp. 2d at 85.

141.    There are many challenges that the faulty data will present the State as it seeks to draw redistricting maps. For one, the inaccurate data will impede Alabama's sovereign interest in drawing representative districts that fairly allocate political power.

142.    For another, faulty data also increases the risks of harm to the voting rights of minorities in Alabama. Deviations in black voting-age population are concerning because, among other reasons, one of the tests for liability under Section 2 of the Voting Rights Act is whether the minority community is "sufficiently large and geographically compact to constitute a majority in a single-member district." *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986).

143.    Because the Census Bureau will not report true population numbers, it will be difficult to know whether a district will be a majority-minority district when it is drawn. The application of differential privacy will obscure whether minority populations are packed into districts where their voting strength is diluted or spread across districts where they may not be able to elect the candidate of their choice.

144.    These difficulties make litigation against the State especially likely. *See* Jeff Zalesin, *Beyond the Adjustment Wars: Dealing With Uncertainty and Bias in Redistricting Data*, 130 Yale L.J. Forum 186, 187-89 (2020) (noting that "the Bureau's adoption of a new system for

protecting respondents' privacy by algorithmically adding error to published data" contributed to "place the 2020 Census at risk of being the least accurate census in living memory," and urging courts to "strike down maps as unconstitutionally malapportioned" even when "the Census Bureau's official data products in isolation would point to the opposite result").

145.    Alabama has an interest in avoiding litigation, its attendant costs, and liability under the Constitution and the Voting Rights Act.

146.    Indeed, liability under the Voting Rights Act is especially worrisome because the legal and factual tests for a finding of liability turn, in part, on past findings of liability. Thus, if Alabama is held liable because it was forced by the Census Bureau to use data tainted by differential privacy, then it will be even *more* likely in future suits to be found liable under Section 2.

147.    Findings of liability under the Voting Rights Act can also potentially subject Alabama, and its subordinate governmental units, to the "bail-in" provisions of Section 3(c), which would subject the relevant jurisdiction to continual judicial monitoring similar to the pre-clearance provisions of Section 5.

148.    Decennial census data are also used in many federal funding formulas that distribute federal funds to states and localities each year. Recent research indicates there are 316 federal programs that use census-derived data to distribute more than $1.5 trillion each year to States and localities.

149.    In Fiscal Year 2017, for example, 176 federal programs relied on local-level census-derived data to distribute federal funding. Roughly 100 programs relied on state-level census-derived data. And 39 programs relied on both state and local-level census-derived data.[29]

---

[29] Andrew Reamer, *Counting for Dollars 2020: The Role of the Decennial Census in the Geographic Distribution of Federal Funds*, Brief 7: Comprehensive Accounting of Census-Guided Federal Spending: Part A: Nationwide Analysis (FY2017), https://perma.cc/WQT9-DBYQ.

150.     "Forty percent of the[se] programs use[d] census-derived data to determine the geographic areas and households eligible to receive the program's funding."[30]

151.     There are four main uses of census-derived datasets to allocate federal funding geographically. They are: (1) to define eligibility criteria, (2) to compute formulas that geographically allocate funds to eligible recipients, (3) to rank project applications based on priorities (e.g., smaller towns, poorer neighborhoods), and (4) to set interest rates for federal loan programs.[31]

152.     Census-derived eligibility or allocation criteria used by federal programs to distribute funding include an area's population density (such as rural or urban designation) and its population size (above or below a specified level); the number of persons in rural areas and persons in overcrowded housing; and the category of the geographic area—whether it is large metro, metro, micro, rural, or isolated county. Every one of these variables will be affected by differential privacy.

153.     The two primary determinants of where census-guided federal spending is allocated among States are (1) poverty rate and (2) percentage of the population living in a rural area. These, too, will be affected by the application of differential privacy to census datasets.

154.     In fiscal year 2017, Alabama received approximately $13 billion through 55 federal spending programs guided by data derived from the 2010 census.[32]

155.     This included approximately $12 billion in federal financial assistance programs such as Medicaid, student loans, Supplemental Nutrition Assistant Program benefits, and Medicare Part B; $171 million in federal tax expenditures such as the low-income housing tax credit and the new markets tax credit; and $250 million in federal procurement programs.

