RECEIVED

2021 MAR 11  P 4: 49

DEBRA P. HACKETT, CL+
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

# Exhibit 5

# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF ALABAMA
## EASTERN DIVISION

THE STATE OF ALABAMA; ROBERT
ADERHOLT, Representative for Alabama's
4th Congressional District, in his official and
individual capacities; WILLIAM GREEN;
AND CAMARAN WILLIAMS,

                      Plaintiffs,

                      v.

UNITED STATES DEPARTMENT OF
COMMERCE; GINA RAIMONDO, in her
official capacity as Secretary of Commerce;
UNITED STATES BUREAU OF THE
CENSUS, an agency within the United States
Department of Commerce; and RON
JARMIN, in his official capacity as Acting
Director of the U.S. Census Bureau,

                      Defendants.

3:21-cv-211-RAH

CASE NO. _____

## <u>DECLARATION OF DR. MICHAEL BARBER</u>

MICHAEL BARBER pursuant to 28 U.S.C. § 1746, Federal Rule of Civil Procedure

26(a)(2)(B), and Rules 702 and 703 of the Federal Rules of Evidence, declares as follows:

1.      I am 37 years old and competent to make this declaration.

2.      I am an associate professor of political science at Brigham Young University and

faculty fellow at the Center for the Study of Elections and Democracy in Provo, Utah.

3.      I received a PhD in politics from Princeton University in 2014 with emphases in

American politics and quantitative methods/statistical analyses.

4.      I teach a number of undergraduate courses in American politics and quantitative

research methods.

5.      I have over 10 years of experience conducting complex demographic and

analytical analyses.

6.      My research focus is on election and voting related topics in American politics

and public opinion. Much of my research uses advanced statistical methods for the analysis of

quantitative data including census data.

7.      I have previously qualified as an expert witness in federal court.

8.      Plaintiffs requested that I assess the Census Bureau's disclosure avoidance

techniques including differential privacy, and to describe the mechanisms by which differential

privacy works and the resulting impacts on the end users of census data.

9.      I am being compensated $400 an hour for my time in connection with this matter.

I am not being compensated for any specific opinion.

10.     Attached and incorporated by reference to this declaration is my expert report in

this matter and my curriculum vitae. The report is attached hereto as Appendix 1. My curriculum

vitae is attached to the expert report as Appendix A.

11.     My curriculum vitae lists, among other things, my qualifications, a list of all publications published over at least the last ten years, and a list of all cases over at least the past four years in which I testified as an expert at trial or by deposition.

12.     I declare under penalty of perjury that the foregoing, including any appendices, are true and correct according to the best of my knowledge, information, and belief.

Dated: March 9, 2021

Michael Barber

3

# Appendix 1

# Expert Report of Michael Barber

Dr. Michael Barber
Brigham Young University
724 Spencer W. Kimball Tower
Provo, UT 84604
barber@byu.edu

# 1   Introduction and Qualifications

I am an associate professor of political science at Brigham Young University and faculty fellow at the Center for the Study of Elections and Democracy in Provo, Utah. I received my PhD in political science from Princeton University in 2014 with emphases in American politics and quantitative methods/statistical analyses. My dissertation was awarded the 2014 Carl Albert Award for best dissertation in the area of American Politics by the American Political Science Association.

I teach a number of undergraduate courses in American politics and quantitative research methods.[1] These include classes about political representation, Congressional elections, statistical methods, and research design.

I have worked as an expert witness in a number of cases in which I have been asked to perform and evaluate various statistical methods. Cases in which I have testified at trial or by deposition are listed in my CV, which is attached to the end of this report.

In my position as a professor of political science, I have conducted research on a variety of election- and voting-related topics in American politics and public opinion. Much of my research uses advanced statistical methods for the analysis of quantitative data. I have worked on a number of research projects that use "big data" that include millions of observations, including a number of state voter files, campaign contribution lists, and data from the US Census.

Much of this research has been published in peer-reviewed journals. I have published nearly 20 peer-reviewed articles, including in our discipline's flagship journal, *The American Political Science Review* as well as the inter-disciplinary journal, *Science Advances*. My CV, which details my complete publication record, is attached to this report as Appendix A.

The analysis and explanation I provide in this report are consistent with my training in statistical analysis and are well-suited for this type of analysis in political science and quantitative analysis more generally.

---

[1]The political science department at Brigham Young University does not offer any graduate degrees.

I teach a number of undergraduate courses in American politics and quantitative research methods.[2] These include classes about political representation, Congressional elections, statistical methods, and research design.

I have worked as an expert witness in a number of cases where I have been asked to evaluate and perform various statistical analyses. Cases in which I have testified at trial or by deposition are listed in my CV, which is attached to the end of this report.

I have been asked to evaluate and explain at an approachable level the process of differential privacy (DP), its application to the 2020 Census, and how it fits within the field of probability theory and statistical methods.

## 2 Introduction to Statistical Disclosure Limitations

The Census collects the confidential information of Americans under Title 13 of the U.S. Code. 13 U.S. Code 9 requires that the confidentiality of these individuals' records be protected and prohibits the Census from making "any publication whereby the data furnished by any particular establishment or individual under this title can be identified." In other words, it should not be possible for a person using the aggregate tables published by the Census Bureau to use those data to identify specific individuals.

To protect individuals' identity, in some cases it becomes necessary in some cases to alter the original data because a person living in a particular area may be unique enough to be identified. For example, an exceptionally wealthy person or an individual who is the only member of a particular race in their census block might be identifiable even when using aggregate statistics.

