

RECEIVED

2021 MAR 11  P 4: 49

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

# Exhibit 6

# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

THE STATE OF ALABAMA; ROBERT
ADERHOLT, Representative for Alabama's
4th Congressional District, in his official and
individual capacities; WILLIAM GREEN;
AND CAMARAN WILLIAMS,

                 Plaintiffs,

          v.

UNITED STATES DEPARTMENT OF
COMMERCE; GINA RAIMONDO, in her
official capacity as Secretary of Commerce;
UNITED STATES BUREAU OF THE
CENSUS, an agency within the United States
Department of Commerce; and RON
JARMIN, in his official capacity as Acting
Director of the U.S. Census Bureau,

                 Defendants.

CASE NO. _____   3:21-cv-211-RAH

## DECLARATION OF THOMAS BRYAN

THOMAS BRYAN pursuant to 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a)(2)(B),

and Rules 702 and 703 of the Federal Rules of Evidence, declares as follows:

1.     I am 51 years old and competent to make this declaration.

2.     I am an applied demographic, analytic, and research professional. I am the

founder and principal of Bryan GeoDemographics, a demographic and analytic consultant firm

to meet the expanding demand for advanced analytic expertise in applied demographic research and analysis.

3.     I have a Master's of Science in Management and Information Systems from George Washington University and a Master's of Science in Urban Studies with an emphasis in Demography and Statistics from Portland State University.

4.     I have over 19 years of experience conducting complex demographic and analytical analyses, especially in the application of census.

5.     My research and work focus includes:

   a.  Redistricting and Voting Rights Act analysis;
   b.   The application of U.S Census Bureau data;
   c.  Large-scale multi-mode consumer survey research, design, and execution;
   d.  Applied demographic techniques;
   e.  Advanced analytics;
   f.  Geographic Information Systems (GIS); and
   g.  U.S. Government, Census, and other primary and secondary survey research data.

6.     Plaintiffs requested that I assess the impact of the U.S. Census Bureau's approach to ensuring respondent privacy and Title XIII compliance by using a disclosure avoidance system involving differential privacy.

7.     I am being compensated $300 an hour for my time in connection with this matter. I am not being compensated for any specific opinion.

8.     Attached and incorporated by reference to this declaration is my expert report in this matter. The report is attached hereto as Appendix 1.

9.     Attached and incorporated by reference to this declaration is a copy of my curriculum vitae which lists, among other things, my qualifications, a list of all publications published over at least the last ten years, and a list of all cases over at least the past four years in which I

testified as an expert at trial or by deposition. My curriculum vitae is attached hereto as Appendix 2.

      10.    I declare under penalty of perjury that the foregoing, including any appendices, are true and correct according to the best of my knowledge, information, and belief.

Dated: March 9, 2021

Thomas Bryan

# Appendix 1

# Census 2020

## Differential Privacy Analysis

## Alabama Case Study

# Census 2020 Differential Privacy Analysis Alabama Case Study

1. **Project Statement P3**

2. **Alabama Demographics P4**

3. **Differential Privacy Data, Analytic Approach and Findings P5**
   a) PPMF Data Releases
   b) Analytic Approach
   c) Analytic Findings
      1) Case Studies: census block analysis
      2) Case Studies: non-voting age (NVA) children
      3) Analysis of impact on the 116th US Congressional Districts
      4) Analysis of impact on the Alabama State Legislative Districts
      5) Summary Statistics and Analysis at different levels of geography

4. **Summary and Conclusions P41**

5. **Appendices P42**

Appendix 1 Differential Privacy Data

Appendix 2 Terms

Appendix 3: 2010 – 2019 Estimated Total Population Changes in Alabama

Appendix 4: 2010 – 2019 Estimated Black African American Population Changes in Alabama

Appendix 5: 2010 – 2019 Estimated Hispanic Population Changes in Alabama

Appendix 6 Census
   a) What is the Census?
   b) Census Accuracy and Adjustments
   c) Census Bureau Privacy, Confidentiality and Title 13 Privacy
   d) Uses of the Census

Appendix 7 Differential Privacy
   a) What is Differential Privacy?
   b) How is Differential Privacy being proposed to be used in the 2020 Census?
   c) Differential Privacy and the Census: Existing concerns from the user community

**Section 1 Project Statement**

The purpose of the project is to assess the impact of US Census Bureau's proposed approach of ensuring respondent privacy and Title XIII compliance in the 2020 Census by using a Disclosure Avoidance System (DAS) involving Differential Privacy (DP). Conceptually, the Census Bureau is attempting to leverage DP to strike a balance between data quality (which would be reporting data as they were collected) and respondent privacy (which would be adjusting or "perturbing" data so dramatically that there would be no chance of anyone identifying a census respondent – which would also result in data that are practically no longer "quality" or of any use.).

The application of DP is a brand new approach for the Census Bureau and is different from all prior Census initiatives to comply with Title XIII. As the Census Bureau has been trying to develop the application of DP to their data, they have released a series of what they call data "demonstration products" to the public, including outside analysts and stakeholders, so they can determine for their purposes the impact DP would have on Census data. These demonstration products generally contain:

- the most common, basic demographic and housing variables;
- different levels of geography;
- data as they were originally reported in the SF (Summary Files) in 2010, which reported actual census data with small privacy protection modifications ; and
- trial data as they have been by adjusted (perturbed) DP.

This project seeks to determine the impact of DP on 2010 Summary file (SF) data for Alabama. We assess "spine" geography, which are standard census geographies such as counties and blocks, as well as "off-spine" geographies, which are political or administrative levels of geography such as cities, school districts, state legislative and senate districts, and congressional districts. This assessment is not only important for practical reasons, but it also enables us to uncover the unknown and oftentimes severe consequences. We believe these specific geographies are representative of the dataset as a whole and will enable us to reach reliable and valid conclusions about the data.

Ruggles et al. (2019: 406) argue that DP goes far beyond what is necessary to keep data safe under census law and precedent, and because it focuses on concealing individual characteristics instead of respondent identities, DP is a blunt and inefficient instrument for disclosure control. They go on to note that because the core metric of DP does not measure the risk of identity disclosure, it cannot assess disclosure risk as defined under census law, making it untenable for optimizing the privacy/usability trade-off.

If DP is implemented, it will affect almost all users of census data, from legislatures relying on the data to design Congressional and other districts to comply with the law, to demographics vendors who supply clients with zip code level characteristics so businesses can make better decisions. Other end users, such as health district administrators who need the data to track health issues such as COVID-19, and businesses that use small area data such as zip codes, blocks, and block groups to improve marketing, stand to be dramatically impacted. Many government agencies also depend on accurate small area census data to make programs run efficiently and effectively, and the biggest impact of DP will be in small areas. The data in small areas are typically used both directly where the small area is the unit of analysis and aggregated into higher levels of geography by these users.

The outcome of the project is a statement on the impact of the usability of 2020 Census data if it is subjected to DP, and alternatives available to the Census Bureau to protect privacy in the absence of DP. We use the most recent data available from the Census Bureau for each analysis.

Our study of the Alabama differential privacy census data leads us to conclude that it is a statistical adjustment of actual census data that make the data essentially unusable and unreliable at geographies below the statewide level for redistricting and other purposes.

## Section 2: Alabama Demographics

To better understand the implication of inaccuracies induced by the application of DP, we must first understand the demographics of Alabama itself. Since the last Decennial Census in 2010, the estimated size of the population in Alabama has not changed significantly: up only about +2% from 4,785,298 to 4,903,185 in 2019 (See Appendix 3). The demographic *complexion* of the state has changed dramatically though, according to estimates.

In this analysis, we examine changes in demographic estimates of Alabama from 2010 to 2019 by:
- Age (18+ / VAP and under 18 / NVA)
- Race (Black / African American and Hispanic)
- CVAP (citizen voting age population by race)

In assessing analysis of early versions of the DP datasets, one of the most significant observations is that the age structure at different geographies is materially changed. An accurate read of the size and changes of the population by age and race/ethnicity is critical for a wide variety of applications such as estimates and forecasts, strategic and infrastructure planning, and funding allocations.

In assessing changes in the total population of Alabama, there has been a significant change in citizenship from 2010-2019. The estimated number of NVA (children under 18) male foreign born dropped dramatically, while the estimated number of VAP who are naturalized grew significantly. This suggests a naturalization process for those males who aged in place. The estimated number of both NVA (under 18) and VAP female foreign born *grew* however, suggesting that this population may have immigrated and naturalized – rather than aging in place. This has profound implications for voting rights and redistricting in the state.

The estimated Black, non-Hispanic population growth outpaced total population growth. While the estimated total NVA (under 18) male foreign born dropped overall, it actually increased among Black, African Americans NVA. The estimated growth in total NVA (under 18) female foreign born was driven by Black, African American women (See Appendix 4).

The estimated Hispanic population growth outpaced all other demographic groups. Their numbers of foreign born dropped, while the numbers of those native and naturalized grew dramatically. Of particular note, the estimated total Hispanic CVAP in the state has nearly doubled. Where that growth took place will have profound implications for political representation and voting rights (See Appendix 5).

**Section 3: Differential Privacy Data, Analytic Approach and Findings**

Two important related issues to consider in regard to applying this new technology called DP to the 2020 census are:

1) the level of testing it has undergone; and
2) the experience of Bureau staff with it.

Could applying DP to the 2020 Census be premature? As of the writing of this report at the beginning of March 2021, the latest view the public end users have of the data is a dataset from November 2020, which shows that the data are untenable and are fraught with contradictions, inconsistencies, and demographic impossibilities. DP has been in development at the Census Bureau for many years, and we are currently in the time frame we would be preparing for the release of the data under statutory timetables. And the Census Bureau has not yet produced a data product that is even remotely usable by the end user community – including state and local governments for the purpose of redistricting[1].

---

[1] This is not the first time the Census Bureau has tried to push a new technology late into the process. The last case was when the Bureau attempted to automate the field data collection in the 2010 census in a program called "Field Data Collection Automation" (FDCA) headed by Deputy Director, Preston Jay Waite. The FDCA program was implemented shortly after the 2000 census was completed (Waite, 2003; Waite and Reist, 2005). Even though the FDCA program started well before the 2010 census, it turned into a debacle (Calleam Consulting, 2012), which resulted in the "early retirement" of Deputy Director Waite in 2008, two years before the 2010 census (PAA Affairs, Summer 2008., p. 6).

According to a report by the Congressional Research Service (Williams, 2012), the center piece of the FDCA program was the development of highly specialized handheld positioning software. Testing eventually revealed significant flaws in the handhelds, such as slow operation, memory problems, and a tendency to lock up when users entered large quantities of data. On April 3, 2008, in congressional testimony, then-Bureau Director Steve Murdock acknowledged that the Bureau had abandoned the plan to use the handhelds for Non Response Follow UP (NRFU) and instead would resort to the traditional paper-based approach and would rely on the handhelds only for address canvassing. The change required the Bureau to hire and train more NRFU staff, at significant increased expense. The GAO testified to Congress on June 11, 2008, that the Bureau had re-estimated the total life-cycle cost of the 2010 Census at between $13.7 billion and $14.5 billion, instead of the previously estimated $11.5 billion. A 2009 House Committee on Appropriations report raised the estimate to $14.7 billion. As the 2010 FDCA debacle demonstrated, the attempt to use an immature technology ended up not only causing problems that challenged the Census Bureau, but also leading to a significant increase in the cost of the 2010 census and the early retirement of Deputy Director Waite.

As the 2010 FDCA case suggests, there is room for concern with regard to applying a new method such as DP to the 2020 Census. Tests have been done in a shorter time frame than the 2010 FDCA tests, which means that it has not been as extensively vetted and Bureau staff have less experience with it than they had with the 2010 FDCA program. The fact that it took the Census Bureau nearly 20 years to get automated data collection right is a lesson to keep in mind when considering using DP for the 2020 census.

**Part 3a: PPMF Data Releases**

In an effort to engage stakeholders, the Census Bureau released a series of demonstration products which showed how the application of differential privacy would have changed the 2010 Census data, had it been used. The National Historical Geographic Information System (NHGIS) linked these DP data with 2010 Census Summary File data to facilitate analysis and comparisons by end user groups. There have been four releases to date:

- **Census Demonstration Products v1 October 2019**
  In October of 2019, the Census Bureau released what they called a Demonstration Product, which consisted of the 2010 Census data with differential privacy applied. The IPUMS NHGIS team added the original census SF data to the differentially privatized data to make it easier for users to compare. In summarizing a review of this file by users, John Abowd (2020), the Census Bureau's architect of DP, wrote that much of the feedback identified areas where the disclosure avoidance system still needed to be improved.

- **Census Demonstration Products v2 May 2020**
  Another file was released by the Census Bureau in May of 2020, called a Privacy Protected Micro-Data File (PPMF). Concurrent with other concerns end users had about the Census Bureau's transparency and access to the files, many data users did not have the computational capacity to use such large files. It contained about 308 million records from the 2010 Census with DP applied. The IPUMS NHGIS team converted the PPMF to tables and added the same tables from the 2010 Census (SF) summary file. This is the last file released that has any age breakdown (in five year intervals) instead of 18 and over (VAP) and under age 18 (NVA).

- **Census Demonstration Products v3 September 2020**
  In September of 2020, the Census Bureau released another PPMF but only with data on the only age breaks on were the population over 18, and the population age 17 and under. This was a related to the PL- 94-171 (redistricting file). After the file was issued, an error was identified[2] so the Census Bureau file had to re-process and re-release the data. It should be noted that while errors can and do occur in data releases, the fact that an external user found one suggests that the quantity and impact of changes introduced by the Census Bureau may make it impossible for them to be sure of the quality of all of the data they are releasing.

- **Census Demonstration Products v4 November 2020**
  Prior to the last data release from the Census Bureau, they reported, "Over the past several months, the Census Bureau has been making a number of improvements to the 2020 Census Disclosure Avoidance System (DAS) to address the concerns raised by the data user community at the December 2019 Committee on National Statistics workshop. Throughout this process, we have received numerous requests for additional tools to help evaluate this ongoing progress."[3]

---

[2] https://www2.census.gov/programs-surveys/decennial/2020/program-management/data-product-planning/2010-demonstration-data-products/ppmf20200917/2020-09-17-erratum.pdf

[3] https://www2.census.gov/programs-surveys/decennial/2020/program-management/data-product-planning/2010-demonstration-data-products/ppmf20201116/2020-11-16-ppmf-factsheet.pdf

Subsequently, the September 2020 files with the coding fixed was re-released in November 2020. This is the most recent data file available from the Census Bureau.

The Census Bureau has recently announced that they will produce one more demonstration product for users to evaluate by April 30, 2021 - and will make a final decision about how DP will be implemented in the redistricting data by early May 2021. Importantly, this leaves end users virtually no time for evaluation and no participation in the decision-making process. In other words, if the most recent data produced by DP is not adequate after several attempts, there is little time or opportunity left to make any other changes.

### Section 3b: Analytic Approach

The U.S. Census Bureau (2020a) has suggested several measures of accuracy that could be used to evaluate the data based on the application of DP to 2010 Census data. The Mean Absolute Error (Mean Absolute Numerical Error to distinguish it from the Mean Absolute Percent Error) and the Mean Absolute Percent Error are important summary measures. An absolute error reflects the magnitude of the error regardless of direction. This approach is used to make sure positive errors and negative errors do not cancel each other out and make it appear as if there are no errors. A geographic unit with an absolute error of 10 percent or more could be 10 percent too high or 10 percent too low. I focus on percent error because it reflects the size of the error relative to the size of the population. An error of a given magnitude (say 1,000 people) may be trivial in large places but very significant in smaller places.

Smaller geographic areas in terms of population size tend to have higher levels of error injected by DP. This is important because the census is designed to produce data for a lot of small geographic units. The vast majority of data produced in the U.S. Census are for small areas, and these small areas are where DP is designed to inject the most error percentage-wise. These errors are likely to cause problems in many use cases, such as the amount of state and federal funds received by school districts. For a small school district to get 10 percent less federal or state money than it would be entitled to with accurate census data will cause serious problems. It will be difficult for child advocates to support the use of DP in the 2020 Census if it produces significant errors like those identified in this paper.

The number and percent of large errors or outliers are the most important measures of accuracy. These extreme errors will be the biggest practical problem caused by DP. The fact that the biggest errors (percentage-wise) happen in smaller places is likely to generate concerns in many places across the state of Alabama. We seek to identify and capture these errors by leveraging a statistical method known as Loss Functions (Hough and Swanson, 2006).

In order to determine how much distortion is being inserted in the data by the application of differential privacy, we compare the 2010 Census data before and after the application of differential privacy. This allows us to measure the size of the inaccuracies caused by differential privacy. We perform a forensic examination of the original 2010 Census SF data and the 2010 DP data provided by the IPUMS NHGIS Privacy-Protected Demonstration Data (PPDD) for different demographic groups at different levels of geography[4].

---

[4] https://www.nhgis.org/privacy-protected-demonstration-data.

Our analysis proceeds in five broad areas:
1) Case Studies: Block Analysis
2) Case Studies: underage non-voting age (NVA)
3) Impact on the 116th US Congressional District
4) Impact on the Alabama State Legislative Districts
5) Summary statistics and analysis at different levels of geography

A recent report commissioned by the Census Bureau concludes:

> "To gain confidence around potential differential count of the population the Census Bureau should make use of its data science resources and summarize the assessments of data quality across various geographies and for relevant demographic groups. The report provided here responds to the recommendation for closer examination of geographies and demographic groups."[5]

Two different types of geographies are examined: "spine" which are the core census statistical geographies such as counties, tracts, and blocks, and "off-spine" which are governmental or administrative geographies such as school districts and legislative districts.  The "spine" geography, particularly blocks, are important because they offer the greatest geographic granularity and are the geographies DP is actually being applied to. "Off-spine" geographies are also critically important because conceptually they could capture the best or worst pieces of statistical geography and aggregate and magnify their errors.

The levels of geography we processed for this analysis are:

o census blocks
o counties
o unified school districts (USDs)
o lower house districts (SLDLs)
o upper house districts (SLDUs)
o Congressional Districts (CDs)
o Cities (Incorporated places and Census Designated Places / CDPs)

An additional important concept that warrants understanding is "invariants".  On November 24th, the Census Bureau's Data Stewardship Executive Policy Committee (DSEP) finalized the list of "invariants" for the first set of 2020 Census data products. Invariants are statistics that are published <u>without</u> DP.  Per the decision, the following statistics will be invariant at these levels of geography and higher:

• Total population (at the state and state-equivalents level)
• Total housing units (at the census block level)
• Number of group quarters facilities by type (*NOT* actual GQ pop, at the census block level)

Aside from these invariants, every other population (such as by age or race / ethnicity) can be impacted by DP at any level of geography.[6]

---

[5] JONAS (2021, pages 8) Letter Report to Christa D. Jones and Deborah M. Stempowski, U.S. Census Burau dated February 8, 2021, https://www2.census.gov/programs-surveys/decennial/2020/program-management/planning-docs/2020-census-data-quality-processes.pdf

[6] https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html

**Part 3c. Analytic Findings**

**Case Inventory**
Moving now to individual cases of examination. There are two general types of case studies are shown below here. First, the implications for significant changes to census blocks for a variety of populations. Second, we focus on the implications for one specific population, NVA children.

**3c1 Census Block Analysis**
- Case 1: Children without Adults: Differential Privacy turned 5 blocks into 13,842.
- Case 2: DP turned 30,338 blocks with one or more VAP into blocks with zero VAP.
- Case 3: DP turned even more blocks with one or more VAP into blocks with zero VAP by race.
- Case 4: Differential Privacy turned 46,730 Blocks with one or more people of non-voting age into blocks with zero people of non-voting age.
- Case 5: Blocks with Extreme Differences between NVA and VAP.
- Case 6: Plaintiff Green's Situation
- Case 7: Household Population and Occupied Housing Unit Inconsistencies.

**3c2 NVA Children Cases**
- Case 8: Implications of DP at Unified School Districts for NVA Children.
- Case 9: Implications of DP at Census Tracts and Counties on Preschoolers.
- Case 10. Unrealistic sex ratios for young children.

**3c1 Case Studies: Census Block Analysis**
In this analysis, 137,081 census blocks with population were extracted from the total of 252,266 blocks in Alabama. This extraction/excluded blocks in which zero people were reported in both the 2010 Census and the DP file built from the 2010 Census (115,185 blocks) leaving 137,081 blocks populated in one, the other or both DP and SF data.[7] This breaks out as:
- a) 118,495 blocks have population in both the SF and DP file
- b) 16,944 blocks have population in the SF file, but not the DP file
- c) 1,642 blocks have population in the DP file, but not the SF file

In order to grasp the severity of the impact of the DP process on the data, we examined how many pieces of Alabama block geography were populated in the 2010 SF file, and how many blocks had populations that were perturbed by DP. In Column 1 below, we see that there were 135,439 total populated blocks (bullet a) above with 118,495 blocks + bullet b) above with 16,944 blocks – not including bullet c) with 1,642 blocks that were previously unpopulated in the SF file – but were populated by DP).

---

[7] The 2010 Census saw a substantial increase in the number of blocks from the 2000 Census. After the 2010 Census data users commented that some of the new census blocks were not useful, particularly very small blocks. Many unnecessary small blocks were formed by incorrect roads that had not been deleted from the Master Address File/Topologically Integrated Geographic Encoding and Referencing (MAF/TIGER) Database as well as misclassified highway ramps, traffic circles, cul-de-sacs, alleys, and minor unnamed roads. In addition, small water bodies and overly detailed or incorrect water features contributed to the increase in unnecessary small blocks. These types of blocks make up the majority of zero population blocks in the SF file in Alabama.

**Table 3c1: Number and Percent of Demographic Groups Whose Populated Blocks Changed**

| Population | Column 1 # of Blocks 2010 SF > 0 Pop | Column 2 # of Blocks Changed SF>DP | Column 3 % of Blocks Changed |
|---|---|---|---|
| Total | 135,439 | 127,809 | 94% |
| Total Hispanic | 26,952 | 26,387 | 98% |
| Total White, non-Hispanic | 116,998 | 112,180 | 96% |
| Total Black, non-Hispanic | 59,878 | 57,950 | 97% |
| Total, Other[8] non-Hispanic | 34,457 | 33,700 | 98% |
| | | | |
| Voting Age Population (VAP) | 135,434 | 129,837 | 96% |
| VAP Hispanic | 24,933 | 24,541 | 98% |
| VAP White, non-Hispanic | 116,878 | 113,055 | 97% |
| VAP Black, non-Hispanic | 59,393 | 57,871 | 97% |
| VAP Other non-Hispanic | 30,226 | 29,665 | 98% |
| | | | |
| Non-Voting Age Pop (NVA) | 103,945 | 100,905 | 97% |
| NVA Hispanic | 16,115 | 15,811 | 98% |
| NVA White, non-Hispanic | 81,057 | 79,188 | 98% |
| NVA Black, non-Hispanic | 42,381 | 41,521 | 98% |
| NVA Other non-Hispanic | 17,494 | 17,234 | 99% |

There were 252,266 blocks for the 2010 Census.  As context for the examples below – many blocks in Alabama had zero population to begin with in SF, before DP was introduced and zeroed out many more. Column 1 shows the number of blocks populated in 2010.  Column 2 shows how many populated blocks were changed by DP, and Column 3 shows the percent of populated blocks that were changed by DP.

**Total reading example:** There are 135,439 total populated blocks in the SF file.  Of these, 127,809 have their population changed – either to zero or some other number by DP.  This represents 94% of all VAP populated blocks.

**VAP reading example:** There are 135,434 VAP populated blocks in the SF file.  Of these, 129,837 have their VAP population changed – either to zero or some other number by DP (as shown in Case 2 below, 30,338 of these blocks had VAP population that was zeroed out by DP).  This represents 96% of all VAP populated blocks.  Note: the difference between the 135,439 total populated blocks and the 135,434 blocks here are the 5 blocks occupied by NVA children alone in the SF file.  As we will see below in Case 1: the block count where there are children but no adults swells from 5 in the SF file to 13,842 in the DP file.

**NVA reading example:** There are 103,945 NVA populated blocks in the SF file.  Of these, 100,905 have their NVA children population changed – either to zero or some other number by DP (as shown in Case 4 below, 46,730 of these blocks had NVA population that was zeroed out by DP).  This represents 97% of all VAP populated blocks.

---

[8] Includes Asian, Native Hawaiian and Pacific Islander, American Indian and Alaskan Native, reported "Other" and 2+ multi-race – all non-Hispanic.

