UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ALABAMA, *et al.* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, *et al.*, <br><br> Defendants. | No. 3:21-CV-211-RAH |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' REQUEST FOR THE APPOINTMENT OF A THREE-JUDGE COURT**

## INTRODUCTION

On March 10, 2021, Plaintiffs filed suit challenging the Census Bureau's (i) use of "differential privacy" to protect the confidential data of respondents to the 2020 Census and (ii) announcement that it would provide redistricting data to states by September 30, 2021. Plaintiffs have requested that these claims be heard by a three-judge court. In support of their request, Plaintiffs rely on a narrow statutory provision, Section 209 of Public Law No. 105-119, which provides for the appointment of three-judge courts to hear claims challenging the Census Bureau's use of certain statutorily defined "statistical methods." Specifically, Section 209 allows three-judge courts to hear challenges to statistical activities that are used "to add or subtract counts to or from the enumeration of the population as a result of statistical inference." *See* 1998 Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act ("1998 Appropriations Act"), §§ 209(b), (e)(1), (h)(1), Pub. L. No. 105-119, 111 Stat. 2440, 2481–82 (1997) (codified at 13 U.S.C. § 141 note).

The activity that Plaintiffs challenge here—differential privacy—does not fall within the scope of Section 209 because it does not "add or subtract counts to or from the enumeration of the population as a result of statistical inference." Rather, differential privacy is an algorithm that the Census Bureau applies *after* the Census Bureau enumerates the population through traditional methods, such as self-response or nonresponse followup. Differential privacy is then applied after that enumeration is complete to ensure that individuals' identities and data are not disclosed to the public. Thus, as explained below, differential privacy is not one of the kinds of statistical methods that Congress intended plaintiffs could challenge before a three-judge court.

Nor does Plaintiffs' "delay" claim give rise to a three-judge court. That claim does not challenge any statistical activity at all, let alone one that adds or subtracts counts to or from the enumeration of the population. And even if the claim could somehow be construed to challenge differential privacy, it still would not give rise to a three-judge

court for the same reasons identified above. Accordingly, Plaintiffs' request for a three-judge court should be denied.

## BACKGROUND

**A.  Differential Privacy**

"Although Congress has broad power to require individuals to submit [census] responses, an accurate census depends in large part on public cooperation." *Baldrige v. Shapiro*, 455 U.S. 345, 354 (1982). "To stimulate that cooperation[,] Congress has provided assurances that information furnished to the Secretary by individuals is to be treated as confidential." *Id.* (citing 13 U.S.C. §§ 8(b), 9(a)). Thus, Title 13 of the U.S. Code forbids the Secretary of Commerce or "any other officer or employee of the Department of Commerce or [Census Bureau]" to "make any publication whereby the data furnished by any particular establishment or individual . . . can be identified." 13 U.S.C. § 9(a).

To ensure that respondents' confidential data is protected, the Census Bureau uses what is known as a "disclosure avoidance" methodology. *See* Pls.' Mot. for Prelim. Inj. Ex. 4., U.S. Census Bureau, *2020 Census Operational Plan: A New Design for the 21st Century – Version 4.0* ("2020 Operational Plan") 135, 139–40 (Dec. 2019), ECF No. 3-4. As Plaintiffs explain in their motion for a preliminary injunction, disclosure avoidance is not unique to the 2020 census—the Census Bureau "has relied on various disclosure avoidance methods to successfully protect the privacy of census respondents in the past." *Id.* at 9. But with "growth in computing power, advances to mathematics, and easy access to large, public databases," it is now easier than ever for sophisticated users to "reconstruct" an individual respondent's data from aggregate statistics. 2020 Operational Plan at 140.

To combat this threat, the Census Bureau in September 2017 announced that it would be using a disclosure avoidance method called "differential privacy" for the 2020 Census. Compl. ¶ 79. Differential privacy relies on a complex algorithm to "inject

noise" into the Census Bureau's population and demographic data to "control the privacy risk of any calculation or statistic."  *Id.* ¶ 81 (quoting Michael Hawes, U.S. Census Bureau, *Title 13, Differential Privacy, and the 2020 Decennial Census* 22 (Nov. 13, 2019)). "[T]he goal of differential privacy is to obscure the presence or absence of any individual, or small group of individuals," from the dataset.  *Id.* ¶ 82.  By "precisely control[ling] the amount of statistical noise added to data products using sophisticated mathematical formulas," the Bureau can "assure enough noise is added to protect privacy, but not so much as to damage the statistical validity of [its] data product."  2020 Operational Plan at 139.

