# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ALABAMA; ROBERT ADERHOLT, Representative for Alabama's 4th Congressional District, in his official and individual capacities; WILLIAM GREEN; and CAMARAN WILLIAMS,<br><br>       Plaintiffs,<br><br>       v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE; GINA RAIMONDO, in her official capacity as Secretary of Commerce; UNITED STATES BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau,<br><br>       Defendants. | CIVIL ACTION NO. 3:21-CV-211-RAH-KFP |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR REQUEST
FOR THE APPOINTMENT OF A THREE-JUDGE COURT**

Defendants are misguided. We know that the Census Bureau's differential-privacy process uses statistical inference because the Census Bureau itself says it does. As the Bureau's Senior Advisor for Data Access and Privacy explained last year, one of the two types of error introduced by the Bureau's new approach is "[p]ost processing *error due to statistical inference*." *See* Michael Hawes, U.S. Census Bureau, *Differential Privacy and the 2020 Decennial Census* at 24 (Mar. 5, 2020), https://perma.cc/3A4N-HPTA (emphasis added) (attached for convenience as Ex. A). Thus, as the Bureau made clear before this litigation, its use of differential privacy relies on "statistical inference" that introduces "error"—i.e., it adds or subtracts counts to or from—the enumeration. A three-judge panel is therefore required.

Indeed, Congress enacted Section 209 of Public Law No. 105-119 to ensure expeditious judicial review of these sorts of Census Bureau attempts to unlawfully use "statistical method[s] … in connection with the … decennial census … to determine the population for purposes of the apportionment or redistricting." Section 209(b). The term "statistical method" includes any "statistical procedure … to add or subtract counts to or from the enumeration of the population as a result of statistical inference." *Id.* § 209(h)(1). Persons aggrieved by such methods have a right to sue and a right to a three-judge panel. The only question here is whether the Bureau's differential-privacy process is a "statistical method." And because the process is a statistical method that uses statistical inference to add or subtract counts to the redistricting data, the answer is clearly yes.

## **ARGUMENT**

Section 2284 provides that "[a] district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." 28 U.S.C. § 2284(a). Section 209 provides a cause of action for "[a]ny person aggrieved

by the use of any statistical method in violation of the Constitution or any provision of law … to determine the population for purposes of the apportionment or redistricting of Members in Congress," allowing such "aggrieved" parties to "obtain declaratory, injunctive, and any other appropriate relief against the use of such method." Pub. L. No. 105-119 § 209(b). Such an action "shall be heard and determined by a district court of three judges in accordance with section 2284 of title 28, United States Code." *Id.* § 209(e)(1).

*First*, differential privacy falls squarely within Section 209's definition of "statistical method." *Id.* § 209(h). Defendants' argument to the contrary fails for several reasons. Not only do Defendants misread the statute itself, but they misdescribe the mechanics of differential privacy and fail to recognize that it constitutes a "statistical method" even by their own reading. Worse yet, in their Response, Defendants embrace a position that directly contradicts the Bureau's previous public statements. *Compare* Response at 7 ("[E]ven if differential privacy could be construed as 'add[ing] or subtract[ing] counts to or from the enumeration of the population[,]' it does not do so 'as a result of statistical inference.'") *with* Ex. A, Michael Hawes, U.S. Census Bureau, *Differential Privacy and the 2020 Decennial Census* at 24 (Mar. 5, 2020), https://perma.cc/3A4N-HPTA (addressing errors in differential-privacy process "due to statistical inference").

Nor do Defendants succeed in their attempt to invoke favorable legislative history or "purpose." Where people are counted each decade—both between the States and within them—determines the flow of tremendous amounts of federal funding and political power. That money and power raise the prospect of political manipulation; Congress thus sought to ensure that their allocation be based on the actual number of people counted rather than numbers produced by statistical methods that could be more easily manipulated. In suggesting that only sampling is covered by

2

Section 209, Defendants miss the forest for the trees. Sampling fit the bill then, and differential privacy fits the bill now.