---

[30] *Id.*

[31] *Id.*

[32] Reamer, *Counting for Dollars 2020: Alabama, supra.*

156.    Because of differential privacy, the amount of future allocations are at risk.

157.    As noted, the rural population rate is a primary determinant of where federal spending is allocated, yet the population data from the 2020 census will not accurately reflect Alabama's rural populations. In fact, "[r]ural areas will see a *greater* variance from the raw data than urban areas."[33]

158.    That variance will directly affect the amount of federal funding Alabama and its citizens receive.

**B.      The Individual Plaintiffs Will Be Harmed by the Inaccurate Census Data.**

159.    Representative Aderholt, Mr. Green, and Mr. Williams will all be harmed by the Bureau's production of false redistricting results.

160.    First, through Section 209 of Public Law No. 105-119, Congress has taken the States' right to accurate redistricting data and extended it to members of Congress and "any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method." *See* Pub. L. No. 105-119, § 209(d)(1)-(2).

161.    Second, each individual Plaintiff is a voter facing a substantial risk that his vote will be diluted as a result of the Bureau reporting false redistricting data to the State.

162.    Representative Aderholt lives in Haleyville, Alabama. Under the latest version of the differential privacy demonstration data, Haleyville's total population is artificially increased 1% over the actual population, demonstrating a substantial risk that Representative Aderholt's vote will be diluted.

---

[33] Nat'l Conf. of State Legislatures, *supra* (emphasis added).

163.    Mr. Green lives in Montgomery, Alabama. He is African-American. The errors dif-
ferential privacy injects into census data have shown up more heavily in minority communities,
demonstrating a substantial risk that Mr. Green's vote will be diluted.

164.    Mr. Williams lives in Pell City. The latest version of the differential privacy demon-
stration data showed Pell City gaining 84 adults while having 65 children deleted. Among African-
American residents, 90 adults were deleted, as were 26 children. And the town is assigned 26
residents of Hispanic descent who do not reside there. Mr. Williams has young children, and the
addition or subtraction from census data of so many children threatens the ability of his local school
district to plan accurately. In this case, the demonstration data added 79 non-existent children to
the school district. Moreover, the fluctuating population numbers create a substantial risk that Mr.
Williams's vote will be diluted.

## V.    Defendants Will Violate The Law By Not Timely Reporting Redistricting Data For The 2020 Census.

165.    On February 12, 2021, the Census Bureau announced that it "will deliver" the "re-
districting data" on September 30, 2021. *See Press Release: Census Bureau Statement on Redis-
tricting Data Timeline*, U.S. Census Bureau (Feb. 12, 2021), https://perma.cc/F8RB-CN6Y (the
"February 12 Press Release"); James Whitehorne, *Census Bureau Statement on Redistricting Data
Timeline*, U.S. Census Bureau (Feb. 12, 2021), https://perma.cc/A2SZ-7L5Q (the "Whitehorne
Statement"; and, in conjunction with the February 12 Press Release, the "February 12 Decision").
The Bureau asserted "COVID-19-related delays" justified this action. February 12 Press Release,
*supra*.

166.    As part of this announcement, the Bureau also informed the public that it "will
deliver the data for all states at once, instead of on a flow basis," as it had in previous decennial

censuses. *Id.* The Bureau pointed to "COVID-19-related shifts in data collection" to justify this decision. *Id.*

167.    The February 12 Decision constitutes a "final agency action" under the Administrative Procedure Act. 5 U.S.C. § 704. By its own terms, the Decision memorializes a "final[] ... schedule for the redistricting data," Whitehorne Statement, *supra*, and thus "mark[s] the consummation of the agency's decisionmaking process," *Canal A Media Holding, LLC v. U.S. Citizenship & Immigr. Servs.*, 964 F.3d 1250, 1255 (11th Cir. 2020) (quoting *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)). And the February 12 Decision clearly constitutes an action "from which legal consequences"—among others, unavoidable abrogation of Alabama's constitutional mandates—"will flow" and directly affect Alabama and its constituents. *Id.; see also id.* ("The 'core question' about finality 'is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992))).