There are a variety of approaches to accomplish statistical disclosure limitation (SDL), many of which have been used by Census in the past. Aboud, et al (2020) discusses these different approaches: "Historically, the Census Bureau has primarily used information reduction and data perturbation methods to support SDL (Lauger et al., 2014). Information

---

[2]The political science department at Brigham Young University does not offer any graduate degrees.

reduction methods include top- and bottom-coding, suppression, rounding or binning, and sampling collected units for release in public use microdata files. Data perturbation methods include swapping, legacy noise injection systems, and partially and fully synthetic database construction. These legacy approaches start with the premise that there are specific data elements that must be protected (e.g., a person's income). A technical analyst chooses an approach from the assortment of available SDL methods that is likely to protect the data without resulting in too much damage to the published data accuracy. Usually, the selection of SDL method takes into consideration the intended uses of the published data along with assumptions about the kind of external data an intruder might have, and the types of privacy attacks an intruder might attempt."[3]

There is a vast literature of scholarly research on these and many other methods of SDL. Wasserman and Zhou (2010), Reiter (2018), and Karr (2016) all provide an excellent summary of many of these methods as well as associated scholarly research in computer science and statistics regarding these approaches.[4]

For example, Karr (2016) provides a classification of various SDL methods, many of which have been used by the Census Bureau in the past: "There are three principal classes of SDL methods. The first class is reduction techniques that do not alter data values. These include cell suppression, subsampling, variable deletion, top-coding, bottom-coding, category aggregation, and conversion of numerical variables to categorical ranges (Kinney et al. 2009). The second class is perturbative methods such as addition of noise, micro-aggregation, and data swapping, as well as combinations of methods (Oganian & Karr 2006, Singh 2010). The

---

[3]`https://www2.census.gov/adrm/CED/Papers/CY20/2020\protect\discretionary{\char\hyphenchar\font}{}{}08\protect\discretionary{\char\hyphenchar\font}{}{}AbowdBenedettoGarfinkelDahleta protect\discretionary{\char\hyphenchar\font}{}{}The%20modernization%20of.pdf`
Lauger, Amy, Billy Wisniewski, and Laura McKenna (2014). Disclosure Avoidance Techniques at the U.S. Census Bureau: Current Practices and Research. Research Report Series (Disclosure Avoidance #2014-02). Washington: Center for Disclosure Avoidance Research, U.S. Census Bureau.

[4]Larry Wasserman & Shuheng Zhou (2010) A Statistical Framework for Differential Privacy, Journal of the American Statistical Association, 105:489, 375-389, DOI: 10.1198/jasa.2009.tm08651
Reiter, Jerome P. "Differential privacy and federal data releases." Annual review of statistics and its application 6 (2019): 85-101
Karr, Alan F. "Data sharing and access." Annual Review of Statistics and Its Application 3 (2016): 113-132.

third class is synthetic data methods originating from techniques for imputation of missing data, in which some, or in extreme cases all, variables are replaced by values generated by a Bayesian posterior predictive distribution (Reiter 2005a,b,c; Reiter et al. 2014)."[5]

The National Conference of State Legislatures, an organization that works with, and advocates on behalf of, state legislatures around the country, discusses this issue and provides an excellent example. "Consider a census block with just 20 people in it, including one Filipino American. Without any disclosure avoidance effort, it might be possible to figure out the identity of that individual. With data swapping, the Filipino American's data might be swapped with that of an Anglo American from a nearby census block—a census block where other Filipino Americans reside. The details for the person would be aggregated with others, and therefore not identifiable, and yet the total population in both census blocks would remain accurate."[6]

# 3   Differential Privacy in the 2020 Census

In the 2020 Census, in addition to many of the SDL methods used in previous decades, the Census Bureau plans to also introduce the concept of differential privacy.[7] Differential

---

[5]Karr, Alan F. "Data sharing and access." Annual Review of Statistics and Its Application 3 (2016): 113-132
Kinney SK, Gonzalez JF Jr, Karr AF. 2009. Data confidentiality—the next five years: summary and guide to papers. J. Priv. Confid. 1(2):125–34
Oganian A, Karr AF. 2006. Combinations of SDC methods for microdata protection. In Privacy in Statistical Databases, ed. J Domingo-Ferrer, L Franconi, pp. 102–13. Lect. Notes Comput. Sci. Ser. 4302. New York: Springer-Verlag, Singh AC. 2010. Maintaining analytic utility while protecting confidentiality of survey and nonsurvey data. J. Priv. Confid. 1(2):155–82
Reiter JP. 2005a. Estimating risks of identification disclosure for microdata. J. Am. Stat. Assoc. 100:1103–13
Reiter JP. 2005b. Releasing multiply-imputed, synthetic public use microdata: an illustration and empirical study. J. R. Stat. Soc. Ser. A 168:185–205
Reiter JP. 2005c. Using CART to generate partially synthetic, public use microdata. J. Off. Stat. 21:441–62
[6]https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-explained.aspx
[7]https://www2.census.gov/ces/wp/2018/CES-WP-18-47.pdf
https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html
https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2010-demonstration-data-products/faqs.html

privacy is a particular type of SDL and is a relatively new application of statistical methods, having been developed within the last 20 years.[8] Differential privacy uses statistical distributions to alter the data by allocating a pre-determined "privacy budget" across different levels of data. These alterations make it increasingly difficult to identify an individual's record in the data. The Harvard University Privacy Tools Project provides a way to think conceptually about differential privacy as a matter of the probability of an individual's information being revealed not substantially increasing if their information is contained in a database. They state: "Consider an algorithm that analyzes a dataset and computes statistics about it (such as the data's mean, variance, median, mode, etc.). Such an algorithm is said to be differentially private if by looking at the output, one cannot tell whether any individual's data was included in the original dataset or not. In other words, the guarantee of a differentially private algorithm is that its behavior hardly changes when a single individual joins or leaves the dataset."[9]