**Table 3c2: Changes Between SF and DP Populations**

The following table highlights the differences between the DP and SF measurement of VAP and NVA populations. For example, in the second to last row, I show that there are 46,730 blocks in the SF file that have NVA children but have zero children in the DP data. We explore this finding in Case 4. This suggests that a frequent outcome of the method is not that DP swaps existing data from another geography to ensure it retains some of its original fidelity, but DP simply deletes data in wholesale fashion if there's a concern.

| VAP DP | NVA DP | VAP SF | NVA SF | Blocks | Case |
|--------|--------|--------|--------|--------|------|
|        |        | 0      | >0     | 5      | Case 1 |
| 0      | >0     |        |        | 13,842 | Case 1 |
| 0      |        | >0     |        | 30,338 | Case 2 |
| >0     |        | 0      |        | 1,199  | Case 2 |
|        | 0      |        | >0     | 46,730 | Case 4 |
|        | >0     |        | 0      | 5      | Case 4 |

**Case 1: Children without Adults: Differential Privacy turned 5 blocks into 13,842.**

The 2010 Census reported in the SF file that there were five blocks in which 1 or more children (under age 18) were listed, but no adults (18 years and over). Of these five blocks, the first had one child, the second, 11 children; the third, 22 children; the fourth, 23 children; and the fifth block, 74 children. It is likely that most if not all of these five blocks have facilities where children reside in the presence of adults who themselves live elsewhere. By comparison, in the DP file there are 13,842 blocks in which there are no VAP adults, and there is at least one NVA child living there.

Out of 137,081 populated blocks in Alabama, it is highly believable that there are five blocks in which only children reside. Juvenile group quarters for example. However, the Differential Privacy Algorithm produced 13,842 such blocks, a *highly* unbelievable number. Ten percent of the blocks examined have children residing alone according to DP. In these blocks there are now 31 blocks in which 50 or more children reside alone, four of which have more than 70 children residing alone. And in between, there are 13,810 blocks with between two and 49 children residing without adults. In total, where the 2010 Census had 131 children residing in five blocks without adults, DP produces over 141,817 children residing in 13,842 blocks without adults.

**Case 2: DP turned 30,338 blocks with one or more VAP into blocks with zero VAP.**

This analysis uses the same 137,081 DP- or SF- populated census blocks in the preceding example.

- In comparing the voting age populations reported by the 2010 Census and the DP file, it was found that there are 30,338 blocks in which DP reported zero VAP while the SF reported one or more VAP in these same blocks. These blocks were populated with 165,744 VAP.

- At the same time, DP turned 1,199 blocks in which SF reported zero persons of voting age into blocks with >0 persons of voting age.

**Case 3: DP turned even more blocks with one or more VAP into blocks with zero VAP by race.**
Again using the same 137,081 populated census blocks found in the preceding cases, it was found that there were:

- 19,666 blocks in which DP reported zero Hispanic persons of voting age while the 2010 Census reported one or more Hispanic persons of voting age in these same blocks;
- 38,568 blocks in which DP reported zero White non-Hispanic persons of voting age while the 2010 Census reported that one or more White non-Hispanic persons of voting age were in these same blocks; and
- 38,010 blocks in which DP reported zero Black Non-Hispanic persons of voting age, while the 2010 Census reported one or more Black non-Hispanic persons in the same blocks.

Looking in the opposite direction, there were:

- 7,384 blocks in which the 2010 Census reported 1 or more Hispanic persons of voting age while DP reported zero Hispanic persons of voting age in these same blocks;
- 4,202 blocks in which the 2010 Census reported 1 or more White non-Hispanic persons of Voting age while DP reported these same blocks to have zero White non-Hispanic persons of voting age; and
- 8,073 blocks in which the 2010 Census reported 1 or more Black non-Hispanic persons of voting age while DP reported zero Black non-Hispanic persons of voting age in these same blocks.

**Case 4: Differential Privacy turned 46,730 Blocks with one or more people of non-voting age into blocks with zero people of non-voting age.**
This analysis uses the same 137,081 census blocks found in the preceding example.

- In comparing the voting age populations reported by the 2010 Census and the DP file, it was found that there are 46,730 blocks in which DP reported zero people of voting age while the SF reported one or more persons of voting age in these same blocks.

- At the same time, DP turned 5 blocks in which SF reported zero non-voting age population into blocks with >0 persons of non-voting age.

**Case 5: Blocks with Extreme Differences between NVA and VAP**
Of the 13,842 blocks containing over 141,000 NVA children and no VAP, four blocks stand out with more than seventy children each in them:

| Block | NVA Pop. DP |
|---|---|
| 010479570001345 | 76 |
| 010730019021024 | 77 |
| 010730118032035 | 82 |
| 010970024001008 | 72 |

Block 010479570001345 is a large, poorly defined heavily rural area west of Carlowville, AL. There is a juvenile GQ facility there. This is plausible.

Block 010730019021024 is the location of the Gateway-Rushton School, a juvenile GQ. There were 25 NVA and 11 VAP there in the SF data. Now there are no adults and 77 residents. This change is not plausible.

Block 010730118032035 is a tree lined single family neighborhood on the north side of Birmingham, where it is simply implausible that there are no adults.



Block 010970024001008 is a tree lined single family neighborhood in Mobile south of US 90 where again it is simply implausible that no adults live here.



**Case 6: Plaintiff Green's Situation**

Plaintiff William Green resides in a block that reflects the all-too-common changes DP inflicts on previously accurately reported census data.  Plaintiff Green resides in census block 011010031003014.  This block was reported in the 2010 SF file to have 22 residents, 21 of whom were Black, non-Hispanic.  15 of these residents were VAP, and 14 of these were Black, non-Hispanic.  7 of these residents were NVA children, all of whom were Black, non-Hispanic.

With DP introduced – the characteristics of Plaintiff Green's block changes dramatically.  The block is increased to have 27 residents, but only 9 of whom are now Black, non-Hispanic with the remaining majority of 18 being Hispanic or other, non-Hispanic.  21 of these residents are now VAP, but only 9 of whom are now Black, non-Hispanic with the remaining majority of 12 being Hispanic.   All 7 of the Black, non-Hispanic children are removed and replaced with 5 Hispanic and 1 other, non-Hispanic child.

**Case 7: Household Population and Occupied Housing Unit Inconsistencies**

In the 2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop,[9] Beth Jarosz (Population Reference Bureau) states that accuracy and internal consistency were key for planning: "Planners look at several mathematical identities in assessing local demographics, for instance: (1) population must equal household population plus group quarters population; (2) occupied units must be the sum of all housing units minus vacant units; and (3) average household size must be at least one, and household size multiplied by number of occupied units gives the population in a size category. None of these identities held for every jurisdiction in the PPMF."

In the SF data, there are no cases where there are more occupied housing units than household population.  It is a demographic and logical impossibility.  In the DP data, there are 22,404 cases where there are more occupied housing units than household population.  Additionally, there are 15,288 blocks where there are occupied housing units, but no household population.

**Case Studies: non-voting age (NVA) children**

In this section the implications of DP are examined for a specific population, namely children (population ages 0 to 17).  It is likely that the implications for children are seen in other population groups, but children are the focus here for a couple of reasons. First, DP infused data are provided for Unified School Districts so the implications for a key public institution can be examined. Also, there are already a number of studies that examined the implication of DP for children and schools that can be built on. (O'Hare 2020, Nagle 2019, Sojourner 2019)

Total federal spending on children is currently $325.4 billion (First Focus on Children, 2019) Children's Budget 2019.  Within this budget, schools (public education institutions) represent the largest share with $39 billion distributed by the U.S. Department of Education (Reamer, 2020).

---

[9] 5.3.2 Housing and Population Consistency Page 87

**Table 3c3**

| Selected Federal Expenditure Programs Focused on Young Children Guided by Census-Related Data , FY2016 Distributions  (2-28-2021) | | |
|---|---|---|
| | Dollars FY 2016 | |
| | U.S | Alabama |
| Head Start | $8,648,933,810 | $138,342,659 |
| Supplemental Nutrition Program for Women, Infants, and Children | $6,383,830,000 | $110,726,000 |
| Child Care Mandatory and Matching Funds | $2,840,075,000 | $41,247,000 |
| Child Care and Development Block Grant | $2,612,564,000 | $50,468,000 |
| Total | $20,485,402,810 | $340,783,659 |
| Source Counting for Dollars website https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/Characteristics%20of%2055%20Large%20Census-guided%20Programs.pdf | | |

The analysis in this section used data from the May 27, 2020 Census Bureau release because that is the most recent data from the Census Bureau that allows one to examine young children (ages 0 to 4) as well as school-aged children (ages 5 to 17).

The use of DP severely impacts the accuracy of data for young children (ages 0 to 4) and for school-aged children (ages 5 to 17) for school districts in Alabama.  These age groups are the focus of the analysis shown later in this report because data on the preschool population (ages 0 to 4) are used to forecast future education needs and the needs for day care centers.  Data for school-aged children (ages 5 to 17) are used to allocate state and federal funding to localities.  Errors in the Census will impact the fairness of such distributions.

The impact of DP on preschoolers (ages 0 to 4) as well as school-aged (ages 5 to 17) are examined in the context of unified school districts in Alabama.  Then the population 0 to 4 is examined in the context of other kinds of geographic units in Alabama.

Metrics for assessing the accuracy of census data for two age groups of children—age 0 to 4 (preschoolers) and ages 5 to 17 (school-age populations)—are assessed here by reporting empirical evidence about the likely level of errors injected into the Census data by DP for children based on the most recently available data from the Census Bureau.

**Case 8: Implications of DP on Unified School Districts and NVA Children**
The first focus is on the population ages 0 to 4.  In their March 2020 release, the U.S. Census Bureau (2020a) provided data related to several "Use Cases" and the population ages 0 to 4 was one of those. Table 5d5b provides several accuracy measures for the population ages 0 to 4 for 134 unified school districts in Alabama (in the 2010 Census).

**Table 3c4**

| Summary Statistics for Application of Differential Privacy for 134 Unified School Districts in Alabama (2-28-2021) | | |
|---|---|---|
| | Ages 0 to 4 | Ages 5 to 17 |
| Mean Absolute Numerical Error | 153 | 104 |
| Mean Absolute Percent Error | 9.8 | 2.8 |
| Percent of School Districts with Errors of 10 pecent or more | 43 | 1 |
| Percent of School Districts with Errors of 5 pecent or more | 65 | 19 |
| Source; Analysis of Census Bureau data released in May 2020 | | |
| *Error is defined here as the difference between the data reported in the 2010 Census and the data after differential privacy was applied. | | |

Number with 10% or more error: 58 for ages  0-4 and 1 for ages 5-17
Number with 5% or more error: 87 for ages 0 to 4 and 25 for ages 5-17

Sometimes positive and negative errors cancel each other out, so it is important to look at absolute errors. Absolute errors reflect the magnitude of the error regardless of the direction (i.e., positive or negative). The mean absolute numerical error for the population ages 0 to 4 in Case Study Table 1 is 153.  That means, on average, the number of children ages 0 to 4 produced by DP infused data was 153 children different than the 2010 Census count based on data from respondents.  Since the average preschool class size is about 17 (Samuels, C.A. 2017) , that means the average error of 153 children represent about nine classrooms.

The mean absolute percent error for ages 0 to 4 was 9.8 percent.  This means on average across the unified school district of Alabama, there was nearly a 10 percent error in the number of young children ages 0 to 4.  Perhaps the more important data in the table is the number of school districts that are likely to have large errors based on the application of DP.  For NVA ages 0 to 4, 43 percent of the school districts displayed errors of 10 percent or more, and 65 percent experienced errors of 5 percent or more after DP was applied.

The 2010 Census SF data reported that Midfield City School District children ages 0 to 4 was 405, but after DP was applied to the data, it was 540.  This is an increase of 135 children.  The average class size for preschools in Alabama is about 18 children.[10]  The error of 135 preschool children in Midfield City School Districts amounts to about 8 classrooms.

The next focus is NVA ages 5 to 17.  The mean absolute numerical error for the population ages 5 to 17 in Table 1 is 104 children.   That means, on average, the number of children ages 5 to 17 produced by DP infused data was 104 children different than the 2010 Census count based on respondents' input.   The mean absolute percent error for ages 5 to 17 was 2.8 percent.

Perhaps the more important data in Table 1 is the number of school districts that are likely to have large error based on the application of DP.  For ages 5 to 17, only 1 school district had an error of 10 percent or more, but 19 percent experienced errors of 5 percent or more after DP was applied.

There are several large changes after DP was applied to the census data that stand out.  For example, the 2010 Census reported that Clarke County School District had 1,295 children ages 0 to 4, but after DP was

---

[10] https://nieer.org/wp-content/uploads/2016/08/9.pdf

applied, the number of children ages 0 to 4 was decreased to only 885. This is a reduction of 410 children, or 32 percent.

According to the National Center for Education Statistics, the average class size for public schools in Alabama is about 20 students. The error of 410 students for Clarke County School Districts amounts to about twenty classrooms. If 410 unexpected students show up in the Clarke County School Districts, that will lead to crowded classrooms. On the other hand, building and staffing 20 classrooms that are unneeded because of inaccurate census data would be problematic. That is why getting accurate data on the school-age population is so important.

The school district with the largest decrease in the number of children ages 0 to 4 was Mobile County School District. The 2010 Census reported 28,201 children ages 0 to 4, but after DP was applied to the reported census data, the figure was decreased to 27,358. This is a decrease of 843, or 3.0 percent. 843 children is the population size of one or two elementary schools.

The 2010 Census reported that Midfield City School District had 1,130 children between the ages of 5 and 17, but after DP was applied to the 2010 Census data, the number of children ages 5 to 17 was only 1,015. This amounts to a reduction of 115 children, or 10.2 percent.

The largest numerical decrease for school-aged children was seen in Madison City School District. The 2010 Census reported 9,548 children ages 5 to 17, but after DP was applied, the figure was changed to 8,774. This is a decrease of 776, or 9.0 percent.

Many other researchers have noted potential problems related to the infusion of differential privacy for data used by school systems. For example, in examining the impact of differential privacy on school-age population in Cambridge, MA, (Cook 2019 page 60) Cook noted that the 2010 DP added 800 5-17 year-olds, for the city compared to SF1, which is a number big enough to justify another elementary school.

The most recent data available from the U.S. Census Bureau regarding the likely impact of DP on 2020 Census data for children suggests that the level of error introduced will result in a high level of errors for many unified school districts in Alabama for both the pre-school population (ages 0 to 4) and the school-age population (ages 5 to 17).

In the previous section, the importance of the population ages 0 to 4 was discussed in the context of school systems. The number of young children in a community has several important ramifications. The number of young children is often used to forecast future school enrollment, which has implications for hiring staff, building facilities, and establishing curriculum. A number of federal programs designed to aid young children provide funding based on the number of young children in a community. Table 5d5a above shows data for four such programs. These federal programs provided $341 million for young children in Alabama in Fiscal Year 2016 (above)

In addition to federal programs, many states and localities provide funds to help young children and their families. The number of preschool children in a community drives the need for childcare as well as things like playgrounds. Young children are one of the most vulnerable populations in Alabama. The poverty for children ages 0 to 4 in Alabama, based on the 2019 American Community Survey, was 24 percent compared to 20 percent for children ages 5 to 17, 15 percent for working age adults (ages 18 to 65), and 11 percent for seniors (ages 65 plus). In other words, the poverty rate for young children (ages 0 to 4) is more than twice that of seniors.

**Table 3c5**

| Poverty Rate by Age in Alabama: 2019  (2-25-2021) | |
|---|---|
| | Percent in Poverty |
| Age 0 to 4 (Preschool Population) | 24 |
| Age 5 to 17 (School-Ages Population | 20 |
| Ae 18 to 64 ( Working Age adults ) Working age adults | 15 |
| Ages 65 plus (Seniors) | 11 |
| Source: U.S. Census Bureau, American Community Survey, 2019 Table ID S 1701 | |

For Black and Hispanic young children, the poverty rates are even higher. Therefore, inaccurate data for young children can have important public policy implications and result in misappropriation of public funds and resources.

**Case 9: Implications of DP on Census Tracts and Counties for Preschoolers**

On average, the application of differential privacy changed the number of young children (ages 0 to 4) in the census tracts in Alabama by 41. That is roughly the size of two preschool classes. The average absolute percent error for the 1,174 tracts in Alabama for ages 0 to 4 was 19.3 percent. For agencies trying to decide the need for preschool facilities, an error of this magnitude could be very problematic. Building two extra preschool classrooms when they are not needed would be problematic. On the other hand, if the number of young children who show up for preschool is much larger than anticipated based on the data, it will result in overcrowded classrooms, inappropriate student/teacher ratios,  and other complications.

**Table 3c6**

| Summary Statistics for Application of Differential Privacy for Population Ages 0 to 4 for 1,174 Census Tracts in Alabama (2-28-2021) | |
|---|---|
| | |
| Mean Absolute Numerical Error* | 41 |
| Mean Absolute Percent Error* | 19.1 |
| Percent of Places with Errors of 10 percent or more (# =771) | 66 |
| Percent of Places with Errors of 5 percent or more (# = 962) | 82 |
| Source; Analysis of Census Bureau data released May 27, 2020 | |
| * Error is defined here as the difference between the data as reported by the Census respondents and the data after the application of DP. | |
| Seven Census tracts were not included in the analysis because they had zero populaiton. | |

There are some census tracts where the problem was particularly acute. In census tract 55.04, the 2010 Census reported 56 children ages 0 to 4 based on respondents' input, but after the application of differential privacy, the number was changed to 137. In census tract 7.02, the 2010 Census reported 105 children ages 0 to 4 based on respondents' input, but after the application of differential privacy, the number was changed to 188. There are many other examples like this. There were 33 census tracts where the number of children ages 0 to 4 reported after application of differential privacy was more than 100 children different than the number reported in the Census. It is not difficult to imagine how this misinformation could be problematic for someone trying to design services for preschoolers.

When differential privacy is applied to the data from the 2010 Census, the number of young children (ages 0-4) is changed significantly in many counties in Alabama. Of the 67 counties in Alabama, there were 16 counties where the number of young children was altered by more than 100 after differential privacy was applied.

Some of the distortions were extreme. For example, the 2010 Census reported there were 2,385 children ages 0 to 4 in Escambia County, but after differential privacy was applied, that number was changed to 2,044. The difference is 341. This amounts to roughly the number of young children there would be in 20 preschool classes. Another example is Clarke County. In Clarke County, the 2010 Census reported that there were 1,468 young children in Clarke County, but after differential privacy was applied that number was changed to 1,256. This amounts to a difference of 212, which is the equivalent of about 12 preschool classes.

**Case 10: Unrealistic Sex Ratios for Young Children**

The sex ratio (number of males divided by the number of females, times 100) is one the most fundamental demographic measures available. Especially for young children, the number of males should generally be nearly equal to the number of females. If the numbers of young males and females are substantially different, it begs an explanation. If there is not a reasonable explanation, it suggests the data are erroneous. If there are large numbers of geographic units where the number of males is much larger or much smaller than the number of females, it is highly improbable.

Sex ratios of young children in census tracts were examined. The table below shows that, before differential privacy was applied to the 2020 Census data, there were no census tracts where the number of males was more than 100 more or more than 100 less than the number of young females. On the other hand, the table below shows that there were 67 tracts where the number of males was more than 100 higher than the number of females, and 53 census tracts where the number of males was 100 less than females after DP had been applied to the 2010 Census data.

**Table 3c7**

| Sex Ratios in 2010 Census Tracts in Alabama for Ages 0 to 4 With and Without Differential Privacy (2-28-2021) | | |
|---|---|---|
| | Number of Tracts where there were at least 100 more males than females | Number of Tracts where there were at least 100 fewer males than females |
| 2010 Census With Differential Privacy | 69 | 53 |
| 2010 Census Without Differential Privacy | 0 | 0 |
| Source: Analysis of file released by the Census Bureau in May 2020 | | |

Some of the situations are extreme. For example, after differential privacy had been applied to 2010 Census Data, Tract 27 had 57 males ages 0 to 4 and 14 females ages 0 to 4. Also, tract 401.05 had 73 males ages 0 to 4 and 28 females ages 0 to 4.

This indicates the application of differential privacy converted mostly reasonable statistics into a large number of statistics that were not reasonable.

**Analysis 3c3: Impact on the 116th US Congressional Districts**

The data tables provided by IPUMS for the 116th Congressional districts are for the data in the pre-2010 Congressional geography. So, we undertook the exercise of assigning IPUMS block data to Alabama's 116th Congressional districts and summarized to reflect Alabama's data post-redistricting.

In this analysis and subsequent analyses, I use thematic shading to highlight significant values and differences. Cells highlighted in green illustrate large values and positive differences. Cells highlighted in red illustrate small values and negative differences.

**Figure 3c3 DP Population, SF Population and Difference by 116th Congressional Districts[11]**

| DP Data | Total Pop | Hispanic Pop | WNH Pop | BNH Pop | ONH Pop |
|---|---|---|---|---|---|
| 1 | 682,747 | 19,114 | 449,222 | 188,251 | 26,160 |
| 2 | 682,791 | 24,486 | 437,298 | 200,530 | 20,477 |
| 3 | 682,844 | 17,959 | 474,706 | 170,881 | 19,298 |
| 4 | 682,820 | 39,219 | 579,848 | 45,689 | 18,064 |
| 5 | 682,820 | 32,630 | 506,301 | 114,680 | 29,209 |
| 6 | 682,688 | 33,215 | 537,604 | 92,201 | 19,668 |
| 7 | 683,026 | 19,180 | 219,557 | 432,227 | 12,062 |
| Grand Total | 4,779,736 | 185,803 | 3,204,536 | 1,244,459 | 144,938 |

| SF Data | Total Pop | Hispanic Pop | WNH Pop | BNH Pop | ONH Pop |
|---|---|---|---|---|---|
| 1 | 682,820 | 19,087 | 449,560 | 187,883 | 26,290 |
| 2 | 682,820 | 24,612 | 437,289 | 200,187 | 20,732 |
| 3 | 682,819 | 17,958 | 474,877 | 170,713 | 19,271 |
| 4 | 682,819 | 38,949 | 579,614 | 46,166 | 18,090 |
| 5 | 682,819 | 32,562 | 506,130 | 114,885 | 29,242 |
| 6 | 682,819 | 33,345 | 537,197 | 92,020 | 20,257 |
| 7 | 682,820 | 19,089 | 219,735 | 432,583 | 11,413 |
| Grand Total | 4,779,736 | 185,602 | 3,204,402 | 1,244,437 | 145,295 |

| Difference | Total Pop | Hispanic Pop | WNH Pop | BNH Pop | ONH Pop |
|---|---|---|---|---|---|
| 1 | -73 | 27 | -338 | 368 | -130 |
| 2 | -29 | -126 | 9 | 343 | -255 |
| 3 | 25 | 1 | -171 | 168 | 27 |
| 4 | 1 | 270 | 234 | -477 | -26 |
| 5 | 1 | 68 | 171 | -205 | -33 |
| 6 | -131 | -130 | 407 | 181 | -589 |
| 7 | 206 | 91 | -178 | -356 | 649 |
| Grand Total | 0 | 201 | 134 | 22 | -357 |

These differences are larger than those that have resulted in at least one federal court striking down congressional redistricting plans in the past[12].

---

[11] Hispanic Pop: population includes all races, WNH Pop: White, non-Hispanic population, BNH Pop: Black, non-Hispanic population, ONH: Other non-Hispanic population, including American Indian and Alaskan Native, Asian, Native Hawaiian and Pacific Islander, Two + and Other races

[12] Veith v. Pennsylvania 195 F. Supp. 2D 672 (M.D.Pa. 2002)

**Analysis 3c4: Impact on the Alabama State Legislative Districts**

The data tables provided by IPUMS for the 105 Alabama State Legislative districts are for the data in the pre-2010 Congressional geography.  So, we undertook the exercise of assigning IPUMS block data to Alabama State Legislative districts and summarized to reflect Alabama's data post-redistricting.