Differential privacy is applied after the Census Bureau has already enumerated the population.  The Bureau's enumeration of the population relies on a number of different operations, none of which involve differential privacy.  For example, the Bureau relies heavily on individuals "self-responding" to the census—including responding to the census online.  *Id.* Ex. 4 at 12.  For those individuals who do not self-respond, the Bureau uses a process known as "Nonresponse Followup," where census field staff (known as enumerators) go door-to-door to collect information.  *Id.*  The Bureau relies on other methods to enumerate the population as well, such as "Update Leave," which involves leaving a questionnaire at a house, or "Group Quarters," which is a method to enumerate people living or staying in group living arrangements, such as college dormitories and correctional facilities.  *See id.*  But differential privacy is not one of the methods that the Census Bureau uses to enumerate the population—it is an algorithm that the Bureau applies after the enumeration is completed to protect individuals' identities and data reported by or on behalf of individuals.

Nor does differential privacy affect the state-level enumerations that are reported to the President and Congress for purposes of congressional apportionment.  *See* 13 U.S.C. § 141(b); 2 U.S.C. § 2a.  As Plaintiffs acknowledge in their complaint, the Census Bureau will hold the numbers at the state level "invariant"—*i.e.*, unaltered.  Compl.

3

¶ 89.   Thus, while the differential privacy algorithm will inject a small amount of statistical noise into the population and demographic data at the census block level, the state-level enumeration that is used for apportionment will remain the same.

### B.   The February 12 Press Release

Separate from their challenge to differential privacy, Plaintiffs also challenge the Census Bureau's February 12, 2021 press release explaining that it would be providing redistricting data to states by September 30, 2021.   As the Bureau recently explained in a challenge brought by the State of Ohio to the same announcement, despite the Census Bureau's best efforts, the final census results have regrettably been delayed for a number of reasons, including the COVID-19 pandemic, hurricanes, wildfires, civil unrest, litigation, and data-processing issues.   *See* Defs.' Opp. to Pl.'s Mot. for Prelim. Inj., *Ohio v. Raimondo*, No. 21-cv-00064 (S.D. Ohio Mar. 12, 2021), ECF No. 11.   As a senior Census Bureau employee explained in a sworn declaration to the Ohio court, "[p]roducing redistricting data by, or even close to, the statutory deadline of March 31, 2021 is not possible under any scenario."   *Id.* at 1 (citing Thieme Decl. ¶ 12, ECF No. 11-1).

### C.   Plaintiffs' Request for a Three-Judge Court

Plaintiffs bring their request for a three-judge court under two statutes:   28 U.S.C. § 2284 and Section 209 of the 1998 Appropriations Act.   Section 2284 provides that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."   28 U.S.C. § 2284(a).   Plaintiffs do not contend that their action "challeng[es] the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."   *Id.*   Thus, they rely exclusively on Section 2284's provision that three-judge courts be convened when "otherwise required" by an "act of Congress."

Plaintiffs maintain that Section 209 is such an act of Congress. That section provides that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . , to determine the population for purposes of the apportionment or redistricting of Members of Congress," may bring a civil action that shall be heard by a three-judge court. Pub. L. No. 105-119 § 209(b), (e)(1). Section 209(h)(1) in turn defines a "statistical method" as "an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference." *Id.* § 209(h)(1).

Congress passed Section 209 in response to the Census Bureau's announcement in 1997 that it was planning to use a particular type of statistical "sampling" for the 2000 Census. *See Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 326 (1999); 1998 Appropriations Act § 209(a)(7). Under the plan for the 2000 Census, the Bureau planned to use sampling in two ways.

First, the Bureau planned to divide the population into census tracts of approximately 4,000 people and then "visit a randomly selected sample of nonresponding housing units, which would be statistically representative of all housing units in [a] nonresponding tract." *Dep't of Commerce*, 525 U.S. at 324. Information gathered from the nonresponding housing units would be used by the Bureau "to estimate the size and characteristics of the nonresponding housing units that the Bureau did not visit." *Id.* at 324–25. The Bureau then planned to add this estimated population to its enumeration of the population. *Id.* at 324–25.