*Second*, all of Plaintiffs' claims—including those related to the Bureau's deliberate delay—require a three-judge panel. While delay, in and of itself, may not entitle Plaintiffs to a three-judge court, a three-judge court is nevertheless proper because differential privacy *causes* at least part of the delay and its resulting harms. *See* Pub. L. No. 105-119 § 209(e)(1).

*Finally*, practical considerations support convening a three-judge court here. If this Court improperly withholds jurisdiction from a three-judge court, a future court—at any stage of the litigation—could remand the case to a three-judge panel and force the litigants to retry their entire case. Any further delay will exacerbate the injuries Plaintiffs are already suffering. But if this Court grants the three-judge panel's jurisdiction and then agrees with the panel's decision, this Court could certify that it would have independently reached the same decision as the panel. "This procedure for minimizing prejudice to litigants when the jurisdiction of a three-judge court is unclear has been used before." *Swift & Co. v. Wickham*, 382 U.S. 111, 114 n.4 (1965); *see also New York v. Trump*, 485 F. Supp. 3d 422, 482 n.21 (S.D.N.Y.) (three-judge court), *vacated and remanded on other grounds*, 141 S. Ct. 530 (2020); *Fed'n for Am. Immigration Reform v. Klutznick*, 486 F. Supp. 564, 577-78 (D.D.C. 1980) (three-judge court). And this procedure would allow parties seeking further review to appeal to the Supreme Court while also filing a protective appeal in the Eleventh Circuit and requesting that the Supreme Court alternatively construe the appellants' jurisdictional statement as a petition for a writ of certiorari before judgment. *See* Sup. Ct. R. 11. This approach best guarantees expeditious resolution of the critical questions the case presents.

**I. Statutory Text and Legislative History Make Clear That Differential Privacy Constitutes a "Statistical Method" Under Section 209.**

**A. Section 209's "Statistical Method" Definition Applies to Redistricting.**

Section 209 provides a cause of action for "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law (other than this Act), in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment *or redistricting* of Members in Congress." Pub. L. No. 105-119 § 209(b) (emphasis added). Thus, Section 209 applies to both congressional apportionment harms among states and redistricting harms within them. And that makes perfect sense. After all, Congress labeled Section 209 a "13 USCA § 141 note," and section 141 of title 13 expressly requires "tabulations of population" for both congressional reapportionment and intrastate redistricting. *See* 13 U.S.C. § 141(b)-(c).

One cannot reasonably read Section 209 as concerned only with interstate apportionment. Defendants seem to suggest that Section 209 covers only, for example, assigning Huntsville's population to Nashville while having nothing to say about assigning Montgomery's population to Mobile. *See* Response at 7 (noting that "differential privacy is not applied at all to the state-level enumeration of population that is used for congressional apportionment"). But to the extent Defendants press that strained reading, the plain text refutes it. Challenges to statistical methods that "determine the population for purposes of the apportionment *or redistricting*" must be heard by a three-judge court. Pub. L. No. 105-119 § 209(b) (emphasis added).

Moreover, "[a]cceptance of the Government's new-found reading … would produce an absurd and unjust result which Congress could not have intended." *Clinton v. City of New York*, 524 U.S. 417, 429 (1998) (cleaned up). The Bureau would be free to use statistical methods like differential privacy—or sampling—which add, subtract, or otherwise adjust States' internal

4

geographic populations so long as the Bureau holds the States' populations invariant. This is not a situation where the Court must invoke any interpretive canons to overcome text which plainly supports Defendants' novel interpretation, *see, e.g.*, Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* at 234 (addressing the "Absurdity Doctrine"); just the opposite, Section 209's text and context explicitly undermine Defendants' position. The scope of Section 209—and that of its "statistical method" definition—includes threats to the allocation of money and power both between the states and within them.