## A.    The Census Bureau's February 12 Decision Lacks Any Legal Justification.

168.    The Secretary may not unilaterally amend—let alone defy—federal law, and any argument to the contrary is self-refuting. *See* U.S. Const., art. I, § 7; *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) ("for an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it" (quoting *New York v. FERC*, 535 U. S. 1, 18 (2002)).

169.    The Bureau attempts to excuse its deliberate disregard for statutory deadlines by simply contending that "COVID-19 delayed census operations significantly." February 12 Decision. This excuse is legally irrelevant.

170.    Congress explicitly required the Secretary to complete, report, and transmit the State-redistricting numbers within one year "*in any event*." 13 U.S.C. § 141(c) (emphasis added).

38

There is no reason to presume Congress did not mean what it wrote or was somehow unaware of catastrophes and pandemics. Thus COVID-19 cannot legally excuse the Bureau's failure to comply with the plain text of the Act.

171.   The Bureau is well aware of States' interests in and reliance on accurate, timely census data. *See* Whitehorne Statement, *supra* (recognizing "[s]ome states have statutory or even state constitutional deadlines and processes that they will have to address due to this delay"). The Bureau could have at least attempted to deliver apportionment and redistricting numbers to different States "on a flow basis"—as it has in the past—prioritizing those States whose laws rely on timely receipt of census data. But instead, the Bureau inexplicably adopted an all-at-once approach, disregarding States' significant interests in timely receipt of redistricting data. *Id.*

172.   The Bureau's February 12 Decision is plainly "not in accordance with law," and thus violates the Administrative Procedure Act. 5 U.S.C. § 706(2)(A). But the February 12 Decision also violates the APA on other grounds, for the Bureau's decision to ignore States' compelling interests and forego any attempt to help States meet these interests even on a piecemeal (or "flow") basis evinces a failure to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020); *see also Motor Vehicles Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action arbitrary and capricious where agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

173.    What is more, the Bureau previously petitioned Congress for a deadline extension, but Congress found these pleas unavailing. *See U.S. Department of Commerce Secretary Wilbur Ross and U.S. Census Bureau Director Steven Dillingham Statement on 2020 Census Operational Adjustments Due to COVID-19* U.S. Census Bureau (Apr. 13, 2020), https://perma.cc/C2RG-UXBX ("[T]he Census Bureau is seeking statutory relief from Congress of 120 additional calendar days to deliver final apportionment counts."). Having failed to extend its statutory deadline through legal means, the Bureau now seeks to do so illegally.

**B.      Nor Can Any Practical Justification Excuse the Bureau's Action.**

174.    Even if the Bureau's practical argument held legal significance—which it does not—in this case any such excuse fails on its own terms.

175.    First, the Bureau initially set July 31, 2020, as its deadline for concluding the counting portion of the 2020 census (including its non-response follow up operations), and then pushed the deadline back to September 30, 2020.[34] With both deadlines, the Bureau planned to report apportionment data by December 31, 2020. The Bureau concluded its count on October 15, 2020, two-and-a-half months past its original deadline and 15 days past its adjusted deadline. *See 2020 Census Response Rate Update: 99.98% Complete Nationwide*, U.S. CENSUS BUREAU (Oct. 19, 2020), https://perma.cc/MFE3-8PDP. The two-and-a-half month delay past the original deadline cannot possibly justify a four-month extension for apportionment numbers and a six-month extension for redistricting numbers.

176.    The Bureau's unprecedented and unexplained four- and six-month delays are even less justifiable considering the 2020 census's remarkable success and *improvement* over its 2010 predecessor. In the Bureau's words: "In all states, the District of Columbia and the Commonwealth

---

[34] Albert E. Fontenot, 2020 Census Update, Presentation to the Census Scientific Advisory Committee March 18, 2021 at 2, https://perma.cc/A4UM-FHCU.

of Puerto Rico, more than 99% of all addresses have been accounted for, and in all but one state that number tops 99.9%. ... [W]e had not expected to exceed the 2010 self-response rate. ... The Census Bureau was able to meet and overcome many challenges because of our innovative design and use of new technology." *Id.*; *see also Adapting Field Operations To Meet Unprecedented Challenges*, U.S. CENSUS BUREAU (Mar. 1, 2021), https://perma.cc/AU4S-9GXC ("As a result of all these extraordinary efforts, we were able to account for over 99.9% of U.S. addresses in the 2020 Census.").