To accomplish this, differential privacy uses various statistical methods to alter (perturb or distort) the original dataset in such a way so as to make it less possible to infer the identity of any individual by looking at any part of the distorted dataset – whether individual records or summary statistics. The JASON advisory group, an independent group of scientists which advise the United States government on matters of science and technology, was asked to review the Census Bureau's plan to use differential privacy in 2020. Their report summarizes the process well. They state that differential privacy "makes possible statistical queries regarding a dataset to be performed while offering a rigorous bound on the amount one learns about a dataset if one record is deleted, added or replaced. Note that this is not, strictly speaking a guarantee of disclosure avoidance, but it does provide in a rigorous way the likelihood of a record linkage attack. It does this by adding specially calibrated noise

Ashmead, Robert, Daniel Kifer, Philip Leclerc, Ashwin Machanavajjhala, and William Sexton. Effective Privacy After Adjusting for Invariants with Applications to the 2020 Census. Technical Report. US Census Bureau, 2019.

[8]Hilton, Michael. "Differential privacy: a historical survey." Cal Poly State University (2002).

[9]https://privacytools.seas.harvard.edu/differential-privacy

to the result of a specific query made on the dataset...The value set for the privacy loss parameter is meant to be a policy decision."[10]

Using the pre-determined privacy budget in conjunction with the chosen statistical distribution, the researcher can in essence "dial up and down" the degree of privacy (typically noted as the Greek letter epsilon) by increasing or decreasing the level to which the original data are altered via parameters set in the statistical distributions used in the method.[11] "Accepted guidelines for choosing epsilon have not yet been developed....The exact choice of epsilon is a policy decision that should depend on the sensitivity of the data, with whom the output will be shared, the intended data analysts' accuracy requirements, and other technical and normative factors."[12]

As a part of its implementation, differential privacy requires a number of decisions and inputs from the researcher. First, there are a variety of different methods by which a researcher can implement differential privacy. One such example is the choice of statistical distribution and the parameters set in that distribution to introduce "noise" for each record in the database. For example, two common distributions that have been used are the Geometric distribution and the Laplace distribution.[13] These distributions are commonly used in various applications of statistics and probability theory. In the context of differential privacy, the process occurs in two steps. First parameters are chosen to calibrate the variance of the chosen distribution, and then random draws from these distributions are taken and applied to the observations to "perturb" or "alter" values in the database up or down by adding the value of the random draw, which can be either positive or negative.

The decision of parameter values in these distributions is made by the researcher as

---

[10]https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/planning-docs/privacy-methods-2020-census.html, pg. 14

[11]Reiter, Jerome P. "Differential privacy and federal data releases." Annual review of statistics and its application 6 (2019): 85-101

[12]Wood, Alexandra, Micah Altman, Aaron Bembenek, Mark Bun, Marco Gaboardi, James Honaker, Kobbi Nissim, David R. OBrien, Thomas Steinke, and Salil Vadhan. "Differential privacy: A primer for a non-technical audience." Vanderbilt Journal of Entertainment & Technology Law 21, no. 1 (2018): 209-275.

[13]Abowd, John, Robert Ashmead, Garfinkel Simson, Daniel Kifer, Philip Leclerc, Ashwin Machanavajjhala, and William Sexton. Census topdown: Differentially private data, incremental schemas, and consistency with public knowledge. Technical Report. US Census Bureau, 2019.

he or she decides how much accuracy to retain from the original, unperturbed database, and how much privacy to introduce into the altered database by obscuring the original values. This tradeoff between accuracy and privacy is known as the "risk-utility paradigm" since greater accuracy increases the risk of identification of individual records while greater privacy decreases the utility of the distorted database since the values in each record (or summary statistics based on those perturbed individual records) become less accurate.

For example, consider the extremes of the "risk-utility" continuum. Making no changes (i.e. implementing no privacy measures) puts individuals at the greatest risk of identification but also provides researchers the greatest utility since they know that the statistics they calculate from the data are based on an entirely accurate database (or at least accurate insofar as the data have been collected accurately and have not been altered by whomever collected the data). However, no additional privacy is afforded those individuals whose information is contained in the database. At the other extreme, individuals' privacy can be absolutely guaranteed if no information at all is made available, or if the information is altered so greatly as to be entirely worthless. This affords perfect privacy; however, the database has no utility to researchers or policymakers.