**Table 3c4a: State Legislative Districts Difference between SF Pop and DP Pop by Race / Ethnicity**

| District | Total Pop | Hispanic Pop | WNH Pop | BNH Pop | ONH Pop |
|---|---|---|---|---|---|
| 1 | -8 | 37 | 202 | 197 | -40 |
| 2 | -9 | -2 | 121 | -78 | -50 |
| 3 | -47 | -11 | 31 | -3 | -64 |
| 4 | 318 | 15 | 224 | 136 | -57 |
| 5 | -259 | -67 | -152 | 41 | -81 |
| 6 | -20 | 118 | 110 | -82 | -166 |
| 7 | -95 | 92 | -171 | 2 | -18 |
| 8 | 0 | -11 | 125 | -251 | 137 |
| 9 | -106 | 53 | -17 | 11 | -153 |
| 10 | 2 | -30 | -98 | 259 | -129 |
| 11 | 126 | 134 | 63 | -32 | -39 |
| 12 | 46 | 41 | -24 | -2 | 31 |
| 13 | -5 | 26 | 182 | -73 | -140 |
| 14 | 17 | 48 | -48 | 30 | -13 |
| 15 | 129 | 28 | 108 | 71 | -78 |
| 16 | 25 | 14 | -95 | 115 | -9 |
| 17 | 1 | 5 | -25 | -84 | 105 |
| 18 | 20 | 49 | 20 | -175 | 126 |
| 19 | 37 | -50 | 54 | -37 | 70 |
| 20 | -19 | -88 | 131 | 23 | -85 |
| 21 | -24 | 119 | 224 | 10 | 71 |
| 22 | 137 | 54 | 109 | 30 | -56 |
| 23 | -47 | -3 | -38 | -110 | 104 |
| 24 | -72 | 29 | -22 | -94 | 15 |
| 25 | -6 | -53 | -21 | -162 | 230 |
| 26 | -58 | -42 | -134 | -97 | 215 |
| 27 | -134 | 147 | 95 | -77 | -5 |
| 28 | 161 | 4 | 312 | -225 | 70 |
| 29 | 56 | 59 | -120 | 148 | -31 |
| 30 | -184 | -21 | -170 | 144 | -137 |
| 31 | -40 | 27 | 31 | -137 | 39 |
| 32 | -42 | -26 | 105 | -269 | 148 |
| 33 | -62 | 17 | -152 | 45 | 28 |
| 34 | 36 | 62 | 28 | 5 | -59 |
| 35 | 68 | -17 | -62 | 177 | -30 |
| 36 | 88 | 153 | -66 | 51 | -50 |
| 37 | -11 | -95 | 108 | -20 | -4 |
| 38 | 74 | 15 | 79 | -39 | 19 |
| 39 | 27 | -60 | 39 | 39 | 9 |
| 40 | 0 | -4 | 76 | -41 | -31 |
| 41 | -6 | -8 | 27 | -46 | 21 |
| 42 | -132 | 50 | -340 | 201 | -43 |
| 43 | -22 | -122 | 117 | 27 | -44 |
| 44 | -36 | -43 | 100 | -121 | 28 |
| 45 | -61 | 48 | -5 | -108 | 4 |
| 46 | 80 | 5 | 74 | 195 | -194 |
| 47 | 32 | -4 | -24 | 19 | 41 |
| 48 | -33 | 2 | 114 | -102 | -47 |
| 49 | -239 | 49 | -84 | -105 | -99 |

Source: 20201116 PPMF

Thomas M. Bryan                     3/10/2021                     P. 22

**Table 3c4a: State Legislative Districts Difference between SF Pop and DP Pop by Race / Ethnicity Cont.**

| District | Total Pop | Hispanic Pop | WNH Pop | BNH Pop | ONH Pop |
|---|---|---|---|---|---|
| 50 | 2 | -62 | 27 | 79 | -42 |
| 51 | 79 | -136 | 137 | 146 | -68 |
| 52 | -25 | 16 | 29 | -57 | -13 |
| 53 | 13 | -76 | 98 | -136 | 127 |
| 54 | 55 | -81 | 18 | -4 | 122 |
| 55 | 68 | -53 | -175 | 144 | 152 |
| 56 | -149 | 49 | -102 | 95 | -1 |
| 57 | 8 | 45 | 51 | -67 | -21 |
| 58 | 1 | 95 | -350 | 204 | 52 |
| 59 | -52 | 91 | 48 | -215 | 24 |
| 60 | -47 | -17 | 40 | -127 | 57 |
| 61 | -21 | -62 | 115 | -85 | 11 |
| 62 | -15 | -126 | 54 | 11 | 46 |
| 63 | 59 | 129 | 85 | -121 | -34 |
| 64 | -43 | 112 | -173 | -3 | 21 |
| 65 | 105 | 93 | -156 | 216 | -48 |
| 66 | -43 | -16 | -136 | 97 | 12 |
| 67 | -17 | -34 | -84 | 111 | -10 |
| 68 | -166 | -5 | 241 | -399 | -3 |
| 69 | -11 | -11 | 10 | 73 | -83 |
| 70 | -64 | -32 | -25 | 70 | -77 |
| 71 | 1 | -7 | 95 | -48 | -39 |
| 72 | 33 | 28 | -17 | 71 | -49 |
| 73 | 242 | 41 | 5 | 246 | -50 |
| 74 | 8 | 70 | 12 | 19 | -93 |
| 75 | 48 | -37 | -37 | 176 | -54 |
| 76 | 65 | -66 | 68 | 72 | -9 |
| 77 | 13 | 145 | 30 | 93 | 35 |
| 78 | -126 | -7 | -84 | -201 | 166 |
| 79 | -88 | 64 | 141 | 175 | -186 |
| 80 | -18 | -80 | 30 | -28 | 60 |
| 81 | 177 | 95 | 12 | 4 | 66 |
| 82 | -16 | 120 | 8 | -266 | 122 |
| 83 | -18 | -129 | 155 | -9 | -35 |
| 84 | 86 | 58 | -56 | 82 | 2 |
| 85 | -19 | -15 | 36 | -107 | 67 |
| 86 | 10 | -45 | -151 | 193 | 13 |
| 87 | -12 | 0 | 220 | -150 | -82 |
| 88 | 46 | 69 | 17 | 173 | 133 |
| 89 | -91 | 55 | 20 | -198 | 32 |
| 90 | 33 | 26 | -19 | 51 | -25 |
| 91 | -27 | -37 | -49 | 156 | -97 |
| 92 | 43 | 33 | 2 | 50 | -42 |
| 93 | 123 | -79 | -6 | 279 | -71 |
| 94 | 28 | -213 | 270 | -20 | -9 |
| 95 | -6 | 114 | -239 | 143 | -24 |
| 96 | 109 | -14 | -149 | 222 | 50 |
| 97 | -39 | -53 | 156 | -339 | 197 |
| 98 | -14 | -83 | -26 | 29 | 66 |
| 99 | 4 | 139 | -183 | 25 | 23 |
| 100 | 30 | -34 | -13 | -43 | 120 |
| 101 | -52 | 39 | 29 | 79 | -199 |
| 102 | -49 | -27 | 36 | 58 | -116 |
| 103 | 41 | -65 | -84 | 26 | 164 |
| 104 | -88 | 8 | 31 | -11 | -116 |
| 105 | 83 | 10 | 115 | 118 | -160 |
| Grand Total | 0 | 201 | 134 | 22 | -357 |

Source: 20201116 PPMF

**Table 3c4b: State Legislative Districts DP and SF VAP, DP and SF BVAP and %BVAP***

| SLDL | Total VAP DP | Total VAP SF | BNH VAP DP | BNH VAP SF | DP % BNH | SF % BNH |
|------|--------------|--------------|------------|------------|----------|----------|
| 1 | 36,191 | 35,951 | 5,234 | 4,990 | 14.5% | 13.9% |
| 2 | 35,429 | 35,725 | 1,238 | 1,375 | 3.5% | 3.8% |
| 3 | 35,845 | 35,849 | 8,205 | 8,171 | 22.9% | 22.8% |
| 4 | 34,252 | 34,151 | 4,194 | 4,138 | 12.2% | 12.1% |
| 5 | 34,407 | 34,435 | 4,355 | 4,209 | 12.7% | 12.2% |
| 6 | 35,108 | 35,051 | 6,295 | 6,660 | 17.9% | 19.0% |
| 7 | 34,438 | 34,547 | 1,350 | 1,349 | 3.9% | 3.9% |
| 8 | 34,289 | 34,257 | 6,164 | 6,331 | 18.0% | 18.5% |
| 9 | 34,194 | 34,332 | 629 | 632 | 1.8% | 1.8% |
| 10 | 34,739 | 34,750 | 5,683 | 5,491 | 16.4% | 15.8% |
| 11 | 34,327 | 34,144 | 81 | 148 | 0.2% | 0.4% |
| 12 | 34,722 | 34,821 | 562 | 509 | 1.6% | 1.5% |
| 13 | 34,843 | 34,775 | 1,906 | 2,040 | 5.5% | 5.9% |
| 14 | 35,007 | 35,083 | 847 | 841 | 2.4% | 2.4% |
| 15 | 33,496 | 33,420 | 3,882 | 3,920 | 11.6% | 11.7% |
| 16 | 35,164 | 35,178 | 4,103 | 4,108 | 11.7% | 11.7% |
| 17 | 35,152 | 35,160 | 1,358 | 1,435 | 3.9% | 4.1% |
| 18 | 34,843 | 34,775 | 1,882 | 1,919 | 5.4% | 5.5% |
| **19** | **34,527** | **34,604** | **19,647** | **19,787** | **56.9%** | **57.2%** |
| 20 | 35,430 | 35,371 | 1,406 | 1,265 | 4.0% | 3.6% |
| 21 | 35,255 | 35,261 | 3,084 | 3,090 | 8.7% | 8.8% |
| 22 | 34,758 | 34,827 | 2,042 | 1,923 | 5.9% | 5.5% |
| 23 | 35,595 | 35,625 | 1,244 | 1,308 | 3.5% | 3.7% |
| 24 | 34,457 | 34,430 | 416 | 485 | 1.2% | 1.4% |
| 25 | 32,222 | 32,170 | 4,791 | 5,097 | 14.9% | 15.8% |
| 26 | 33,112 | 33,195 | 355 | 459 | 1.1% | 1.4% |
| 27 | 34,997 | 35,226 | 466 | 518 | 1.3% | 1.5% |
| 28 | 35,631 | 35,588 | 9,827 | 9,929 | 27.6% | 27.9% |
| 29 | 34,716 | 34,708 | 976 | 1,051 | 2.8% | 3.0% |
| 30 | 34,602 | 34,651 | 1,495 | 1,386 | 4.3% | 4.0% |
| 31 | 35,481 | 35,541 | 5,862 | 5,982 | 16.5% | 16.8% |
| **32** | **35,514** | **35,496** | **17,842** | **17,750** | **50.2%** | **50.0%** |
| 33 | 35,029 | 34,950 | 8,727 | 8,756 | 24.9% | 25.1% |
| 34 | 34,268 | 34,231 | 537 | 537 | 1.6% | 1.6% |
| 35 | **34,864** | **34,868** | 5,105 | 5,048 | 14.6% | 14.5% |
| 36 | 35,495 | 35,584 | 4,425 | 4,621 | 12.5% | 13.0% |
| 37 | 35,564 | 35,483 | 9,152 | 9,189 | 25.7% | 25.9% |
| 38 | 34,595 | 34,584 | 6,869 | 6,953 | 19.9% | 20.1% |
| 39 | 35,561 | 35,635 | 1,811 | 1,791 | 5.1% | 5.0% |
| 40 | 35,695 | 35,507 | 4,523 | 4,673 | 12.7% | 13.2% |
| 41 | 33,850 | 33,802 | 3,975 | 3,894 | 11.7% | 11.5% |
| 42 | 34,184 | 34,156 | 4,281 | 4,100 | 12.5% | 12.0% |
| 43 | 34,074 | 34,167 | 2,234 | 2,196 | 6.6% | 6.4% |
| 44 | 33,870 | 33,824 | 3,873 | 3,823 | 11.4% | 11.3% |
| 45 | 34,324 | 34,370 | 5,059 | 5,225 | 14.7% | 15.2% |
| 46 | 34,280 | 34,103 | 2,531 | 2,520 | 7.4% | 7.4% |
| 47 | 34,913 | 34,968 | 5,970 | 6,161 | 17.1% | 17.6% |
| 48 | 34,954 | 34,971 | 1,988 | 2,008 | 5.7% | 5.7% |
| 49 | 33,460 | 33,728 | 4,088 | 4,301 | 12.2% | 12.8% |
| 50 | 34,982 | 34,949 | 3,084 | 2,983 | 8.8% | 8.5% |
| 51 | 34,795 | 34,669 | 1,831 | 1,872 | 5.3% | 5.4% |
| **52** | **36,021** | **35,997** | **21,398** | **21,262** | **59.4%** | **59.1%** |
| **53** | **35,882** | **35,861** | **18,146** | **17,966** | **50.6%** | **50.1%** |

Source: 20201116 PPMF, **\* Bolded Districts are Black Majority-Minority Districts**

**Table 3c4b: State Legislative Districts DP and SF VAP, DP and SF BVAP and %BVAP\* Continued**

| SLDL | Total VAP DP | Total VAP SF | BNH VAP DP | BNH VAP SF | DP % BNH | SF % BNH |
|------|-------------|-------------|-----------|-----------|---------|---------|
| 54 | 35,877 | 35,922 | 20,205 | 20,393 | 56.3% | 56.8% |
| 55 | 35,716 | 35,844 | 26,271 | 26,125 | 73.6% | 72.9% |
| 56 | 33,999 | 34,006 | 21,101 | 20,878 | 62.1% | 61.4% |
| 57 | 34,437 | 34,552 | 19,691 | 19,770 | 57.2% | 57.2% |
| 58 | 32,951 | 32,947 | 19,782 | 19,752 | 60.0% | 60.0% |
| 59 | 32,817 | 32,765 | 24,282 | 24,221 | 74.0% | 73.9% |
| 60 | 35,563 | 35,616 | 23,179 | 23,316 | 65.2% | 65.5% |
| 61 | 34,810 | 34,846 | 8,244 | 8,139 | 23.7% | 23.4% |
| 62 | 34,028 | 34,089 | 6,044 | 5,813 | 17.8% | 17.1% |
| 63 | 39,623 | 39,599 | 4,797 | 5,031 | 12.1% | 12.7% |
| 64 | 34,413 | 34,366 | 5,089 | 5,103 | 14.8% | 14.8% |
| 65 | 34,489 | 34,355 | 11,713 | 11,613 | 34.0% | 33.8% |
| 66 | 35,403 | 35,447 | 8,755 | 8,669 | 24.7% | 24.5% |
| 67 | 33,198 | 33,259 | 21,853 | 21,668 | 65.8% | 65.1% |
| 68 | 34,003 | 34,105 | 17,121 | 17,278 | 50.4% | 50.7% |
| 69 | 34,638 | 34,576 | 21,464 | 21,188 | 62.0% | 61.3% |
| 70 | 35,683 | 35,788 | 18,624 | 18,702 | 52.2% | 52.3% |
| 71 | 34,599 | 34,436 | 19,960 | 19,949 | 57.7% | 57.9% |
| 72 | 34,190 | 34,176 | 21,258 | 21,086 | 62.2% | 61.7% |
| 73 | 33,495 | 33,133 | 3,492 | 3,214 | 10.4% | 9.7% |
| 74 | 35,918 | 35,887 | 8,371 | 8,423 | 23.3% | 23.5% |
| 75 | 34,918 | 34,878 | 8,810 | 8,739 | 25.2% | 25.1% |
| 76 | 33,358 | 33,396 | 25,385 | 25,639 | 76.1% | 76.8% |
| 77 | 35,222 | 35,198 | 20,573 | 20,486 | 58.4% | 58.2% |
| 78 | 33,663 | 33,695 | 21,812 | 21,674 | 64.8% | 64.3% |
| 79 | 37,893 | 37,981 | 5,675 | 5,262 | 15.0% | 13.9% |
| 80 | 34,186 | 34,048 | 5,970 | 5,992 | 17.5% | 17.6% |
| 81 | 35,995 | 35,958 | 7,272 | 7,389 | 20.2% | 20.5% |
| 82 | 36,248 | 36,488 | 19,640 | 19,962 | 54.2% | 54.7% |
| 83 | 33,707 | 33,681 | 17,383 | 17,539 | 51.6% | 52.1% |
| 84 | 35,643 | 35,558 | 18,334 | 18,070 | 51.4% | 50.8% |
| 85 | 34,617 | 34,625 | 14,511 | 14,560 | 41.9% | 42.1% |
| 86 | 34,898 | 34,967 | 5,782 | 5,746 | 16.6% | 16.4% |
| 87 | 35,215 | 35,155 | 2,939 | 2,980 | 8.3% | 8.5% |
| 88 | 33,404 | 33,512 | 5,477 | 5,899 | 16.4% | 17.6% |
| 89 | 35,254 | 35,283 | 10,821 | 10,739 | 30.7% | 30.4% |
| 90 | 35,342 | 35,286 | 12,112 | 11,908 | 34.3% | 33.7% |
| 91 | 34,034 | 34,066 | 5,089 | 5,071 | 15.0% | 14.9% |
| 92 | 34,962 | 34,899 | 4,040 | 4,048 | 11.6% | 11.6% |
| 93 | 34,805 | 34,765 | 5,561 | 5,386 | 16.0% | 15.5% |
| 94 | 35,074 | 35,076 | 2,452 | 2,612 | 7.0% | 7.4% |
| 95 | 37,081 | 37,023 | 1,557 | 1,532 | 4.2% | 4.1% |
| 96 | 34,250 | 34,301 | 3,969 | 3,768 | 11.6% | 11.0% |
| 97 | 33,792 | 33,762 | 18,563 | 18,683 | 54.9% | 55.3% |
| 98 | 33,998 | 33,888 | 18,921 | 18,863 | 55.7% | 55.7% |
| 99 | 33,832 | 33,812 | 20,345 | 20,211 | 60.1% | 59.8% |
| 100 | 33,234 | 33,064 | 4,702 | 4,716 | 14.1% | 14.3% |
| 101 | 35,634 | 35,854 | 5,904 | 5,876 | 16.6% | 16.4% |
| 102 | 33,010 | 33,320 | 3,074 | 3,158 | 9.3% | 9.5% |
| 103 | 32,747 | 32,667 | 18,773 | 18,898 | 57.3% | 57.9% |
| 104 | 34,167 | 34,257 | 4,470 | 4,588 | 13.1% | 13.4% |
| 105 | 33,688 | 33,596 | 4,110 | 3,778 | 12.2% | 11.2% |

Source: 20201116 PPMF, **\* Bolded Districts are Black Majority-Minority Districts**

**Table 3c4c: State Legislative Districts # and % Difference in BVAP Between SF and DP\***

| SLDL | BNH VAP DP | BNH VAP SF | BNH VAP # Diff | BNH VAP % Diff |
|---|---|---|---|---|
| 1 | 5,234 | 4,990 | 244 | 4.9% |
| 2 | 1,238 | 1,375 | -137 | -10.0% |
| 3 | 8,205 | 8,171 | 34 | 0.4% |
| 4 | 4,194 | 4,138 | 56 | 1.4% |
| 5 | 4,355 | 4,209 | 146 | 3.5% |
| 6 | 6,295 | 6,660 | -365 | -5.5% |
| 7 | 1,350 | 1,349 | 1 | 0.1% |
| 8 | 6,164 | 6,331 | -167 | -2.6% |
| 9 | 629 | 632 | -3 | -0.5% |
| 10 | 5,683 | 5,491 | 192 | 3.5% |
| 11 | 81 | 148 | -67 | -45.3% |
| 12 | 562 | 509 | 53 | 10.4% |
| 13 | 1,906 | 2,040 | -134 | -6.6% |
| 14 | 847 | 841 | 6 | 0.7% |
| 15 | 3,882 | 3,920 | -38 | -1.0% |
| 16 | 4,103 | 4,108 | -5 | -0.1% |
| 17 | 1,358 | 1,435 | -77 | -5.4% |
| 18 | 1,882 | 1,919 | -37 | -1.9% |
| 19 | 19,647 | 19,787 | -140 | -0.7% |
| 20 | 1,406 | 1,265 | 141 | 11.1% |
| 21 | 3,084 | 3,090 | -6 | -0.2% |
| 22 | 2,042 | 1,923 | 119 | 6.2% |
| 23 | 1,244 | 1,308 | -64 | -4.9% |
| 24 | 416 | 485 | -69 | -14.2% |
| 25 | 4,791 | 5,097 | -306 | -6.0% |
| 26 | 355 | 459 | -104 | -22.7% |
| 27 | 466 | 518 | -52 | -10.0% |
| 28 | 9,827 | 9,929 | -102 | -1.0% |
| 29 | 976 | 1,051 | -75 | -7.1% |
| 30 | 1,495 | 1,386 | 109 | 7.9% |
| 31 | 5,862 | 5,982 | -120 | -2.0% |
| 32 | 17,842 | 17,750 | 92 | 0.5% |
| 33 | 8,727 | 8,756 | -29 | -0.3% |
| 34 | 537 | 537 | 0 | 0.0% |
| 35 | 5,105 | 5,048 | 57 | 1.1% |
| 36 | 4,425 | 4,621 | -196 | -4.2% |
| 37 | 9,152 | 9,189 | -37 | -0.4% |
| 38 | 6,869 | 6,953 | -84 | -1.2% |
| 39 | 1,811 | 1,791 | 20 | 1.1% |
| 40 | 4,523 | 4,673 | -150 | -3.2% |
| 41 | 3,975 | 3,894 | 81 | 2.1% |
| 42 | 4,281 | 4,100 | 181 | 4.4% |
| 43 | 2,234 | 2,196 | 38 | 1.7% |
| 44 | 3,873 | 3,823 | 50 | 1.3% |
| 45 | 5,059 | 5,225 | -166 | -3.2% |
| 46 | 2,531 | 2,520 | 11 | 0.4% |
| 47 | 5,970 | 6,161 | -191 | -3.1% |
| 48 | 1,988 | 2,008 | -20 | -1.0% |
| 49 | 4,088 | 4,301 | -213 | -5.0% |
| 50 | 3,084 | 2,983 | 101 | 3.4% |
| 51 | 1,831 | 1,872 | -41 | -2.2% |
| 52 | 21,398 | 21,262 | 136 | 0.6% |
| 53 | 18,146 | 17,966 | 180 | 1.0% |

Source: 20201116 PPMF, **\* Bolded Districts are Black Majority-Minority Districts**

**Table 3c4c: State Legislative Districts # and % Difference in BVAP Between SF and DP\* Continued**

| SLDL | BNH VAP DP | BNH VAP SF | BNH VAP # Diff | BNH VAP % Diff |
|---|---|---|---|---|
| 54 | 20,205 | 20,393 | -188 | -0.9% |
| 55 | 26,271 | 26,125 | 146 | 0.6% |
| 56 | 21,101 | 20,878 | 223 | 1.1% |
| 57 | 19,691 | 19,770 | -79 | -0.4% |
| 58 | 19,782 | 19,752 | 30 | 0.2% |
| 59 | 24,282 | 24,221 | 61 | 0.3% |
| 60 | 23,179 | 23,316 | -137 | -0.6% |
| 61 | 8,244 | 8,139 | 105 | 1.3% |
| 62 | 6,044 | 5,813 | 231 | 4.0% |
| 63 | 4,797 | 5,031 | -234 | -4.7% |
| 64 | 5,089 | 5,103 | -14 | -0.3% |
| 65 | 11,713 | 11,613 | 100 | 0.9% |
| 66 | 8,755 | 8,669 | 86 | 1.0% |
| 67 | 21,853 | 21,668 | 185 | 0.9% |
| 68 | 17,121 | 17,278 | -157 | -0.9% |
| 69 | 21,464 | 21,188 | 276 | 1.3% |
| 70 | 18,624 | 18,702 | -78 | -0.4% |
| 71 | 19,960 | 19,949 | 11 | 0.1% |
| 72 | 21,258 | 21,086 | 172 | 0.8% |
| 73 | 3,492 | 3,214 | 278 | 8.6% |
| 74 | 8,371 | 8,423 | -52 | -0.6% |
| 75 | 8,810 | 8,739 | 71 | 0.8% |
| 76 | 25,385 | 25,639 | -254 | -1.0% |
| 77 | 20,573 | 20,486 | 87 | 0.4% |
| 78 | 21,812 | 21,674 | 138 | 0.6% |
| 79 | 5,675 | 5,262 | 413 | 7.8% |
| 80 | 5,970 | 5,992 | -22 | -0.4% |
| 81 | 7,272 | 7,389 | -117 | -1.6% |
| 82 | 19,640 | 19,962 | -322 | -1.6% |
| 83 | 17,383 | 17,539 | -156 | -0.9% |
| 84 | 18,334 | 18,070 | 264 | 1.5% |
| 85 | 14,511 | 14,560 | -49 | -0.3% |
| 86 | 5,782 | 5,746 | 36 | 0.6% |
| 87 | 2,939 | 2,980 | -41 | -1.4% |
| 88 | 5,477 | 5,899 | -422 | -7.2% |
| 89 | 10,821 | 10,739 | 82 | 0.8% |
| 90 | 12,112 | 11,908 | 204 | 1.7% |
| 91 | 5,089 | 5,071 | 18 | 0.4% |
| 92 | 4,040 | 4,048 | -8 | -0.2% |
| 93 | 5,561 | 5,386 | 175 | 3.2% |
| 94 | 2,452 | 2,612 | -160 | -6.1% |
| 95 | 1,557 | 1,532 | 25 | 1.6% |
| 96 | 3,969 | 3,768 | 201 | 5.3% |
| 97 | 18,563 | 18,683 | -120 | -0.6% |
| 98 | 18,921 | 18,863 | 58 | 0.3% |
| 99 | 20,345 | 20,211 | 134 | 0.7% |
| 100 | 4,702 | 4,716 | -14 | -0.3% |
| 101 | 5,904 | 5,876 | 28 | 0.5% |
| 102 | 3,074 | 3,158 | -84 | -2.7% |
| 103 | 18,773 | 18,898 | -125 | -0.7% |
| 104 | 4,470 | 4,588 | -118 | -2.6% |
| 105 | 4,110 | 3,778 | 332 | 8.8% |
| Grand Tota | 902,350 | 902,278 | 72 | 0.0% |

Source: 20201116 PPMF, **\* Bolded Districts are Black Majority-Minority Districts**

Please note: these figures above differ from those in State Legislative Issues (below). The data in the figures above are for the legislative underlined boundaries as they existed after the 2010 based redistricting. The data in State Legislative Issues (below) are for the legislative underlined boundaries as they existed prior to the 2010 Census. We use this latter definition because these are the data exactly as were published by IPUMS.