Second, the Bureau planned to use "Integrated Coverage Measurement" (ICM) to "adjust the census results to account for undercount in the initial enumeration." *Id.* at 325. Each of the country's 7 million census blocks were to be classified into "strata," which the Bureau would then select at random for further interviews by census enumerators. *Id.* The Bureau then planned to compare the data gathered on the

5

sample blocks during the ICM and the data gathered on those same blocks through the initial phase of the census "to produce an estimation factor for each poststratum."  *Id.*  The Bureau would then use this information to sum the totals for the poststrata "to determine state and national population totals."  *Id.*

In response to these plans, Congress passed Section 209, which provided a private right of action and three-judge court for plaintiffs to challenge statistical methods, such as sampling, that add or subtract counts to or from the Bureau's enumeration of the population.  *Id.* at 326.  A group of plaintiffs then challenged the Bureau's sampling plans under Section 209, and the Supreme Court held that the Census Act prohibited the plans to the extent the Bureau intended to use such sampling as a substitute or supplement to traditional enumeration methods for calculating the population for the apportionment of Representatives in Congress.  *Id.* at 335–42.

## ARGUMENT

### I. Plaintiffs' Differential Privacy Claim Does Not Give Rise To A Three-Judge Court.

Plaintiffs' request for a three-judge court relies exclusively on Section 209.  In interpreting that provision, "[t]he court starts, 'as always, with the statutory text.'" *Alabama v. Dep't of Commerce*, No. 2:18-CV-00772-RDP, 2020 WL 5994259, at *2 (N.D. Ala. Oct. 9, 2020) (quoting *United States v. Gonzales*, 520 U.S. 1, 4 (1997)).  Here, the statutory text is straightforward:  three-judge courts are to hear only those claims challenging statistical activities that are used to add or subtract counts to or from the Census Bureau's enumeration of the population as a result of statistical inference, not activities that are used to protect a individuals' identities and data after the enumeration is complete.

As explained above, Section 209 allows for the appointment of a three-judge court only where plaintiffs are challenging a "statistical method" used to determine the population for purposes of apportionment or redistricting.  And Section 209(h) contains a precise definition of what Congress meant by "statistical method": "an activity related to the design, planning, testing, or implementation of the use of representative sampling,

6

or any other statistical procedure, including statistical adjustment, *to add or subtract counts to or from the enumeration of the population as a result of statistical inference*." Pub. L. No. 105-119 § 209(h)(1) (emphasis added).

Plaintiffs nowhere in their motion attempt to explain how differential privacy falls within this statutory definition. To be sure, Plaintiffs *assert* that differential privacy is a "statistical method"—and perhaps it is in a colloquial sense—but the reasons they offer in support of that conclusion are untethered from the express statutory definition of "statistical method" found in Section 209's text. *See* Pls.' Mem. in Support of Request for Appointment of a Three-Judge Court (Pls.' Mem.) 4–5, ECF No. 2. Plaintiffs note that differential privacy "injects a precisely calibrated amount of noise . . . into the data to control the privacy risk of any calculation or statistic." *Id.* at 1. But Section 209 does not allow three-judge courts to hear any challenges to statistical activities that "inject noise" into data—it allows three-judge courts *only if* those activities are used "to add or subtract counts to or from the enumeration of the population as a result of statistical inference." Pub. L. No. 105-119 § 209(h)(1). The Bureau does not use differential privacy for that purpose. Indeed, differential privacy is not applied at all to the state-level enumeration of population that is used for congressional apportionment, Compl. ¶ 89, which Congress in Section 209 recognized is the "sole constitutional purpose of the decennial enumeration of the population," Pub. L. No. 105-119 § 209(a)(2).

Moreover, even if differential privacy could be construed as "add[ing] or subtract[ing] counts to or from the enumeration of the population[,]" it does not do so "as a result of statistical inference." *Id.* Statistical inference involves "the drawing of inferences about a population based on data taken from a sample of that population." *Statistical inference*, Oxford English Dictionary Online (2021); *see also Statistical inference*, Merriam-Webster.com Dictionary ("the making of estimates concerning a population from information gathered from samples"). Differential privacy, by contrast, does not involve inferring anything about the population from samples of the residents. To the

7

contrary, it "*obscure[s]*" specific information about individuals in the population by injecting "noise" into the data.   Compl. ¶¶ 81–82 (emphasis added).