### B. Section 209's "Statistical Method" Definition Encompasses Differential Privacy.

"Statutory interpretation, as [the Supreme Court] always say[s], begins with the text." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 209 provides that "[f]or the purposes of this section … the term 'statistical method' means an activity related to the design, planning, testing, or implementation of the use of representative sampling, or any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference." Pub. L. 105-119 § 209(h)(1). Differential privacy satisfies these conditions.

Defendants' arguments to the contrary fail for at least two independent reasons. First, differential privacy *does* "add or subtract counts to or from the enumeration of the population as a result of statistical inference." *Id.* And second, differential privacy also requires "representative sampling," thus satisfying one of the statutory definition's disjunctive—and sufficient—requirements.

#### i. Differential Privacy Uses Statistical Inference to Add or Subtract Counts to or from the Enumeration.

The Bureau's differential-privacy process is a "statistical method" under Section 209(h)(1) because the method necessarily relies on statistical inference. *See* March 25, 2021 Expert Report

5

of Michael Barber (attached as Exhibit B) at 5 ("From top to bottom, the process of choosing the degree of statistical noise to inject into the dataset, the process by which that noise is introduced, and the adjustments made afterward to comply with various constraints, is an exercise in statistical inference."). As part of the Bureau's novel effort to make census data less accurate, differential privacy requires the Bureau to add and subtract data—including population counts—to and from certain geographies. *Id.* at 8-9 (explaining method of injecting error by which "particular values are … added to, or subtracted from, the original, accurate counts"). The geographies to which the Bureau applies differential privacy are not random; rather, the Bureau applies differential privacy to those demographic regions it deems most vulnerable to "leakages of privacy." *Id.* at 4. And, to determine which regions fit these specifications, the Bureau relies on statistical inference. *See id.* at 7 ("[T]he Census Bureau is using information from the population and distribution of various demographics in the population to learn about and make statistical inferences regarding the total size of the privacy budget and the degree to which certain places and people's information needs more or less of that privacy budget allocated.").

The next stage of the differential-privacy process also requires statistical inference. Once the Bureau has applied differential privacy, certain census geographies end up with *negative people* or possess other strange, patently unrealistic phenomena. (After all, there is no such thing as a census block with negative residents.) *Id.* at 10. In an attempt to minimize these flaws, the Bureau engages in "post-processing." *Id.* During the post-processing stage of the differential-privacy process, the Bureau's statisticians adjust figures from other geographies to keep statewide totals constant and offset the effects of the initial adjustment. *Id.* at 10-12. Because privacy-based adjustments from the statistical distribution require mirror-image offsets elsewhere in a State's

6

geography, the initial adjustments' impacts ripple outward and distort nearly 95% of census blocks. *See* Expert Report of Thomas Bryan, Doc. 3-6 at 9-10.

This is where statistical inference makes its second appearance. Rather than randomly or arbitrarily offsetting populations throughout Alabama's hundreds of thousands of sub-state geographies, the Bureau runs a sophisticated "least squares optimization" regression model to determine which manipulation of these geographies' populations will best reconcile the Bureau's initial adjustments. *See* Ex. B. at 11. Reconciling the newly erroneous data "via the method of least squares is an extremely common application of statistical inference and is widely used across the social sciences, natural sciences, and many other disciplines." *Id.* at 12. Moreover, this use of statistical inference requires that "an equal number of people must be subtracted from another block (or subgroup within the block) to maintain the correct population numbers across the various states," as well as across "geographies that are nested within other geographies." *Id.* at 10. The Bureau's differential-privacy process therefore unequivocally "add[s] or subtract[s] to or from the enumeration of the population as a result of statistical inference." Pub. L. 105-119 § 209(h)(1).