177.    Furthermore, the Census Bureau recently stated it would finalize the Decennial Response File 2 ("DRF2") numbers over the last weekend of February. *See Nat'l Urban League, et al. v. Wynn Coggins, et al.*, No. 5:20-CV-05799-LHK (N. D. Cal. 2021), Dkt. No. 469, Joint Case Management Statement at 3. This leaves only the Census Unedited File ("CUF") to complete before reviewing and delivering the census numbers to the President. *See Census Data Processing 101*, U.S. CENSUS BUREAU (Feb. 11, 2020), https://perma.cc/E8JK-4S9V.

178.    Per the Bureau, typical estimates of the time required to complete the CUF process appear to hardly exceed one month. And the final counting prior to presentment generally runs on an even shorter timeline.[35]

179.    Waiting almost seven more months for reapportionment numbers implies unprecedently lengthy CUF and final-review processes. Again, the Bureau has failed to explain or justify these abnormalities.

180.    In the same vein, the Census Act codifies the apparently uncontroversial expectation that the Bureau can (and will) produce redistricting data from apportionment data within a

---

[35] *See* Letter from JASONs to U.S. Census Bureau (February 8, 2021), https://perma.cc/D3RF-TEBA, at 5, fig. 1.

three-month timeframe. *See* 13 U.S.C. §§ 141(b) (nine-month deadline from census date for "tabulation of total population"); 141(c) (one-year deadline from census date to "complete[], report[], and transmit[]" redistricting numbers "to each respective State"). Yet the Bureau granted itself five months with which to produce redistricting data following the long-delayed delivery of the apportionment data. *See* February 12 Decision (state-population count to be delivered April 30; redistricting data to be delivered September 30). And again, the Bureau failed to explain this discrepancy.

### C.    The Bureau's Decision to Implement Experimental, Unconstitutional Methodologies Cannot Excuse Its Delay Either.

181.    Part of the reason the Bureau plans to wait until September 30, 2021, is to continue to address problems with its experimental differential privacy rollout.[36]

182.    Differential privacy is no excuse for the Bureau's delay.

183.    For starters, the Bureau decided to implement differential privacy on its own accord. The Bureau may not, therefore, point to delays resulting from its own initiatives as a legal justification for deliberately missing a statutory deadline.

184.    But perhaps more significantly, as explained above, *see supra* § III.C, differential privacy is illegal for redistricting purposes, doubly dooming its validity as an excuse for the Bureau's delay in producing redistricting data.

185.    If the Bureau abandoned differential privacy or were enjoined from using it, the Bureau could quickly adapt the disclosure avoidance methodology it used in 2010 to more promptly deliver redistricting data to the States while still preserving respondents' privacy.

---

[36] *See The Road Ahead: Upcoming Disclosure Avoidance System Milestones*, U.S. Census Bureau (Feb. 23, 2021), https://perma.cc/YLH7-JGWH (explaining objectives, timeline to implement experimental DAS program).

**VI.     The Census Bureau's February 12 Decision Harms Plaintiffs.**

    **A.     Delayed Redistricting Data Harms Alabama.**

    186.     When the federal government prevents a State from effectuating state law, the State suffers an irreparable harm. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers). The Census Bureau's February 12 Decision hamstrings Alabama's ability to meet its constitutional obligations and to run its 2022 statewide elections effectively or in accordance with State law, and thus irreparably harms the State.

    187.     The people of Alabama constitutionalized the procedures by which the Legislature must reapportion and redistrict both chambers of the State's legislature. *See* Ala. Const. art. IX, §§ 197-200. As required under the Constitution, the State Legislature must undertake this redistricting and reapportionment "at its first session after the taking of the decennial census." *Id.* §§ 199-200.

    188.     The Alabama Legislature's "first session after the taking of the decennial census" began on February 2 and will conclude May 30. Because the Census Bureau will not provide these numbers until September 30, the Bureau's February 12 Decision makes it impossible for the Alabama Legislature to fulfill its constitutional obligations.