Karr (2016) summarizes this tradeoff by stating: "Modern approaches to SDL are based explicitly or implicitly on a trade-off between disclosure risk and data utility (Cox et al. 2011). Crucially, higher risk and higher utility go together. No release, the only action that means no risk, also means no utility to analysts. The risk-utility approach requires quantified measures of both disclosure risk and data utility for each candidate SDL method and setting of parameters within it."[14]

In the context of the US Census, the discussion of risk in the risk-utility paradigm would include all individuals whose information is contained in the Census records while the discussion "utility" in the risk-utility paradigm would include government agencies, state

---

[14]Data Sharing and Access, Alan F. Karr, Annu. Rev. Stat. Appl. 2016. 3:113–32
Cox LH, Karr AF, Kinney SK. 2011. Risk-utility paradigms for statistical disclosure limitation: how to think, but not how to act (with discussion). Int. Stat. Rev. 79(2):160–99

legislatures, interest groups, scholars, and other policymaking organizations who regularly use and rely upon summary statistics of the population derived from the decennial Census data to guide their decision-making, research, and advocacy. The National Conference of State Legislatures discusses differential privacy in the 2020 Census and how it may affect policies and procedures taken up by various state legislatures. "Differential privacy will mean that, except at the state level, population and voting age population will not be reported as enumerated. And, race and ethnicity data are likely to be farther from the "as enumerated" data than in past decades, when data swapping was used to protect small populations. (In 2010, at the block level, total population, voting age population, total housing units, occupancy status, group quarters count and group quarters type were all held invariant.) This may raise issues for racial block voting analyses."[15]

Individual states have also expressed their concern that if the degree of privacy in the 2020 Census is set too far towards the privacy side of the risk-utility scale, it may have negative effects with regards to policymaking, legislative redistricting, the allocation of government funding, or simply having an accurate measure of the state of affairs in their states and municipalities.[16]

While the mathematical and statistical details of the algorithms used to implement differential privacy in the 2020 Census are computationally intense and highly technical, the overall process can be described in a general sense quite simply. I omit the technical details here, but they are contained in various documents published by Census researchers.[17] The

---

[15]https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-explained.aspx

[16]https://www.ncsl.org/Portals/1/Documents/Redistricting/VA_CensusDistortionProgram_VAGovernor_2020-01-23.pdf
https://www.ncsl.org/Portals/1/Documents/Redistricting/WA_OFM_DAS_Response_Letter.pdf
https://www.ncsl.org/Portals/1/Documents/Redistricting/UT_Differential_Privacy_%28Signed%29.pdf

[17]Abowd, John, Robert Ashmead, Garfinkel Simson, Daniel Kifer, Philip Leclerc, Ashwin Machanavajjhala, and William Sexton. Census topdown: Differentially private data, incremental schemas, and consistency with public knowledge. Technical Report. US Census Bureau, 2019.
https://github.com/uscensusbureau/census2020-das-e2e/blob/master/doc/20190711_0938_2018_E2E_Test_Algorithm_Description.pdf
https://github.com/uscensusbureau/census2020-das-e2e/blob/master/doc/20190711_0941_Effective_Privacy_after_Adjusting_for_Constraints__With_applications_to_the_2020_Census.

process is referred to as "TopDown", as it begins with the entire country and subsequently applies privacy measures to lower and lower geographies (i.e. state, county, tract, block group, block).

The first step is to create a multi-dimensional histogram based on the intersection of the variables collected in the Census in the PL94-171 microdata – a table with attributes Race (63 possible values), Ethnicity (Hispanic or not), Voting Age (whether age is 18+ or not), and Housing Type (nine possible values), and location (state, county, tract, block group, and block). The intersection of these variables would create an enormously large set of cells, particularly given the number of unique blocks in the country (i.e. the unique intersection of each variable and geographic unit, such as the number of White, non-Hispanic, and 18+ persons living in single family dwelling units in a particular census block would be computationally intractable). As such, the PL94-171 dataset is too large to process at once, and so the TopDown algorithm begins by creating a national histogram for the entire country, leaving out the various smaller geographic units.

The algorithm then samples from a statistical distribution (the Geometric or Laplace distribution) with parameters set to the desired level of variance (higher variance yields greater noise injection and thus greater privacy and less accuracy) and applies this pertur-bation to the values in each cell. It then solves a minimization procedure (for example, least squares) to select the optimal "noisy" histogram.

The degree of noise injected via the statistical sampling from the Geometric or Laplace distributions is a direct consequence of a choice made by the Census Bureau regarding the degree of privacy that should be present versus the degree of accuracy that should remain in the altered database (the choice of epsilon). Riper, Kugler, and Ruggles (2020) describe this process in the following way: "The global privacy-loss budget (PLB), usually denoted by the Greek letter epsilon, establishes the trade-off between the privacy afforded to Census respondents and the accuracy of the published data. Values for epsilon range from essentially

pdf

0 to infinity, with 0 representing perfect privacy/no accuracy and infinity representing no privacy/perfect accuracy. Once the global PLB is established, it can then be spent by allocating fractions to particular geographic levels and queries. Geographic levels or queries that receive larger fractions will be more accurate, and levels or queries that receive smaller fractions or no specific allocation will be less accurate (pg. 357)."[18]

The application of this random noise will in some cases cause cells to extend beyond logical values (i.e. cells with negative numbers), and the total sum of the cells must still sum to the actual total in the population. Thus, the "noisy" histogram is further adjusted to constrain cells to meet these criteria. Finally, the histogram values are constrained to be integer values (i.e. whole numbers - no fractions of people) while the sum of the cells must still sum to the total population. This means that there will not be any blocks with -3 or 5.35 people in them.

This process is then repeated down the geographic "spine" of the census. "This process happens recursively—first, we fix (i.e., hold constant) the root node and generate its children (e.g., histograms for each state) with the constraint that the child histograms add up to the parent histogram while satisfying their own implied constraints. Then, for each state histogram, we fix the histogram and generate its county-level children such that they add up to the state, and so forth down to the block (pg. 7)."[19]

The final constraint is the introduction of "invariants", or statistics for which the Census Bureau has committed to providing the exact values rather than the statistically altered, noisy values. For the 2020 Census, the Census Bureau currently plans to provide the following invariants: total number of people per state, total number of housing units by block, and number of group quarters facilities by block.[20] These same four counts were

---

[18]Van Riper, David, Tracy Kugler, and Steven Ruggles. "Disclosure Avoidance in the Census Bureau's 2010 Demonstration Data Product." In International Conference on Privacy in Statistical Databases, pp. 353-368. Springer, Cham, 2020.