### 3c5: Summary Statistics and Analysis at Different levels of Geography

Each layer of geography we examine has a unique importance. With high levels of geography such as Congressional Districts, we find numeric and percent differences that are small by demographic standards but hold *significant* importance in redistricting where precision to the individual is required by law. At other levels of geography, such as places, unified school districts, and legislative districts, there are geographies that have very small numeric errors, but large percent errors (typically in small places). And there are other geographies that have very small percent errors, but large numeric errors (typically in large places). In order to quickly identify geographies that had the most significant errors, we deployed a statistical technique called "loss functions." In mathematical optimization and decision theory, a loss function or cost function is a function that maps an event or values of one or more variables onto a real number intuitively representing some "cost" associated with the event. (Hough and Swanson, 2006).

The analytic tables illustrate geographies with the largest differences for VAP and NVA. These tables are followed in turn with scatterplot figures showing the change in percent share of NVA from the SF to DP files. Non-Voting Age (NVA) children represent some share of the total population at every level of geography—sometimes more, sometimes less, but usually around 20% total. In theory, if children make up a share of the total in the SF data, it should be approximately the same in the DP data.

In the scatterplot below, the SF data are on the X axis, and the DP data are on the Y axis. The further the data are from the **orange, dotted line**, the greater the departure from the SF data. Exceptional cases of "0%" literally reflect NVA populations going from none to some, or some to none.

**Figure 3c2: Illustrative Example of Scatterplot of % NVA in SF and % NVA in DP**



 The orange dot representing data at position 1 are what we would expect. This shows that 50% of the population are children in the SF file (original census data shown on the X axis) and that 50% of the population are also 50% children in the DP file (shown on the Y axis). The further the blue data points are from the orange line, the greater the difference between the SF and DP % children values.

The orange dot representing data at position 2 is *not* what we would expect. This shows that 0% of the population are children in the SF file (original census data shown on the X axis) but are 100% of the population in the DP file (shown on the Y axis). This is practically implausible.

The orange dot representing data at position 3 is also *not* what we would expect. This shows that 100% of the population are children in the SF file (original census data shown on the X axis) but are 0% of the population in the DP file (shown on the Y axis). This is also practically implausible.

An important component of analyzing and interpreting the impact of DP is knowing the number of pieces of geography there are at each level (see Figure 5d4 below). Experience with the existing data tell us that geographic layers with more pieces and smaller pieces, such as Places, harbor more data issues than layers with fewer, larger pieces, such as Congressional Districts. In the following analysis, we examine the numeric and percent difference in VAP, then NVA side-by-side by race for counties, state legislative districts, Unified School Districts; and Alabama Places. This is followed by a series of detailed cases using census blocks

### Figure 3c5a: Number of Geographic Units in the US and Alabama

|                             | U.S.       | Alabama |
|-----------------------------|------------|---------|
| Counties                    | 3,142      | 67      |
| Congressional Districts     | 435        | 7       |
| State Legislative Districts |            | 105     |
| State Senate Districts      |            | 35      |
| Unified School Districts    | 10,914     | 134     |
| Places                      | 29,514     | 578     |
| Census Blocks               | 11,155,486 | 252,266 |

Based on data from 2010 Census Summary File

### County Issues

We proceed here with an analysis of differences at the county level. There is only one county with notable differences among Black / African American VAP and NVA – DeKalb. The Asian population has many more significant differences. In Tallapoosa County, all 63 NVA children from the SF file are removed, leaving no Asian children there. This happens to 17 other counties in Alabama as well and can be seen in Table 5d3. This difference can be compared with almost equal and dramatic increases of Asian children in other counties such as Franklin County. How would each county deal with the complete absence or introduction of a minority population erroneously? Similarly, in Monroe and Pickens Counties, how would they manage the reporting of numerous Hispanic children that don't actually exist? Would they be compelled to provide language programs and services, and be at risk of violating the law for not providing for a population that didn't actually exist?

| Black / African American | # Error VAP, NVA | % Error, VAP, NVA |
|--------------------------|------------------|-------------------|
| DeKalb                   | -122, +83        | -15%, +29%        |

| Asian             | # Error VAP, NVA | % Error, VAP, NVA |
|-------------------|------------------|-------------------|
| Autauga County    | +151,-126        | +44%, -98%        |
| Franklin County   | -36, +59         | -80%, +328%       |
| Lauderdale County | -100, +82        | -17%, +75%        |
| St. Clair County  | +44, -108        | +12%, -78%        |
| Tallapoosa County | +53, -63         | +40%, -100%       |

| Hispanic | # Error VAP, NVA | % Error, VAP, NVA |
|----------|------------------|-------------------|
| Monroe   | -74, +79         | -53%, +99%        |
| Pickens  | -87, +74         | -36%, +104%       |

In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5a: Asian Differences in NVA between SF and DP by Alabama County**



**Figure 3c5b: Hispanic Differences in NVA between SF and DP by Alabama County**



**State Legislative Issues**

We continue by assessing 105 state legislative districts. Please note: these figures differ from those in Figure 5d3. The data here are for the legislative boundaries as they existed prior to the 2010 Census. The data in Figure 5d3 are for the legislative boundaries as they existed after the 2010 Census redistricting. The districts in this analysis are what we refer to as being "off-spine." That is, the DP process does not make a direct explicit effort to control or manage data at this level of geography. Its results are a function of smaller geographies such as blocks that comprise it.

Differences in VAP and NVA by Legislative District and Race in Alabama (SF -- PL data).

For Black / African Americans, there are six districts with both significant numeric and percent differences, which would result in a *significant* change in demographic complexion in these areas.

| Black / African Americans | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| District 25 | -376, +199 | -5%, +7% |
| District 35 | +414, -73 | +8%, -4% |
| District 62 | +421, -451 | +5%, -12% |
| District 64 | -262, +440 | -3%, +18% |
| District 68 | -93, -533 | -1%, -8% |
| District 70 | -361, +287 | -2%, +4% |

For the Asian population, which is smaller than the Black / African American population, the numeric changes are small, but the percent changes are large. As with counties, there are whole districts where the Asian NVA children population are either wiped out (such as District 36, see figure 5d7) or appear out of nowhere. In some districts, the differences are compounding (both NVA and VAP gain or lose population); in others they are offsetting.

| Asian | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| District 19 | -27, +133 | -11%, +359% |
| District 32 | +48, +41 | +56%, +456% |
| District 36 | +67, -96 | +21%, -100% |
| District 61 | -112, +75 | -54%, +117% |
| District 88 | +141, -125 | +33%, -87% |
| District 102 | -31, +87 | -27%, +242% |

In cases such as District 36, the interpretation is that DP eliminated all 96 of the Asian NVA children, hence -100%.

For the Hispanic population, similar to the Black / African American population, there are districts with large, severe changes that fundamentally would change the demographic complexion of these districts.

| Hispanic | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| District 57 | -173, +160 | -28%, +50% |
| District 83 | +199, -205 | -19%, -39% |
| District 87 | +180, -192 | +19%, -31% |
| District 94 | +64, -239 | +4%, -28% |

In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5c: Black Differences in NVA between SF and DP by Alabama Legislative District**



**Figure 3c5d: Hispanic Differences in NVA between SF and DP by Alabama Legislative District**



In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5e: Asian Differences in NVA between SF and DP by Alabama Legislative District**



**Unified School District Issues**

There are 134 unified school districts in Alabama – slightly more than the number of legislative districts. There are also "off-spine" geography, subject to more variation in the analysis because no effort has been made to "balance" the size of these school district populations. They vary from small to very large.

As with legislative districts, the Black / African American population varies significantly with both large numeric and percent differences in districts such as Hoover, Mountain Brook City, and Talladega County.

| Black | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Hoover City | -225, +312 | -3%, +8% |
| Auburn City | +342, -179 | +5%, -8% |
| Mountain Brook City CSD | +70, +148 | +56%, +185% |
| Pike County SD | +123, -238 | +3%, -18% |
| Talladega County SD | -317, +173 | -3%, +5% |

As seen in other levels of geography, the relatively small Asian population is dramatically affected. In a pattern seen with other minority groups, the Asian NVA population is frequently "zeroed out".

| Asian | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Autauga County SD | +151, -126 | +44%, -98% |
| Bessemer County SD | +103, +16 | +240%, +160% |
| Fort Payne SD | -63, +61 | -83%, +156% |
| Jefferson CSD | -205, +172 | -17%, +54% |

For the Hispanic population, the errors are most numerous. It is difficult to imagine how a school district would manage providing (or not providing) services and support to hundreds of minority students that were reported to exist and didn't, or vice versa.

| Hispanic | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Athens SD | -137, +196 | -12%, +25% |
| Eufaula CSD | -115, +110 | -31%, +56% |
| Limestone SD | +140, -203 | +9%, -19% |
| Madison SD | -65, +274 | -3%, +21% |
| Midfield City CSD | -48, +61 | -87%, +277% |
| Monroe CSD | -74, +79 | -53%, +99% |
| Pickens CSD | -87, +74 | -36%, +104% |
| Vestavia CSD | +177, -154 | +34%, -49% |

In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5f: Black Differences in NVA between SF and DP by Alabama USD**



**Figure 3c5g: Hispanic Differences in NVA between SF and DP by Alabama USD**



In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5h: Asian Differences in NVA between SF and DP by Alabama USD**



## Place Issues

There are 578 incorporated and Census Designated Places in Alabama. Many of them are small, and differential privacy often has a big impact on the accuracy of data for small places. In the 2010 Census, 272 of the 578 had a population of less than 1,000 people, and 514 of the 578 had a population of less than 10,000 people.

Some of the changes based on application of differential privacy were large. For example, the 2010 Census reported a total population of 215 in Belk Town, but after differential privacy was applied, that number was changed to 153, which amounts to a 29 percent change. In Graysville City, the 2010 Census reported a population of 2,165, but after differential privacy was applied, the number was changed to 2,043, a loss of 122 people.

For large cities, an error of 122 people might not make much difference. But in smaller places, like most of those in Alabama, such a distortion can have a big impact. With numerous places, and the largest differentials in size of all the geographies we examine, places show the greatest errors.

Not surprisingly, the Black / African American population shows numerous significant errors. While some of the bases are small, the percent differences for places like Carlton and Peterman are impressive. Iooioioo0ooiii976i7Black / African American NVA are "zeroed out" of an amazing 68 places under DP.

Differences in VAP and NVA by Place and Race in Alabama (SF – PL data)

| Black | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Carlton CDP | -19, +48 | -90%, +4,800% |
| Foley city | -279, +137 | -18%, +21% |
| Mountain Brook city | +99, +175 | +77%, +213% |
| Peterman CDP | +61, +16 | +1,017%, +800% |
| Prattville city | -368, +236 | -10%, +13% |
| Weaver city | -141, +110 | -53%, +76% |

As with other layers of geography, Asians are dramatically affected by DP at the place level. Aside from significant numeric and percent errors, their NVA population is "zeroed out" of an amazing 131 places.

| Asian | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Bessemer city | +103, +16 | +225%, +240% |
| Pelham city | -139, +133 | -37%, +95% |
| Prattville city | +104, -105 | +29%, -86% |

Finally, Hispanics are also dramatically affected by DP at the place level. Aside from significant numeric and percent errors, the Hispanic NVA population is "zeroed out" of an alarming 120 places.

| Hispanic | # Error VAP, NVA | % Error, VAP, NVA |
|---|---|---|
| Athens city | -137, +196 | -12%, +25% |
| Coker town | +79, -7 | +878%, -78% |
| Eufaula city | -115, +110 | -31%, +56% |
| Midfield city | -48, +61 | -87%, +277% |
| Vestavia Hills city | +177, -154 | +34%, -49% |

In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5i: Black Differences in NVA between SF and DP by Alabama Place**



**Figure 3c5j: Asian Differences in NVA between SF and DP by Alabama Place**



In the scatterplots by race below, the SF data are on the X axis, and the DP data are on the Y axis.

**Figure 3c5k: Hispanic Differences in NVA between SF and DP by Alabama Place**



## Section 4: Summary and Conclusions

The evidence we have from the DP demonstration products is that the output exhibits a degree of statistical adjustment that irreparably harms Census data in different ways at all levels of spine and off-spine geography. Ruggles at al. (2019: 403-404) observe that differential privacy is inconsistent with the statutory obligations, history, and core mission of the Census Bureau and that by imposing unrealistic rules, the Census Bureau may be forced to "lock up" data that are indispensable for basic research and policy research. To this, we add that the errors introduced by DP would adversely affect political redistricting and the demographics industry, as well as planning for public health and public safety needs, and the planning needs of educational, municipal, and regional planning organizations.

As we noted early in this report, Ruggles et al. (2019: 406) also observe that, because it focuses on concealing individual characteristics instead of respondent identities, DP is a blunt and inefficient instrument for disclosure control. In regard to how blunt DP can be, recall the examples of median and extreme income given in Section 3 (p. 18) and consider the fact that the Census Bureau will not be able to alter DP levels for each individual query. Instead, it will set universal levels within given domains. In terms of the income example, this implies that a query about median income will run into the same level of inaccuracy as a query on maximum income, even though the probability that the query about median income could result in "leaked" information is so small as to be virtually zero.

While the threat of a confidentiality breach is always present, the Census Bureau has not reported any such breaches from prior census data releases, a fact also noted by Ruggles et al. (2019: 404) who state, " ... [T]here is not a single documented case of anyone outside The Census Bureau revealing the responses of a particular identified person in public use Decennial Census or ACS data." These facts suggest that the Census Bureau's current confidentiality and privacy protocols are effective. We understand that new threats can emerge, but as was the case with the "handheld" devices that led to the 2010 FDCA debacle, we believe that DP is still an immature technology in the hands of an agency with insufficient experience to implement it in a manner that will preserve the accuracy of small area data while protecting the privacy and confidentiality of respondent information. Far more testing and development needs to be done, allowing both Bureau staff and stakeholders to become familiar with DP in order to make reasonable decisions about using it to statistically adjust the 2020 Census.

While the Census Bureau has invested in the deployment of the 2020 Census using DP, we conclude that DP should not be applied to the 2020 Decennial Census and related products. The results of our analysis and the observations of others strongly suggest that the deployment of DP will violate the mission of the Census Bureau of publishing quality, accurate data available to the public, to the extent that the data as published under DP would not allow states to comply with the law (starting with redistricting). Perfect compliance with Title XIII and perfect privacy would mean that no census data be released at all. In the absence of such standards, the Bureau is inventing implausible and oftentimes demographically impossible data at the 11th hour that are demonstrably flawed and would provide a disservice to a wide variety of census data consumers. In the absence of such standards, and until DP is adequately vetted and standards exist for balancing privacy and quality, we conclude that the US Census Bureau should continue using their established DAS methodology from the 2010 Census. The Census Bureau has this methodology "on the shelf" and should have immediate access to sufficient human capital in the form of staff and contractor experience required to use it in a short period of time.

**Appendix 1: Differential Privacy Data**

In June 2020, the Census Bureau announced plans to release a Privacy-Protected Microdata File (**PPMF**) after each programming sprint, for which the Bureau generates a corresponding set of quality metrics. The Bureau is continually modifying its differentially private algorithm, and each version of the PPMF will reflect those modifications. Data users may use the PPMF to track changes in accuracy and utility. To make these data more user-friendly, IPUMS NHGIS is creating a Privacy-Protected Summary File (**PPSF**) from each version of the PPMF. Our PPMF consists of tabulations where each row represents a geographic unit and each column represents a summary statistic (e.g., VAP population in DP and SF).

To facilitate comparisons, we (NHGIS) link comparable data from the PPSF and original 2010 Census Summary File 1. These linked files comprise the IPUMS NHGIS Privacy-Protected 2010 Census Demonstration Data product[13].

**Appendix 2: Terms**

(DP) Differential Privacy: A statement by Cynthia Dwork (2006): "A statistic is a quantity computed from a sample. If a database is a representative sample of an underlying population, the goal of a privacy-preserving statistical database is to enable the user to learn properties of the population as a whole, while protecting the privacy of the individuals in the sample." Since the application of differential privacy occurs within the Census Bureau's Disclosure Avoidance Systems (DAS), that term has sometimes been used to describe the use of differential privacy. To avoid confusion, the term differential privacy (DP) is used here to distinguish the version of DAS that includes DP from other versions of DAS.

(DAS) Disclosure Avoidance System: Before the Census Bureau publishes any statistic, they apply safeguards that help prevent someone from being able to trace that statistic back to a specific respondent. They call these safeguards "disclosure avoidance," although these methods are also known as "statistical disclosure controls" or "statistical disclosure limitations." Although it might appear that a published table shows information about a specific individual, the Census Bureau has taken steps to disguise the original data in such a way that the results are still useful. These steps include using statistical methods such as "data swapping" and "noise injection."[14]

(PPDD) Privacy-Protected Demonstration Data: To protect the confidentiality of 2020 Census respondents, the U.S. Census Bureau plans to use a framework termed "differential privacy." Beginning in October 2019, the Census Bureau began releasing privacy-protected demonstration data products (PPDD) to help users assess the impact of differential privacy on the utility and accuracy of Decennial Census data. This product was a differentially private version of the 2010 Decennial Census.

(PPMF) Privacy-Protected Microdata File: PPMFs are the underlying microdata files for the entire nation used to generate Detailed Summary Metrics.

(PPSF) Privacy-Protected Summary File: Produced by IPUMS NHGIS from each version of the PPMF.

(SF) Summary Files: 2010 census data as they were originally published by the Census Bureau.

(GQ) Group Quarters

(VAP) Voting Age Population >18

(NVA) Non-Voting Age < 18

---

[13] https://www.nhgis.org/privacy-protected-demonstration-data#purpose

[14] https://www.census.gov/about/policies/privacy/statistical_safeguards.html

**Appendix 3: 2010 – 2019 Total Population Estimated Changes in Alabama**

| Label | Total 2010 | Total 2019 | # Difference | % Difference |
|---|---|---|---|---|
| Total: | 4,785,298 | 4,903,185 | 117,887 | 2% |
| Male: | 2,322,243 | 2,369,611 | 47,368 | 2% |
| Under 18 years: | 582,172 | 556,757 | -25,415 | -4% |
| Native | 572,304 | 549,178 | -23,126 | -4% |
| Foreign born: | 9,868 | 7,579 | -2,289 | -23% |
| Naturalized U.S. citizen | 2,245 | 1,620 | -625 | -28% |
| Not a U.S. citizen | 7,623 | 5,959 | -1,664 | -22% |
| 18 years and over: | 1,740,071 | 1,812,854 | 72,783 | 4% |
| Native | 1,662,134 | 1,734,786 | 72,652 | 4% |
| Foreign born: | 77,937 | 78,068 | 131 | 0% |
| Naturalized U.S. citizen | 18,846 | 33,600 | 14,754 | 78% |
| Not a U.S. citizen | 59,091 | 44,468 | -14,623 | -25% |
| Female: | 2,463,055 | 2,533,574 | 70,519 | 3% |
| Under 18 years: | 553,256 | 528,840 | -24,416 | -4% |
| Native | 544,673 | 520,180 | -24,493 | -4% |
| Foreign born: | 8,583 | 8,660 | 77 | 1% |
| Naturalized U.S. citizen | 2,056 | 2,882 | 826 | 40% |
| Not a U.S. citizen | 6,527 | 5,778 | -749 | -11% |
| 18 years and over: | 1,909,799 | 2,004,734 | 94,935 | 5% |
| Native | 1,837,591 | 1,924,089 | 86,498 | 5% |
| Foreign born: | 72,208 | 80,645 | 8,437 | 12% |
| Naturalized U.S. citizen | 24,952 | 38,861 | 13,909 | 56% |
| Not a U.S. citizen | 47,256 | 41,784 | -5,472 | -12% |
| Total Under 18 | 1,135,428 | 1,085,597 | -49,831 | -4% |
| Total Over 18 | 3,649,870 | 3,817,588 | 167,718 | 5% |
| CVAP | 3,543,523 | 3,731,336 | 187,813 | 5% |

Source: American Community Survey 2010-2019

**Appendix 4: 2010 – 2019 Black African American Estimated Population Changes in Alabama**

| Label | B / AA 2010 | B / AA 2019 | # Difference | % Difference |
|---|---|---|---|---|
| Total: | 1,262,980 | 1,319,551 | 56,571 | 4% |
| Male: | 587,644 | 620,017 | 32,373 | 6% |
| Under 18 years: | 178,038 | 166,682 | -11,356 | -6% |
| Native | 177,700 | 166,122 | -11,578 | -7% |
| Foreign born: | 338 | 560 | 222 | 66% |
| Naturalized U.S. citizen | 45 | 216 | 171 | 380% |
| Not a U.S. citizen | 293 | 344 | 51 | 17% |
| 18 years and over: | 409,606 | 453,335 | 43,729 | 11% |
| Native | 404,676 | 447,911 | 43,235 | 11% |
| Foreign born: | 4,930 | 5,424 | 494 | 10% |
| Naturalized U.S. citizen | 1,819 | 3,829 | 2,010 | 111% |
| Not a U.S. citizen | 3,111 | 1,595 | -1,516 | -49% |
| | | | | |
| Female: | 675,336 | 699,534 | 24,198 | 4% |
| Under 18 years: | 171,215 | 152,776 | -18,439 | -11% |
| Native | 171,003 | 151,923 | -19,080 | -11% |
| Foreign born: | 212 | 853 | 641 | 302% |
| Naturalized U.S. citizen | 96 | 313 | 217 | 226% |
| Not a U.S. citizen | 116 | 540 | 424 | 366% |
| 18 years and over: | 504,121 | 546,758 | 42,637 | 8% |
| Native | 498,700 | 541,156 | 42,456 | 9% |
| Foreign born: | 5,421 | 5,602 | 181 | 3% |
| Naturalized U.S. citizen | 2,208 | 3,916 | 1,708 | 77% |
| Not a U.S. citizen | 3,213 | 1,686 | -1,527 | -48% |
| | | | | |
| Total Under 18 | 349,253 | 319,458 | -29,795 | -9% |
| Total Over 18 | 913,727 | 1,000,093 | 86,366 | 9% |
| CVAP | 907,403 | 996,812 | 89,409 | 10% |

Source: American Community Survey 2010-2019

**Appendix 5: 2010 – 2019 Total Population Estimated Changes in Alabama**

| Label | Hispanic 2010 | Hispanic 2019 | # Difference | % Difference |
|---|---|---|---|---|
| Total: | 182,795 | 219,296 | 36,501 | 20% |
| Male: | 98,816 | 109,914 | 11,098 | 11% |
| Under 18 years: | 33,094 | 43,397 | 10,303 | 31% |
| Native | 27,569 | 38,873 | 11,304 | 41% |
| Foreign born: | 5,525 | 4,524 | -1,001 | -18% |
| Naturalized U.S. citizen | 915 | 608 | -307 | -34% |
| Not a U.S. citizen | 4,610 | 3,916 | -694 | -15% |
| 18 years and over: | 65,722 | 66,517 | 795 | 1% |
| Native | 18,500 | 28,871 | 10,371 | 56% |
| Foreign born: | 47,222 | 37,646 | -9,576 | -20% |
| Naturalized U.S. citizen | 5,363 | 9,824 | 4,461 | 83% |
| Not a U.S. citizen | 41,859 | 27,822 | -14,037 | -34% |
| | | | | |
| Female: | 83,979 | 109,382 | 25,403 | 30% |
| Under 18 years: | 34,121 | 45,079 | 10,958 | 32% |
| Native | 29,280 | 40,875 | 11,595 | 40% |
| Foreign born: | 4,841 | 4,204 | -637 | -13% |
| Naturalized U.S. citizen | 501 | 598 | 97 | 19% |
| Not a U.S. citizen | 4,340 | 3,606 | -734 | -17% |
| 18 years and over: | 49,858 | 64,303 | 14,445 | 29% |
| Native | 16,093 | 33,374 | 17,281 | 107% |
| Foreign born: | 33,765 | 30,929 | -2,836 | -8% |
| Naturalized U.S. citizen | 5,906 | 8,693 | 2,787 | 47% |
| Not a U.S. citizen | 27,859 | 22,236 | -5,623 | -20% |
| | | | | |
| Total Under 18 | 67,215 | 88,476 | 21,261 | 32% |
| Total Over 18 | 115,580 | 130,820 | 15,240 | 13% |
| CVAP | 45,862 | 80,762 | 34,900 | 76% |

Source: American Community Survey 2010-2019

**Appendix 6: US Census**

**Part 6a: What is the Census?**

The 2020 Census attempts to count every person living in the United States and the five U.S. territories. The goal is to count everyone only once and in the right place. The count is mandated by the Constitution and conducted by the U.S. Census Bureau.  The requirement of taking a census is one of the first things mentioned in the U.S. Constitution, which provides some indication of how important a census was to the Founding Fathers (Voss and Cork, 2006).