Differential privacy is thus unlike the sampling that was at issue in *Department of Commerce v. U.S. House of Representatives*—the sole case Plaintiffs could cite as supporting their position at the initial hearing in this matter.  The sampling at issue in that case involved the Bureau's plan for the 2000 Census to take a "statistically representative" sample of all housing units in a nonresponding census tract and then extrapolating from that sample to "estimate the size and characteristics of the nonresponding housing units that the Bureau did not visit."   525 U.S. at 324.   The Bureau then planned to use such sampling (and the sampling as part of its Integrated Coverage Measurement described above) to add to the Bureau's actual enumeration used for apportionment.   *Id.* at 324–25.  Indeed, it was the very sampling at issue in the 2000 census that prompted Congress to pass Section 209 in the first place—to allow plaintiffs to challenge *that* sampling before a three-judge court.

*Utah v. Evans*, 536 U.S. 452 (2002), provides another example of a "statistical method" that falls under Section 209.   In *Utah*, plaintiff challenged the Bureau's use of "hot-deck imputation," whereby the Bureau "filled in certain gaps in its information" by "inferring that [an] address or unit about which it is uncertain has the same population characteristics as those of a nearby sample . . . address or unit."   *Id.* at 458 (alterations omitted).   While different in "kind and degree" from the sampling at issue in *Department of Commerce v. U.S. House of Representatives*, imputation, like sampling, was used by the Bureau to infer something about the population itself, and thus Section 209 allows a challenge to imputation to be heard by a three-judge court.

Nothing in the text, structure, or purpose of Section 209, however, suggests that Congress intended to allow three-judge courts to hear broader challenges to the Census Bureau's disclosure-avoidance methods that are separate from the Bureau's enumeration of the population.   Those methods are necessary to ensure that the Bureau complies with

8

other federal statutes—the confidentiality provisions applicable to the Census Bureau in 13 U.S.C. §§ 8(b) and 9(a)(2)—and if Congress intended to allow three-judge courts to hear challenges to such methods, it could have easily referenced disclosure-avoidance methods in Section 209. But Congress did not do so, because Congress was focused only on those narrow statistical activities that the Census Bureau uses to add or subtract counts to or from the enumeration of the population as a result of statistical inference.

Judge Proctor's recent decision denying Alabama's request for a three-judge court in another challenge to the 2020 Census further explains why Section 209 should not be construed to encompass Plaintiffs' claims here. *See Alabama*, 2020 WL 5994259, at *4. As that decision explains, three-judge-court statutes "should be strictly construed and not used as a social policy tool." *Id.* Such courts should "be used sparingly considering the heavy burden on judicial resources consumed by convening a three-judge court and direct review to the Supreme Court." *Id.* If the Court were to accept Plaintiffs' broad reading of Section 209, it would significantly expand the types of challenges to Census Bureau statistical activities that could be heard by three-judge courts. Disclosure avoidance protocols are used in every decennial census. Nothing suggests that Congress intended that challenges to such protocols would be heard by three-judge courts as a matter of course. Because differential privacy is not used "to add or subtract counts to or from the enumeration of the population as a result of statistical inference," Plaintiffs' challenge does not fall within the scope of Section 209.

**II. Plaintiffs' Delay Claim Does Not Give Rise To A Three-Judge Court.**

Plaintiffs' argument that their "delay" claim satisfies Section 209 is even more attenuated. That claim does not challenge any statistical activity at all, let alone one that adds or subtracts counts to or from the enumeration of the population as a result of statistical inference. Rather, Plaintiffs challenge an alleged "decision to deliberately delay delivery of redistricting data to the States." Pls.' Mem. 8. Plaintiffs do not argue that any delay, in and of itself, entitles them to a three-judge court. Indeed, as this Court

9

observed at the initial hearing in this matter, the State of Ohio did not seek a three-judge court in its challenge asserting a similar delay claim. *See* Compl., *Ohio v. Raimondo*, No. 3:21-cv-64 (S.D. Ohio Feb. 25, 2021).

Plaintiffs nonetheless contend that the Census Bureau's announcement that it would deliver redistricting data by September 30, 2021 was "likely" a "byproduct of its . . . decision to implement differential privacy." *See* Pls.' Mem. 8. But even if this claim could be construed to challenge differential privacy, the claim still would not give rise to a three-judge court for all the reasons discussed above.

## CONCLUSION

Plaintiffs' request for the appointment of a three-judge court should be denied.

Dated: March 23, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

BRAD P. ROSENBERG
Assistant Director, Federal Programs Branch

/s/ John Robinson
ZACHARY A. AVALLONE
ELLIOTT M. DAVIS
JOHN ROBINSON (D.C. Bar No. 1044072)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC   20005
Tel: (202) 616-8489
john.j.robinson@usdoj.gov

*Attorneys for Defendants*