Defendants know this. In fact, their prior public statements confirm Plaintiffs' analysis and undermine the position Defendants now take before this Court. In its *Differential Privacy and the 2020 Decennial Census* presentation, for example, the Bureau expressly referred to "[p]ost-processing error *due to statistical inference*." *See* Ex. A at 24 (emphasis added). Further down the same slide, the Bureau cited "[p]ost-processing error specifically introduced by our Non-negative Least Squares (L2) optimization routine," and the adjacent slides noted that most of the error in the demonstration data came from this step. *Id*. A "least squares optimization routine" unequivocally constitutes "statistical inference." Ex. B at 12. This is why the Bureau refers to post-processing errors as "due to statistical inference." *Differential Privacy and the 2020 Decennial*

*Census*, *supra* at 24.[1] And this is also why the Bureau's implementation of differential privacy "add[s] or subtract[s] counts to or from the enumeration of the population as a result of statistical inference," thus requiring a three-judge court. Pub. L. 105-119 § 209(h)(1).

Finally, Defendants note that the Bureau's differential-privacy process is "applie[d] *after* the Census Bureau enumerates the population," Response at 1, but Defendants never explain why this timing is relevant. Not only is the "when" beside the point; Section 209 plainly includes as a "statistical method" those methods which the Bureau conducts following enumeration. Indeed, it is hard to imagine how the Bureau would "subtract to or from the enumeration" otherwise. *See also* Ex. B at 12 (explaining Defendants' "hard distinction between the 'enumeration' period of the census and the 'disclosure avoidance' methods … is … a matter of semantics and not one of substance").

> ii. **Differential Privacy Also Implements the Use of Representative Sampling, Which Independently Satisfies Section 209's "Statistical Method" Definition.**

Differential privacy falls within the definition of "statistical method" for another, independent reason. Section 209(h)(1) employs the disjunctive "or" to explicitly delineate between (1) "an activity related to the design, planning, testing, or implementation of the use of representative sampling," *or* (2) "any other statistical procedure, including statistical adjustment, to add or subtract counts to or from the enumeration of the population as a result of statistical inference." *See, e.g.*, *United States v. Woods*, 134 S. Ct. 557, 567 (2013) ("[T]he operative terms are connected by the conjunction 'or.' … [That term's] ordinary use is almost always disjunctive, that is, the words

---

[1] Since its March 5, 2020 presentation, the Bureau has continued to modify its post-processing algorithm. Based on the Bureau's public representations following its March 5, 2020 presentation, however, its current post-processing algorithm appears to be largely the same as the original. *See* John M. Abowd, *Modernizing Disclosure Avoidance: A Multipass Solution to Post-processing Error*, The Census Bureau, (June 18, 2020), https://perma.cc/432L-4CKT.

it connects are to 'be given separate meanings.'"); *accord* Scalia & Garner, *supra* at 116 ("*And* joins a conjunctive list, *or* a disjunctive list.") (emphasis in original). The framing of the first clause is also expansive, evincing Congress' desire to define statistical method, as it relates to statistical sampling, in broad terms. *See* Section 209(h)(1) ("[A]n activity *related* to the design, planning, testing, or implementation . . . ." (emphasis added)). Because differential privacy not only "add[s] or subtract[s] counts to or from the enumeration of the population as a result of statistical inference," *see supra* § I.B.i, but also "implement[s] … the use of representative sampling," the statute provides another independent ground on which to base a three-judge court's jurisdiction.

The Census Bureau plans to implement differential privacy using what it calls a "TopDown" approach, beginning with the entire country and subsequently applying privacy measures to progressively smaller geographies. *See* March 15 Expert Report of Michael Barber, Doc. 3-5 at 9-10. To apply differential privacy to various geographies, the TopDown algorithm "samples from a statistical distribution (the Geometric or Laplace distribution) with parameters set to the desired level of variance." *Id.* at 10. This is the "complex algorithm" on which Defendants contend "[d]ifferential privacy relies." Response at 2. On the horizontal axis of the statistical distribution lie values the Bureau will apply to actual data in order to obscure them. *See* Ex. B at 8 (Fig. 1). For example, if a point along the distribution curve has a horizontal-axis value of negative two, then the Bureau will subtract two from the underlying—actual—population value. *Id.* at 7-9. The vertical axis represents those values' relative probabilities of being sampled; that is, the total number of that point's horizontal-axis value applied to the underlying data set. *Id.* at 7-9. The sampling ultimately renders the "perturbation"—error—the Bureau applies to the underlying data. *Id.* at 7-9.