    189.     Furthermore, the Bureau's February 12 Decision jeopardizes the integrity of Alabama's upcoming elections.

    190.     First, delivering redistricting data on September 30 would likely leave Alabama's Boards of Registrars only four months (at most) for reassigning their respective counties' registered voters to their correct precincts and districts. But four months is likely an insufficient amount of time to complete these reassignments considering that in approximately 50 counties the Boards of Registrars perform the reassignment process manually, which can take up to 6 months.

191.    Requiring the Boards of Registrars to complete the reassignment process on such an abbreviated schedule will result in some or all of the following: (1) thousands of dollars in unexpected costs incurred by the Boards of Registrars to contract with an entity to assist them in the process; (2) a rushed reassignment process, potentially increasing the likelihood of mistaken reassignments; and (3) less time to notify voters about changes, potentially increasing the likelihood of voter, candidate, and political party confusion.

192.    Furthermore, the Bureau's delayed delivery of redistricting data effectively reduces by at least four months the amount of time candidates can spend campaigning and fundraising, directly harming their electoral prospects. Ala. Code § 17-5-7(b)(2).

193.    As noted above, this delay is all the more harmful for independent candidates who cannot appear on the ballot without collecting a statutorily required number of signatures. *See* Ala. Code § 17-6-22.

194.    These delays create a substantial risk that Alabama will face litigation from candidates or political parties who are provided less time to comply with ballot access requirements before the next election.

**B.    Delayed Redistricting Data Harms Representative Aderholt.**

195.    Representative Aderholt has represented Alabama's 4th Congressional District since 1997, and he intends to run for reelection in 2022.

196.    The primary election in Alabama for the congressional race is scheduled for May 24, 2022. The runoff election, should it be required, is scheduled for June 21, 2022. The general election is scheduled for November 8, 2022

197.    The Bureau's delay in reporting redistricting data will result in less time for Representative Aderholt to educate voters as to his policy positions, campaign among voters, and solicit new votes.

## CLAIMS FOR RELIEF

### COUNT I

**(Violation of 13 U.S.C. § 141(c) –
Failure to produce accurate tabulations of population as required by law)**

198.    Plaintiffs reallege and incorporate by reference paragraphs 1–44 and 50–164 of this Complaint as though fully set forth herein.

199.    The Census Act requires the Secretary to work with each State to develop and approve plans "identifying the geographic areas for which specific tabulations of population are desired." 13 U.S.C. § 141(c). After completing the decennial census, the Secretary is then required to provide accurate "[t]abulations of population for the areas identified in any" such "plan." *Id.*

200.    Defendants have declared that they will provide Alabama an accurate tabulation of the State population. But due to the use of differential privacy, Defendants will provide inaccurate data for any other geographic area within Alabama.

201.    The decision to provide inaccurate data violates 13 U.S.C. § 141(c).

202.    The decision will harm Plaintiffs.

### COUNT II

**(Violation of the Fundamental Right to Vote under the Equal Protection Component of the
Due Process Clause of the 5th Amendment to the U.S. Constitution –
Violation of one-person, one-vote resulting in vote dilution)**

203.    Plaintiffs reallege and incorporate by reference paragraphs 1–44, 50–164, and 198–202 of this Complaint as though fully set forth herein.

204.    The equal protection component of the Fifth Amendment's due process clause protects the fundamental right to vote. The Constitution requires that, without extraordinary justification, one person's vote in a congressional election be worth as much as another's.

205.    To meet the requirements of equal protection, Congressional districts are required to "be apportioned to achieve population equality 'as nearly as practicable.'" *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (citation omitted).

206.    The "as nearly as practicable standard" requires a "good-faith effort to achieve precise mathematical equality." *Id*. In practice, this requires States to draw congressional districts to mathematic precision of +/- one person, lest the State face a substantial risk of litigation.

207.    To meet the requirements of equal protection, representational districts that are not for the national congress must be within a total population variation of +/- 5% to be presumptively constitutional. *See, e.g., Brown v. Thomson*, 462 U.S. 835, 842 (1983).

208.    The Bureau's decision to apply differential privacy and thus supply false redistricting data to Alabama creates a substantial risk that Plaintiffs Representative Aderholt, Mr. Green, and Mr. Williams will have their votes in local, state, and federal elections diluted. Defendants are not using a good-faith effort to provide as precise data as possible, and Alabama, along with its subordinate governmental units, will be forced to redistrict and reapportion numerous representative districts, including congressional districts, with intentionally flawed data.