[19]Abowd, John, Robert Ashmead, Garfinkel Simson, Daniel Kifer, Philip Leclerc, Ashwin Machanavajjhala, and William Sexton. Census topdown: Differentially private data, incremental schemas, and consistency with public knowledge. Technical Report. US Census Bureau, 2019.

[20]https://content.govdelivery.com/accounts/USCENSUS/bulletins/2ae5eda

11

invariant at the census block-level (note the difference in 2010 where total population is invariant at the block rather than state level) in the 2010 Decennial Census. Additionally, voting age population and occupied housing units (i.e., households) were invariant at the census block-level in 2010.[21] The final product is a new database that has these statistically altered values that protect the privacy of those included in the original database but also contains the accurate values for the variables determined to be held invariant.

The lack of invariant populations at the block level (as was included in the 2010 Census data) poses significant issues for state legislatures and other bodies tasked with the creation of legislative districts that are required by law to contain equal populations. As redistricting bodies assemble districts by drawing lines across their respective states, they depend on accurate population data to ensure that those districts contain equal populations. Moreover, in some cases districts are designed to contain certain percentages of minority populations, which becomes increasingly difficult without accurate counts. Legislative leaders in the state of Utah expressed concerns similar to this in a letter to Census Director Dillingham in early 2020: "[W]ith respect to redistricting, we notice larger population shifts than expected, particularly within legislative house districts. Consequently, we fear that differential privacy will require the states to legally defend whether differential privacy protected census data will satisfy the states' constitutional obligation to meet population and equality requirements. Based upon our analysis of differential privacy as applied to the 2010 census redistricting data, we believe, if differential privacy is applied to the 2020 redistricting data, that the integrity of the data used to redistrict the state into congressional and legislative districts, and also within our local jurisdictions, will be threatened."[22]

---

[21] Van Riper, David, Tracy Kugler, and Steven Ruggles. "Disclosure Avoidance in the Census Bureau's 2010 Demonstration Data Product." In International Conference on Privacy in Statistical Databases, pp. 353-368. Springer, Cham, 2020.

[22] https://www.ncsl.org/Portals/1/Documents/Redistricting/UT_Differential_Privacy_%28Signed%29.pdf

# 4   Inequitable Distribution of Intentionally Introduced Error

Riper, Kugler, and Ruggles (2020) also note that the implementation of the non-negativity and block-level total housing unit invariant constraints can lead to greater error as well as error that is biased in a particular direction in the new "altered" database. "The non-negativity constraint requires that every cell in the final detailed histogram be non-negative. As described above, many of the cells in the noisy household histograms will be negative, especially for geographic units with smaller numbers of households. Returning these cells to zero effectively adds households to these small places, resulting in positive bias. . . The invariant number of housing units down to the block level implies an upper-bound constraint on the number of households. Each geographic unit must have no more households than it has housing units. With the low signal-to-noise ratio in the noisy histograms, especially at the block level, this constraint is the strongest signal present in the optimization problem. Many geographic units therefore receive a number of households equal to the number of housing units, resulting in 100% occupancy rates. This is especially true for geographic units with smaller numbers of households that are affected by positive bias due to the non-negativity constraint...The issue of scale-independent noise affects all of the millions of cells with small counts in both the person and household histograms, making counts of many population subsets unreliable. The combination of the non-negativity constraint and population invariants consistently leads to bias increasing counts of small subgroups and small geographic units and decreasing counts of larger subgroups and geographic units. (pg 363-364)."

As noted earlier, the process of differential privacy is not applied equally across the entire population. Places with fewer people (rural locations) and areas with smaller, distinctive populations (minority communities) are more likely to be impacted since these are the places where identification is more concerning, and the application of statistical noise

is more likely to have a larger impact on the summary statistics derived from the altered data. This is especially the case when reported statistics must be in whole numbers (i.e. no fractional people or housing units). A simplified example helps illustrate the point. Suppose there are two census blocks, one with 10 people and another with 100 people. The block with 10 people is more susceptible to an identification "attack" given its smaller population. Furthermore, any perturbations will have a larger impact on the summary statistics of the smaller block — a change in the ethnicity of one individual in the smaller block represents a 10% change overall while one individual change in the large block represents a 1% alteration to the summary statistics in the block. Furthermore, to add noise to small blocks without having negative population numbers requires that small blocks, on average, get bigger. In turn, because of the decision to keep state population invariant (i.e. accurate), this means that the largest blocks, on average, get smaller.[23]

Garfinkle, et al (2018) succinctly summarize the situation: "By design, the noise-injection mechanisms used by the Census Bureau will result in increased accuracy as population sizes increase."[24] Santos-Lozada, et al (2020) elaborate on this issue and discuss some of the potential problems it presents: "Infusing noise in the data, in comparison to the current disclosure avoidance system, will produce inaccurate patterns of demographic change with higher levels of error found in the calculations for non-Hispanic blacks and Hispanics. At the same time, these counts are bound to impact post-2020 districting for both federal and state elections, as well as evaluations of that redistricting....[T]hese changes in population counts will affect understandings of health disparities in the nation, leading to overestimates of population-level health metrics of minority populations in smaller areas and underestimates of mortality levels in more populated ones."[25] Pujol, et al (2020) provide a generalized study of how the application of differential privacy may "disproportionately

---

[23]https://datasociety.net/wp-content/uploads/2019/12/DS_Differential_Privacy_L.pdf

[24]Garfinkel, Simson L., John M. Abowd, and Sarah Powazek. "Issues encountered deploying differential privacy." In Proceedings of the 2018 Workshop on Privacy in the Electronic Society, pp. 133-137. 2018.