The U.S. Constitution requires an "actual enumeration" of the population every 10 years in order to apportion seats in the House of Representatives among the states. States and localities also use census numbers for redistricting, to draw political boundary lines for their congressional delegations, legislatures, and other government districts. The census plays an important role in guiding the distribution of $1.5 trillion in federal funding, as well as identifying needs for government services, such as schools and roads. Census statistics are the basis for a wide range of research and business decisions.

In a recent publication of the International Association of Official Statistics discussing the importance of Censuses in an international context, Everaers (2021) stated, "Population and Housing Censuses are an important cornerstone for National Statistical Systems. They provide a range of important statistics, relevant for policy-making, planning, and monitoring but also functioning as reference point and sample frame for many other national and regional statistics." This description certainly applies to the U.S. Census.  There is no single statistical resource more important than the Decennial Census.

In every census, the U.S. Census Bureau faces a trade-off between privacy protection and accuracy. According to the U.S. Census Bureau (2020d),

> "One of the most important roles that national statistical offices (NSOs)  play is to carry out a national population and housing census.  In so doing, NSOs have two data stewardship mandates that can be in direct opposition.  Good data stewardship involves both safeguarding the privacy of the respondents who have entrusted their information to the NSOs as well as disseminating accurate and useful census data to the public."

The preceding suggests that this is an appropriate place to discuss privacy and confidentiality, two concepts that are often used interchangeably, but are distinct.[15] Privacy generally is used in regard to the right of an individual or organization to withhold information from others, while confidentiality is viewed as an extension of privacy in which an organization (such as the Census Bureau) that holds individual or organizational information is obligated to ensure that only authorized individuals have access to the information. While we will strive to maintain this distinction, the two concepts will inevitably overlap in this report.

---

[15] https://research.uci.edu/compliance/human-research-protections/docs/privacy-confidentiality-hrp.pdf

**Part 6b: Census Accuracy and Adjustments**

For over a century and for nearly as long as the Census Bureau has existed in its present form, it has had to balance its inherent, ingrained mission of collecting and producing high quality statistical information for the public good with a mandate to avoid disclosing information about any individual.  In fact, the Census Bureau's mission is "to serve as the nation's leading provider of **quality data** about its people and economy."  However, the mandate of "quality data" is tempered by an obligation to protect the privacy of Census respondents.  The Census Bureau is bound by Title XIII of the United States Code. Title XIII provides the following protections to individuals and businesses:[16]

- Private information is never published. It is against the law to disclose or publish any private information that identifies an individual or business such, including names, addresses (including GPS coordinates), Social Security Numbers, and telephone numbers.

- The Census Bureau collects information to produce statistics. Personal information cannot be used against respondents by any government agency or court.

- Census Bureau employees are sworn to protect confidentiality. People sworn to uphold Title XIII are legally required to maintain the confidentiality of data. Every Census Bureau employee or contractor with access to personal data is sworn for life to protect your information and understands that the penalties for violating this law are applicable for a lifetime.

As part of this balancing act, the Census Bureau has used methods to help avoid disclosure of individual census respondents for many decades. According to the U.S. Census Bureau (2018), some method of disclosure avoidance has been used by the U.S. Census Bureau since 1970.  However, as the privacy protections were put in place by the Census Bureau over the past several decades, there was never the threat of distorting the data as much as DP threatens to distort the 2020 Census data, and there was never the resistance seen among data users and demographers regarding the potential use of DP in the 2020 Census (Ruggles et al., 2019).  The increase in resistance among data users reflects the extent to which they fear differential privacy will distort the data to the point that it is not usable for many functions.[17]

---

[16] https://www.census.gov/history/www/reference/privacy_confidentiality/title_13_us_code.html

**Part 6c: Census Bureau Privacy and Confidentiality and Title XIII**

Privacy, that is, the freedom to give or withhold information, and confidentiality, the government's obligations once it possesses the data, have been the most frequently raised concerns in the Twentieth Century with regard to the census.  Privacy concerns and the public and private need for census information met head on in 1954 when Title XIII, the Census Act, was passed, which made responses to all census questionnaires mandatory. Title XIII U.S.C. §221, Chapter 7 states: "Whoever, being over eighteen years of age, refuses or willfully neglects, when requested by the Secretary ... to answer, to the best of his knowledge, any of the questions ... in connection with any census, shall be fined." Title 18 U.S.C. §3571 and §3559 provides that anyone over 18 years old who refuses or willfully neglects to answer questions posed by census takers of a fine of not more than $5,000.

Even with Title XIII in place, privacy and confidentiality have been ongoing concerns with the census.  It is important to note that the U.S. Census Bureau has used methods to help avoid disclosure of individual census respondents for many decades.  According to U.S. Census Bureau (2018), some method of disclosure avoidance has been used since 1970 (Long, 2020).  However, as the privacy protections were put in place by the Census Bureau, there was never the threat of distorting the data as much as DP threatens to distort the 2020 Census data.

**Part 6d: Uses of the Census**

To understand the importance of census accuracy, it is important to understand how census data are used.  In addition to the scientific and scholarly interest in obtaining correct Decennial Census counts, there are many practical and policy-related reasons why it is important for Decennial Census data to be accurate.  Census errors are important because they are both a data problem and, in many cases, a social equity issue.

Subnational Census inaccuracies are critical in terms of public policy consequences. The demographic numbers from the Census are used to distribute political power both in terms of assigning seats in Congress to states based on population and in the judicially mandated one-person/one-vote rule used for constructing political districts (Grofman 1982; McKay 1965; Balinski and Young 1982).

There is no definitive number of election districts where census data are used to draw boundaries for political districts.  In addition to the 435 seats in Congress, almost all the 7,383 state legislators are elected from single member districts (National Conference of State Legislators 2017).  Also, nearly every large city has council members elected from single-member districts, and the same is true for county commission seats in many jurisdictions.  There are 19,355 elected county board members and elected executives, plus 18,629 independently elected officials result in 37,984 total county elected officials (including county board, executives and row officers).[18]  School board members and many special districts also use census data to construct districts.  Over 90,000 members make up the 49 U.S. States and the Virgin Islands School Board Associations.

State Decennial Census counts are used for apportioning the seats in the U.S. House of Representatives (Conk 1987), and sometimes small differences can be important.  Crocker (2011) found that if 2010 Decennial Census count for North Carolina had been 15,753 higher it would have received an additional seat in Congress.  This shows how small differences in counting might have large implications for political

---

[18] https://www.naco.org/sites/default/files/documents/CM_2019.pdf

representation.  Siegel (2002, Chapter 12) provides additional examples of how demographic data are used in a variety of political applications.  The most recent estimates for Alabama show that a difference of as few as 5,000 people could make the difference between Alabama keeping its 7th congressional district or losing it to another state.[19]

Decennial Census data are also used in many federal funding formulas that distribute federal funds to states and localities each year (U.S. Senate 1992; Reamer 2009; Blumerman and Vidal, 2009). Recent research indicates there are 316 federal programs that use Census derived data  to distribute more than $1.5 trillion a year to states and localities (Reamer, 2019). The 55 largest federal programs that use census-derived data to distribute funds sent $13.1 billion to Alabama in Fiscal Year 2016. The table below shows how much Alabama received from 16 large federal programs that use Census-derived data to distribute funds.

---

[19] https://www.electiondataservices.com/wp-content/uploads/2020/12/NR_Appor20wTableMaps.pdf

**Table 6d1**

| Selected Federal Assistance Programs That Distribute Funds on Basis of Decennial Census-Derived Data, U.S. and Alabama  Fiscal Year 2016(2-28-2021) | | |
|---|---|---|
| Program Name | Fiscal Year 2016 Obligations | |
| | U.S. | Alabama |
| Medical Assistance Program (Medicaid) | $361,218,476,000 | $3,964,085,000 |
| Supplemental Nutrition Assistance Program (SNAP) | $66,376,250,674 | $1,254,835,320 |
| Medicare Part B (Supplemental Medical Insurance) – Physicians Fee Schedule Services | $66,076,784,523 | $1,129,410,997 |
| Highway Planning and Construction | $40,271,249,273 | $797,046,829 |
| Section 8 Housing Choice Vouchers | $19,387,184,000 | $194,272,000 |
| Title I Grants to Local Education Agencies (LEAs) | $14,364,454,918 | $230,728,658 |
| National School Lunch Program | $12,042,774,000 | $219,343,000 |
| Special Education Grants (IDEA) | $11,779,555,245 | $185,979,742 |
| State Children's Health Insurance Program (S-CHIP) | $13,761,924,000 | $457,272,000 |
| Section 8 Housing Assistance Payments Program (Project-based) | $10,156,542,138 | $105,166,471 |
| Head Start/Early Head Start | $8,648,933,810 | $138,342,659 |
| Supplemental Nutrition Program for Women, Infants, and Children (WIC) | $6,383,830,000 | $110,726,000 |
| Foster Care (Title IV-E) | $4,727,773,596 | $11,111,295 |
| Health Center Program | $4,319,604,643 | $76,252,531 |
| Low Income Home Energy Assistance (LIHEAP) | $3,351,810,105 | $43,520,240 |
| Child Care and Development Fund – Entitlement | $2,612,564,000 | $50,468,000 |
| Total | $645,479,710,925 | $8,968,560,742 |

Source: Reamer, 2017, Counting for Dollars,
https://gwipp.gwu.edu/sites/g/files/zaxdzs2181/f/downloads/IPP-1819-3%20CountingforDollars_AL.pdf

Demographic data are also used to distribute state government funds within states, but there is no good estimate of how much money is distributed by state governments based on census data (O'Hare 2020).

Many population projections also start with the Decennial Census counts, so differences such as those introduced by DP in the Decennial Census are likely to be reflected in projections for many years (U.S. Census Bureau 2014b). The 2010 Census figures are used as the base for the most recent Census Bureau (2014a) population estimates and projections (2014b). In discussing where to get data for state and local projections, Smith et al. (2001, page 113) indicate, "The most commonly used source--and the most comprehensive in terms of demographic and geographic detail--is the Decennial Census of population and housing."

In addition, Decennial Census results and the Census Bureau's post-census population estimates are often used to weight sample surveys both inside and outside government. If the Decennial Census counts and subsequent population estimates overestimate or underestimate a population group, the weighted survey results will reflect this error (Jensen and Hogan, 2017; O'Hare and Jensen 2014; O'Hare et al. 2013).

Data from the U.S. Decennial Census counts as well as projections which are based on the Census are used for many planning activities including schools (Edmonston 2001; McKibben 2007 and 2012). School systems in Alabama are examined more closely later in this report. In addition, data from the Census Bureau are often used as denominators for constructing rates such as the child mortality rates. Census

errors and data that have been significantly adjusted with methods such as DP may *significantly* skew such rates. These rates are based on using the Census counts as denominators.

For many groups, the Census is seen as a civil rights issue (Leadership Conference on Civil Rights 2017). In addition to heavy use of Decennial Census data in the context of voting rights, data from the Census are used to examine equality in jobs, housing, and education opportunities. A flawed census can undermine the ability to examine such issues. According to the Leadership Conference on Civil and Human Rights (2017, page 1), "Federal agencies rely on census and American Community Service (ACS) data to monitor discrimination and implement civil rights laws that protect voting rights, equal employment opportunity, and more."

Moreover, census inaccuracies can provide misleading public impressions about the size or growth of the population.  This point is difficult to quantify, but in many instances the size of a population translates into the importance given to the population. In response to the 2000 Census, one public official stated, "Pride in the community is involved. I want people to really know how big we are. We aren't just a little burgh in south Louisiana." (cited in Prewitt 2003, page 7).  It is difficult to overstate the places and ways in which census data are used, and the need for accuracy is critical.

The seminal document on issues with DP is 2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop (2020),[20] organized by the Committee on National Statistics (CNSTAT) of the National Academies of Sciences. Therein are numerous exceptional and detailed examples of the uses of small area Census Data and issues with the DP data produced to date. References will be made to proceedings of the workshop going forward in this document.

**School District Infrastructure**

One of the most important uses of accurate small-area data are school district infrastructure, enrollment, and forecasting. Small area Census data is used in the calculated population and enrollment forecasts for school districts at the district and attendance area level. These results are used to help districts with their short- and long-term planning on staffing, building utilization, and attendance area boundary modifications. Further, this research helps district balance their attendance area by size, socio-economic status, and race/ethnicity. Of particular importance is the age data that identifies the distribution of people throughout the course of life. Since school district attendance areas are not a census recognized "spine" geography, the data for these areas must be aggregated from block level Decennial Census data. The Decennial Census is the only source for reliable, valid, and accurate information of the demographic

---

[20] https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-data-products-data-needs-and-privacy-considerations

The Workshop on 2020 Census Data Products is organized by the Committee on National Statistics (CNSTAT) of the National Academies of Sciences, Engineering, and Medicine, at the request of the U.S. Census Bureau. The U.S. Census Bureau is implementing a new Disclosure Avoidance System (DAS) for the 2020 Census, after concluding that its previous methods permitted larger than expected risks of person reidentification. Implementing the 2020 DAS on 2010 Census data yielded a set of 2010 Demonstration Data Products, allowing data users to study impacts of the new system. The December 11-12, 2019, workshop provided a forum for studying the utility of privatized census tabulations and engaged the user and privacy communities in discussing trade-offs between "accuracy" and "privacy" in shaping the final 2020 DAS.

characteristics that can be used in this kind of research. Any additional, incremental error infused to the census results virtually eliminates the usefulness of this information. Given that there is no other source for this type of data at this level, its loss will be critical.

**Consumer Demographics**

In the latter part of the 20th century, statistics became a commodity independent of government, and a statistical services industry developed. This development is pertinent because these services are primarily a business information industry. While demographics vendors such as Claritas and ESRI generate their own zip code estimates and forecasts, the Census Bureau uses both block and block group data to generate zip code population and housing estimates.[21] In the case of the zip code data generated by the Census Bureau, it is certain to be subject to DP if the latter is implemented; in the case of the zip code generated by demographic vendors, it is certain that the block and block group data they use in the process will be subject to DP if the latter is implemented. In 2018, for example, the Census Bureau decided to no longer approve requests for sub-state data if the data were not protected using strengthened disclosure avoidance methods providing small area data in its for-pay Custom Table operation.[22]

**Health and Safety**

Small area data are important for public health and public safety, both for planning and reporting. As one example of the use of small area data for public health, the Thomas Jefferson Health District of Virginia (2016) developed a plan that incorporates census tract population data.[23] Similarly, in Clark County, Nevada, the Southern Nevada Healthy Food Access Program uses census tract population and income data.[24]

As another example, the US. Department of Energy issued a radiological monitoring plan[25] for the investigation of a proposed nuclear waste storage at Yucca Mountain, Nevada. The radiological studies area is defined by a circle 84 km in radius, whose center is assumed to be located at the proposed site of the central surface facilities (see Figure 1 below). The circle is divided into 160 cells radiated out from the 16 km radius area in the center of the study area, designated as the near field (NF) study area. The remainder of the area (16-84 km) is called the far field (FF) study area. The FF study area required that the population of each of the 160 cells be estimated on a regular basis (Swanson, Carlson, and Williams, 1990). As mentioned earlier, one researcher found the application of DP to the 2010 Census data would increase the teen pregnancy rate in one community from 5 percent to 66 percent. For someone concerned about adolescent health in that community, such a variation from the original census data would be very problematic.

---

[21] https://www.census.gov/programs-surveys/geography/guidance/geo-areas/zctas.html

[22] https://www.census.gov/programs-surveys/acs/data/custom-tables.html

[23] https://www.vdh.virginia.gov/content/uploads/sites/91/2016/07/2016-MAPP2Health-Report.pdf

[24] http://sns.rtcsnv.com/wp-content/uploads/2019/11/Southern-Nevada-Healthy-Food-Access-Webmap-About-the-Data-11.2019.pdf

[25] https://www.nrc.gov/docs/ML0037/ML003753101.pdf

**Figure 6e1: The Radiological Studies Area.**



## Natural Disaster Assessment

Closely related to public health and safety, but distinct is natural disaster preparedness and assessment. As one example, Swanson and his colleagues (2009) examined the effect of Hurricane Katrina on the populations of 79 ZIP code areas in Louisiana (55) and Mississippi (24) devastated by the hurricane. Using the results by zip code, they estimated that Katrina reduced the area's overall population by 311,150 people (21.2%) from the 1,464,280 expected in the absence of Katrina.

In another study of the demographic effects of Hurricane Katrina, Swanson (2009) examined the effects of Hurricane Katrina on the client populations and candidates for a specific medical procedure in the service areas associated with two medical facilities on the Mississippi gulf coast. The two service areas were defined by zip codes, and in analyzing them, Swanson found that Katrina had an adverse impact on the client base of both medical facilities.

**Regional Planning Organizations**

There are hundreds of regional planning organizations in the U.S.[26] Although they exist in every state, they may come under different names in different states, (Council of Government (COG), Metropolitan Planning Organizations (MPO)) but they all have similar missions, centered on land use and transportation planning, both of which require small area data.

TARCOG (Top of Alabama Regional Council of Governments) is an example of such an organization.[27] In its transportation planning, TARCOG uses block group data extensively (TARCOG, 2012). Like the plan issued by TARCOG, the 2015 transportation plan issued by the Montgomery, AL MPO issued makes use of small area data, including data representing census tracts.[28]

Although it is not a regional planning organization, Oak Ridge National Laboratory has developed LANDSCAN, a .geographically based population information system for the entire world.[29] The U.S. segment of the LANDSCAN system uses block data acquired from the Census Bureau (Bhaduri et al. 2007).

**Public Use Microdata Samples (PUMS)**

The Public Use Microdata Samples (PUMS) are produced by the Census Bureau and primarily used by researchers. They are sets of individual and household records stripped of names and other information that could identify people. The Minnesota Population Center is perhaps the largest site in the U.S. where US and international PUMS (IPUMS), files can be accessed at no cost under the auspices of the "IPUMS" program.[30] The Minnesota Population Center is acutely concerned about DP and the error it will introduce into PUMS files (Ruggles et al., 2019).[31]

---

[26] https://en.wikipedia.org/wiki/List_of_metropolitan_planning_organizations_in_the_United_States

[27] http://tarcog.us/regional-planning-agency/

[28] http://montgomerympo.org/DOCS/2015/September23/Montgomery2040DraftLRTPAugust17.pdf

[29] https://landscan.ornl.gov/

[30] https://ipums.org/

[31] https://ipums.org/changes-to-census-bureau-data-products

## Section 7 Differential Privacy

### Part 7a: What is Differential Privacy?

A statement by Ben Rossi (2016) is telling: "…[I]f a database is a representative sample of an underlying population, the goal of a privacy-preserving statistical database is to enable the user to learn properties of the population as a whole, while protecting the privacy of the individuals in the sample."

Since the application of differential privacy occurs within the Census Bureau's Disclosure Avoidance Systems (DAS), that term has sometimes been used to describe the use of differential privacy. To avoid confusion, the term differential privacy (DP) is used here to distinguish the version of DAS that includes DP from other versions of DAS.

This statement is telling because it reveals that the DP tradeoff is to make available properties of the population as a whole while protecting the privacy of individuals. In the world of the Census Bureau this tradeoff has been translated to mean that the population as a whole is defined by a population at a level of geography beyond the block. The tradeoff means that a user cannot learn properties of the population at the block level with any degree of confidence. If DP is implemented, it will affect all of the many users of small area data, to include those described earlier, the demographics vendors who supply clients with zip code level characteristics, public health and public safety organizations, and businesses that use small area data such as zip codes, school districts, and Regional Planning Organizations. The data associated with these census stakeholders are those that represent small areas directly as well as being aggregated into other small areas and into higher levels of geography. This means that DP, a statistical adjustment, will increase the error in the small area data needed by these stakeholders.

Is DP complicated? Here is a formal Definition followed by a discussion.[32]

**Definition 2.4** (Differential Privacy). A randomized algorithm $\mathcal{M}$ with domain $\mathbb{N}^{|\mathcal{X}|}$ is $(\varepsilon, \delta)$-differentially private if for all $\mathcal{S} \subseteq \text{Range}(\mathcal{M})$ and for all $x, y \in \mathbb{N}^{|\mathcal{X}|}$ such that $\|x - y\|_1 \leq 1$:

$$\Pr[\mathcal{M}(x) \in \mathcal{S}] \leq \exp(\varepsilon) \Pr[\mathcal{M}(y) \in \mathcal{S}] + \delta,$$

Where,

M: Randomized algorithm i.e., query (db) + noise or query(db + noise).

S: All potential output of M that could be predicted.

x: Entries in the database. (i.e., N)

y: Entries in parallel database (i.e., N-1)

ε: epsilon, The maximum distance between a query on database (x) and the same query on database (y).

δ: Delta, the probability of information accidentally being leaked.

---

[32] Equation 1.1 in Lecture 1, Introduction to Differential Privacy: January 28, CSE711, Topics in Differential Privacy, SUNY Buffalo, Spring, 2016, M. Gaboardi https://www.acsu.buffalo.edu/~gaboardi/teaching/cse711Spring2016/Lecture1.pdf).

This definition of DP is a measure of "How much privacy is afforded by a query?" This is an important point in that DP represents an offer of privacy according to a provable and quantifiable amount, sometimes referred to as the privacy-loss budget (Snoke and McKay, 2019). It is this probabilistic quantifiable feature that is DP's major selling point because other forms of DAS (Disclosure Avoidance Systems) do not provide a formal quantification of the protection they offer. How does it do this? As this suggests, DP is not the system that creates privacy; it is the system that measures privacy using the definition just given. How does DP measure privacy?

The DP algorithm gives the comparison between running a query M on database (x) and on a parallel database (y), where the latter has one less entry than database (x). The measure by which the full database(x) and the parallel database(y) can differ is given by Epsilon (ε) and delta (δ). Specifically, DP works by tying privacy to how much the answer to a question or statistic is changed given the absence or presence of the most extreme possible person in the population. This is done within a statistical framework. An example by Snoke and McKay (2019) helps to explain this. Suppose the data we want to protect is income data, and the statistic we want answered is, "What is the median income?" The most extreme person who could possibly be in any given income data could be Jeff Bezos. If he is absent or present in the data set, the median will not change much, if at all. This means that DP can provide a more accurate answer about the median income without using much privacy-loss budget.

However, what if the question is, "What is the maximum income?" Unlike the median, the answer to this question would be likely to significantly change if Bezos is absent or present in the data set. A DP algorithm would provide a less accurate answer, or require more privacy-loss budget, to answer this query and protect the extreme case, Bezos (Snoke and McKay, 2019).

So, when Epsilon (ε) is small, DP asserts that for all pairs of adjacent databases x, y and all outputs M, an adversary cannot distinguish which is the true database on the basis of observing the output—the probabilities are too low. That is, if we are interested in median income, it does not matter if Jeff Bezos is in or out of the data set: For this query Epsilon (ε) should be set at a high level because for a query regarding median income there is little need to "protect" the data base. This example translates formally into something like the following. When (ε) is large DP merely says that there exists neighboring databases and an output M, for which the ratio of probabilities of observing M conditioned on the database being, respectively, x or y, is large.