The Bureau thus injects into the unadulterated PL94-171 data varying degrees of "statistical noise based on samples drawn from the Laplace distribution," to "add[] to or subtract[] from the counts." *Id.* at 9; *see also* Doc. 3-5 at 10. In other words, the Bureau *samples* from these distributions to determine the extent to which it will distort the real counts through its differential-privacy process. That process "implement[s] … the use of representative sampling," which is all Section 209's definition of a "statistical method" requires. Pub. L. 105-119 § 209(h)(1).

### C. Section 209's Legislative History Evinces Unmistakable Intent to Prevent the Bureau from Implementing Statistical Methods Like Differential Privacy.

Because the text of a statute is clear, the Court need go no further. *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 942 (2017) ("The text is clear, so we need not consider this extra-textual evidence."). Defendants nevertheless go further, repeatedly invoking legislative history and purpose to support their reading of the Section 209. *See* Response at 5-6, 8, 9. But these extra-textual sources only underscore that Congress intended to stop the use of statistical methods just like differential privacy. When Congress passed Section 209, top of mind was the Bureau's plan to use sampling for the 2000 census. *See, e.g.*, *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 325-26 (1999) (explaining origin of Section 209). But Congress' concern extended beyond sampling to numerous statistical methods that could be used to create population counts because these methods—like sampling—also carry with them the specter of political manipulation. *See, e.g.*, 143 Cong. Rec. H8229-02, 1997 WL 599738, 7 ("Sampling is not constitutional. Like all statistics, it is easily manipulated."); *id.* at 11 ("[O]ur Founding Fathers envisaged that some day an administration would abuse its power and would attempt to manipulate the census. And Mr. Chairman, like they have done so many times before, thank goodness, our Founding Fathers predicted the error of our ways and saved us from our own demise; they provided us with a guide on how to run a democracy."); *id.* at 24 ("I oppose the use of sampling for several reasons. It would

leave the census numbers open to political manipulation and would tend to undermine the public's confidence in the census.").

When the Census Bureau attempted to implement statistical sampling in the 2000 census, Congress and various private plaintiffs took their fight to the Supreme Court and won. *U.S. House of Representatives*, 525 U.S. 316. In his concurring opinion—which Justice Thomas joined in full and Chief Justice Rehnquist and Justice Kennedy joined in relevant part—Justice Scalia further legitimized Congress's concerns: "To give Congress the power, under the guise of regulating the 'Manner' by which the census is taken, to select among various estimation techniques having credible (or even incredible) 'expert' support is to give the party controlling Congress the power to distort representation in its own favor. In other words, genuine enumeration may not be the most accurate way of determining population, but it may be the most accurate way of determining population *with minimal possibility of partisan manipulation*." *Id.* at 348-49 (Scalia, J., concurring) (emphasis added).

Like sampling before it, differential privacy harbors the risk of political manipulation. By its very design, differential privacy injects error into census data and necessarily renders the data *less* accurate. Michael Hawes, U.S. Census Bureau, *Title 13, Differential Privacy, and the 2020 Decennial Census* 22 (Nov. 13, 2019), https://perma.cc/MRQ2-67WG. And after the Bureau skews the data the post-processing stage follows, where the Bureau makes further adjustments to the numbers—adding some people here, subtracting some there. *See* Ex. B at 10-12. The Bureau claims to reconcile geographic data based on input from "Census Bureau geography experts." *See Modernizing Disclosure Avoidance: A Multipass Solution to Post-processing Error*, *supra*. Post-processing, however, is largely a black box, and the public knows only what the Bureau reveals. Officials in the Bureau might be doing their level best to ensure that differential privacy moves

people (and power and money) in only the fairest way, but Section 209 recognizes the risk of placing such concentrated power in the hands of a few workers at the Census Bureau. This risk is precisely what Congress sought to quash.