209.    Defendants are directly responsible for this vote dilution, which violates Plaintiffs' equal protection rights.

## COUNT III

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Differential privacy is not in accordance with law and contrary to constitutional right)

210.    Plaintiffs reallege and incorporate by reference paragraphs 1–44, 50–164, and 198–209 of this Complaint as though fully set forth herein.

211.    The APA requires courts to "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction [or]

authority," or that was implemented "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

212.     The decision to use differential privacy protection constitutes final agency action that is reviewable by this Court.

213.     The decision to use differential privacy is "not in accordance with law" because it violates 13 U.S.C. § 141(c).

214.     The decision to use differential privacy is contrary to constitutional right because it creates a substantial risk that individual Plaintiffs' votes will be diluted in violation of their equal protection rights.

## COUNT IV

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Differential privacy is arbitrary, capricious, or an abuse of discretion)

215.     Plaintiffs reallege and incorporate by reference paragraphs 1–44, 50–164, and 198–214 of this Complaint as though fully set forth herein.

216.     The Administrative Procedure Act requires courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

217.     Defendants' decision to utilize differential privacy for the 2020 Census is arbitrary and capricious because the Bureau: (1) failed to consider the impact that its decision would have on the States, including Alabama, which rely on the provision of accurate census data for redistricting and other purposes; (2) failed to offer States, including Alabama, the ability to accurate tabulations of population for redistricting purposes; and/or (3) offered an explanation for its decision that runs counter to the evidence before the agency.

218.     Defendants' decision to use differential privacy for the 2020 Census is therefore "arbitrary, capricious, [or] an abuse of discretion" in violation of the Administrative Procedure Act.. 5 U.S.C. § 706(2)(A).

## COUNT V

### (Violations of 13 U.S.C. § 141(c) –
### Failure to produce data in the time required by law)

219.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

220.     Section 141 of the Census Act sets a timeline for the delivery of redistricting data to the States. Section 141(c) requires that the redistricting data be sent to the States no later than one year after the census date. One year after the census date is March 31, 2021.

221.     The Census Bureau has announced that the data will not be released by March 31, 2021, and will instead be delivered September 30, 2021.

222.     This delay violates Section 141 and directly harms Alabama and its citizens, including Plaintiff Aderholt.

## COUNT VI

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) –
### The February 12 Decision is not in accordance with law)

223.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

224.     The APA requires this Court to hold unlawful and set aside any final agency action that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

225.     The February 12 Decision is a final agency action.

226.     The February 12 Decision is "not in accordance with law," *id.*, because it contradicts, and purports to override, the congressionally imposed deadline of March 31.

227.    This delay violates 13 U.S.C. § 141(c) and directly harms Alabama and its citizens, including Plaintiff Aderholt.

## COUNT VII

### (Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – The February 12 Decision is arbitrary and capricious)

228.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

229.    The APA requires this Court to hold unlawful and set aside any final agency action that is "arbitrary, capricious, … or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

230.    The February 12 Decision is arbitrary and capricious because the Bureau, in issuing it, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

231.    Under the February 12 Decision, and "[d]ifferent from previous censuses, the Census Bureau will deliver the data for all states at once, instead of on a flow basis." *See* February 12 Press Release, *supra*.

232.    The Bureau failed to address the fact that certain States, like Alabama, have constitutional mandates which rely on timely and accurate census data. There is no indication that the agency properly considered that problem, including by considering ways it might address the varying needs of different States, such as by prioritizing States with earlier and inflexible deadlines. The failure to address this obvious and serious issue was arbitrary and capricious.

233.    The February 12 Decision is additionally arbitrary and capricious because the agency failed to properly "assess whether there were reliance interests, determine whether they

were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915.

234.    The agency failed to assess and weigh the varying degrees to which States relied on the March 31 deadline, and so failed to account for significant reliance interests in deciding to release all the data at once long after the March 31 deadline.

235.    For this reason and others, the February 12 Decisions must be vacated and "set aside" as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### COUNT VIII

### (Entitlement to a writ of mandamus under 28 U.S.C. § 1361)

236.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint as though fully set forth herein.