[25]Santos-Lozada, Alexis R., Jeffrey T. Howard, and Ashton M. Verdery. "How differential privacy will affect our understanding of health disparities in the United States." Proceedings of the National Academy of Sciences 117, no. 24 (2020): 13405-13412.

impact some groups over others (pg. 189)" and find disparities among smaller populations with important applications to the allocation of government funds, voting rights benefits to minority communities, and calculations for the apportionment of legislative seats.[26]

Individual states have also taken note of the potential problems that this issue can present. For example, the state of Washington, when testing the proposed 2020 process on 2010 census data found, "There is a bias in the demonstration data that causes areas with small populations to get larger while areas with larger populations get smaller." They also found, "There is another bias in the data that makes communities with similar racial characteristics more dispersed geographically."[27] The state of Utah came to similar conclusions when looking at the test data in their state. They find, "We observe that the population loss in our cities and towns are re-allocated to unincorporated, rural areas of the state," and that "we are currently assessing how this net loss will impact state and federal funding that is disbursed in compliance with state revenue sharing statues and federally mandated population formulas."[28] California has expressed concern regarding the application of differential privacy with regard to the number of persons residing in census blocks containing incarcerated individuals.[29]

In July 2020, Census Director Dillingham wrote to the National Conference of State Legislatures to address their concerns of how differential privacy might impact the PL94-171 redistricting data. In his letter, he noted that after an adjustment to the "operations in the post processing algorithms" in the 2010 demonstration data products provided by the Census Bureau that there were notable "improvements in accuracy for total population counts." However, there are still large differences, particularly at smaller levels of geography. For example, "At the block level, error in the population for the average urban census

---

[26]Pujol, David, Ryan McKenna, Satya Kuppam, Michael Hay, Ashwin Machanavajjhala, and Gerome Miklau. "Fair decision making using privacy-protected data." In Proceedings of the 2020 Conference on Fairness, Accountability, and Transparency, pp. 189-199. 2020.

[27]https://www.ncsl.org/Portals/1/Documents/Redistricting/WA_OFM_DAS_Response_Letter.pdf

[28]https://www.ncsl.org/Portals/1/Documents/Redistricting/UT_Differential_Privacy_%28Signed%29.pdf

[29]https://www.ncsl.org/Portals/1/Documents/Redistricting/California_Leaders_Letter_to_RonaldKlain_Feb2021.pdf

block has likewise been reduced from 9.2 people to 7.7 people."[30]  The difficulty faced by policymakers is that 7.7 people can represent a substantial proportion of a census block, given their extremely small size.  While there is certainly variation, a simple calculation of the total US population divided by the number of census blocks yields an average population per block of 28 people.  An average variation of 7.7 people would represent an average error of more than 25%.[31]  The metrics tables released with the 2010 demonstration data indicate that even with this reduction in error, nearly 50 percent of blocks classified as "urban" contained an error larger than 5% while 36% of blocks classified as "rural" contained an error larger than 5%.[32]  These differences could pose significant problems for states such as Alabama that are trying to satisfy legal requirements of one person, one vote or the creation of majority-minority districts in their redistricting process.

# 5   Differential Privacy in the Context of Probability and Statistics

While the idea of differential privacy has its roots in computer science, the procedure can be thought of as a question of probability theory and statistical methods.  At its core, the process of ensuring privacy is a combination of sampling and constrained optimization.  Privacy is introduced into the data by introducing random error through sampling from statistical distributions with parameters set to a desired level of variance (privacy).  These random draws are then added or subtracted to the actual observations (or summary statistics

---

[30]https://www.ncsl.org/Portals/1/Documents/Elections/CensusBureau_letter_to_NCSL%20Storey_071620.pdf

[31]To produce the average population per block I simply took the total national population as of the 2010 census (308,746,065) and divided it by the total number of blocks (11,078,300) in the 2010 census.  However, many blocks are uninhabited (4,871,270).  Removing them from the calculation would yield an average population per block of approximately 50 people and an average error of $7.7/50 = .15$.  See https://tumblr.mapsbynik.com/post/82791188950/nobody-lives-here-the-4-million-census-blocks for total number of blocks and unpopulated blocks.

[32]https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html, see "Detailed Summary Metrics" file.

of the actual observations in the form of histograms) and then further adjusted to conform to certain constraints using an algorithm that is designed to minimize the alterations necessary to achieve this objective. The final process is akin to a constrained optimization problem, which is well within the wheelhouse of statistics and econometrics. For a more detailed and mathematical consideration of the relationship between differential privacy and probability theory and statistical inference, see Wasserman and Zhou (2010) and Dwork and Smith (2010).[33] Differential privacy is thus an application of statistical processes and methods to adjust the original counts of the Census to protect the privacy of individual's records. It is dramatically different in its methods and application from the methods used previously to protect the identity of individuals in the Census.

---

[33]Larry Wasserman & Shuheng Zhou (2010) A Statistical Framework for Differential Privacy, Journal of the American Statistical Association, 105:489, 375-389, DOI: 10.1198/jasa.2009.tm08651
Dwork, Cynthia, and Adam Smith. "Differential privacy for statistics: What we know and what we want to learn." Journal of Privacy and Confidentiality 1, no. 2 (2010).