However, if we are interested in knowing the maximum income in the data base, it will matter if Jeff Bezos is in or out of the database. Thus, Epsilon (ε) should be set at a low value in order to prevent "leaking" the maximum income. However, even if Epsilon (ε) is not set low, an adversary may not have the right auxiliary information to recognize that a revealing output has occurred; or may not know enough about the database(s) to determine the value of their difference.

As you can see, the DP algorithm represents a statistical adjustment in that it uses a probability framework, typically based on the Laplace probability distribution (as stated elsewhere in this report), which is used to produce the errors / noise in the data. Moreover, as noted by Ruggles et al. (2019) under DP, responses of individuals cannot be divulged even if the identity of those individuals is unknown and cannot be determined. Returning to the example of a query about maximum income, it would not matter if the identify of Bezos was not divulged; the correct answer to the question about the maximum income in a dataset would not be provided under DP.

A final important point about differential privacy is how it is applied geographically. In our analysis, we look at two different types of geography: "spine" which are the core census statistical geographies such as counties, tracts, and blocks, and "off-spine" which are governmental or administrative geographies such as school districts and legislative districts. The "spine" geography, particularly blocks, are important because they offer the greatest geographic granularity and are the geographies DP is actually being applied to. "Off-spine" geographies are also critically important because conceptually they could capture the best or worst pieces of statistical geography and aggregate and magnify their errors. As shown in Figure X.X (above), legislative districts, voting districts, congressional districts, places, VTDs, and ZIP codes are all "off-spine," that is, not in the hierarchy of geographic areas for which the TopDown Algorithm (TDA) maximizes accuracy and so are built up from the lower-level block groups and blocks.[33]

**Figure 7a1: Hierarchy of census geographic entities, with reference to generation of the 2010 Demonstration Data Products.**



**Source:** 2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop Page 33.

---

[33] 2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop Page 67

**Part 7b: How is Differential Privacy being Proposed to be Used in the 2020 Census**

Historically, surveys and the census require respondents to reveal sensitive information under the promise that such information will remain confidential. Traditionally, protection from disclosure was accomplished by anonymizing records. In this way,

> "statistical analyses on issues of public importance could be accomplished while protecting the identity of the respondent. Over time however, the availability of public external data and the increase in capability of data analytics has made protecting confidential data a challenge. By linking information in one data set with that of another containing some intersecting information (known as a record-linkage attack) it is sometimes possible to connect an anonymous record containing confidential information with a public record and thus identify the respondent. This is called re-identification of previously de-identified data." (Long, 2020)

This is exactly the kind of reidentification the Census Bureau is trying to protect against. While there have been a number of newsworthy reidentifications, there have been no known cases against the 2010 Census. (Ruggles et al., 2019). After several years of developing the method and infrastructure, in October 2019, the Census Bureau released a demonstration data product to help users assess the impact of differential privacy on the utility and accuracy of Decennial Census data. This product was a differentially private version of the 2010 Decennial Census. Several assessments of the demonstration data were presented at the Workshop on 2020 Data Products (December 11-12, 2019) organized by the Committee on National Statistics of the National Academy of Sciences. These assessments identified limitations in the differentially private data, particularly for low-population geographic units, for which there are no other sources of complete, reliable population data. Workshop participants urged the Bureau to release additional demonstration data as they work to improve utility by refining the differentially private algorithm.[34]

The problem that DP is designed to fix is complicated, as is the implementation of DP. The passage below from the U.S. General Accountability Office (2020, page 14) is a good, short description of this issue.

> "Differential privacy is a disclosure avoidance technique aimed at limiting statistical disclosure and controlling privacy risk. According to the Bureau, differential privacy provides a way for the Bureau to quantify the level of acceptable privacy risk and mitigate the risk that individuals can be reidentified using the Bureau's data. Reidentification can occur when public data are linked to other external data sources. According to the Bureau, using differential privacy means that publicly available data will include some statistical distortions, noise, or data inaccuracies, to protect the privacy of individuals. Differential privacy provides algorithms that allow policy makers to decide the trade-offs between data accuracy and privacy."

---

[34] Source: https://www.nhgis.org/privacy-protected-demonstration-data#purpose

Reference: https://www.census2020now.org/challenges-blog/2019dp

Reference: https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-metrics.html#par_list

Basically, DP injects intentional error into the census tabulations that are based on the true responses to the census by adding or subtracting random numbers from table cells that reflect the true responses. Adding or subtracting random numbers to the census is intended to make it more difficult to specific respondents. While the process of introducing numbers may be random, it is important to note that the outcomes are anything but. As seen in the analytics section, errors are much more heavily concentrated in NVA children, minorities, and off-spine geographies. The U.S. Census Bureau (2020e) provides more information on the use of DP in the 2020 Census along with regular updates of their work (U.S. Census Bureau 2020c). For an independent look at differential privacy see Boyd (2020).

**Part 7c: Differential Privacy and the Census: Existing Concerns from the User Community**
Many researchers, demographers, and data users have expressed concerns about the possible use of DP in the 2020 Census. A few of the comments expressing worries about the use of DP are provided below.

The National Academy of Sciences, Committee on National Statistics (CNSTAT) Workshop held December 11-12, 2019, titled "Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations" provides a lot of data related to the accuracy of the Census Bureau's October 2019 Demonstration Product (Committee on National Statistics 2019). Many of the presenters at this conference expressed apprehensions about the potential use of DP in the 2020 Census.

Based on the evidence presented at the CNSTAT workshop and their own internal analysis, the U.S. Census Bureau (2020b) concluded, "The October Vintage of the DAS falls short of ensuring 'Fitness for use' for several priority use cases." This led to subsequent versions of DP-infused data being released by the Census Bureau.

Two prominent demographers Hotz and Salvo (2020) helped organize the December 2019 CNSTAT conference and later provided a review and summary of the event. They concluded,
> "At the same time, evidence presented at the Workshop indicated that most data for small geographic areas – especially census blocks – are not usable given the privacy-loss level used to produce the demonstration file."

In their summary Hotz and Salvo go on to say, "Many within the community remain skeptical of the Bureau's adoption of differential privacy and its consequences for the use cases."

Many presenters at the Committee on National Statistics Conference found impossible or improbable results when DP was applied to the 2020 Census data. For example, with respect to Differential Privacy (DP) the state demographer of Virginia (Qian Cai, 2020) noted,
> "As another example Cai mentioned that DP information for the small city of Emporia suggests that the city's teen pregnancy rate would shift form 5 percent to 66 percent, which has definite implications. "

At a recent research conference, Cropper and Stojakovic (2021) examined the use of DP for data often used in the context of school enrollment projections: namely population pyramids which is the population broken down by age and sex. Population pyramids are used to calculate the expected number of future births based on the age and sex composition of the population in a school district. In discussing the implications of DP for school district demography, they conclude: "Although total population at the school

district level is relatively close pre- and post-DAS, the error in age/sex cohorts is very problematic." They go on to say, "Working with Census 2020 population less than 100,000 (in terms of age/sex) may not even be reliable/usable."

The impact of DP on census data may have negative implications for health matters. In a very recent publication, after examining the impact differential privacy has on Covid-19 Rates, Hauer and Santos-Lozada (2021, page 1) conclude,

> "Using empirical COVID-19 mortality curves, the authors show that differential privacy will introduce substantial distortion in COVID-19 mortality rates, sometimes causing mortality rates to exceed 100 percent, hindering our ability to understand the pandemic. This distortion is particularly large for population groupings with fewer than 1,000 persons: 30 percent of all county-level age-sex groupings and 60 percent of race groupings."

At a research conference held in February 2021, Dr. Richelle Winkler and several colleagues examined the implications of DP for a widely used product based on Decennial Census data. The product is county-specific net migration rates that have been produced from Decennial Census data for the past several decades. They concluded that "inaccuracies in DP data pose critical challenges to NME accuracy." (NME is Net Migration Estimates.)

Researchers are not the only ones raising concerns about differential privacy. In a letter dated September 21, 2020, 33 members of Congress sent a letter to the Census Bureau director raising some concerns about differential privacy.  They said, "We write to express concern with the U.S. Census Bureau's proposed "differential privacy" approach to maintain the confidentiality of data collected in the 2020 Decennial Census." Near the end of the letter, they say, "As Members of Congress, we are concerned about the potential unintended consequences that a differential privacy method could have on the allocation of important funding and other activities that rely on census data."

Redistricting is one the most important uses of census data, and jeopardizing accuracy by using DP could result in unfair districts being constructed. Several organizations have raised concerns about what the use of DP might do to the redistricting process.

In a letter to the Census Bureau dated May 14, 2020, The National Conference of State Legislatures stated, "The Census Bureau's decision to use differential privacy as its statistical method to meet the goal of avoiding the disclosure of individual response may not be the best method to ensure states receive the most accurate data for redistricting purposes."

In a letter to the Census Bureau dated February 13, 2020, the Utah State Legislature stated, "Based upon our analysis of differential privacy as applied to the 2010 Census redistricting data, we believe, if differential privacy is applied to the 2020 redistricting data, that the integrity of the data used to redistrict the state into congressional and legislative districts, and also with local jurisdictions will be threatened."

In a letter to the Census Bureau dated April 24, 2020, the head of National Redistricting Foundation stated, "I write today on behalf of the National Redistricting Foundation ("NRF") to convey our significant concerns regarding the Census Bureau's proposed use of differential privacy for the 2020 Census. We are concerned that the Bureau's proposed application of differential privacy will substantially diminish the

usability of the resulting data for redistricting, hampering the ability of state and local government s to comply with constitutional and statutory requirements that ensure fair and equal political representation."

In a report from the U.S. General Accountability Office in December 2020 related to the 2020 Census, they label the last section in the report "The Bureau Has Work Remaining to Protect the Privacy of Respondents' data." In this section they note several things that the Census Bureau must do before implementing differential privacy.

In another significant example, Toni G. Atkins (California Senate President pro Tempore) and Anthony Resdon (California Speaker of the Assembly) have written to the Honorable Ronald Klain (the current Presidential Chief of Staff), copying Vice President Kamala Harris (among others), stating:

> "The adjustment to Census data that remain a concern is referred to as "differential privacy." It has been developed by the Census Bureau as part of its mandate to maintain the confidentiality of individual American residents, while at the same time producing accurate detailed data. The Census Bureau is required to balance these two goals – which can be in conflict.
>
> Differential privacy is a new system that the previous administration rushed to complete to avoid disclosing individuals' identities. The intent was to serve the laudable privacy goal, but the system also has the effect of scattering minority voters, making it much more difficult to serve the goals of the Voting Rights Act.
>
> The rush to implement differential privacy also negatively impacts the ability of states to implement their laws. For example, California requires Census data to be adjusted for persons incarcerated in state correctional facilities, using the data provided by the Census Bureau. However, if this data has been modified by the Bureau with limited transparency, California's important electoral reform will be undermined. We include an enclosure describing this particular problem in the California setting in more detail, but the issue of this new adjustment's impact is a national one."[35]

Ruggles et al. (2019: 404) observe that the application of differential privacy to census data products is a radical departure from established Census Bureau confidentiality laws. They go on to note that differential privacy requirement that database outputs do not significantly change when any individual data are added or removed has implications, especially the aspect under differential privacy in which it is prohibited to reveal characteristics of an individual even if the identity of that individual is effectively concealed. Continuing, Ruggles et al. (2019: 404) point out that as the Census Bureau acknowledges, masking respondent characteristics is not required under census law. Instead, the laws require that the identity of particular respondents shall not be disclosed. In 2002, Congress explicitly defined the concept of identifiable data: "It is prohibited to publish any representation of information that permits the identity of the respondent to whom the information applies to be reasonably inferred by either direct or indirect means."

---

[35]

https://www.ncsl.org/Portals/1/Documents/Redistricting/California_Leaders_Letter_to_RonaldKlain_Feb2021.pdf

## References

Abowd, J (2020). Modernizing Disclosure Avoidance: What We've Learned, Where We Are Now. https://www.census.gov/newsroom/blogs/research-matters/2020/03/modernizing_disclosu.html

Anderson, M. and Fienberg, S.E., (2001). Who Counts? The Politics of Census Taking in Contemporary America, Russell Sage Foundation, New York.

Balinski, M. and Young, H. P., (1982). Fair Representation: Meeting the Ideal of One Man, One Vote, Yale University Press, New Haven, CT.

Blumerman, L.M., and Vidal, P.M., (2009). Uses of Population and Income Statistics in Federal Funds Distribution—With a Focus on Census Bureau Data, Government Divisions Report Series, Research Report #2009-1, U.S. Census Bureau, Washington, DC.

Brace, K. (2016) "No Change in Apportionment Allocations with New 2016 Census Estimates: But Greater Changes Likely by 2020." Election Data Services, December

Bryant, B.E., Dunn, W. (1995). Moving Power and Money: The Politics of U.S. Decennial Census Taking, New Strategists Publications, Ithaca NY.

Calleam Consulting (2012). Failed Project Case Study -The United Stated 2010 Census – Field Data Collection Automation (FDCA). (http://calleam.com/wp-content/uploads/US_Census_FDCA_Case_Study_V1.0.pdf )

Clogg, C.C., Massaglie, M.P, and Eliason, S.R., (1989). Population Undercount and Social Science Research, Social Indicators Research, Vol. 21, no. 6, pp 559-598.

Committee on National Statistics (2019). "Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations," presentations are available at https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-data-products-data-needs-and-privacy-considerations

Conk. M., (1987). According to Their Respective Numbers, Yale University Press, New Haven, CT.

Conk. M., (1987). According to Their Respective Numbers, Yale University Press, New Haven, CT.

Crocker, R. (2011). House Apportionment 2010: States Gaining, Losing and on the Margin, Congressional Research Service, 7-5700 R41584.

Cropper, M. and Stojakovic, Z (2021) "The Impact of Differential Privacy on School Demography and Small Area Forecasts," presentation at the Applied Demography Conference February 2-4, 2021, Final slide in presentation.

Daponte, B.O., and Wolfson, L.J., (2003). How many American Children are Poor? Considering Census Undercounts by Comparing Census to Administrative Data," unpublished paper.

Dinur, I. and K. Nissim. (2003). Revealing Information while Preserving Privacy. In PODS, pages 202–210. ACM.

Dwork, C. (2006) Differential Privacy (https://www.microsoft.com/en-us/research/wp-content/uploads/2016/02/dwork.pdf ).

Edmonston, B., (2001). Effects of U.S. Decennial Census Undercoverage on Analyses of School Enrollments: A Case Study of Portland Public Schools, U.S. Census Monitoring Board, Report Series, Report No. 5, February

Everaers, P. (2021)   Editorial, Statistical Journal of the International Association of Official Statistics: Statistical Journal of the IAOS, vol. 36, no. 1, pp. 1-3, 2020 DOI-10.3233/SJI-209002.

First Focus on Children (2019) Children's Budget 2019

Grofman, B., (1982). Representation and Redistricting Issues, Lexington Books, Lexington, MA.

Hauer, M. E. and A. Santos-Lozada. (2021) "Differential Privacy in the 2020 Census Will Distort COVID-19 Rates, Socius: Sociological Research for a Dynamic World,

Hernandez, D. and N. Denton. (2001). Census Affects Children in Poverty, U.S. Census Monitoring Board, Washington, DC.

Hough, G., and Swanson, D. (2006). An evaluation of the American Community Survey: Results from the Oregon test site. Population Review and Policy Research 25(3): 257-273.

Hotz, J. and Salvo J. (2020). Addressing the Use of Differential Privacy for the 2020 Census: Summary of What We Learned from the CNSTAT Workshop. https://www.apdu.org/2020/02/28/apdu-member-post-assessing-the-use-of-differential-privacy-for-the-2020-census-summary-of-what-we-learned-from-the-cnstat-workshop/.

Jensen, E., and H. Hogan (2017). The coverage of young children in demographic surveys. Statistical Journal of the International Association for Official Statistics 33: 321-333.

Leadership Conference on Civil and Human Rights (2017). Fact Sheet: The Census and Civil Rights," Downloaded on June 13, 2017 from http://civilrightsdocs.info/pdf/census/Fact-Sheet-Census-and-Civil-Rights.pdf

Long, G., (2020) Formal Privacy Methods for the 2020 Census. Mitre.Org

McKay, R., (1965). Reapportionment: The Law and Politics of Equal Representation, The Twentieth Century Fund, New York, NY.

McKibben, J., (2007). The Use of School Enrollment Data to Estimate Census Undercounts in Small Areas, presentation and Applied Demography Conference, San Antonio, TX January 2007.

McKibben, J., (2012). Using School Enrollment Data to Measure Small Area Coverage Rates of the 2010 Census, presentation and Applied Demography Conference, San Antonio, TX January 2012.

Murphy, S.L. Xu, J., Kochanek, K.D., (2013). Deaths: Final data for 2010, National Vital Statistics Reports, Volume 61, No. 4.

Nagle, N. and Kuhn, T. (2019). "Implications for School Enrollment Statistics." https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-data-products-data-needs-and-privacy-considerations

National Conference of State Legislators (2017) downloaded June 11, 2017 from http://www.ncsl.org/research/about-state-legislatures/number-of-legislators-and-length-of-terms.aspx

National Conference of State Legislators (2017) downloaded June 11, 2017 from http://www.ncsl.org/research/about-state-legislatures/number-of-legislators-and-length-of-terms.aspx

O'Hare, W.P., Jensen, E. and O'Hare, B.C., (2013). Assessing the Undercount of Young Children in the U.S. Decennial Census: Implications for Survey Research and Potential Explanations. Paper presented at the2013 American Association of Public Opinion Researchers Annual Conference, Boston, MA.

O'Hare, W.P., (2014c). State-Level 2010 Census Coverage Rates for Young Children, Population Research and Policy Review, Volume 33, no. 6, pages 797-816.

O'Hare, W. P., and Jensen, E. B., (2014). The Representation of Young Children in the American Community Survey, presentation at the ACS Users Group Conference, Washington, DC. May 29-30.

O'Hare, W.P. (2017) presentation at American Community Survey User Conference, 2017, Alexandria, VA

O'Hare W. P. (2020). "Many States Use Decennial Census Data to Distribute State Money, The Census Project Website https://thecensusproject.org/2020/01/09/many-states-use-decennial-census-data-to-distribute-state-money/

O'Hare, W.P. (2020). "The Politicization of the 2020 Census," PAA Affairs, Fall 2020, The Population Association of America, Washington DC. https://higherlogicdownload.s3.amazonaws.com/POPULATIONASSOCIATION/3e04a602-09fe-49d8-93e4-1dd0069a7f14/UploadedImages/Documents/PAA_Affairs/PAA-Fall_20_.pdf

O'Hare, W.P, Jacobsen, L.A., Mather, M. VanOrman and Pollard, K (2019). "What Factors Are Most Closely Associated with the Net Undercount of Young Children in the U.S. Census?" Population Reference Bureau, Washington, DC. https://www.prb.org/wp-content/uploads/2019/03/net-undercount-children-acs.pdf

O'Hare, W.P. (2019)."Evidence mounts regarding respondent confusion about counting young children in the Census" The Census Project https://thecensusproject.org/2019/12/11/evidence-mounts-regarding-respondent-confusion-about-counting-young-children-in-the-census/

Prewitt, K. (2003). Politics and Science in Census Taking, in series The American People: Census 2000, Russell Sage Foundation and Population Reference Bureau, Population Reference Bureau, Washington, DC.

Prewitt, K., (2014). What Is Your Race? The Census and Our Flawed Efforts to Classify Americans, Princeton University Press, Princeton, NJ.

Price Waterhouse Cooper (2001). Effect of U.S. Decennial Census2000 Undercount on Federal Funding to States and Selected Counties, 2001-2012, Report to the U.S. Census Monitoring Board, Presidential Members.

Qian, C., (2020) Census Data Products, Data Needs and Privacy Considerations, Proceedings of a Workshop, The National Academy Press, page 28, Washington DC.

Reamer, A. D., (2009). Counting for Dollars, Brookings Institute, Metropolitan Policy Program, Washington, DC.

Reamer, A. D., (2019). Counting for Dollars, George Washington University, Washington, DC.

Reamer, A. D., (2020). Counting for Dollars, George Washington University, Washington, DC.

Ruggles, S., C. Fitch, D. Magnuson, and J. Schroeder. (2019) Differential Privacy: Implications for Social and Economic Research. American Economic Association Papers and Proceedings 109 (May): 403-408.

Samuels, C.A. (2017) "Preschool Class Size – Within Reason – Does It Matter Study Finds" Education Week, August 4 2017.

Schwede, L., Terry, R., and Hunter, J. (2015). "Ethnographic evaluations on coverage of hard-to-count minority in the US decennial censuses," in Hart-to-Survey Populations, Edited by Tourangeau, R., Edwards, B., Johnson, T.P., Wolter, K.M., and Bates, N. Cambridge University Press, Cambridge, England, pp 293-315

Smith, S., Tayman, J., and Swanson, D.A., (2001) State and Local Population Projections: Methods and Analysis, The Plenum Series on Demographic Methods and Population Analysis, Kluwer

Snoke, J., and C. McKay. (2019). Differential Privacy: What is it? AMSTAT News (March). (https://magazine.amstat.org/blog/2019/03/01/differentialprivacy/ ).

Swanson, D. (2009). "Hurricane Katrina: A Case Study of Its Impacts on Medical Service Providers and Their Client Populations." The Open Demography Journal 2: 8-17.

Swanson, D., J. Carson, and C. Williams. (1990). "The Development of Small Area Socioeconomic Data to be Utilized for Impact Analysis: Rural Southern Nevada." pp.985-990 in High Level Radioactive Waste Management: Proceedings of the 1990 International Conference, American Nuclear Society and American Society of Civil Engineers, New York, New York, 1990.

Swanson, D., R. Forgette, J. McKibben, M. Van Boening, and L. Wombold. (2009). "The Socio-Demographic and Environmental Effects of Katrina: An Impact Analysis Perspective". The Open Demography Journal.2 (11): 36-46.

The Leadership Conference Education Fund/Advancing Justice/National Association of Latino Elected Officials (2014). Race and Ethnicity in the 2020 Census: Improving Data to Capture a Multiethnic America, Leadership Conference Education Fund, Washington DC.

U.S. Senate (1992). Dividing Dollars: Issues in Adjusting Decennial Counts and Intercensal Estimates for Funds Distribution, Report prepared by the Subcommittee on Government Information and Regulation of the Committee on Government Affairs, 102nd Congress, 2nd session Senate Print 102-83, U.S. Government Printing Office, Washington, DC.

U.S. Census Bureau (1974). Estimates of Coverage of Population by Sex, Race and

U.S. Census Bureau (2014a) (BILL UPDATE). The 2013 population estimates are available online at http://factfinder2.census.gov/faces/tableservices/jsf/pages/productview.xhtml?src=bkmk

U.S. Census Bureau (2014b). U.S. Population Projections: 2014-2060, Release Number CB14-TPS.86.

U.S. Census Bureau (2017) 2020 Census Operation Plan, Version 3.0, Issued September 2017, U.S. Census Bureau, Washington, DC.

U.S. Census Bureau (2018), "Disclosure Avoidance Techniques Used for the 1970 through 2010 Decennial Censuses of Population and Housing," THE RESEARCH AND METHODOLOGY DIRECTORATE, Mc Kenna, L. U.S. Census Bureau, Washington DC., https://www.census.gov/content/dam/Census/library/working-papers/2018/adrm/Disclosure%20Avoidance%20for%20the%201970-2010%20Censuses.pdf

U.S. Census Bureau (2020a). 2020 Census Disclosure Avoidance Improvement Metrics, U.S Census Bureau, Washington DC., March 18, https://www2.census.gov/programs-surveys/decennial/2020/program-management/data-product-planning/disclosure-avoidance-system/2020-03-18-2020-census-da-improvement-metrics.pdf?#

U.S. Census Bureau (2020b), "2020 Census Data Products and the Disclosure Avoidance System, Hawes M. and Garfinkel. S. L., Planned presentation at the Census Scientific Advisory Committee meeting, March 26,

U.S. Census Bureau (2020c) DAS Updates, U.S Census Bureau, Hawes M. June 1 Washington DC., https://www2.census.gov/programs-surveys/decennial/2020/program-management/data-product-planning/disclosure-avoidance-system/2020-06-01-das-updates.pdf?#

U.S. Census Bureau (2020d). "Disclosure Avoidance and the Census," Select Topics in International Censuses, U.S. Census Bureau, October 2020. https://www.census.gov/library/working-papers/2020/demo/disclos-avoid-census.html

U.S. Census Bureau (2020e). "Disclosure Avoidance and the 2020 Census, U.S. Census Bureau," Washington DC., Accessed November 2, https://www.census.gov/about/policies/privacy/statistical_safeguards/disclosure-avoidance-2020-census.html

U.S. Census Bureau (2020f) Error Discovered in PPM, U.S. Census Bureau, Washington DC. https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html

U.S. Census Bureau (2020g), "2020 Disclosure Avoidance System Updates," U.S. Census Bureau, Washington DC., https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html

U.S. General Accountability Office (2020). "COVID-19 Presents Delays and Risks to Census Counts," U.S. General Accountability Office, Washington, DC., https://www.gao.gov/products/GAO-20-551R

U.S. Senate (1992). Dividing Dollars: Issues in Adjusting Decennial Counts and Intercensal Estimates for Funds Distribution, Report prepared by the Subcommittee on Government Information and Regulation of the Committee on Government Affairs, 102nd Congress, 2nd session Senate Print 102-83, U.S. Government Printing Office, Washington, DC.