Defendants further miss the point when they contend that Congress should have explicitly provided for a three-judge court for various disclosure-avoidance methods. *See* Response at 8-9. The problem with the Bureau's differential-privacy method is not that it is a disclosure avoidance method writ large; the problem is *how* the differential-privacy method specifically works—by adding or subtracting people from the population counts as a result of statistical inference. Moreover, Congress could have drafted Section 209 to prohibit only those sampling methods with which they were immediately familiar, *see* Response at 5-6, but they did not. Instead, Congress sought to curb "statistical methods" whose mechanics might jeopardize the decennial census's integrity. In fact, had Congress indeed intended to constrict the definition of "statistical method" to sampling (as Defendants claim), the second half of the statutory definition—from "or any other statistical method" on—would be "redundant or largely superfluous, in violation of the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979).

With sampling, the Bureau sought to invent population counts for the ostensible purpose of improving accuracy; with differential privacy, the Bureau seeks to invent population counts for the ostensible purpose of improving privacy. Both methods carry obvious risks of manipulation by producing population numbers that purposefully depart from those obtained through an actual count. Section 209 demands that either sort of statistical method receive expeditious review by a three-judge court and, if necessary, the Supreme Court.

## II. Plaintiffs' Delay Claims Require a Three-Judge Panel.

By alluding to several sorts of harm that might flow from the Bureau's decision to implement an invalid "statistical method," *see id.* § 209(a)(7) (noting "risk of an inaccurate, invalid, and unconstitutional census"), and by leaving undefined exactly what sorts of grievances might "aggrieve[]" a "person," Section 209 embraces an expansive notion of actionable harms. Defendants' six-month delay and its attendant harms thus fall within Section 209's unenumerated ambit of actionable harms where that delay is a byproduct of the Bureau's unlawful "statistical method"—which, as Plaintiffs' opening memorandum explains in greater detail, is the case here. *See* Doc. 2 at 8-10. Like their differential-privacy claims, Defendants' delay claims thus fall within the scope of Section 209 and, accordingly, "shall be heard and determined by a district court of three judges." *Id.* § 209(e)(1).

Defendants do not attempt to engage with Plaintiffs' argument. Rather, they respond that "Plaintiffs do not argue that any delay, in and of itself, entitles them to a three-judge court." Response at 9. But Plaintiffs do not argue that a constitutional or statutory violation, "in and of itself," requires that this matter go before a three-judge court either; because differential privacy *causes* these harms, however, a three-judge court is proper. *See* Pub. L. No. 105-119 § 209(e)(1). So too with the harms Plaintiffs suffer due to Defendants' delay. Section 209 provides a cause of action for "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law," *id.* at (b); because differential privacy is such a statistical method and has caused the delays harming Plaintiffs, Section 209 provides a cause of action (and a three-judge court) for Plaintiffs' delay-related claims. In any event, a three-judge court can and should exercise pendent jurisdiction over Plaintiffs' delay-related claims. *See* Doc. 2 at 9-11.

## III. Practical Considerations Also Support a Three-Judge Panel.

This Court can and should confirm the propriety of a three-judge court based on a straight-forward reading of Section 209. But if the parties' arguments have failed to convince the Court one way or the other, Plaintiffs respectfully submit that the Court should grant the three-judge panel because the risks of improperly convening a three-judge court pale in comparison to the risks of improperly depriving a three-judge court of jurisdiction—especially where, as here, time is of the essence.