237.    "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

238.    A court may grant a writ of mandamus to a plaintiff who has "exhausted all other avenues of relief" for enforcing "a clear nondiscretionary duty" that the defendant owes to it, *Heckler v. Ringer*, 466 U.S. 602, 616 (1984), and if issuance of the writ is "appropriate under the circumstances," *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 381 (2004).

239.    If the Court determines the State is not entitled to an injunction, the State has no other avenue of relief to keep the Secretary from breaching a clear nondiscretionary duty.

240.    The Secretary's failure to act in a timely fashion will cause the irreparable harms as discussed above, and issuance of "the writ is appropriate under the circumstances." *Cheney*, 542 U.S. at 381.

241.    Therefore, if the Court determines that the State is unable to obtain injunctive relief, the Court should issue a writ of mandamus requiring the Secretary to comply with the March 31 deadline imposed by § 141(c)

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.  Declare that using differential privacy to alter the tabulations of population the Secretary of Commerce must provide the States is a violation of 13 U.S.C. § 141(c).

b.  Declare that using differential privacy to alter the tabulations of population the Secretary of Commerce must provide the States is unconstitutional.

c.  Declare that using differential privacy to alter the tabulations of population the Secretary of Commerce must provide the States is not in accordance with law or is contrary to constitutional right.

d.  Declare that using differential privacy to alter the tabulations of population the Secretary of Commerce must provide the States is arbitrary and capricious or otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

e.  Preliminarily and permanently enjoin Defendants from using differential privacy to alter the tabulations of population the Secretary of Commerce must provide the States in connection with the 2020 census.

f.  Declare that the February 12 Decision violates the Census Act, 13 U.S.C. § 141(c).

g.  Declare that the February 12 Decision is arbitrary and capricious or otherwise not in accordance with law in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

h.  Vacate the February 12 Decision that delays the release of redistricting data to the States.

i.  Enjoin Defendants from implementing the February 12 Decision and from failing to fulfill their statutory duties under 13 U.S.C. § 141(c) by March 31, 2021—or, alternatively, enjoin Defendants from delaying the release of data beyond the earliest possible date this Court determines equitable and that will allow the State to use the redistricting data during the redistricting process.

j.  Issue a writ of mandamus requiring the timely sharing of redistricting data by March 31, 2021, as required by 13 U.S.C. § 141(c).

k.  Award Plaintiffs their costs and reasonable attorneys' fees, and litigation expenses incurred in bringing this action pursuant to 28 U.S.C. § 2412.

l.  Grant further relief as this Court deems just and proper.

Dated: March 10, 2021

STEVE MARSHALL
*Attorney General of Alabama*

/s/ *Edmund G. LaCour*

Edmund G. LaCour Jr. (ASB-9182-U81L)
*Solicitor General*

A. Barrett Bowdre (ASB-2087-K29V)
*Deputy Solicitor General*

James W. Davis (ASB-4063-I58J)
Winfield J. Sinclair (ASB-1750-S81W)
Brenton M. Smith (ASB-1656-X27Q)
*Assistant Attorneys General*

STATE OF ALABAMA
OFFICE OF THE ATTORNEY GENERAL
501 Washington Ave.
Montgomery, AL 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Edmund.LaCour@AlabamaAG.gov
Barrett.Bowdre@AlabamaAG.gov
Jim.Davis@AlabamaAG.gov
Winfield.Sinclair@AlabamaAG.gov
Brenton.Smith@AlabamaAG.gov

*Counsel for the State of Alabama*

Respectfully submitted,

/s/ *Jonathan P. Shel*

Jason B. Torchinsky*
Jonathan P. Lienhard*
Shawn T. Sheehy*
Phillip M. Gordon*

HOLTZMAN VOGEL JOSEFIAK
TORCHINSKY, PLLC
15405 John Marshall Hwy
Haymarket, VA 20169
(540) 341-8808 (Phone)
(540) 341-8809 (Fax)
Jtorchinsky@hvjt.law
Jlienhard@hvjt.law
Ssheehy@hvjt.law
Pgordon@hvjt.law

*\*pro hac vice* application to be filed

*Counsel for Plaintiffs*