# Appendix A - Curriculum Vitae

# Michael Jay Barber

CONTACT
INFORMATION

Brigham Young University
Department of Political Science
724 KMBL
Provo, UT 84602

barber@byu.edu
http://michaeljaybarber.com
Ph: (801) 422-7492

ACADEMIC
APPOINTMENTS

**Brigham Young University**, Provo, UT

2020 - present    Associate Professor, Department of Political Science
2014 - 2020    Assistant Professor, Department of Political Science

2014 - present    Faculty Scholar, Center for the Study of Elections and Democracy

EDUCATION

**Princeton University Department of Politics**, Princeton, NJ

Ph.D., Politics, July 2014

- Advisors: Brandice Canes-Wrone, Nolan McCarty, and Kosuke Imai
- Dissertation: "Buying Representation: the Incentives, Ideology, and Influence of Campaign Contributions on American Politics"
- 2015 Carl Albert Award for Best Dissertation, Legislative Studies Section, American Political Science Association (APSA)

M.A., Politics, December 2011

**Brigham Young University**, Provo, UT

B.A., International Relations - Political Economy Focus, April, 2008

- *Cum Laude*

RESEARCH
INTERESTS

American politics, congressional polarization, political ideology, campaign finance, survey research

PUBLICATIONS

18. **"Comparing Campaign Finance and Vote Based Measures of Ideology"**
Forthcoming at *Journal of Politics*

17. **"The Participatory and Partisan Impacts of Mandatory Vote-by-Mail"**, with John Holbein
*Science Advances*, 2020. Vol. 6, no. 35, DOI: 10.1126/sciadv.abc7685

16. **"Issue Politicization and Interest Group Campaign Contribution Strategies"**, with Mandi Eatough
*Journal of Politics*, 2020. Vol. 82: No. 3, pp. 1008-1025

15. **"Campaign Contributions and Donors' Policy Agreement with Presidential Candidates"**, with Brandice Canes-Wrone and Sharece Thrower
*Presidential Studies Quarterly*, 2019, 49 (4) 770–797

14. **"Conservatism in the Era of Trump"**, with Jeremy Pope
    *Perspectives on Politics*, 2019, 17 (3) 719–736

13. **"Legislative Constraints on Executive Unilateralism in Separation of Powers Systems"**, with Alex Bolton and Sharece Thrower
    *Legislative Studies Quarterly*, 2019, 44 (3) 515–548
    Awarded the Jewell-Loewenberg Award for best article in the area of subnational politics published in *Legislative Studies Quarterly* in 2019

12. **"Electoral Competitiveness and Legislative Productivity"**, with Soren Schmidt
    *American Politics Research*, 2019, 47 (4) 683–708

11. **"Does Party Trump Ideology? Disentangling Party and Ideology in America"**, with Jeremy Pope
    *American Political Science Review*, 2019, 113 (1) 38–54

10. **"The Evolution of National Constitutions"**, with Scott Abramson
    *Quarterly Journal of Political Science*, 2019, 14 (1) 89–114

9. **"Who is Ideological? Measuring Ideological Responses to Policy Questions in the American Public"**, with Jeremy Pope
   *The Forum: A Journal of Applied Research in Contemporary Politics*, 2018, 16 (1) 97–122

8. **"Status Quo Bias in Ballot Wording"**, with David Gordon, Ryan Hill, and Joe Price
   *The Journal of Experimental Political Science*, 2017, 4 (2) 151–160.

7. **"Ideologically Sophisticated Donors: Which Candidates Do Individual Contributors Finance?"**, with Brandice Canes-Wrone and Sharece Thrower
   *American Journal of Political Science*, 2017, 61 (2) 271–288.

6. **"Gender Inequalities in Campaign Finance: A Regression Discontinuity Design"**, with Daniel Butler and Jessica Preece
   *Quarterly Journal of Political Science*, 2016, Vol. 11, No. 2: 219–248.

5. **"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"**
   *Public Opinion Quarterly*, 2016, 80: 225–249.

4. **"Donation Motivations: Testing Theories of Access and Ideology"**
   *Political Research Quarterly*, 2016, 69 (1) 148–160.

3. **"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"**
   *Journal of Politics*, 2016, 78 (1) 296–310.

2. **"Online Polls and Registration Based Sampling: A New Method for Pre-Election Polling"** with Quin Monson, Kelly Patterson and Chris Mann.
   *Political Analysis* 2014, 22 (3) 321–335.

1. **"Causes and Consequences of Political Polarization"** In *Negotiating Agreement in Politics*. Jane Mansbridge and Cathie Jo Martin, eds., Washington, DC: American Political Science Association: 19–53. with Nolan McCarty. 2013.