Vink, J. (2019). "Elementary School Enrollment," https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-data-products-data-needs-and-privacy-considerations

Voss, P. and D. Cork (2006). Once, Only Once, and in the Right Place: Residence Rules in the Decennial Census. National Research Council. Washington, DC: The National Academies Press.

Waite, P. J. (2003). The reengineered 2010 Census. Proceedings of Statistics Canada Symposium 2003 Challenges in Survey Taking for the Next Decade (https://www150.statcan.gc.ca/n1/en/catalogue/11-522-X20030017608 ).

Waite, P. J. and B Reist (2005). Reengineering the census of population and housing in the United States Statistical Journal of the United Nations Economic Commission for Europe, 22 (1): 13-23

Weldon Cooper Center for Public Service (2013) Projections for the 50 States and D.C., available online at http://www.coopercenter.org/demographics/national-population-projections

West, K.K, and Fein, D.J., (1990). U.S. Decennial Census Undercount: An Historical and Contemporary Sociological Issues, Sociological Inquiry, Vol. 60, No. 2, May pp 127-141.

Williams, J. (2012). The 2010 Census: Background and Issues. Congressional Research Service. (https://www.census.gov/history/pdf/2010-background-crs.pdf ).

Winkler, R. L., Butler, J.L, Curtis, K. J., Robinson, D. E. (2021) "Impact of Differential Privacy on New Net Migration Estimates (2010-2020) presentation at the PAA Applied Demography Conference, February 2-4, 2021.

# Appendix 2

# Thomas M. Bryan

3132 Briarmoor Lane
Midlothian, VA 23113
425-466-9749
tom@bryangeodemo.com

## Résumé and C.V.

## Introduction

I am an applied demographic, analytic and research professional. I have expertise in the collection, management, analysis and reporting of demographic, business and consumer data to deliver insights and drive decision making. I have subject matter expertise in:

- Political redistricting and Voting Rights Act related litigation
- US Census Bureau data and national health statistics
- Large-scale multi-mode consumer survey research design and execution
- Applied demographic techniques
- Advanced analytics
- Consumer package goods market information and consumer research
- FDA compliance and the Family Smoking Prevention and Tobacco Control Act
- Geographic Information Systems (G.I.S.)
- U.S. Government, Census and other primary / secondary survey research data (NHIS, BRFSS, NSDUH)
- Syndicated data and vendor management (IRI, Nielsen, GfK, ORC Engine, etc.)

## Education & Academic Honors

2002 MS, Management and Information Systems - George Washington University

2002 GSA CIO University graduate* - George Washington University

1997 Graduate credit courses taken at University of Nevada at Las Vegas

1996 MUS (Master of Urban Studies) Demography and Statistics core - Portland State University

1996 Oregon Laurels Scholar

1992 BS, History - Portland State University

1987-1988  Undergraduate credit courses taken at Portland OR, Community College

---

Granted by the General Services Administration (GSA) and the Federal IT Workforce Committee of the CIO Council.
http://www.gwu.edu/~mastergw/programs/mis/pr.html

**Bryan GeoDemographics, January 2001-Current: Founder and Principal**

I founded Bryan GeoDemographics (BGD) in 2001 as a demographic and analytic consultancy to meet the expanding demand for advanced analytic expertise in applied demographic research and analysis.  Since then, my consultancy has broadened to include litigation support, political redistricting, school redistricting, and municipal infrastructure initiatives.  Since 2001, BGD has undertaken over 150 such engagements in three broad areas: 1) state and local political redistricting, 2) applied demographic studies, and 3) school redistricting and municipal Infrastructure analysis.

The core of the BGD consultancy has been in political redistricting litigation, particularly on Voting Rights Act and discrimination cases.  Engagements include:

State and Local Political Redistricting

- 2020: In the matter of The Christian Ministerial Alliance (CMA), Arkansas Community Institute, Marion Humphrey, Olly Neal, And Ryan Davis v. the State of Arkansas.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Providing demographic and analytic litigation support.
  - https://www.naacpldf.org/wp-content/uploads/CMA-v.-Arkansas_FILED-without-stamp.pdf

- 2020: In the matter of *Louisiana State Conference of the NAACP, Allen and Anthony (Plaintiffs) v. the State of Louisiana (Defendants)* in US District Court.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Providing demographic and analytic litigation support for the analysis and testing of LA Supreme Court Districts.
  - https://apnews.com/c44c986a29ec4035a87e5ca94d4e6324
  - https://www.bloomberglaw.com/public/desktop/document/AllenetalvStateofLouisianaOfficeoftheGovernorDivisionofAdministra?1595341263

- 2020: In the matter of *Aguilar, Gutierrez, Montes, Palmer and OneAmerica (Plaintiffs) v. Yakima County (Defendant)* in Superior Court of Washington under the recently enacted Washington Voting Rights Act ("WVRA" Wash. Rev. Code § 29A.92.60).  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Providing demographic and analytic litigation support.
  - https://bloximages.newyork1.vip.townnews.com/yakimaherald.com/content/tncms/assets/v3/editorial/a/4e/a4e86167-95a2-5186-a86c-bb251bf535f1/5f0d01eec8234.pdf.pdf

- 2018-2020: In the matter of *Flores, Rene Flores, Maria Magdalena Hernandez, Magali Roman, Make the Road New York, and New York Communities for Change (Plaintiffs) v. Town of Islip, Islip Town Board, Suffolk County Board of Elections (Defendants)* in US District Court.  On behalf of Defendants - provided a critical analysis of plaintiff's demographic and

environmental justice analysis. The critique revealed numerous flaws in both the demographic analysis as well as the tenets of their environmental justice argument, which were upheld by the court. Ultimately developed mutually agreed upon plan for districting.

- o https://nyelectionsnews.wordpress.com/2018/06/20/islip-faces-section-2-voting-rights-act-challenge/
- o https://www.courthousenews.com/wp-content/uploads/2018/06/islip-voting.pdf

- 2017-2020 In the matter of *NAACP, Spring Valley Branch; Julio Clerveaux; Chevon Dos Reis; Eric Goodwin; Jose Vitelio Gregorio; Dorothy Miller; and Hillary Moreau (Plaintiffs) v East Ramapo Central School District (Defendant)* in United States District Court Southern District Of New York (original decision May 25, 2020), later the U.S. Second Circuit Court of Appeals. On behalf of Defendants, developed mutually agreed upon district plan and provided demographic and analytic litigation support.

  - o https://www.lohud.com/story/news/education/2020/05/26/federal-judge-sides-naacp-east-ramapo-voting-rights-case/5259198002/

  - o

- 2017-2020: In the matter of *Pico Neighborhood Association et al (Plaintiffs) v. City of Santa Monica (Defendant)* brought under the California VRA. In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Providing demographic and analytic litigation support. Executed geospatial analysis to identify concentrations of Hispanic and Black CVAP to determine the impossibility of creating a minority majority district, and demographic analysis to show the dilution of Hispanic and Black voting strength in a district (vs at-large) system. Work contributed to Defendants prevailing in landmark ruling in the State of California Court of Appeal, Second Appellate District.

  - o https://www.santamonica.gov/press/2020/07/09/santa-monica-s-at-large-election-system-affirmed-in-court-of-appeal-decision

- 2019: In the matter of *Johnson (Plaintiffs) v. Ardoin / the State of Louisiana (Defendants)* in United States District Court. In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Provided demographic and analytic litigation support.

  - o https://www.brennancenter.org/sites/default/files/2019-10/2019-10-16-Johnson%20v_%20Ardoin-132-Brief%20in%20Opposition%20to%20MTS.pdf

- 2019: In the matter of *Suresh Kumar (Plaintiffs) v. Frisco Independent School District et al*. (Defendants) in United States District Court. In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Provided demographic and analytic litigation support. Successfully defended.

  - o https://www.friscoisd.org/news/district-headlines/2020/08/04/frisco-isd-wins-voting-rights-lawsuit

  - o https://www.courthousenews.com/wp-content/uploads/2020/08/texas-schools.pdf

- 2019: At the request of the City of Frisco, TX in collaboration with demographic testifying expert Dr. Peter Morrison.  Provided demographic assessment of the City's potential liability regarding a potential Section 2 Voting Rights challenge.

- 2019: In the matter of *Vaughan (Plaintiffs) v. Lewisville Independent School District et al. (Defendants)* in United States District Court.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Provided demographic and analytic litigation support.
  - o https://www.nbcdfw.com/news/local/lawsuit-filed-against-lewisville-independent-school-district/1125/

- 2019: In the matter of *Holloway, et al. (Plaintiffs) v. City of Virginia Beach (Defendants) in* United States District Court, Eastern District of Virginia.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Provided demographic and analytic litigation support.
  - o https://campaignlegal.org/cases-actions/holloway-et-al-v-city-virginia-beach

- 2018: At the request of Kirkland City, Washington in collaboration with demographic testifying expert Dr. Peter Morrison.  Performed demographic studies to inform the City's governing board's deliberations on whether to change from at-large to single-member district elections following enactment of the Washington Voting Rights Act.  Analyses included gauging the voting strength of the City's Asian voters and forming an illustrative district concentrating Asians; and compared minority population concentration in pre- and post-annexation city territory.
  - o https://www.kirklandwa.gov/Assets/City+Council/Council+Packets/021919/8b_Spec ialPresentations.pdf#:~:text=RECOMMENDATION%3A%20It%20is%20recommended %20that%20City%20Council%20receive,its%20Councilmembers%20on%20a%20city wide%2C%20at-%20large%20basis.

- 2018: At the request of Tacoma WA Public Schools in collaboration with demographic testifying expert Dr. Peter Morrison.  Created draft concept redistricting plans that would optimize minority population concentrations while respecting incumbency.  Client will use this plan as a point of departure for negotiating final boundaries among incumbent elected officials.

- 2018: At the request of the City of Mount Vernon, Washington., in collaboration with demographic testifying expert Dr. Peter Morrison.  Prepared a numerous draft concept plans that preserves Hispanics' CVAP concentration.  Client utilized draft concept redistricting plans to work with elected officials and community to agree upon the boundaries of six other districts to establish a proposed new seven-district single-member district plan.

- 2017: In the matter of *John Hall, Elaine Robinson-Strayhorn, Lindora Toudle, Thomas Jerkins, (Plaintiffs) v. Jones County Board Of Commissioners (Defendant).*  In collaboration with

demographic testifying expert Dr. Peter Morrison.  Worked to create draft district concept plans to resolve claims of discrimination against African Americans attributable to the existing at-large voting system.

- o http://jonescountync.gov/vertical/sites/%7B9E2432B0-642B-4C2F-A31B-CDE7082E88E9%7D/uploads/2017-02-13-Jones-County-Complaint.pdf

- 2017: In the matter of *Harding (Plaintiffs) v. County of Dallas (Defendants)* in U.S. District Court.  In collaboration with demographic testifying expert Dr. Peter Morrison.  In a novel case alleging discrimination *against* White, non-Hispanics under the VRA, I was retained by plaintiffs to create redistricting scenarios with different balances of White-non-Hispanics, Blacks and Hispanics.  Deposed and provided expert testimony on the case.
  - o https://www.courthousenews.com/wp-content/uploads/2018/08/DallasVoters.pdf

- 2016: Retained by The Equal Voting Rights Institute to evaluate the Dallas County Commissioner existing enacted redistricting plan.  In collaboration with demographic testifying expert Dr. Peter Morrison, the focus of our evaluation was twofold: (1) assess the failure of the Enacted Plan (EP) to meet established legal standards and its disregard of traditional redistricting criteria; (2) the possibility of drawing an alternative Remedial Plan (RP) that did meet established legal standards and balance traditional redistricting criteria.
  - o http://equalvotingrights.org/wp-content/uploads/2015/01/Complaint.pdf

- 2016: In the matter of *Jain (Plaintiffs) v. Coppell ISD et al (Defendant)* in US District Court.  In collaboration with demographic testifying expert Dr. Peter Morrison.  Consulted in defense of Coppell Independent School District (Dallas County, TX) to resolve claims of discriminatory at-large voting system affecting Asian Americans.  While Asians were shown to be sufficiently numerous, I was able to demonstrate that they were not geographically concentrated - thus successfully proving the Gingles 1 precondition could not be met resulting the complaint being withdrawn.
  - o https://dockets.justia.com/docket/texas/txndce/3:2016cv02702/279616

- 2016: In the matter of *Feldman et al (Plaintiffs) v. Arizona Secretary of State's Office et al, (Defendant)* in SCOTUS.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Provided analytics on the locations and proximal demographics of polling stations that had been closed subsequent to *Shelby County v. Holder* (2013) which eliminated the requirement of state and local governments to obtain federal preclearance before implementing any changes to their voting laws or practices.  Subsequently provided expert point of view on disparate impact as a result of H.B. 2023.  Advised Maricopa County officials and lead counsel on remediation options for primary polling place closures in preparation for 2016 elections.
  - o https://arizonadailyindependent.com/2016/04/05/doj-wants-information-on-maricopa-county-election-day-disaster/).

- o https://www.supremecourt.gov/DocketPDF/19/19-1257/142431/20200427105601341_Brnovich%20Petition.pdf
- 2016: In the matter of *Glatt (Plaintiff) v. City of Pasco, et al. (Defendants)* in US District Court (Washington). In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Provided analytics and draft plans in defense of the City of Pasco. One draft plan was adopted, changing the Pasco electoral system from at-large to a six-district + one at large.
    - o https://www.pasco-wa.gov/DocumentCenter/View/58084/Glatt-v-Pasco---Order---January-27-2017?bidId=
    - o https://www.pasco-wa.gov/923/City-Council-Election-System
- 2015: In the matter of *The League of Women Voters et al. (Plaintiffs) v. Ken Detzner et al (Defendants)* in the Florida Supreme Court. In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Performed a critical review of Florida state redistricting plan and developed numerous draft concept plans.
    - o http://www.miamiherald.com/news/politics-government/state-politics/article47576450.html
    - o https://www.floridasupremecourt.org/content/download/322990/2897332/file/OP-SC14-1905_LEAGUE%20OF%20WOMEN%20VOTERS_JULY09.pdf
- 2015: In the matter of *Evenwel, et al. (Plaintiffs) v. Abbott / State of Texas (Defendants)* in SCOTUS. In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Plaintiffs. Successfully drew map for the State of Texas balancing both total population from the decennial census and citizen population from the ACS (thereby proving that this was possible). We believe this may be the first and still only time this technical accomplishment has been achieved in the nation at a state level. Coauthored SCOTUS Amicus Brief of Demographers.
    - o https://www.supremecourt.gov/opinions/15pdf/14-940_ed9g.pdf
    - o https://www.scotusblog.com/wp-content/uploads/2015/08/Demographers-Amicus.pdf
- 2015: In the matter of *Ramos (Plaintiff) v. Carrollton-Farmers Branch Independent School District* (Defendant) in US District Court (Texas). In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants. Used 2009-2013 5-year ACS data to generate small-area estimates of minority citizen voting age populations and create a variety of draft concept redistricting plans. Case was settled decision in favor of a novel cumulative voting system.
    - o https://starlocalmedia.com/carrolltonleader/c-fb-isd-approves-settlement-in-voting-rights-lawsuit/article_92c256b2-6e51-11e5-adde-a70cbe6f9491.html
- 2015: In the matter of *Glatt (Plaintiff) v. City of Pasco et al. (Defendants)* in US District Court (Washington). In collaboration with demographic testifying expert Dr. Peter Morrison, on

behalf of Defendants.  Consulted on forming new redistricting plan for city council review. One draft concept plan was agreed to and adopted.

- o https://www.pasco-wa.gov/923/City-Council-Election-System

- 2015: At the request of Waterbury, Connecticut, in collaboration with demographic testifying expert Dr. Peter Morrison.  As a result of a successful ballot measure to convert Waterbury from an at-large to a 5-district representative system -consulted an extensive public outreach and drafted numerous concept plans.  The Waterbury Public Commission considered alternatives and recommended one of our plans, which the City adopted.

  - o http://www.waterburyobserver.org/wod7/node/4124

- 2014-15:  In the matter of *Montes (Plaintiffs) v. City of Yakima (Defendant)* in US District Court (Washington).  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants.  Analytics later used to support the Amicus Brief of the City of Yakima, Washington in the U.S. Supreme Court in *Evenwel v. Abbott*.

  - o https://casetext.com/case/montes-v-city-of-yakima-3

- 2014: At the request of Gulf County, Florida in collaboration with demographic testifying expert Dr. Peter Morrison.  Upon the decision of the Florida Attorney General to force inclusion of prisoners in redistricting plans – drafted numerous concept plans for the Gulf County Board of County Commissioners, one of which was adopted.

  - o http://myfloridalegal.com/ago.nsf/Opinions/B640990E9817C5AB85256A9C0063138 7

- 2012-2015: In the matter of *GALEO (Plaintiffs) and the City of Gainesville (Defendants)* in Georgia.  In collaboration with demographic testifying expert Dr. Peter Morrison, on behalf of Defendants -consulted on defense of existing at-large city council election system.

  - o http://atlantaprogressivenews.com/2015/06/06/galeo-challenges-at-large-voting-in-city-of-gainesville/

- 2012-: Confidential.  Consulted (through Morrison & Associates) to support plan evaluation, litigation, and outreach to city and elected officials (1990s - mid-2000s).  Executed first statistical analysis of the American Community Survey to determine probabilities of minority-majority populations in split statistical/administrative units of geography, as well as the cumulative probabilities of a "false-negative" minority-majority reading among multiple districts.

- 2011-: Confidential. Consulted on behalf of plaintiffs in Committee (Private) vs. State Board of Elections pertaining to citizen voting-age population.  Evaluated testimony of defense expert, which included a statistical evaluation of Hispanic estimates based on American Community Survey (ACS) estimates.  Analysis discredited the defendant's expert's analysis and interpretation of the ACS.

Applied Demography Studies

In addition to political redistricting cases, BGD has provided demographic and analytic expertise across a broad array of issues, oftentimes creating pivotal evidence that has been decisive in legal cases and analytics that were core to the success of clients.  Examples include:

- 2018-2019: Client Confidential.  Leveraged the National Survey of Drug Use and Health (NSDUH) to develop a comprehensive analysis of opioid use, misuse, dependence, abuse and opioid use disorder (OUD).  Analytics included prevalence analysis, demographic profiles, insurance and treatment trends, comorbidities, other drug use, dependence and abuse covariates.  This analysis culminated in what is believed to be the only long-term forecast of opioid misuse, dependence, abuse and OUD by age, race and sex, marital status, educational attainment and income for the United States.

- 2016-ongoing: Consulted (through Morrison & Associates) in defense against a US Department of Justice housing discrimination complaint against Oyster Bay, New York. Leveraged 9 years of the ACS PUMS data measure local demographic makeup and gross migration patterns by age and race.  Findings refuted plaintiffs' claim that housing practices were discriminatory. (Access at: http://oysterbayguardian.com/stories/Town-accused-of-housing-discrimination,145)

- 2016: Consulted (through Morrison & Associates) in defense class action claim against Shorter University (Georgia) in Bishop, et al. v. Shorter University, Inc. Estimated the citizenship/state of residence of the proposed class members using 2008-2014 ACS PUMS data.  Findings contributed to partial dismissal of the case.  (access at: http://www.lexislegalnews.com/articles/10983/university-awarded-attorney-fees-for-discovery-disputes-in-stolen-records-suit )

- 2016: Consulted (through Morrison & Associates) in defense of class action claim against consumer product manufacturer. Used ACS PUMS data to compute gross annual out-migration flows from Illinois.  Data were used to calibrate demographic accounting model that tracks movement over time of victim cohorts for whom legal redress is sought.

- 2013 - Consulted (through Morrison & Associates) in using the 2008-2012 ACS and Census 2000 PUMS data to estimate Persons >/< 18 in household by number of bedrooms in a technical analysis supporting housing discrimination litigation sought in Florida.

- 2012 - Consulted (through Morrison & Associates) in generating a time-series of ACS Citizen Voting Age Population estimates by race and ethnicity from 2005-2010 ACS to assess the impact of a State of Wisconsin proposed rule requiring driver licenses to verify voters' current addresses.

- 2011 - Commissioned by ESRI as member of expert team to conduct 1st-ever evaluation of small-area private-party population estimates to produce "Vendor Accuracy Study Population and Household Estimates vs. 2010 Census".  Built databases containing five vendors across

>200,000 units of geography and executed 4 summary error calculations for each to provide to succeeded experts for analysis and interpretation (with David A. Swanson, Jeff Tayman and Jerome McKibben).

- 2008 - Commissioned as expert to provide demographic analytic support in defense of putative class-action lawsuit against DuPont alleging PFOA's and other chemicals were released by Teflon products during cooking. Used Consumer Expenditure Survey, Current Population Survey, and U.S. Census PUMS data to produce model showing how interstate migration diluted the class over the 10-year class period plaintiffs sought (with Morrison & Associates). Result: class successfully de-certified (access summary at: http://www.masstortdefense.com/2008/12/articles/federal-court-denies-class-certification-in-teflon-litigation/).

- 2008 – Retained by RAND Corporation as expert to create a Census 2000 Block-Group (BG) level file that re-allocates the "some other race" population to known race-alone and Hispanic categories. File was generated using U.S. Census Bureau's county-level modified age-race-sex (MARS) file, U.S. Census 2000 data and the U.S. Census Bureau's Iterative Proportionate Fitting (IPF) algorithm (with Morrison & Associates).

- 2008 – Commissioned as expert to analyze 2007 US NAICS Manufacturing Codes and Total Employment for Louisiana, Mississippi and Texas in support of local-area forecasting for area school districts (with Cropper G.I.S.).

- 2007 - Consulted (through Morrison & Associates) to provide demographic analytic support of the "Proposed Revision of The Census Bureau's 2006 Population Estimate for the Town of Nantucket, MA". Result: successful challenge accepted by the U.S. Census Bureau.

- 2007 - Produced annual birth and death data from U.S. vital statistics and state-specific migration rates from IRS data for 2001-2003 in support of presentation to Western Planners Association (with McKibben Demographics).

- 2007 - Produced California age-specific time series of domestic and international migration from the U.S. Census Modified Age race Sex (MARS) and Census 2000 data files for the State of California (with McKibben Demographics).

- 2007 - Consulted (through Morrison & Associates) to write "Analysis of Census 2000 Hispanic Estimate in Westchester, NY".

- 2006 - Commissioned as expert to provide demographic analysis of the Island of Hawaii for Tradewinds Forest Products. Hilo, Hawaii.

- 2006 – Commissioned as expert by wine retailer "Vino 100" to support site location in Wisconsin. Used U.S. Consumer Expenditure Survey and U.S. Census data to produce a geospatial model predicting optimal site location in Milwaukee, WI. The recommended site was chosen, and grew to the #2 highest grossing store in the chain in < 12 months.

- 2006 - Consulted (through Morrison & Associates) to use the U.S. Census PUMS data to estimate the proportion of Hispanic and non-Hispanic individuals aged 18+, who are citizens, who speak English well by migration status in Yolo, California.

- 2004 - Consulted (through Morrison & Associates) to provide demographic analytic support of Anheuser Busch in defense of putative class-action lawsuit alleging: "minors' intentional violations of state alcohol laws on lawful product advertising, generally asserting theories of consumer fraud, unjust enrichment and public nuisance". Leveraged IRS State-to-State migration flow files and 2000 Census PUMS data file to prove inter-state class dilution (with Morrison & Associates). Result: case dismissed in 2006. (access at: http://www.wikinvest.com/stock/Anheuser-Busch_Companies_(BUD)/Legal_Proceedings)

- 2004 - Consulted (through Morrison & Associates) to provide demographic analytic support of Modesto, CA (defendants) against plaintiff claim of racially-biased annexation practices.

- 2004 - Consulted (through Morrison & Associates) to provide demographic analysis of market potential of "Experience Pennsylvania" tourism campaign.