Three-judge panels can cleanly dissolve without altering a case. For example, where factual or legal developments eliminate a three-judge court's jurisdiction over a matter, the three-judge court will dissolve and the individual court's presiding judge—a member of the three-judge panel—can seamlessly proceed. This is especially so where the presiding judge would have resolved the case's various dispositions in the same manner as the panel. In such circumstances the presiding judge's consensus with the panel would prevent litigants from having to retry the case even if, for example, the Supreme Court were to hold on direct appeal that a three-judge court lacked jurisdiction in the first instance. *See, e.g.*, *New York v. Trump*, 485 F. Supp. 3d 422, 482 n.21 (S.D.N.Y.), *vacated and remanded on other grounds*, 141 S. Ct. 530 (2020) ("[W]e follow the lead of prior three-judge panels by certifying that Judge Furman, to whom these cases were originally assigned, individually arrived at the same conclusions that we have reached collectively."); *see also Swift & Co. v. Wickham*, 382 U.S. 111, 114 n.4 (1965) ("This procedure for minimizing prejudice to litigants when the jurisdiction of a three-judge court is unclear has been used before.").

But when a court improperly deprives a three-judge panel of jurisdiction, the parties *must* relitigate the proceedings before a three-judge panel in accordance with Section 2284—no matter how far the case has progressed. *See Shapiro v. McManus*, 577 U.S. 39, 43 (2015) (remanding to

three-judge court because "the district judge was *required* to refer the case to a three-judge court, for § 2284(a) admits of no exception, and the mandatory 'shall' ... normally creates an obligation impervious to judicial discretion" (internal quotation marks omitted; emphasis in original)). Thus, if the Court declines to convene a three-judge court and the Eleventh Circuit or Supreme Court later decide that this Court lacked jurisdiction to hear Plaintiffs' claims, the process restarts from the beginning.

Defendants' deliberate delays have already harmed Plaintiffs, and any litigation-related delay prolonging Defendants' delivery of census data will only exacerbate Plaintiffs' injuries. Because in the three-judge-panel context remedying improvidently granted jurisdiction will cause less delay—and thus less harm—than remedying improvidently withheld jurisdiction, this Court should, if otherwise undecided on the pending jurisdictional question, err toward less harm and confirm a three-judge court's propriety in this case.

## **CONCLUSION**

In accordance with 28 U.S.C. § 2284(a) and Public Law No. 105-119 § 209(e)(1), a three-judge court should be convened.

| | |
|---|---|
| Dated: March 25, 2021 | Respectfully submitted, |

STEVE MARSHALL
*Attorney General of Alabama*

| | |
|---|---|
| */s/ Edmund G. LaCour Jr.* | */s/ Jason B. Torchinsky* |
| Edmund G. LaCour Jr. (ASB-9182-U81L) | Jason B. Torchinsky (VA Bar No. 47481)* |
| *Solicitor General* | Jonathan P. Lienhard (VA Bar No. 41648)* |
| | Shawn T. Sheehy (VA Bar No. 82630)* |
| A. Barrett Bowdre (ASB-2087-K29V) | Phillip M. Gordon (VA Bar. No. 95621)* |
| *Deputy Solicitor General* | HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC |
| James W. Davis (ASB-4063-I58J) | 15405 John Marshall Hwy |
| Winfield J. Sinclair (ASB-1750-S81W) | Haymarket, VA 20169 |
| Brenton M. Smith (ASB-1656-X27G) | (540) 341-8808 (Phone) |
| *Assistant Attorneys General* | (540) 341-8809 (Fax) |
| | Jtorchinsky@hvjt.law |
| STATE OF ALABAMA | Jlienhard@hvjt.law |
| OFFICE OF THE ATTORNEY GENERAL | Ssheehy@hvjt.law |
| 501 Washington Ave. | Pgordon@hvjt.law |
| Montgomery, AL 36130 | |
| Telephone: (334) 242-7300 | *pro hac vice |
| Fax: (334) 353-8400 | |
| Edmund.LaCour@AlabamaAG.gov | *Counsel for Plaintiffs* |
| Barrett.Bowdre@AlabamaAG.gov | |
| Jim.Davis@AlabamaAG.gov | |
| Winfield.Sinclair@AlabamaAG.gov | |
| Brenton.Smith@AlabamaAG.gov | |

*Counsel for the State of Alabama*