   - Reprinted in *Solutions to Political Polarization in America*, Cambridge University Press. Nate Persily, eds. 2015
   - Reprinted in *Political Negotiation: A Handbook*, Brookings Institution Press. Jane Mansbridge and Cathie Jo Martin, eds. 2015

AVAILABLE
WORKING PAPERS

**"Ideological Disagreement and Pre-emption in Municipal Policymaking"**
with Adam Dynes (Revise and Resubmit at *American Journal of Political Science*)

**"Taking Cues When You Don't Care: Issue Importance and Partisan Cue Taking"**
with Jeremy Pope (Revise and Resubmit at *Public Opinion Quarterly*)

**"A Revolution of Rights in American Founding Documents"**
with Scott Abramson and Jeremy Pope (Under Review)

**"410 Million Voting Records Show That Minority Citizens, Young People, and Democrats Are at a Profound Disadvantage at the Ballot Box"**
with John Holbein (Under Review)

**"Misclassification and Bias in Predictions of Individual Ethnicity from Administrative Records"** (Under Review)

**"Partisanship and Trolleyology"**
with Ryan Davis (Under Review)

**"Who's the Partisan: Are Issues or Groups More Important to Partisanship?"**
with Jeremy Pope (Under Review)

**"The Policy Preferences of Donors and Voters"**

**"Estimating Neighborhood Effects on Turnout from Geocoded Voter Registration Records."**
with Kosuke Imai

**"Super PAC Contributions in Congressional Elections"**

WORKS IN
PROGRESS

**"Collaborative Study of Democracy and Politics"**
with Brandice Canes-Wrone, Gregory Huber, and Joshua Clinton

**"Preferences for Representational Styles in the American Public"**
with Ryan Davis and Adam Dynes

**"Representation and Issue Congruence in Congress"**
with Taylor Petersen

**"Education, Income, and the Vote for Trump"**
with Edie Ellison

INVITED
PRESENTATIONS

"Are Mormons Breaking Up with Republicanism? The Unique Political Behavior of Mormons in the 2016 Presidential Election"

- Ivy League LDS Student Association Conference - Princeton University, November 2018, Princeton, NJ

"Issue Politicization and Access-Oriented Giving: A Theory of PAC Contribution Behavior"

- Vanderbilt University, May 2017, Nashville, TN

3

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- Yale University, April 2016, New Haven, CT

"The Incentives, Ideology, and Influence of Campaign Donors in American Politics"

- University of Oklahoma, April 2016, Norman, OK

"Lost in Issue Space? Measuring Levels of Ideology in the American Public"

- University of Wisconsin - Madison, February 2016, Madison, WI

"Polarization and Campaign Contributors: Motivations, Ideology, and Policy"

- Hewlett Foundation Conference on Lobbying and Campaign Finance, October 2014, Palo Alto, CA

"Ideological Donors, Contribution Limits, and the Polarization of State Legislatures"

- Bipartisan Policy Center Meeting on Party Polarization and Campaign Finance, September 2014, Washington, DC

"Representing the Preferences of Donors, Partisans, and Voters in the U.S. Senate"

- Yale Center for the Study of American Politics Conference, May 2014, New Haven, CT

CONFERENCE
PRESENTATIONS

Washington D.C. Political Economy Conference (PECO):

- 2017 discussant

American Political Science Association (APSA) Annual Meeting:

- 2014 participant and discussant, 2015 participant, 2016 participant, 2017 participant, 2018 participant, 2019 participant

Midwest Political Science Association (MPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2018 participant, 2019 participant, 2020 (accepted, but not presented due to COVID-19)

Southern Political Science Association (SPSA) Annual Meeting:

- 2015 participant and discussant, 2016 participant and discussant, 2017 participant, 2020 (accepted, but not presented due to earthquake)

TEACHING
EXPERIENCE

Poli 315: Congress and the Legislative Process

- Fall 2014, Winter 2015, Fall 2015, Winter 2016, Summer 2017, Fall 2018, Spring 2019

Poli 328: Quantitative Analysis

- Winter 2017, Fall 2017, Fall 2019, Winter 2020, Fall 2020, Winter 2021

Poli 410: Undergraduate Research Seminar in American Politics

- Fall 2014, Winter 2015, Fall 2015, Winter 2016,Summer 2017, Fall 2018

4

| | |
|---|---|
| AWARDS AND GRANTS | 2021 BYU Social Science College Research Grant, $6,500 |
| | 2020 BYU Social Science College Young Scholar Award |
| | 2019 BYU Mentored Environment Grant (MEG), Ideology in America Project, $35,000 |
| | 2017 BYU Political Science Teacher of the Year Award |
| | 2017 BYU Mentored Environment Grant (MEG), Funding American Democracy Project, $20,000 |
| | 2016 BYU Political Science Department, Political Ideology and President Trump (with Jeremy Pope), $7,500 |
| | 2016 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3 |

- Hayden Galloway, Jennica Peterson, Rebecca Shuel

2015 BYU Office of Research and Creative Activities (ORCA) Student Mentored Grant x 3

- Michael-Sean Covey, Hayden Galloway, Sean Stephenson

2015 BYU Student Experiential Learning Grant, American Founding Comparative Constitutions Project (with Jeremy Pope), $9,000

2015 BYU Social Science College Research Grant, $5,000

2014 BYU Political Science Department, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Social Science College Award, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $3,000

2014 BYU Center for the Study of Elections and Democracy, 2014 Washington DC Mayoral Pre-Election Poll (with Quin Monson and Kelly Patterson), $2,000

2012 Princeton Center for the Study of Democratic Politics Dissertation Improvement Grant, $5,000

2011 Princeton Mamdouha S. Bobst Center for Peace and Justice Dissertation Research Grant, $5,000

2011 Princeton Political Economy Research Grant, $1,500

| | |
|---|---|
| ADDITIONAL TRAINING | EITM 2012 at Princeton University - Participant and Graduate Student Coordinator |
| COMPUTER SKILLS | Statistical Programs: R, Stata, SPSS, parallel computing |

Updated March 8, 2021

I, Michael Barber, am being compensated for my time in preparing this report at an hourly rate of $400/hour. My compensation is in no way contingent on the conclusions reached as a result of my analysis.

Michael Barber

March 9, 2021