- 2004 - Commissioned as expert to provide opinion on need and site location for cardiac facility for the Future Forth Valley Healthcare Strategy Initiative. Leveraged Nationwide Inpatient Sample - part of the Healthcare Cost and Utilization Project (HCUP), State of South Carolina inpatient data and U.S. Census data to provide recommendation that was approved (with Third Wave Research).

- 2003 - Commissioned as expert to provide demographic analysis of Antelope Family YMCA "Lancaster Site" location (with Morrison & Associates).

- 2003 – "Real World Business Demography" seminar taught at request of Dr. Roger Hammer RSOC 676 "Applied Demography" at University of Wisconsin.

- 2002 – Commissioned to develop and produce data and methodology using 5-year migration data in support of aging-in-place analytics in Pittsburgh, PA (with Morrison & Associates).

Note: numerous other projects redacted at client's request or due to confidentiality.

**Note: The remainder of this page is intentionally blank**

School Redistricting and Municipal Infrastructure Projects

BGD worked with McKibben Demographics from 2004-2012 providing expert demographic and analytic support.  These engagements involved developing demographic profiles of small areas to assist in building fertility, mortality and migration models used to support long-range population forecasts and infrastructure analysis in the following communities:

| | |
|---|---|
| Fargo, ND 10/2012 | Charleston, SC 8/08 |
| Columbia, SC 3/2012 | Woodland, IL 7/08 |
| Madison, MS 9/2011 | White County, IN 6/08 |
| Rockwood, MO 3/2011 | Gurnee District 56, IL 5/08 |
| Carthage, NY 3/2011 | Central Noble, IN 4/08 |
| NW Allen, IN 9/2010 | Charleston First Baptist, SC 4/08 |
| Fayetteville, AR 7/2010 | Edmond, OK 4/08 |
| Atlanta, GA 2/2010 | East Noble, IN 3/08 |
| Caston School Corp., IN 12/09 | Mill Creek, IN 5/06 |
| Rochester, IN 12/09 | Rhode Island 5/06 |
| Urbana, IL 11/09 | Garrett, IN 3/08 |
| Dekalb, IL 11/09 | Meridian, MS 3/08 |
| Union County, NC 11/09 | Madison County, MS 3/08 |
| South Bend, IN 8/09 | Charleston 12/07 |
| Lafayette, LA 8/09 | Champaign, IL 11/07 |
| Fayetteville, AR 4/09 | Richland County, SC 11/07 |
| New Orleans, LA 4/09 | Lake Central, IN 11/07 |
| Wilmington New Hanover 3/09 | Columbia, SC 11/07 |
| New Berry, SC 12/08 | Duneland, IN 10/07 |
| Corning, NY 11/08 | Union County, NC 9/07 |
| McLean, IL 11/08 | Griffith, IN 9/07 |
| Lakota 11/08 | Rensselaer, IN 7/07 |
| Greensboro, NC 11/08 | Hobart, IN 7/07 |
| Guilford 9/08 | Buffalo, NY 7/07 |
| Lexington, SC 9/08 | Oak Ridge, TN 5/07 |
| Plymouth, IN 9/08 | Westerville, OH 4/07 |

_Projects Continued_

Baton Rouge, LA 4/07

Cobb County, GA 4/07

Charleston, SC District 20 4/07

McDowell County, NC 4/07

East Allen, IN 3/07

Mt. Pleasant, SC District 2 2/07

Peach County, GA 2/07

North Charleston, SC District 4 2/07

Madison County, MS revisions 1/07

Portage County, IN 1/07

Marietta, GA 1/07

Porter, IN 12/06

Harrison County, MS 9/06

New Albany/Floyd County, IN 9/06

North Charleston, SC 9/06

Fairfax, VA 9/06

Coleman 8/06

DeKalb, GA 8/06

LaPorte, IN 7/06

NW Allen, IN 7/06

Brunswick, NC 7/06

Carmel Clay, IN 7/06

Calhoun, SC 5/06

Hamilton Community Schools, IN 4/06

Dilworth, MN 4/06

Hamilton, OH 2/06

West Noble, IN 2/06

New Orleans, LA 2/06

Norwell, IN 2/06

Middletown, OH 12/05

West Noble, IN 11/05

Madison, MS 11/05

Fremont, IN 11/05

Concord, IN 11/05

Allen County 11/05

Bremen, IN 11/05

Smith Green, IN 11/05

Steuben, IN 11/05

Plymouth, IN 11/05

North Charleston, SC 11/05

Huntsville, AL 10/05

Dekalb, IN 9/05

East Noble, IN 9/05

Valparaiso, IN 6/05

Penn-Harris-Madison, IN 7/05

Elmira, NY 7/05

South Porter/Merriville, IN 7/05

Fargo, ND 6/05

Washington, IL 5/05

Addison, NY 5/05

Kershaw, SC 5/05

Porter Township, IN 3/05

Portage, WI 1/05

East Stroudsburg, PA 12/04

North Hendricks, IN 12/04

Sampson/Clinton, NC 11/04

Carmel Clay Township, IN 9/04

SW Allen County, IN 9/04

East Porter, IN 9/04

Allen County, IN 9/04

Duplin, NC 9/04

Hamilton County / Clay TSP, IN 9/04

Hamilton County / Fall Creek TSP, IN 9/04

Decatur, IN 9/04

Chatham County / Savannah, GA 8/04

Evansville, IN 7/04

Madison, MS 7/04

Vanderburgh, IN 7/04

New Albany, IN 6/04

**Publications**

- "Constructing Life Tables from the Kaiser Permanente Smoking Study and Applying the Results to the Population of the United States" Population Research & Policy Review (with Dr. Dave Swanson and Dr. Simeon Chow) 2020.

- Peter A. Morrison and Thomas M. Bryan, Redistricting: A Manual for Analysts, Practitioners, and Citizens (2019). Springer Press: Cham Switzerland.

- "Small Area Business Demography." in D. Poston (editor) Handbook of Population, 2nd Edition. (2018). Springer Press: London (with D. Swanson and S. Smith).

- "From Legal Theory to Practical Application: A How-To for Performing Vote Dilution Analyses." *Social Science Quarterly*. (with M.V. Hood III and Peter Morrison). March 2017 http://onlinelibrary.wiley.com/doi/10.1111/ssqu.12405/abstract

- In the Supreme Court of the United States Sue Evenwel, Et Al., *Appellants,* V. Greg Abbott, in his official capacity as Governor of Texas, et al., *Appellees. On appeal from the United States District Court for the Western District of Texas.* Amicus *Brief of Demographers Peter A. Morrison, Thomas M. Bryan, William A. V. Clark, Jacob S. Siegel, David A. Swanson, and The Pacific Research Institute* - As *amici curiae* in support of Appellants. August 2015. (access at: www.scotusblog.com/wp-content/uploads/2015/08/Demographers-Amicus.pdf )

- Workshop on the Benefits (and Burdens) of the American Community Survey, Case Studies/Agenda Book 6 "Gauging Hispanics' Effective Voting Strength in Proposed Redistricting Plans: Lessons Learned Using ACS Data." June 14–15, 2012 http://docplayer.net/8501224-Case-studies-and-user-profiles.html

- "MAPE-R: A Rescaled Measure of Accuracy for Cross-Sectional, Sub-national Forecasts." Journal of Population Research 28: 225-243 (with Dr. Dave Swanson and Dr. Jeff Tayman). 2011.

- "Targeting Spatial Clusters of Elderly Consumers in the U.S." in Population Research & Policy Review. *Access at*: http://link.springer.com/article/10.1007/s11113-009-9149-2

- "Basic Sources of Statistics" by Bryan, Thomas in J. Siegel and D. Swanson (eds.) The Methods and Materials of Demography, Condensed Edition, Revised. (2004). Academic/Elsevier Press: Los Angeles (with D. Swanson and P. Morrison).

- "Collection and Processing of Demographic Data" by Bryan, Thomas in J. Siegel and D. Swanson (eds.) The Methods and Materials of Demography, Condensed Edition, Revised. (2004). Academic/Elsevier Press: Los Angeles (with D. Swanson and P. Morrison).

- "Internal and Short Distance Migration" by Bryan, Thomas in J. Siegel and D. Swanson (eds.) The Methods and Materials of Demography, Condensed Edition, Revised. (2004). Academic/Elsevier Press: Los Angeles (with D. Swanson and P. Morrison).

- "Population Estimates" by Bryan, Thomas in J. Siegel and D. Swanson (eds.) <u>The Methods and Materials of Demography, Condensed Edition, Revised.</u> (2004). Academic/Elsevier Press: Los Angeles (with D. Swanson and P. Morrison).

- "Demographic Trends and Market Analysis: Knowledge is Power, Market Analysis 101." *Shopping Center Business*. May, 2002.

- "U.S. Census Bureau Population Estimates and Evaluation with Loss Functions." *Statistics in Transition Journal*. Warsaw, Poland. March 2000.

- <u>Yucca Mountain Site Characterization Project: Summary of Socioeconomic Data Analyses Conducted in Support of the Radiological Monitoring Program: April 1997 to April 1998.</u> TRW Environmental Safety Systems, Inc. Las Vegas, Nevada (with Dave Swanson). June 1998.

- <u>Yucca Mountain Site Characterization Project: Summary of Socioeconomic Data Analyses Conducted in Support of the Radiological Monitoring Program: April 1996 to April 1997.</u> TRW Environmental Safety Systems, Inc., Las Vegas, Nevada (with Dave Swanson). June 1997.

- "The Size of Selected Lifestyle Segments: 1990 to 2010." Third Wave Research, Madison, WI. (with D. Swanson and G. Hough) March 1996.

- "Population Estimation Techniques Using the Housing Unit Method." Master of Urban Science (M.U.S.) Research Paper. Department of Urban Studies, Portland State University (Co-chaired by D. Swanson and George Hough). June 1996.

**Professional Presentations and Conference Participation**

- "New Technical Challenges in Post-2020 Redistricting" 2020 Population Association of America Applied Demography Conference, 2020 Census Related Issues, February 2021. With Dr. Peter Morrison. https://www.youtube.com/watch?v=ETvvoECt9sc&feature=youtu.be

- "Tutorial on Local Redistricting" 2020 Population Association of America Applied Demography Conference, February 2021. With Dr. Peter Morrison. https://www.youtube.com/watch?v=ETvvoECt9sc&feature=youtu.be

- "Demographic Constraints on Minority Voting Strength in Local Redistricting Contexts" 2019 Southern Demographic Association meetings (coauthored with P. Morrison) New Orleans, LA, October 2019.

- "The Implications of Demography Trends for Future Opioid Abuse," 2019 Southern Demographic Association meetings (coauthored with Dr. Rick Thomas) New Orleans, LA, October 2019.

- "Prisoner Populations and Redistricting: Counting vs. Discounting," 2019 Southern Demographic Association meetings (coauthored with P. Morrison) New Orleans, LA, October 2019.

- "Estimating the Potential Population Health Impact of Authorizing the Marketing of E-cigarettes in the US" with Muhammad-Kah, R.; Hannel, T.; Wei, L.; Black, R.; Gogova, M.; Pithawalla, Y.B.;  Presented at 24th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), Baltimore, Maryland, February 21-24, 2018.

- "Estimating the Population Health Impact of Authorizing the Marketing of a Smokeless Tobacco Product with a Proposed Modified Risk Claim" with Muhammad-Kah, R.; Hannel, T.; Wei, L.; Black, R.; Gogova, M.; Pithawalla, Y.B.;  24th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), Baltimore, MD, February 21-24, 2018.

- "The Impact of Tobacco Use History on e-Cigarette and Cigarette Transition Patterns - A Longitudinal Analysis of Population Assessment of Tobacco and Health (PATH) Study" with Wei, L.; Black, R.; Muhammad-Kah, R.; Pithawalla, Y.B.; Chow, S.; 24th Annual Meeting of the Society for Research on Nicotine and Tobacco (SRNT), Baltimore, MD, February 21-24, 2018.

- "Projecting Future Demand for Assisted Living: A Case Study" 2017 Population and Public Policy Conference, Houston, TX.

- "Applications of Big Demographic Data in Running Local Elections" 2017 Population and Public Policy Conference, Houston, TX.

- "Distinguishing 'False Positives' Among Majority-Minority Election Districts in Statewide Congressional Redistricting," 2017 Southern Demographic Association meetings (coauthored with P. Morrison) Morgantown, WV.

- "Devising a Demographic Accounting Model for Class Action Litigation: An Instructional Case" 2016 Southern Demographic Association (with Peter Morrison), Athens, GA.

- "Gauging Hispanics' Effective Voting Strength in Proposed Redistricting Plans: Lessons Learned Using ACS Data." 2012 Conference of the Southern Demographic Association, Williamsburg, VA.

- "MAPE-R: An Empirical Assessment." 2011 Conference of the Population Association of American (with Jeff Tayman and Dave Swanson) Washington, D.C.

- "MAPE-R: A Refined Measure of Accuracy for Ex Post Evaluation of Estimates and Forecasts." Presented at the 2010 International Symposium of Forecasting (with J. Tayman and D. Swanson) San Diego, CA.

- "Targeting Spatial Clusters of Elderly Consumers in the U.S."  Co-authored for the 2007 International Seminar on Applications of Demography in Business (presented by Peter Morrison) Sydney, Australia.

- "Characteristics of the Arab-American Population from Census 2000 and 1990: Detailed Findings from PUMS." 2004 Conference of the Southern Demographic Association, (with Samia El-Badry) Hilton Head, SC.

- "Small-Area Identification of Arab American Populations," 2004 Conference of the Southern Demographic Association, Hilton Head, SC.

- "New Approaches to Spotting Elderly Enclaves." 2004 Conference of the Population Association of America, (with Peter Morrison) Boston, MA.

- "Small Area Market Potential of Hospitals." 2004 Conference of the Population Association of America, Boston, MA.

- "Spatial Research Frontiers Using GIS" 2002 Southern Demographic Association, Austin, TX.

- "MAPE-R: It's Features and Results from a National Block-Group Test." 2002 Conference of the American Statistical Association. (with D. Swanson, J. Tayman, and C. Barr). New York City, NY

- "Applied Demography in Action: A Case Study of Population Identification." 2002 Conference of the Population Association of America, Atlanta, GA.

- "CACI One" Product Presentation/Poster Session, presented at the 2000 Conference of the Population Association of America, Washington, DC.

- "Statistical Evaluation of Distributive Housing Unit Method" 2000 Conference of the Southern Demographic Association, New Orleans, LA.

- "Results of FSCPE Survey on Small-Area Estimate Accuracy and the Development of Data Mining Techniques to Detect Problematic Cases in Small Area Estimates" 2000 Conference of the Population Association of America, Los Angeles, CA.

- "Small Area Population Estimates Methodology in the United States." 1999 Conference of the Population Association of America, New York, NY.

- "On the Measurement of Accuracy for Subnational Demographic Estimates Using MAPE Transformation and Re-Expressions." Presented at the 1999 U.S. Census Bureau Population Estimates Methods Conference (with D. Swanson, J. Tayman and C. Barr) Washington, D.C.

- "U.S. Census Bureau Estimates and Evaluation with Loss Functions" 1999 Conference of the International Statistics Institute, Helsinki, Finland.

- "Evaluating Estimate Outliers with Loss Functions." 1999 Conference of the International Association of Survey Statisticians, Riga, Latvia.

- "Evaluation of 1998 Subcounty Population Estimates." 1999 Conference of the Federal-State Cooperative for Population Estimates, Baltimore, MD.

- "Evaluation of Components of the Housing Unit Method." 1999 Conference of the Southern Demographic Association," San Antonio, TX.

- "Small-Area Population Estimation Technique Using Administrative Records and Evaluation of Results with Loss Functions and Optimization Criteria." 1999 Conference of the Federal Committee on Statistical Methodology, Arlington, VA.

- "Housing Unit Estimates and Estimates Geography." 1998 Conference of the Federal-State Cooperative for Population Estimates, Park City, UT.

- "A Test of the Housing Unit Method in Multnomah County, OR." 1997 Conference of the Population Association of America, Washington, DC.

- "Linear and Logarithmic Population Forecasting Techniques." 1996 Conference of the Federal-State Cooperative for Population Projections, New Orleans, LA.

- "Small Area Population Estimates Using the Housing Unit Method." 1996 Conference of the Southern Demographic Association, Memphis, TN.

**Professional Conference Chairs, Peer Reviews and Conference Discussant Roles**

- "The Historical Roots of Contentious Litigation Over Census Counts in the Late 20th Century". Peer reviewer for presentation at the Hawaii International Conference on the Social Sciences, Honolulu, Hawaii, June 17-19, 2004 by David A. Swanson and Paula A. Walashek.

- 2004 - Population Research and Policy Review External Peer Reviewer / MS #253 "A New Method in Local Migration and Population Estimation".

- Session Discussant on "Spatial Demography" at the 2003 Conference of the Southern Demographic Association, Arlington, VA.

- Subject Moderator at the International Program Center (IPC) 2000 Summer Workshop on Subnational Population Projections for Planning, Suitland, MD.

- Session Chairman on "Population Estimates: New Evaluation Studies" at the Conference of the Southern Demographic Association, Austin, TX.

- Conference Session Chairman at the 2000 Conference of the Federal Forecasters Conference (FFC), Washington, DC.

- Session Discussant on "New Developments in Demographic Methods" at the 2000 Conference of the Southern Demographic Association, New Orleans, LA.

- Panel Discussant on GIS Applications in Population Estimates Review at the 2000 Conference of the Population Association of America, Los Angeles, CA.

- Panel Discussant on Careers in Applied Demography at the 2000 Conference of the Population Association of America, Los Angeles, CA.

**Professional Employment History (now retired)**

June 2019-May 2020: Swedish Match North America / Senior Director: Marketing Research and Analytics

Responsibilities: reported to SMNA executive leadership and directed the development and execution of adult consumer research and enhancement of the business intelligence function. My objectives were to build an Analytic and Research Center of Excellence, to develop analytic and leadership talent within the organization and to create rigorous and repeatable processes and drive the development and success of reduced-harm alternatives to cigarettes. Led the development and execution of market and consumer research and reporting for ZYN and other smokeless / reduced harm tobacco products.

December 2012-February 2019: Altria Center of Excellence / Director: Population Modeling, Consumer Tracking and Analytics

Responsibilities: directed the adult consumer research and advanced analytic function for the Altria OpCos (PMUSA, USSTC and NuMark), Regulatory Affairs and the Food and Drug Administration (RA/FDA) engagements.

*OpCo* engagement included managing adult consumer tracking infrastructure to deliver timely and accurate reads of adult consumer behavior in the marketplace; and marketing science and survey research design and advanced analytic support across Altria's marketing function.

*RA/FDA* engagement included acquiring and managing health data, the development and execution of population modeling infrastructure to evaluate the health impacts of introducing reduced-harm tobacco products, and the development of postmarket surveillance tools to measure the performance of reduced-harm tobacco products in the marketplace.

- Internal clients: Altria's Executive Leadership Team; Legal (provided litigation support); HR (drawing upon my diversity and inclusion expertise); Business Analysis and Research; Investor Relations and External Affairs; Brand, Strategy & Business Development (to support Merger & Acquisition activity); and Forecasting & Business Analysis (drawing upon my advanced analytic expertise).

- Management responsibilities: five-member staff of senior analysts / managers and two offshore KPO analytic and research teams (11 FTE total).

- Connecting Altria with external expertise as needed, based upon my peer network of academic researchers.

May 2011-November 2012: Microsoft / Senior Manager: Central Marketing Group MS Office

Responsibilities: managed the global market research of consumers and small- to mid-market businesses for Microsoft Office 365 release. Notable accomplishments:

- O365 Feature and Functionality Testing: Managed all aspects (including budgeting, contract negotiation, research execution and reporting) of online research and subsequent Kano analysis among O365 target audiences.  Research results were used to identify which O365 features and functionality would be used throughout the subsequent value proposition work and featured in the O365 media campaign.

- Office Impact Tracker (OIT): Managed all aspects of the biannual Office tracker covering four key objectives: 1) assessing the current state of the Microsoft Office business; 2) measuring multiple device ownership; 3) interpreting productivity tasks and usage scenarios on devices; and 4) gauging [measuring] the size of the consumer and small business markets.  Research was successfully executed on time and under budget in the US, France, Germany and Brazil.

- SMB Segmentation: Managed the design and execution of a latent class segmentation to identify the major firmographic, attitudinal and behavioral differences across SMB.  Managed additional qualitative research to develop personas for each segment.  Resulting model now serves as the foundation for other current and future SMB research at Microsoft and is currently used as the targeting vehicle for upcoming Microsoft campaigns. This research was executed on time and under budget in the US, Germany, Korea, India and Brazil.

May 2005-May 2011:  Altria / Manager of Market Information and Consumer Research
Responsibilities: developed and enhanced advanced consumer research and business analytics.  Oversee Information Management and Forecasting / Business Analysis groups.   Notable accomplishments:
- Managed one of the nation's largest and most complex (multi-audience / multi-mode) adult CPG tracking surveys – including contracting a multi-year, multi-million dollar agreement for continued service delivery.
- Developed marketing science models to leverage product concept purchase interest scores into post-launch share-of-category forecasts.
- Authored Altria's organizational consumer research supplier management handbook.
- Developed advanced analytics and numerous predictive models in support of the OpCos.

April 2003-May 2005 Third Wave Research / Director: Population Research
Responsibilities: managed corporate G.I.S., developed demographic and business data, managed customer accounts and implemented statistical software development standards.  Performed B-2-B and B-2-C customer analyses that integrated primary survey and research data with consumer household and business databases, US Census data, and other secondary data sources.  Experience with large databases, sampling and processing of survey research data.   Notable accomplishments:
- Built a nationwide census block-group level population estimate & forecast system, used for integrated targeted marketing.

- Built improved methods for estimating the small-area market potential of hospitals using the Nationwide Inpatient Sample (part of the Healthcare Cost and Utilization Project / HCUP).
- Built the first National Basketball Association season ticket holder customer segmentation.

January 2001- April 2003 ESRI Business Information Solutions / Demographer
Responsibilities included demographic data management, small-area population forecasting, IS management and software product and specification development.  Additional responsibilities included developing GIS-based models of business and population forecasting, and analysis of emerging technology and R&D / testing of new GIS and geostatistical software.

May 1998-January 2001 U.S. Census Bureau / Statistician
Responsibilities: developed and refined small area population and housing unit estimates and innovative statistical error measurement techniques, such as Loss Functions and MAPE-R.

**Primary Software Competencies**
ESRI ArcGIS: advanced
SAS: intermediate
Microsoft Office: advanced

**Professional Affiliations**
International Association of Applied Demographers (IAAD) Board of Directors
Population Association of America (Member)
Southern Demographic Association (Member)
American BAR Association (Affiliated Professional: Solo, Small Firm and General Practice Division)

**Service**
Eagle Scout, 1988, Boy Scouts of America. Member of the National Eagle Scout Association.  Involved in leadership of the Boy Scouts of America Heart of Virginia Council. 

Prior Director, "Salute" Recruitment and Development – Altria's external engagement group with US Veterans.

## References

Dr. David Swanson
*Professional Peer*
david.swanson@ucr.edu
951-534-6336

Dr. Peter Morrison
*Professional Peer*
petermorrison@me.com
310-266-9580

Dr. Jerome McKibben
*Professional Peer*
j.mckibben@mckibbendemographics.com
978-501-7069

Brian Cruikshank
*President, Engine Insights North America*
brian.cruikshank@enginegroup.com
612-205-4846

 **Mohamadi Sarkar**
Director of Regulatory
Sciences at Altria
August 9, 2017, Mohamadi was
senior to Thomas but didn't
manage directly

Tom is one of the smartest numbers guys that I have met. He has the unique ability of dissecting complex data analysis into easily understandable and actionable outcomes. He is a true team player and great colleague to work with.

 **Peter A. Morrison**
Applied Demographic
Analysis
August 8, 2017, Thomas worked
with Peter A. in the same group

Tom is a superb data scientist, with deep experience accessing and using Census and other public data. (He was once a statistician at the Census Bureau.) Tom adheres to standards distinctive of any seasoned Census Bureau statistician, notably understanding how to assure quality control with "big data." Most of our projects here at Morrison & Associates rely heavily on Tom's analytic skills, GIS proficiency, and overall years of experience.

 **Ozlem Yaylaci • 1st**
Associate Manager & Applied Statistician at Altria          1w •••

Thank you for your leadership & support Tom. You are the best manager I've ever had and I learned a lot from you. Good luck!

Tom, thank you sincerely for your leadership, constant support, wisdom, and reliable direction during this busy and uncertain time. You have done an incredible job shaping our team into a fully integrated and supportive unit.


Alex Ogilvie

"*Flectere si nequeo superos, Acheronta movebo*"

| Thomas M. Bryan | Resume and C.V. | Pg. 21 | 3/10/2021 |