**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

THE STATE OF ALABAMA, *et al.*

        Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
COMMERCE, *et al.*,

        Defendants.

No. 3:21–cv–00211–RAH–ECM–KCN

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND PETITION FOR WRIT OF MANDAMUS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 4

    A.    The Decennial Census ...................................................... 4

    B.    The Census Act's Confidentiality Provisions ................................ 5

    C.    The Rise of Computing Power and Its Implications for Confidentiality ..... 6

    D.    Differential Privacy ........................................................ 8

    E.    The Census Bureau's Delivery of Redistricting Data ..................... 16

ARGUMENT .................................................................................................. 19

I.    Plaintiffs Lack Standing. ..................................................... 19

    A.    Plaintiffs Have Not Sustained Any Injuries-in-Fact ..................... 20

        1.    Plaintiffs Are Not Injured by Differential Privacy ........................ 20

            a.    Informational Injury ................................................ 20

            b.    Sovereign Injury .................................................... 29

            c.    Federal Funding .................................................... 33

            d.    Vote Dilution ....................................................... 35

            e.    Section 209 ......................................................... 36

        2.    Plaintiffs Are Not Injured by Delayed Redistricting Data .............. 36

    B.    Plaintiffs' Alleged Injuries Are Not Traceable to Defendants' Actions ..... 38

        1.    Plaintiffs' Alleged Injuries Cannot Be Traced to Defendants' Plan to Use Differential Privacy ........................................... 38

        2.    Plaintiffs' Alleged Injuries Cannot Be Traced to Defendants' Delay in Producing Redistricting Data ....................................... 40

C.    Plaintiffs' Purported Injuries Are Not Redressable ...................................... 40

   1.    Enjoining Differential Privacy Would Not Redress Plaintiffs'
         Alleged Injuries ...................................................................................... 41

   2.    Requiring the Census Bureau to Produce Redistricting Data Sooner
         Would Not Redress Plaintiffs' Alleged Injuries ................................. 42

II.    Plaintiffs Are Not Entitled to a Preliminary Injunction. .......................................... 44

   A.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Differential
         Privacy Claims........................................................................................................ 45

   1.    Plaintiffs' Census Act Claim Is Not Likely to Succeed ..................... 45

   2.    The Individual Plaintiffs' Equal Protection Claim Is Not Likely to
         Succeed ...................................................................................................... 48

   3.    Plaintiffs' APA Challenges to Differential Privacy Are Not Likely
         To Succeed................................................................................................ 49

         a.    The Differential Privacy Announcement Was Not
               Final Agency Action ................................................................... 49

         b.    Even Assuming the Differential Privacy
               Announcement Constituted Final Agency Action, It
               Did Not Violate the APA ........................................................... 55

   4.    The Doctrine of Laches Bars Plaintiffs' Differential Privacy Claims
         ....................................................................................................................... 59

   B.    Plaintiffs' Challenge to the February 12 Press Release Is Not Likely to
         Succeed. ................................................................................................................... 61

   1.    Plaintiffs' Claim that the Press Release "Violates the Census Act" Is
         Not Likely to Succeed............................................................................. 61

   2.    Alabama's APA Challenge to the February 12 Press Release Is Not
         Likely to Succeed..................................................................................... 64

         a.    The February 12 Press Release Was Not Final Agency
               Action............................................................................................. 64

         b.    The February 12 Press Release is Not Arbitrary or
               Capricious ...................................................................................... 66

C.     Plaintiffs Will Suffer No Harm, Much Less Irreparable Harm. ................. 68

    1.     Plaintiffs Have Not Established Irreparable Harm Due to Differential Privacy ................................................................................ 68

    2.     Plaintiffs Have Not Established Irreparable Harm on Their Delay Claim ........................................................................................................ 71

D.     Defendants and the Public Would Be Harmed by an Injunction. ............. 73

III.     Mandamus Relief Is Unavailable. ............................................................. 75

CONCLUSION .................................................................................................................. 78

## INTRODUCTION

Every decade, the United States Census Bureau has the responsibility of "counting the whole number of persons in each State."  U.S. Const. amend. XIV, § 2.  Counting over 330 million people across 3.8 million square miles is a very difficult and complex task.  Each decennial census takes over a decade to plan, execute, and complete, and involves myriad operational decisions.  The 2020 decennial census—a 15.6-billion-dollar operation—is monitored and managed using a master schedule with over 27,000 separate lines of census activities, and is supported by no fewer than 52 separate information-technology systems.

The decennial census is also very important.  It underpins our Nation's representative democracy.  It is used to allocate political power at all levels of government.  And the data it collects and produces are used for countless purposes by governments, businesses, organizations, and individuals.  Given the importance of the census, the Census Bureau must proceed carefully, with meticulous planning.  Systems are developed, and tested, and tested again.

None of this would be possible without the cooperation of the public at large.  Members of the public can be reluctant to reveal their and their household's personal information to the government.  But we ask them to do so every decade based on the promise—printed at the top of the census questionnaire—that their responses "are protected by law."

This lawsuit concerns two large obstacles to the successful operation of the 2020 decennial census.  The first obstacle is the COVID-19 pandemic, which unfortunately emerged just as hundreds of thousands of census field staff prepared to fan out around the country to collect information from the public.  The once-in-a-century pandemic, along with major hurricanes and wildfires, caused a series of cascading delays that has rendered the Census Bureau unable to meet the statutory deadlines for delivering apportionment and redistricting data.

The second obstacle is the rise of computational power that threatens to reveal confidential information.  It is now possible, using sophisticated algorithms on powerful systems, to reverse-engineer large sets of aggregated, supposedly de-identified data.  Given this development, the Census Bureau set out to determine whether its data products were susceptible to such a "reconstruction attack."  And the Census Bureau determined—and third parties have confirmed—that the disclosure-avoidance method the Bureau applied to protect its 2010 data products no longer suffices to protect the confidentiality of census responses.  If the Census Bureau were to continue doing what it did in 2010, it would be violating not only federal law, but also the confidentiality promise that it made to census respondents.  And with that bond of trust broken, future census response rates would undoubtedly fall, and the accuracy of future censuses would suffer.

Plaintiffs—the State of Alabama, a congressional representative, and two individuals—would impose a third obstacle to the Census Bureau's operations if the relief they seek through this lawsuit were granted.  Plaintiffs first argue that the disclosure-avoidance method that the Census Bureau will apply to its forthcoming redistricting data products—differential privacy—will result in flawed numbers.  They attempt to bolster their claim by relying on demonstration data that the Census Bureau specifically tuned to *amplify* the infusion of noise so that it could work with its data users to identify and mitigate issues in its various algorithms.  But Plaintiffs acknowledge that the Census Bureau will release more-realistic demonstration data later this month.  And, as Defendants explain below, those data—which will more-closely resemble the final redistricting data products—will be quite accurate.  Plaintiffs nevertheless argue that *any* application of differential privacy will violate the Census Act on the grounds that the resulting data products would not constitute "tabulations of population."  But that argument is belied by the Census Act itself—as well as by Plaintiffs, who themselves refer to the Bureau's forthcoming redistricting data products in their brief as tabulations of population.

2

The relief Plaintiffs seek also raises significant concerns.  If this Court were to enjoin the use of differential privacy, the Bureau would still need to impose some form of disclosure avoidance.  Plaintiffs suggest that the Bureau could use its ineffective 2010 disclosure-avoidance methodology for this year's census.  But as explained below, any feasible alternative solution would result in far-less-accurate data and would take months to implement, at a minimum.

Though Plaintiffs ask that the Court prolong the extant delay, they also demand that Defendants produce the redistricting data now.  But the redistricting data set does not yet exist, and will likely not come into existence in any form until late August, as the data are still being processed.  To the extent that Defendants can produce the redistricting data earlier, they will do so.  But any Order from this Court must take into account not only Plaintiffs' desires for the prompt publication of redistricting data, but also the reality that events beyond the Census Bureau's control have delayed the creation and production of those data products.

* * *

The decennial census is an extremely complicated endeavor.  It is steered by expert scientists, statisticians, and systems engineers.  It is the type of process that should be managed by subject-matter experts ultimately accountable to the elected Executive. "There is no basis for the judiciary to inject itself into this sensitive political controversy and seize for itself the decision to reevaluate the competing concerns between [census] accuracy and speed." *Nat'l Urban League v. Ross*, 977 F.3d 698, 713 (9th Cir. 2020) (Bumatay, J., dissenting from denial of administrative stay), *stay granted*, 141 S. Ct. 18 (2020). The same principle applies here:  the Secretary of Commerce and the Census Bureau—not Plaintiffs or this Court—are best positioned to balance accuracy, confidentiality, and speed.  Plaintiffs' motion and petition should be denied.

3

**BACKGROUND**

A.    **The Decennial Census**

"The Constitution requires an 'actual Enumeration' of the population every 10 years and vests Congress with the authority to conduct that census 'in such Manner as they shall by Law direct.'"  *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996) (quoting U.S. Const. art. I, § 2, cl. 3).  Congress, in turn, "has delegated to the Secretary of the Department of Commerce the responsibility to take 'a decennial census of [the] population . . . in such form and content as he may determine.'"  *Id.* (quoting 13 U.S.C. § 141(a)).  "The Secretary is assisted in the performance of that responsibility by the Bureau of the Census and its head, the Director of the Census."  *Id.* (citing 13 U.S.C. §§ 2, 21).

"The Constitution provides that the results of the census shall be used to apportion the Members of the House of Representatives among the States."  *Id.*  And "[b]ecause the Constitution provides that the number of Representatives apportioned to each State determines in part the allocation to each State of votes for the election of the President, the decennial census also affects the allocation of members of the electoral college."  *Id.*  "[C]ensus data also have important consequences not delineated in the Constitution:  The Federal Government considers census data in dispensing funds through federal programs to the States, and the States use the results in drawing intrastate political districts."  *Id.* at 5–6.

Today, the decennial census is a 15.6-billion-dollar operation, designed to count over 330 million people across 3.8 million square miles.  *See* Declaration of Michael Thieme ¶¶ 4–5.  And it necessarily requires the cooperation of the American public.  For the 2020 census, the Census Bureau spent hundreds of millions of dollars to encourage the country to respond to the census, *see, e.g.*, *id.* ¶ 12, and hundreds of thousands census field staff fanned out across the country to follow up on nonresponding addresses, *see id.* ¶¶ 4, 19–28.

"Although each [decennial census] was designed with the goal of accomplishing an 'actual Enumeration' of the population, no census is recognized as having been wholly successful in achieving that goal." *Wisconsin*, 517 U.S. at 6.  As a massive, human-driven operation, the census is, almost by definition, imperfect, despite the monumental efforts of the Census Bureau staff who strive to "count everyone living in the country once, only once, and in the right place."  Thieme Decl. ¶ 3.  "Persons who should have been counted are not counted at all or are counted at the wrong location; persons who should not have been counted (whether because they died before or were born after the decennial census date, because they were not a resident of the country, or because they did not exist) are counted; and persons who should have been counted only once are counted twice." *Wisconsin*, 517 U.S. at 6.  As a result, census data "may be as accurate as such immense undertakings can be, but they are inherently less than absolutely accurate." *Gaffney v. Cummings*, 412 U.S. 735, 745 (1973).

### B.     The Census Act's Confidentiality Provisions

"[A]n accurate census," of course, "depends in large part on public cooperation." *Baldrige v. Shapiro*, 455 U.S. 345, 354 (1982).  But many people chafe at the notion of providing the government with their personal information.  Census Bureau research shows that over half of census respondents were at least "somewhat concerned"—with 28% "very concerned" or "extremely concerned"—about the confidentiality of their census responses.  Declaration of John M. Abowd ¶ 11.  And "[t]hese concerns are even more pronounced in minority populations and represent a major operational challenge to enumerating traditionally hard-to-count populations." *Id.*

"To stimulate [the public's] cooperation Congress has provided assurances that information furnished to the Secretary by individuals is to be treated as confidential." *Baldrige*, 455 U.S. at 354 (citing 13 U.S.C. §§ 8(b), 9(a)).  In particular, sections 8 and 9 of the Census Act provide in part that:  (i) "the Secretary [of Commerce] may furnish copies

of tabulations and other statistical materials which do *not* disclose the information reported by, or on behalf of, any particular respondent," 13 U.S.C. § 8(b) (emphasis added); and (ii) Defendants, and their officers and employees, may not "make *any* publication whereby the data furnished by any particular establishment or individual under this title can be identified," 13 U.S.C. §§ 9(a), (a)(2) (emphasis added).  Indeed, the Census Act provides that Census Bureau staff that publish information protected by § 9 "shall be" subject to fines "or imprisoned not more than 5 years, or both."  13 U.S.C. § 214.  In short, "§ 8(b) and § 9(a) of the Census Act embody explicit congressional intent to preclude *all* disclosure of raw census data reported by or on behalf of individuals."  *Baldrige*, 455 U.S. at 361 (emphasis added).

### C.  The Rise of Computing Power and Its Implications for Confidentiality

In past decennial censuses, the Census Bureau protected the confidentiality of the released data by using disclosure-avoidance mechanisms such as suppression (*i.e.*, withholding data) and, in later censuses, data-swapping (*i.e.*, where certain characteristics of a number of households are swapped with those of other households as paired by a matching algorithm).  Abowd Decl. ¶¶ 23–25.  The 2010 decennial census employed data-swapping as its primary disclosure-avoidance mechanism, and the Census Bureau's data-swapping methodology kept the total population and total-voting-age population constant for each census block, the smallest level of census geography.  *Id.* ¶ 25.  This method of disclosure avoidance was considered sufficient at the time.  *See id.* ¶¶ 26, 49.

That is no longer the case.  It has long been known that purportedly de-identified, aggregated data may be "reconstructed" by a series of mathematical algorithms, though such attacks had been constrained by the limits of available computational power.  In one famous example, Professor Latanya Sweeney revealed in 1997 that she had re-identified then-Massachusetts Governor William Weld's medical records in a purportedly de-identified public database.  *See id.* ¶ 27.  And as computing power becomes cheaper, more

6

plentiful, and more accessible as it moves to the cloud, re-identification attacks have increased, and have targeted increasingly large datasets. One recent article recounted re-identification attacks on supposedly de-identified datasets as varied as German internet browsing histories, Australian medical records, New York City taxi trajectories, and London bike-sharing trips. *See* Luc Rocher *et al.*, "Estimating the success of re-identifications in incomplete datasets using generative models," *Nature Communications* (2019), available here; *see also* Abowd Decl. ¶¶ 33–36 (collecting other examples).

The decennial census is not immune to these trends. Following the 2010 census, the Census Bureau published *over 150 billion independent statistics* about the characteristics of the 308,745,538 persons enumerated in the census. Abowd Decl. ¶ 18. The Census Bureau thus conducted its own reconstruction experiment based on just 6.2 billion of those statistics. The Bureau's simulated attack precisely reconstructed approximately 46% of the 308,745,538 records with their exact race, ethnicity, sex, *and* age—and more than 70% of the reconstructed records had exact race, ethnicity, and sex, and were within one year of actual age. *See* Abowd Decl. App'x B ¶¶ 5–7.

The Census Bureau then attempted a re-identification experiment using commercially available databases, and was able to successfully re-identify about 52 million individuals—roughly 17% of the people enumerated in the 2010 census. *See id.* ¶¶ 22–23; Abowd Decl. ¶ 38. And if an attacker had access to data better than the third-party data used in the Census Bureau's simulation, as many as 179 million people could correctly be re-identified. *See* Abowd Decl. App'x B ¶¶ 24; Abowd Decl. ¶ 38. Although Dr. Abowd had in 2018 described the re-identification risk as "small," he retracted that tentative conclusion at the February 16, 2019, session of the American Association for the Advancement of Science. *See* Abowd Decl. ¶ 83.

This serious reconstruction and re-identification vulnerability has been confirmed by the JASON group, which Plaintiffs describe as "an independent group of scientists and engineers from whom the Census Bureau has sought third-party review," and on

whose work Plaintiffs rely.  Pls. Mot., Doc. 3 ("Mot.") at 31.  The JASON group explained—in a publication that Plaintiffs repeatedly cited to the Court, *see* Mot. 13 & n.24, 29 & n.57, 31, 32 & nn.58–59—that, in its view, "Census has convincingly demonstrated the existence of a vulnerability that census respondents can be re-identified through the process of reconstructing microdata from the decennial census tabular data and linking that data to databases containing similar information that can identify the respondent." *See generally* JASON, *Formal Privacy Methods for the 2020 Census* (Apr. 2020) at 89, available [here](here).  The JASON group summarized its findings on this point as:

- The Census has demonstrated the re-identification of individuals using the published 2010 census tables.

- Approaches to disclosure avoidance such as swapping and top and bottom coding applied at the level used in the 2010 census are insufficient to prevent re-identification given the ability to perform database reconstruction and the availability of external data.

*Id.* at 6; *accord id.* at 93–94.  In short, as Dr. Abowd explains, data produced by the 2010 disclosure-avoidance mechanism would be "vulnerable to reconstruction and re-identification attacks because of the parameters of the swapping mechanism's 2010 implementation: an overall insufficient level of noise, the invariants preserved without noise, and the geographic and demographic detail of the published summary data."  Abowd Decl. ¶ 39.  As such, "[t]he Census Bureau can no longer rely on the swapping implementation used in 2010 if it is to meet its obligations to protect respondent confidentiality."  *Id.*; *see generally id.* ¶¶ 41–43, 50–51.

### D.  Differential Privacy

At a fundamental level, all disclosure-avoidance methodologies have a necessary impact on the availability and accuracy of the resulting data.  That is how confidentiality is protected.  Data-swapping, for example, injects noise into the census redistricting data by swapping certain characteristics between a subset of households.  *See* Abowd Decl.

¶¶ 25.  But data-swapping—as demonstrated by the Census Bureau and corroborated by the JASON group—is susceptible to database reconstruction attacks.  *See id.* ¶¶ 26, 39. And the precise data-swapping methodology used is necessarily opaque, so as to better protect the confidentiality of the data.  As Dr. Abowd explains, "[i]mplementation parameters for these legacy disclosure avoidance methods, especially swapping rates, are often some of the most tightly guarded secrets that the Census Bureau protects."  Abowd Decl. ¶ 62.

Given the now-demonstrable flaws with the disclosure-avoidance methodologies used in the 2010 decennial census, "a swapping mechanism that targets vulnerable households for swapping would require significantly higher rates of swapping than were used in 2010 to protect against a reconstruction attack."  *Id.* ¶ 42.  And utilizing such higher swapping rates would "have a significant, detrimental impact on data quality."  *Id.*  Moreover, "[i]mplementing swapping in 2020 would also require abandoning the total population and voting-age population invariants that were used in 2010" for two reasons:  (i) it would be "impossible to find enough paired households with the same number of persons and adults without searching well outside the neighborhood of the original household"; and (ii) "holding the total and adult populations invariant gives the attacker a huge reconstruction advantage—exact record counts in each block for persons and adults"—and that advantage "vastly improves the accuracy of the reconstructed data." *Id.*  But "[i]nternal experiments . . . confirmed that increasing the swap rate from the level used in 2010 and removing the invariants on block-level population counts (to permit the increased level of swapping and protect against reconstruction attacks) would render the resulting data unusable for most data users."  *Id.*

Nor is data suppression a viable option.  "While the Census Bureau could use suppression to protect from a reconstruction attack, the resulting data would be only available at a very high level of generality."  *Id.* ¶ 43.  "Today's data users, including redistricters, rely on detailed block and tract-level data, which would not be available for

many areas if the Census were to return to suppression to protect against modern attacks." *Id.*

Ultimately, the Census Bureau's Data Stewardship Executive Policy Committee (DSEP) determined that neither swapping nor suppression would allow the Census Bureau "to produce high quality statistics from the decennial census while also protecting the confidentiality of respondents' census records" as required by the Census Act. *Id.* ¶ 46; *see also id.* ¶ 51 ("[T]o achieve the necessary level of privacy protection, both enhanced data swapping and suppression had severely deleterious effects on data quality and availability.").

This led the Census Bureau to differential privacy, "[t]he best disclosure avoidance option that offers a solution capable of addressing the new risks of reconstruction-abetted re-identification attacks, while preserving the fitness-for-use of the resulting data for the important governmental and societal uses of census data." *Id.* ¶ 47. Differential privacy is used by major private-sector technology firms, and the Census Bureau has been using differential privacy to protect certain of its statistical products since 2008. *See id.* ¶ 45.

"Differential privacy, first developed in 2006, is a framework for quantifying the precise disclosure risk associated with each incremental release from a confidential data source." *Id.* ¶ 44. This framework allows "the Census Bureau to quantify the precise amount of statistical noise required to protect privacy." *Id.* "This precision allows the Census [Bureau] to calibrate and allocate precise amounts of statistical noise in a way that protects privacy while maintaining the overall statistical validity of the data." *Id.* The amount of noise injected is determined by a measure known as the privacy-loss budget (PLB) or the "epsilon." Michael Hawes, U.S. Census Bureau, "Differential Privacy and the 2020 Decennial Census" (Mar. 5, 2020), at 18, available here. Setting epsilon to zero would result in perfect privacy but useless data, and setting the epsilon to infinity would result in perfect accuracy, but would result in releasing data in fully identifiable form. *Id.*

The advantages of differential privacy are myriad. *See, e.g.*, Simson L. Garfinkel, U.S. Census Bureau, *Modernizing Disclosure Avoidance* (Sept. 15, 2017) at 10, available here. Those advantages include protection against database reconstruction attacks and privacy guarantees that do not depend on the availability of external data. *See id.* It can do so while still producing highly accurate data. Abowd Decl. ¶ 54. And, as will be implemented by the Census Bureau, the accuracy of the data increases, not decreases, as census geographies increase in size. *See id.* ¶ 56.

Moreover, differential privacy can be tuned to determine the optimal setting whereby the privacy of confidential data can be reasonably assured, yet the resulting data will be fit for redistricting and other uses. *See id.* ¶¶ 52, 54, 59. The Bureau's "empirical analysis showed that differential privacy offered the most efficient trade-off between privacy and accuracy—[its] calculations showed that the efficiency of differential privacy dominated traditional methods." *Id.* ¶ 41. "In other words, regardless of the level of desired confidentiality, differential privacy will always produce more accurate data than the alternative traditional methods considered by the Census Bureau." *Id.*

Differential privacy also allows for unprecedented transparency. "The Census Bureau has submitted its differential privacy mechanisms, programming code, and system architecture to thorough outside peer review." Abowd Decl. ¶ 62. The Bureau has "also committed to publicly releasing the entire production code base and full suite of implementation settings and parameters." *Id.* Whereas swapping techniques "must be implemented in a 'black box,'" to protect the resulting data, differential privacy, by contrast, "does not rely on the obfuscation of its implementation as a means of protecting the data." *Id.* "The Census Bureau's transparency will allow any interested party to review exactly how the algorithm was applied to the 2020 Census data, and to independently verify that there was no improper or partisan manipulation of the data." *Id.*

And the Census Bureau has aimed to tune the disclosure-avoidance algorithms, and will tune the privacy-loss budget, in the public eye. *See generally id.* ¶¶ 57–62. In

October 2019 and throughout 2020, the Census Bureau publicly released "demonstration data." *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here. Exactly as designed, these public releases resulted in "extensive actionable feedback from the data user community," which "has informed ongoing [disclosure-avoidance] system improvements and design changes." *Id.* During this iterative process, the Census Bureau "used a lower privacy-loss budget than [it] anticipate[s] using for the final 2020 Census data—that is, these demonstration data were purposefully 'tuned' to privacy and not 'tuned' for producing highly accurate redistricting data." Abowd Decl. ¶ 61. The Bureau did so in order "to home in on the elements of the algorithm that were causing systemic distortions that needed to be addressed." U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here. This decision "meant that the resulting [demonstration] data would have substantially more noise (error) than should be expected in the final 2020 Census data products," but it "unfortunately led some of our data users to expect comparable amounts of noise in the final 2020 Census data." *Id.*

Fortunately, that will not be the case. By keeping the privacy-loss budget roughly constant in the demonstration data to date, the Census Bureau has been able to improve the post-processing algorithms and mitigate post-processing errors. *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 3, 2021), available here.[1] For example, "the Census Bureau has identified and corrected the algorithmic sources of [certain] distortions," and "any residual impact of the types of systematic bias observed in the early

---

[1]     The *amicus* States prove this point. They note, for example, that Utah "analyzed the 2010 demonstration data, comparing it with the previously received 2010 redistricting data and sent its findings to the Census Bureau." Doc. 40 at 2. And they acknowledge that this iterative process worked: Utah acknowledges that it "saw an improvement from the October 2019 to the November 2020 demonstration data," *id.* at 3, though they incorrectly attribute that improvement to modifications in the privacy-loss budget. *See id.*

demonstration data will be negligible and well within the normal variance and total error typical for a census." Abowd Decl. ¶ 67.

And with those algorithmic improvements in place, the Census Bureau moved to tuning the privacy-loss budget. "On March 25, 2021, DSEP approved the privacy-loss budget to be used for the next demonstration product. This privacy-loss budget reflects empirical analysis of over 600 full-scale runs of the Disclosure Avoidance System using 2010 Census data." Abowd Decl. ¶ 70. "The Census [Bureau] evaluated these experimental runs using accuracy and fitness-for-use criteria for the redistricting use case informed by the extensive feedback we have received from the redistricting community and the Civil Rights Division at the U.S. Department of Justice. " *Id.*

The Census Bureau intends to release the next set of demonstration data by April 30, 2021. *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here. This set of data employs a higher privacy-loss budget, tuned for accuracy, "that better approximates the final privacy-loss budget that will likely be selected for the redistricting data product." Abowd Decl. ¶ 69. "These new demonstration data will also reflect system design changes that have been made since the last demonstration data release, along with tuning and optimization of the system that have been done specifically to prioritize population count accuracy and the ability to identify majority-minority districts." *Id.*

"The next iteration of demonstration data will establish that differential privacy protections can produce extremely accurate redistricting data." Abowd Decl. ¶ 54. In the upcoming release of demonstration data:

- "Total populations for counties have an average error of +/- 5 persons . . . as noise from differential privacy" (an error rate of about 0.04% of the counties' population). Compare that level of precision with the "average county-level" estimated uncertainty inherent in census counts, which "is +/- 960 persons (averaging 1.6% of the county census counts)." *Id.*

13

- "At the block level the differentially private data have an average population error of +/- 3 persons" which is also more precise than "the simulated error inherent in the census which puts the average error uncertainty of block population counts at +/- 6 people." *Id.*

- "In the April 2021 Demonstration Data Product, Congressional districts as drawn in 2010 [nationwide] have a mean absolute percentage error of 0.06%." *Id.* ¶ 56.

- "Even for state legislative districts, which had average sizes of 159,000 (upper chambers) and 64,000 (lower chamber[s]), the mean absolute percentage errors are 0.09% (upper chambers) and 0.16% (lower chambers), respectively. Such errors are trivial and imply that the difference between districts drawn from the April 2021 Demonstration Data Product and those drawn from the original 2010 P.L. 94-171 Redistricting Data Summary File would be statistically and practically imperceptible." *Id.*

- "The April 2021 demonstration data show no meaningful bias in the statistics for racial and ethnic minorities even in very small population geographies like Federal American Indian Reservations." *Id.* ¶ 55 (emphasis omitted). "The data permit assessment of the largest OMB-designated race and ethnicity group in each geography—the classification used by the Department of Justice for Voting Rights Act scrutiny—with a precision of 99.5% confidence in variations of +/- 5 percentage points for off-spine geographies as small as 500 persons, approximately the minimum voting district size in the redistricting plans that the Department of Justice provided as examples." *Id.*

In sum, the demonstration data that will be released later this month will demonstrate that the differential-privacy algorithm, "when properly tuned, ensures that redistricters

14

can remain confident in the accuracy of the population counts and demographic characteristics of the voting districts they draw, despite the noise in the individual building blocks." *Id.* ¶ 56 (emphasis omitted).

Data-users will have at least four weeks to review the next set of demonstration data, perform their analyses, and submit feedback. *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here. In early June, DSEP will set the final privacy-loss budget and production parameters for the redistricting data product. *See id.* Applying differential privacy to the redistricting data will take roughly three weeks—"similar to the period required to implement disclosure avoidance in prior censuses"—and "is not the cause of the delay in the delivery of the redistricting data." Abowd Decl. ¶ 72. In fact, "the disclosure avoidance procedures completed in the 2010 census processing took 27 days--or nearly *four* weeks." Thieme Decl. ¶ 71 (emphasis added).

To the contrary, shifting disclosure-avoidance methodologies now is all but guaranteed to cause further delay—and "[t]he effect on the schedule for delivering redistricting data would be substantial." Abowd Decl. ¶¶ 84–85. "[U]nder all scenarios the delay would be *multiple months*." *Id.* ¶ 85 (emphasis added). "This delay is unavoidable because the Census Bureau would need to develop and test new systems and software, then use them in production and subject the results to expert subject matter review prior to production of data." *Id.*

Because the 2010 census data are vulnerable to a database reconstruction attack, "the Census Bureau cannot simply repeat the swapping protocols from the 2010 census, but rather would be forced to fashion appropriate levels of protection"—and "[u]sing an appropriate level of protection for either suppression or swapping would produce far less accurate data than would differential privacy." *Id.* ¶ 87. And even if the Census Bureau were "ordered to repeat exactly what was done in 2010 (despite the serious risks to privacy the Census has identified)," the Bureau "could not simply 'flip a switch' and

15

revert to the prior methodology." *Id.* ¶ 86. "The 2020 Census's system architecture is completely different than that used in the 2010 Census, and it is thus not possible to simply 'plug in' the disclosure-avoidance system used in 2010." *Id.* "Instead," the Bureau "would need to conduct the requisite software development and testing." *Id.*

Simply put, it is not practical at this late hour to change the disclosure-avoidance system's methodologies. Such decisions "are highly technical and can have unanticipated consequences." *Id.* ¶ 88. "While [the Census Bureau] cannot predict the full impact of any change, there is a danger than any change would have cascading effects on data accuracy and privacy, making race and ethnicity data, along with age data, substantially less accurate." *Id.* And "[a]ny sort of change in the basic methodology would be minimally tested and would not have the benefit of any input from the user community." *Id.*

### E.      The Census Bureau's Delivery of Redistricting Data

As explained above, the 2020 Census has been a massive undertaking. While the Bureau has done everything in its power to complete the census as expeditiously as possible, the COVID-19 pandemic has resulted in some unavoidable delay. The original plan was for the Census Bureau to begin in-person operations (called Nonresponse Followup or NRFU) in May 2020, but it was forced to suspend those operations for months due to the pandemic. Thieme Decl. ¶ 30. By the time the Census Bureau entered the field in earnest three months later, it did so during a perfect storm of natural disasters and civil unrest. *Id.* ¶ 33. "Devastating hurricanes in the Gulf Coast area . . . limited and slowed the Census Bureau's ability to conduct NRFU operations." *Id.* In "large areas of the West Coast, field operations were hampered by conflagrations that caused health alerts due to fire and smoke." *Id.* And "in cities across the country," civil unrest made the already-difficult enumeration even harder. *Id.*

Making matters worse, the Secretary and the Census Bureau were under a statutory directive to report the census results to the President by December 31, 2020 so that he could timely submit them to Congress for reapportionment of the House. *See* 13 U.S.C.

§ 141(b); 2 U.S.C. § 2a.  And although the Secretary had asked for an extension of these statutory deadlines, Congress did not oblige.  Thieme Decl. ¶ 35.  So the Census Bureau again adjusted its operations in an attempt to meet the statutory deadlines.  *Id.* ¶ 36.  But that adjustment led to the intervention of another Branch: the Judiciary.  After a court-ordered preliminary injunction forced the Census Bureau to remain in the field, an emergency Supreme Court ruling stayed that injunction and allowed the Census Bureau to conclude field operations in mid-October 2020, having resolved 99.9% of all housing units in the process.  *See Ross v. Nat'l Urban League*, 141 S. Ct. 18 (2020); Thieme Decl. ¶ 36.

But collecting responses through completed questionnaires and in-person field work is not the end of the story — the Census Bureau must then summarize the individual and household data that it collected into usable, high-quality tabulations.  Thieme Decl. ¶¶ 37–83.  Although creating such tabulations may appear easy, it is not.  The Census Bureau must integrate data from different enumeration methods used across the country, identify any issues or inconsistencies that arise, rectify them, and produce tabulations that will guide the country for the next ten years, all without compromising its statutory mandate to maintain the confidentiality of census responses.  13 U.S.C. §§ 8, 9; Thieme Decl. ¶¶ 53–59 (describing how administrative records are incorporated and data are reconciled to produce the Census Unedited File); *id.* ¶¶ 60–64 (describing how the federally affiliated overseas population is incorporated into the data to produce apportionment numbers); *id.* ¶¶ 65–70 (describing the iterative process for compiling detailed information such as race, ethnicity, and age to produce the Census Edited File); *id.* ¶¶ 71–74 (describing the process for applying the Census Bureau's disclosure-avoidance methodology); *id.* ¶¶ 75–78 (describing the process for generating usable data files).

Even working with all possible dispatch, the Census Bureau was not able to meet its December 31, 2020 statutory deadline for reporting apportionment numbers.  Due to the difficulties encountered during data collection and issues that arose during the processing phase, the Census Bureau projects that it will not complete apportionment counts

until April 30, 2021.  Thieme Decl. ¶ 37.  Another court and other parties have even relied upon Defendants' representation that "the Census Bureau will not under any circumstances report the results of the 2020 Census . . . before April 16, 2021."  *Nat'l Urban League v. Raimondo*, No. 20–cv–05799, ECF Nos. 465 & 467 (N.D. Cal. Feb. 3, 2021).

The delay in producing apportionment data also means the Secretary and the Census Bureau have missed the statutory deadline (March 31, 2021) to submit census-based redistricting data to the States.  13 U.S.C. § 141(c).  This was not a secret.  In a February 12, 2021 Press Release, the Census Bureau explained that "it will deliver the [ ] redistricting data to all states by Sept. 30, 2021" because "COVID-19-related delays and prioritizing the delivery of the apportionment results delayed the Census Bureau's original plan to deliver the redistricting data to the states by March 31, 2021."  *Census Bureau Statement on Redistricting Data Timeline*, U.S. Census Bureau (Feb. 12, 2021), available here.

That announcement was not for the Census Bureau's benefit, but for States that use census-based redistricting data to draw their congressional or state election districts. While no federal law requires the use of census data for this purpose, the data are generally utilized as the gold standard, including by the Department of Justice, which uses such data for enforcement of the Voting Rights Act.  Declaration of James Whitehorne ¶ 4.  That's why States generally use census data for redistricting.  And many of those States make up the 27 States that are bound by their own laws to redistrict in 2021.  *See 2020 Census Delays and the Impact on Redistricting*, National Conference of State Legislatures (last visited Apr. 11, 2021), available here.  That has led some States under self-imposed redistricting pressure to find workable solutions.  In New Jersey, for example, voters approved a constitutional amendment that allowed the State to use previous district maps until the new maps are in effect for the 2023 elections.  *See* Whitehorne Decl. ¶ 7; N.J. Const. art. IV, § 3, ¶ 4.  And in California, the state legislature sought and obtained at least a four-month delay of the redistricting deadlines from the California Supreme Court.  *Legislature of the State of Cal. v. Padilla*, 469 P.3d 405, 413 (Cal. 2020);

Whitehorne Decl. ¶ 7. These States—and many others—gathered information from the Census Bureau and found a way to remedy their own redistricting issues. Whitehorne Decl. ¶¶ 7–8.

Alabama is not one of those States. Instead, Alabama now seeks redistricting data that does not exist by a statutory deadline that is impossible to meet. Whitehorne Decl. ¶¶ 14–16. Defendants oppose that request.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING.

"The doctrine of standing is an essential and unchanging part of the case-or-controversy requirement embodied in Article III of the Constitution." *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1300 (11th Cir. 2019).[2] "In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims, and the court is powerless to continue." *Aaron Private Clinic Mgmt. LLC v. Berry*, 912 F.3d 1330, 1335 (11th Cir. 2019).

"The irreducible constitutional minimum of standing requires a plaintiff to show that he (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Flat Creek Transp., LLC*, 923 F.3d at 1300. "[A]s the part[ies] invoking federal jurisdiction," Plaintiffs "bear[] the burden of establishing these elements." *Id.* "And because standing doctrine is intended to confine the federal courts to a properly judicial role," those courts must "take seriously the requirement that a plaintiff *clearly* demonstrate each requirement." *Id.* (emphasis added). "If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." *Aaron Private Clinic Mgmt. LLC*, 912 F.3d at 1336.

---

[2] Unless expressly included, all citations and internal quotation and alteration marks have been omitted.

Plaintiffs have not demonstrated—let alone "clearly" demonstrated—any of the three necessary standing elements.  Accordingly, their motion should be denied.

### A.      Plaintiffs Have Not Sustained Any Injuries-in-Fact

An "injury in fact" is "the invasion of a judicially cognizable interest that is concrete and particularized and actual and imminent."  *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1228 (11th Cir. 2019).  Plaintiffs have not demonstrated that any of them have been injured or will imminently be injured, either by the application of differential privacy, or by the delay in producing the redistricting data.

### 1.      Plaintiffs Are Not Injured by Differential Privacy

Plaintiffs assert five forms of injury-in-fact in connection with their differential-privacy claims.  None has merit.

### a.      Informational Injury

Asserting a supposed informational injury, Plaintiffs argue that Alabama is statutorily entitled to "tabulations of population" under 13 U.S.C. § 141(c), *see* Mot. 29–33; Compl. ¶¶ 133–140—and that is precisely what the Secretary will provide to the State. Plaintiffs acknowledge that the term "'tabulate' has long been understood to mean '[t]o put or arrange in a tabular, systemic, or condensed form.'"  Mot. 29 n.57 (quoting The Random House College Dictionary 1337 (revised ed. 1975)).  It follows that a "tabulation" is the arrangement of data in such form.  And Plaintiffs do not dispute that the Secretary will provide to the State data in such an arranged form.  Hence, Alabama will receive "tabulations."

One need only review Plaintiffs' brief to confirm this fact.  Plaintiffs contend that the "*tabulations*" "will be intentionally scrambled."  *Id.* at 2.  They allege that they will suffer harm from supposedly "flawed *tabulations*."  *Id.* at 4 (emphasis added).  They express concern about supposedly "false *tabulations*."  *Id.* at 27 (emphasis added).  They argue that "Defendants plan to provide the State with inaccurate *tabulations*."  *Id.* at 34 (emphasis added).  And they contemplate what might happen if "both *tabulations*"—*i.e.*,

tabulations with and without the application of differential privacy—"can be released." *Id.* at 55 (emphasis added). Plaintiffs may not agree with the methodology that will underlie the Secretary's tabulations, but Plaintiffs readily acknowledge that they are, in fact, tabulations.

These tabulations will further constitute the "tabulations of population" contemplated in § 141(c). Plaintiffs do not contend that the Secretary will simply invent population numbers. Rather, to ensure compliance with the confidentiality requirements imposed by Congress, *see* 13 U.S.C. §§ 8 & 9, the Census Bureau will inject slight statistical "noise" into the sub-state population counts. *See, e.g.*, Abowd Decl. ¶¶ 54, 69. But that process hardly renders the resulting data something other than "tabulations of population."

Again, Plaintiffs themselves prove the point. They claim that the Secretary will, in their view, "provide the States purposefully flawed *population tabulations*." Mot. 1–2 (emphasis added). They contend that "[i]f the Census Bureau uses differential privacy, the *population tabulations* it reports to States for redistricting will be inaccurate." *Id.* at 24 (emphasis added); *accord id.* at 25. They represent that "[t]he Court will be unable to remedy" supposed "harms if Defendants deliver *population tabulations* infected by differential privacy." *Id.* at 27 (emphasis added). They argue about what might happen "once the skewed *population tabulations* are delivered." *Id.* at 51 (emphasis added). And they talk about losing funding "if the *population tabulations* are inaccurate." *Id.* at 52 (emphasis added); *see also, e.g., id.* at 4 (characterizing differential privacy as "a 'statistical method'" used "'to determine the population for purposes of . . . redistricting'"); Pls. Reply, Doc. 25, at 4 ("Challenges to statistical methods that 'determine the population for purposes of the apportionment or redistricting' must be heard by a three-judge court.") (emphasis omitted). But they admit that the tabulations that the Secretary will deliver are, in fact, "tabulations of population."

In an effort to call into question future population tabulations, Plaintiffs point to their experts' analysis of the Census Bureau's releases of demonstration data.  *See generally* Mot. 18–24.  Yet Plaintiffs acknowledge that "[f]or the demonstration data products, the Census Bureau set a more conservative privacy-loss budget than it expects will be set for the 2020 census—meaning that the demonstration data will have more 'noise (error) than should be expected in the final 2020 Census data products.'"  *Id.* at 18 (quoting U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021)).

In fact, the Census Bureau explained that it maintained this conservative privacy-loss budget—even though doing so "meant that the resulting data would have *substantially* more noise (error) than should be expected in the final 2020 Census data products"—so the Bureau and its data users could "home in on the elements of the algorithm that were causing systemic distortions that needed to be addressed."  U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here (emphasis added). The Census Bureau is planning to release the next set of demonstration data on April 30, 2021.  *Id.*; *see* Mot. 49 (acknowledging same).  That demonstration data:  (i) "will feature a higher [privacy-loss budget] and system parameter optimization informed by the hundreds of full-scale [disclosure-avoidance system] experimental runs [the Bureau has] been performing over the last several months"; (ii) "will more closely approximate the expected accuracy and fitness-for-use of the final 2020 Census redistricting data product"; and (iii) "will enable [the Bureau's] data users to provide critical fitness-for-use analyses" and to "submit feedback and recommendations prior to" the Bureau's Data Stewardship Executive Policy Committee's decision that will set the final privacy-loss budget in June. U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here.  Indeed, the average population error in the forthcoming April 30 demonstration data falls well within the estimated uncertainty inherent in the census.  *See* Abowd Decl. ¶ 54; *see supra* Background Part D.

Because Plaintiffs do not know how the privacy-loss budget will ultimately be set, or how that future budget will affect the redistricting data, their challenge to differential privacy is facial in nature.  Plaintiffs concede as much.  Admitting that the final redistricting data will be subject to less noise than the demonstration data to date, Plaintiffs argue that "no matter where the epsilon value is set," the redistricting data "will just be less wrong than the demonstration numbers were," and that "*any* application of differential privacy will produce erroneous numbers."  Mot. 18, 35 (emphasis added).  In other words, Plaintiffs acknowledge their burden on this facial challenge:  they "must establish that no set of circumstances exists under which" the application of differential privacy "would be valid."  *Reno v. Flores*, 507 U.S. 292, 301 (1993) (no-set-of-circumstances test applies to "both the constitutional challenges . . . and the statutory challenge"); *accord, e.g., Associated Builders & Contractors of Tex., Inc. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 220 (5th Cir. 2016); *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243 (10th Cir. 2011) (Gorsuch, J.); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011).  And "[t]his heavy burden makes such an attack the most difficult challenge to mount successfully."  *Doe v. Kearney*, 329 F.3d 1286, 1294 (11th Cir. 2003).

Plaintiffs' effort to satisfy their heavy burden rests on the theory that the "tabulation of total population by States" referenced in § 141(b) is equivalent to the "actual population counts for States," and "[i]t follows that the 'tabulations of population' referenced in subsection 141(c) must also be the actual population counts."  Mot. 30.  But nothing in *§ 141(b)* suggests that the term "tabulation" contemplates any particular methodology.  The methodology used to determine the apportionment counts stems from the *Constitution*, which requires that the apportionment of Representatives be based on an "actual Enumeration."  U.S. Const. art. I, § 2, cl. 3; *see Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 346–47 (1999) (Scalia, J., concurring) ("Dictionaries roughly contemporaneous with the ratification of the Constitution demonstrate that an 'enumeration'

requires an actual counting, and not just an estimation of number.").  Section 141(b) references only "[t]he *tabulation* of total population by States," 13 U.S.C. § 141(b) (emphasis added), and not, for example, "[t]he *enumeration* of total population by States."  It does not make sense, then, for Plaintiffs to attempt to synonymize "tabulation" with "enumeration."  *Cf. Firstar Bank, N.A. v. Faul*, 253 F.3d 982, 991 (7th Cir. 2001) (noting "the canon that different words within the same statute should, if possible, be given different meanings").  Instead, Congress used the term "tabulation of total population" in § 141(b) to mean exactly what it says—and how Plaintiffs use it repeatedly in their brief, *see supra*: an arrangement of population data for transmission to the President.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Put simply, Plaintiffs' invocation of the obvious—that the word "tabulation" appears in both § 141(b) and § 141(c)—is a non sequitur; it proves only that Congress wanted the Secretary to arrange population data for two different distributions.

And even if the term "tabulation" in § 141(b) could be construed to incorporate a particular methodology, the Census Act itself disproves the notion, *contra* Mot. 30, that any such methodology carries over to § 141(c).  For example, the data that underlie the § 141(c) tabulations may be based on statistical sampling, whereas the data that underlie the § 141(b) tabulation may not.  Section 195 of the Census Act provides that "the Secretary shall, if [s]he considers it feasible, authorize the use of the statistical method known as 'sampling' in carrying out the provisions of this title"—"[e]xcept for the determination of population for purposes of apportionment of Representatives."  13 U.S.C. § 195.  So the data that underlie "[t]he tabulation of total population by States . . . as required for the apportionment of Representatives," § 141(b), cannot be premised on statistical sampling.  But § 195 expressly provides that determinations of population for non-apportionment purposes—such as the redistricting data contemplated by § 141(c)—may properly be based on statistical sampling.  *See, e.g.*, *Glavin v. Clinton*, 19 F. Supp. 2d 543, 552–53 (E.D.

Va. 1998) (three-judge court) ("[T]he only plausible interpretation of the plain language and structure of the Act is that Section 195 prohibits sampling for apportionment and Section 141 allows it for all other purposes."), *aff'd sub nom.*, *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).  In other words, nothing in the Census Act would preclude the Secretary from both: (i) producing the "tabulation of total population by States . . . as required for the apportionment of Representatives" under § 141(b) based on the actual enumeration; and (ii) developing the sub-state "[t]abulations of population" contemplated by § 141(c) through, say, a hybrid enumeration-and-statistical-sampling protocol.

This point is further borne out by the drafting history of the Census Act.  Congress added § 141(c) in December 1975 but did not at that time amend § 195 to carve out the § 141(c) tabulations from § 195's statistical-sampling authorization.  *See* Pub. L. No. 94–171, 89 Stat. 1023 (Dec. 23, 1975).  And less than a year later, Congress amended both § 141(c) and § 195.  *See* Pub. L. No. 94–521 §§ 7(a) & 10, 90 Stat. 2459 (Oct. 17, 1976).  But Congress again declined to carve out the § 141(c) tabulations from § 195's statistical-sampling authorization.  Congress's intent, as expressed through its legislative decisions and statutory text, is clear:  statistical sampling is off limits only when "determin[ing] [the] population for purposes of apportionment of Representatives."  13 U.S.C. § 195.  In every other context—including the redistricting context—statistical sampling is fair game.  So the Census Act's structure and drafting history disproves the thesis central to Plaintiffs' legal theory:  that the data underlying the tabulations contemplated in § 141(c) must be premised on the same methodology as those that underlie the tabulation contemplated in § 141(b).  Rather, the Census Act itself demonstrates that the data underlying § 141(b) and § 141(c) may differ in methodology.

Plaintiffs also seem to argue in passing that the *Constitution* somehow obligates Defendants to produce redistricting data through their preferred methodology.  Mot. 31.  The single case Plaintiffs cite says nothing of the sort, and they quickly back away from

this undeveloped this argument.  *See id.* ("At the very least, the constitutional question is raised . . . .").  But "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see Forsberg v. Pefanis*, 634 F. App'x 676, 680 (11th Cir. 2015) ("Pefanis makes two other arguments, both of which he has forfeited by failing to develop them.").  In all events, Plaintiffs are mistaken.  "[T]he constitutional purpose of the census" is "to determine the *apportionment* of the Representatives among the States," *Wisconsin*, 517 U.S. at 20 (emphasis added)—that is, to determine the number of Representatives to which each State is entitled after the decennial census.  Though "the States use the [census] results in drawing intrastate political districts," that "consequence[]" is "not delineated in the Constitution." *Id.* at 5–6 (emphasis added); *see also* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1998, § 209(a)(2), Pub. L. No. 105–119, 111 Stat. 2440 (1997) (codified at 13 U.S.C. § 141 note) ("1998 Appropriations Act") ("[T]he *sole* constitutional purpose of the decennial enumeration of the population is the *apportionment* of Representatives in Congress among the several States.") (emphases added).

Plaintiffs fare no better in attempting to import a judicially enforceable "accuracy" requirement into § 141(c).[3]  The decennial enumeration is an attempt to determine the true population of the United States, and "[t]hese figures may be as accurate as such immense undertakings can be."  *Gaffney*, 412 U.S. at 745.  But as a matter of reality, census data "are inherently less than absolutely accurate."  *Id.*  "Those who know about such

---

[3]     *Amica* Professor Bambauer argues that an accuracy requirement can be found in 13 U.S.C. § 181.  Doc. 33 at 20–21.  Even assuming that Professor Bambauer's interpretation of § 181 were correct, § 181 expressly concerns certain data produced "[d]uring the *intervals between* each census of population required under section 141." 13 U.S.C. § 181(a) (emphasis added).  It does not relate to the data produced pursuant to § 141(c).

things," the Supreme Court explained, "recognize this fact." *Id.*   And even if the enumeration could somehow result in a perfect population count, "the well-known restlessness of the American people means that population counts for particular localities are outdated long before they are completed." *Karcher v. Daggett*, 462 U.S. 725, 732 (1983); *see also, e.g., Gaffney*, 412 U.S. at 745–46 ("[I]t makes little sense to conclude from relatively minor 'census population' variations among legislative districts that any person's vote is being substantially diluted. The 'population' of a legislative district is just not that knowable to be used for such refined judgments.").

In other words, the population counts determined in the decennial census are an approximation within a statistical range of the inherently unknowable population on Census Day. *See* Abowd Decl. ¶ 54.  And the Census Bureau expects that the statistical "noise" that the differential-privacy algorithm will inject into those numbers will be measurably within that statistical range. *See id.* ¶¶ 54, 69.  And in many cases, the post-differential-privacy population counts will have the effect of being *more* accurate.

For example, say the actual (but inherently unknowable) population of a given census block on Census Day is 50 individuals.  The population count as determined by the actual enumeration might nonetheless record only 47 individuals as residing in the census block.  But after the differential-privacy algorithm has been applied, the resulting population count increases by one person, *i.e.*, to 48 individuals.  Plaintiffs' legal position is that the post-differential-privacy population count of 48 individuals is illegally inaccurate while the 47-person figure is not—even though the 48-person figure is, in truth, more accurate.  Such a result would not make sense.

Moreover, Plaintiffs' position—that the Census Act incorporates *sub silentio* a judicially enforceable accuracy requirement hiding somewhere in the Census Act's penumbrae, *see* Mot. 32–33—is the precise argument adopted by the district court in *National Urban League v. Ross* in enjoining the Secretary's attempt to comply with the statutory apportionment deadline on the grounds that it was trumped by a supposed "statutory

duty of accuracy."  489 F. Supp. 3d 939, 982, 994 (N.D. Cal. 2020), *stay denied in part*, 977 F.3d 770 (9th Cir. 2020), *stay granted*, 141 S. Ct. 18 (2020).  We know how that ended:  with a "rare and exceptional" Supreme Court stay.  *Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 1014 (1993) (O'Connor, J., concurring in denial of stay application); *see Ross v. Nat'l Urban League*, 141 S. Ct. 18 (2020).  And the Supreme Court granted the government's requested stay despite the solo dissent's position that "respondents [would] suffer substantial injury if the Bureau is permitted to sacrifice accuracy for expediency."  *Nat'l Urban League*, 141 S. Ct. at 21 (Sotomayor, J., dissenting).

"Through the Census Act, Congress has delegated its broad authority over the census to the Secretary."  *Wisconsin*, 517 U.S. at 19.  And the Secretary and the Census Bureau—not Plaintiffs or the Court—are best positioned to optimally balance accuracy and confidentiality.  Indeed, "there's one branch Congress has not delegated any census decisions to:  the judiciary."  *Nat'l Urban League*, 977 F.3d at 704 (Bumatay, J., dissenting).  And just as "[t]here is no basis for the judiciary to inject itself into this sensitive political controversy and seize for itself the decision to reevaluate the competing concerns between accuracy and speed," *see id.* at 713 (Bumatay, J., dissenting), there is similarly no basis for this Court to inject itself into the Census Bureau's disclosure-avoidance methodology and seize for itself the decision to reevaluate the competing concerns between accuracy and confidentiality.

In sum, the Secretary will provide to the States redistricting data subject to differential privacy.  Those data will be provided in a "tabulation," and they represent the sub-state population.  They are hence "tabulations of population."  13 U.S.C. § 141(c).  Because the Secretary will provide Alabama with "tabulations of population" as afforded to the State in § 141(c), "Defendants' decision to apply differential privacy will" not "deprive Alabama of information which it is entitled to receive."  *Contra* Mot. 32.  Alabama thus suffers no informational injury.

### b.    Sovereign Injury

Plaintiffs argue that the application of differential privacy will injure Alabama by "imped[ing] the State's sovereign interest in drawing fair districts."  Mot. 33.   In fact, Alabama will suffer no such injury for two independent reasons.

*First*, the redistricting data that the Secretary will ultimately produce to Alabama will be perfectly fit for redistricting.  As explained above, the redistricting data need not exactly reflect the population counts from the enumeration, and the Census Bureau expects that the noise injected by differential privacy will be less than the estimated uncertainty inherent in the census.  *See* Abowd Decl. ¶¶ 54, 69.  After application of the differential-privacy algorithm, the redistricting data will remain "the best population data available"—indeed, Plaintiffs have not pointed to any other extant data that would be better—and, absent a source of better data, the redistricting data will constitute "the only basis for good-faith attempts to achieve population equality."  *Karcher*, 462 U.S. at 738.

Nonetheless, in an effort to show some sort of injury-in-fact, Plaintiffs contend—citing a short law journal article written by a law clerk—that if Alabama were to redistrict based on data subject to the differential-privacy algorithm, "litigation against the State" will be "especially likely."  Compl. ¶ 144.  But Plaintiffs do not explain what source of alternative data could undergird such imagined lawsuits.  And in all events, "[a]llegations of injury based on predictions regarding future legal proceedings are . . . too speculative to invoke the jurisdiction of an Article III Court."  *Platte River Whooping Crane Critical Habitat Maint. Tr. v. Fed. Energy Regulatory Comm'n*, 962 F.2d 27, 35 (D.C. Cir. 1992).  Indeed, the Supreme Court has "been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).  Moreover, injuries-in-fact must be "real, immediate, and direct."  *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1202 (11th Cir. 2018).  And "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be

stretched beyond its purpose, which is to ensure that the alleged injury is not too specu-lative for Article III purposes—that the injury is *certainly* impending." *Clapper*, 568 U.S. at 409 (emphasis in original). Alabama's supposed injury—the possibility of future liti-gation brought by third parties on a speculative basis at some point in the distant future—cannot support standing.

*Second*, even if Alabama believes that it cannot use the redistricting data as pro-duced by the Secretary, Alabama law does not obligate Alabama to use that data in draw-ing districts. "While the use of census data is the general practice, no stricture of the federal government requires States to use decennial census data in redistricting, so long as the redistricting complies with the Constitution and the Voting Right Act." *Ohio v. Raimondo*, No. 3:21–cv–064, 2021 WL 1118049, at *8 (S.D. Ohio Mar. 24, 2021), *appeal filed*, No. 21–3294 (6th Cir. docketed Mar. 25, 2021); *see Burns v. Richardson*, 384 U.S. 73, 91 (1966) ("[T]he Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured."); *Tucker v. U.S. Dep't of Commerce*, 958 F.2d 1411, 1418 (7th Cir. 1992) (Posner, J.) ("[S]tates are not required to use census figures for the appor-tionment of their legislatures."). Rather, States are required to use "the best population data available" to redistrict, *City of Detroit v. Franklin*, 4 F.3d 1367, 1374 (6th Cir. 1993)—and that data does not necessarily have to derive from the decennial census.

And, in fact, nothing in Alabama's Constitution requires that the State use U.S. census data for its state legislative apportionment or redistricting. To be sure, Plaintiffs argue that the Alabama Constitution: (i) "requires that the State Legislature use the num-ber of inhabitants, as reported by the Census Bureau, to apportion the seats in the State House and State Senate," and (ii) obligates "[t]he Legislature [to] conduct legislative re-districting based on the Census Bureau's tabulations." Mot. 7 (citing Ala. Const. §§ 197–200). But neither proposition is correct.

30

*First*, Alabama's Constitution expressly provides that the State's apportionment need not necessarily be based on U.S. census data.  Though section 198 provides that Alabama's representatives shall be apportioned among the State's counties "according to the number of inhabitants in them . . . as ascertained by the decennial census of the United States," Ala. Const. § 198, section 201—which Plaintiffs conspicuously neglect to mention—provides in part that if the decennial census is not "full and satisfactory" to the State, then "the legislature shall have the power at its first session after the time shall have elapsed for the taking of said census, to provide for an enumeration of all the inhabitants of this state, upon which it shall be the duty of the legislature to make the apportionment of representatives and senators."  Ala. Const. § 201.  Plaintiffs allege that the Alabama Legislature's "'first session after taking the decennial census of the United States' began February 2, 2021, and will adjourn May 30."  Compl. ¶ 71.  And this very lawsuit reflects that in Alabama's view, the decennial census is not "full and satisfactory" to the State.  Accordingly, Alabama's Legislature *is currently empowered* to conduct its own statewide census, after which "it shall be the duty of the legislature to make the apportionment of representatives and senators."  Ala. Const. § 201.

*Second*, no provision of Alabama's constitution obligates "[t]he Legislature [to] conduct legislative redistricting based on the Census Bureau's tabulations."  *Contra* Mot. 7 (citing Ala. Const. §§ 199–200).  Sections 199 obligates the legislature to conduct a new apportionment of representatives "after each . . . decennial census."  Ala. Const. § 199.  Section 200 obligates the legislature "to divide the state into as many senatorial districts as there are senators" "after each . . . decennial census."  Ala. Const. § 200.  Neither section refers to—let alone requires—the *use* of U.S. census data.  *See id.*

 Simply put, nothing in Alabama's constitution obligates the State to use census data to fulfill its "sovereign interest in drawing fair districts."  Mot. 33.  Rather, if Alabama (incorrectly) believes that the future census redistricting data will be unsuitable for apportionment and redistricting, Alabama may conduct its own census.  *See* Ala. Const.

§ 201.  And in that case, Alabama's decision *not* to conduct its own census is a classic "self-inflicted harm" that "does not amount to an 'injury' cognizable under Article III." *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

The United States District Court for the Southern District of Ohio recently arrived at a similar conclusion.  In *Ohio v. Raimondo*, the State of Ohio sued Defendants, arguing "that the Census Bureau's plan to deliver redistricting data by September 30, 2021 is contrary to the deadlines established in 13 U.S.C. § 141(c)."  *Ohio*, 2021 WL 1118049, at *6. Like Alabama here, Ohio argued that the September delivery date impeded its sovereign interests.  But just like Alabama's constitution, Ohio's constitution also "contemplates ways in which redistricting can be accomplished in the absence of census data."  *Id.*  Because Ohio's laws were not actually "frustrated or rendered invalid by the delay in census data," "[t]he absence of census data thus does not stop the state from implementing its constitutional scheme or otherwise impinge on its sovereign interests in effectuating its law."  *Id.* at *7.  The same analysis applies here.

To be clear, Defendants are not suggesting that Alabama actually conduct its own census.  To Defendants' knowledge, Alabama has no such expertise.  But Alabama's constitution expressly empowers the State to conduct its own census if it is displeased with this year's decennial census—and if Alabama's census produces better data than the decennial census, Alabama may use its census to redistrict.  Alabama's concerted decision not to avail itself of its own constitutional powers is a classic self-inflicted injury that cannot support standing.

Pointing to *Karcher v. Daggett*, 462 U.S. 725 (1983), Plaintiffs also suggest—contrary to the Alabama constitution—that the decennial census "'is the only basis for good-faith attempts to achieve population equality.'"  Mot. 33 (quoting *Karcher*, 462 U.S. at 738).  But Plaintiffs misread *Karcher*.  "The Court in *Karcher* did not hold that the states must use census figures to reapportion congressional representation."  *City of Detroit*, 4 F.3d at

1374.  "The Supreme Court merely reiterated a well-established rule of constitutional law: states are required to use the 'best census data available' or 'the best population data available' in their attempts to effect proportionate political representation." *Id.*  And "[i]f figures other than the census count are the best population data available, the Supreme Court did not, in *Karcher*, bar their use." *Id.*

### c.    Federal Funding

Plaintiffs allege that "[d]ecennial census data are also used in many federal funding formulas that distribute federal funds to states and localities each year."  Compl. ¶ 148; *see generally id.* ¶¶ 148–158.  But Plaintiffs conspicuously do not allege that Alabama is likely—let alone substantially likely—to suffer a *loss* of federal funds based on the application of differential privacy.  Indeed, Plaintiffs make no effort to plausibly allege that the level of noise that the differential-privacy algorithm will inject into the future redistricting data will suffice to move the needle on even a *single* source of Alabama's federal funding—let alone move the needle in a manner that will actually injure the State.  Instead, Plaintiffs merely allege (in conclusory fashion) that purported funding variables "will be *affected* by differential privacy" and that such supposed "variance will directly *affect* the amount of federal funding Alabama and its citizens receive." *Id.* ¶¶ 152, 158 (emphases added).  Even assuming these naked allegations could surmount the plausibility threshold, they do not suffice to show substantial risk of *injury*.

In fact, Plaintiffs' own expert strongly suggests that, to the extent that Alabama's funding would be affected by differential privacy, it will result in a *windfall* to the State.  Plaintiffs allege that "the rural population rate is a primary determinant of where federal spending is allocated."  Compl. ¶ 157.  And Plaintiffs' expert Dr. Barber opines that "[p]laces with fewer people (rural locations) . . . are more likely to be impacted" by the application of differential privacy—and the impact is (in his opinion) that rural areas would *gain* population:  that "small [census] blocks, on average, get bigger" and "the largest blocks, on average, get smaller."  Barber Rep., Doc. 3–5, at 13–14; *see also id.* at 15

(quoting the State of Washington: "'There is a bias in the demonstration data that causes areas with small populations to get larger while areas with larger populations get smaller.'"); *id.* (quoting the State of Utah: "'We observe that the population loss in our cities and towns are re-allocated to unincorporated, rural areas of the state.'").

In their motion, Plaintiffs also argue that differential privacy will result in the misallocation of federal funds. *See* Mot. 52–55. But like the challenge to the census rejected by the Supreme Court for lack of standing and ripeness in *Trump v. New York*, 141 S. Ct. 530 (2020), Plaintiffs' supposed funding "injuries" are also "riddled with contingencies and speculation that impede judicial review." *Id.* at 535. Plaintiffs' "misallocation" arguments mirror the arguments improperly accepted by the *New York* district court. *See, e.g.*, *New York v. Trump*, 485 F. Supp. 3d 422, 451 (S.D.N.Y. 2020) ("degraded census data jeopardizes various sovereign interests in allocating funds and administering public works through programs that rely on quality census data"), *vacated and remanded*, 141 S. Ct. 530 (2020). And though the Supreme Court's dissenters argued that the *New York* plaintiffs' predictions about the allocation of federal funds should be sufficient for standing purposes, *see* 141 S. Ct. at 540 (Breyer, J., dissenting), the majority rejected that argument. *See id.* at 536 ("The impact on funding is no more certain. According to the Government, federal funds are tied to data derived from the census, but not necessarily to the apportionment counts addressed by the memorandum. . . . Under that view, changes to the Secretary's § 141(b) report or to the President's § 2a(a) statement will not inexorably have the direct effect on downstream access to funds or other resources predicted by the dissent.") (citation omitted).

Just as in *New York*, Plaintiffs' allegations and arguments regarding a supposed "'substantial risk' of reduced . . . federal resources" "involve[] a significant degree of guesswork." 141 S. Ct. at 535–36. But the future application of differential privacy, like the future application of the presidential memorandum at issue in *New York*, will not

"*predictably* change the count." *Id.* at 536 (emphasis added). Accordingly, Plaintiffs' "prediction about future injury [is] just that—a prediction." *Id.*

### d.      Vote Dilution

Plaintiffs also argue that "[t]he Census Bureau's decision to apply differential privacy . . . creates a substantial risk that" the individual plaintiffs "will have their votes in local, state, and federal elections diluted." Mot. 36. But "'injury results only to those persons domiciled in the under-represented voting districts.'" *Wright v. Dougherty Cnty.*, 358 F.3d 1352, 1355 (11th Cir. 2004) (per curiam) (quoting *Fairley v. Patterson*, 493 F.2d 598, 603 (5th Cir. 1974)). Individuals who "have not suffered any harm or injury by the malapportioned voting districts" lack standing. *Id.*; *see also, e.g.*, *Common Cause v. Rucho*, 279 F. Supp. 3d 587, 610 n.7 (M.D.N.C. 2018) (three-judge court) ("Plaintiffs in underpopulated districts lack standing to challenge a districting plan on one-person, one-vote grounds.") (citing *Fairley*, 493 F.2d at 603–04), *vacated and remanded on other grounds*, 138 S. Ct. 2679 (2018).

The individual plaintiffs do not know how the future application of the differential-privacy algorithm will affect the population counts at any level of census geography. Indeed, each of them declares that they do not presently know, "and, in fact, may never know . . . if [their] vote is being weighed as equally as the vote of another voter in a neighboring district." Williams Decl., Doc. 3–9, ¶ 12; *see* Green Decl., Doc. 3–10, ¶ 16 (substantially similar); Aderholt Decl., Doc. 3–11, ¶ 26 (substantially similar). At best, Plaintiffs' argument reduces to the notion that the individual plaintiffs' votes *may* be diluted. But the Supreme Court's decisions "are consistent in recognizing a high standard for the risk-of-harm analysis." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020) (en banc). And "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409. *See, e.g.*, *Mont. Envtl. Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1189 n.4 (9th Cir. 2014) (45% chance of harm "does not suffice to show a substantial risk").

### e.      Section 209

Plaintiffs also assert injury based on the supposed violation of § 209 of the 1998 Appropriations Act, Pub. L. No. 105–119.  *See* Mot. 36–38.  No such injury exists.

Section 209 provides in part that "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any provision of law . . . in connection with the 2000 or any later decennial census, to determine the population for purposes of the apportionment or redistricting of Members in Congress, may in a civil action obtain declaratory, injunctive, and any other appropriate relief against the use of such method." 1998 Appropriations Act, § 209(b).  Even assuming *arguendo* that Plaintiffs constitute such "person[s] aggrieved," the Eleventh Circuit has made clear that "alleging a statutory violation is not enough to show injury in fact."  *Muransky*, 979 F.3d at 924.  And *U.S. House of Representatives* demonstrates this principle in the § 209 context.  In that case, the Supreme Court indicated that § 209 "eliminated . . . prudential concerns," *see* 525 U.S. at 328 — and then proceeded to explain that "the only open justiciability question in this case is whether appellees satisfy the requirements of Article III standing."  *Id.* at 329.  If a mere statutory violation of § 209 were sufficient to create Article III standing, the Court's standing analysis, *see U.S. House of Representatives*, 525 U.S. at 329–34, would have been entirely unnecessary.  *See also Muransky*, 979 F.3d at 928 ("A conclusory statement that a statutory violation caused an injury is not enough.").

### 2.      Plaintiffs Are Not Injured by Delayed Redistricting Data

Plaintiffs argue that Alabama is injured by the "delay in producing the population tables."  Mot. 55.  "When the federal government prevents a State from applying state law," they argue, "the State suffers an irreparable harm."  *Id.* (citing *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers)).  But as explained above, Defendants are not preventing Alabama from complying with its own state law, because Alabama's own constitution does not require census data for redistricting purposes.

36

Plaintiffs also argue that "delivering redistricting data on September 30 will also likely leave Alabama's Boards of Registrars at most only four months for reassigning their respective counties' registered voters to their correct precincts and districts," yet "[t]he reassignments typically take up to six months." Mot. 56. But the Boards of Registrars can get started right now with information that the Census Bureau has already provided to Alabama. *See, e.g.*, Whitehorne Decl. ¶¶ 10–12. And Plaintiffs' declarant also makes clear that the State can "push[] back [its] primary election" by seven weeks. Helms Decl., Doc. 3–3, ¶¶ 14–15. In all events, this is just another way of saying that the 2020 decennial census is not "full and satisfactory" to the State of Alabama, thus empowering Alabama's legislature to "provide for an enumeration of all the inhabitants" of the State. Ala. Const. § 201. In any event, Plaintiffs—citing the Helms declaration—argue that the Secretary's September delivery of redistricting data "*will* result" in one or more harms. Mot. 56 (emphasis added). But the Helms declaration they cite is not so definitive. Rather, the Helms declaration states that "[r]equiring the Boards of Registrars and county commissions to complete the reassignment process on an abbreviated schedule *could* result in one or more" harms. Helms Decl., Doc. 3–3, ¶ 12 (emphasis added). This equivocal declaration cannot support standing: "threatened injury must be *certainly impending* to constitute injury in fact"; "[a]llegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (emphases in original).

Plaintiffs also argue that "the Bureau's delay harms" Representative Aderholt "by effectively reducing by at least four months the amount of time [he] can spend campaigning and fundraising." Mot. 56; *see also* Compl. ¶ 197. But "[t]o establish standing, an injury in fact must be concrete." *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019) (footnote omitted). In turn, "[a] 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Id.* Representative Aderholt's supposed injury does not meet this standard. Plaintiffs do not contend that these lost months will make it less likely for Representative Aderholt to win reelection. And it is clear why: delayed redistricting data affects *every*

*candidate*—not just Representative Aderholt.  In fact, as the incumbent, Representative Aderholt is perhaps likely to *benefit* from a shorter campaign cycle.  In all events, Representative Aderholt cannot be said to be injured by the delay in producing redistricting data.

> **B.    Plaintiffs' Alleged Injuries Are Not Traceable to Defendants' Actions**
>
> **1.    Plaintiffs' Alleged Injuries Cannot Be Traced to Defendants' Plan to Use Differential Privacy**

For similar reasons, Plaintiffs fail to establish the requisite "causal connection between" their alleged injuries and the actions they challenge—*i.e.*, they cannot show that any alleged injury is "fairly . . . trace[able]" to Defendants' actions.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Specifically, Plaintiffs have failed to show that their alleged injuries related to redistricting—*i.e.*, Alabama's "sovereign interest in drawing fair districts" and the individual plaintiffs' interest in not having their votes diluted—are traceable to Defendants.  *See* Mot. 33, 36.  The Supreme Court has explained in no uncertain terms that "[r]edistricting is primarily the duty and responsibility of the State," *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018), and "involves *choices* about the nature of representation with which [courts] have been shown no constitutionally founded reason to interfere," *Burns*, 384 U.S. at 92 (emphasis added).  "While the use of census data is the general practice, no stricture of the federal government requires States to use decennial census data in redistricting, so long as the redistricting complies with the Constitution and the Voting Rights Act."  *Ohio*, 2021 WL 1118049, at *8.  Thus, in dismissing the State of Ohio's recent lawsuit against Defendants, Judge Rose concluded that Ohio's alleged injuries were not traceable to Defendants' challenged actions, but rather Ohio's "independent decision to create a state redistricting timeline without the flexibility to accommodate the COVID-19 pandemic."  *Id.*

Here, Alabama's timetables do not even appear to be incompatible with a September 30, 2021, release of redistricting data.  *See* Helms Decl., Doc. 3–3, ¶¶ 14–15 (conceding

that the State can "push[] back" its primary by seven weeks).  And in all events, Plaintiffs' claimed injuries here could only occur if the Alabama legislature declines to exercise its power, in the event that the U.S. decennial census is "not full and satisfactory," "to provide for an enumeration of all the inhabitants of th[e] state."  Ala. Const. § 201.  So any purported injury Alabama may suffer is "fairly . . . trace[able]" to the Alabama legislature's independent decision to use U.S. census data and the State's failure to adjust its own timetables, not "the challenged action of the defendant."  *Lujan*, 504 U.S. at 560.

Moreover, even if the Alabama legislature were required to use U.S. census data, Plaintiffs cannot demonstrate traceability because they cannot show that differential privacy will result in data that is less accurate when "compared to a feasible, alternative methodology," *Nat'l Law Ctr. on Homelessness & Poverty v. Kantor*, 91 F.3d 178, 183 (D.C. Cir. 1996) (emphasis omitted), or that the difference between the two methodologies is sufficiently large to produce some kind of harm, *id.* at 185–86; *see also Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality) (challengers to the allocation of overseas employees among states had "neither alleged nor shown . . . that [they would] have had an additional Representative if the allocation had been done using some other source of 'more accurate' data" and accordingly did not have standing "to challenge the accuracy of the data used in making that allocation").  As noted above, Plaintiffs maintain that differential privacy will result in inaccurate numbers, but they have identified no other feasible, Census Act-compliant disclosure-avoidance methodology that would produce more accurate numbers.  While Plaintiffs note that the Census Bureau has relied on other disclosure-avoidance methods in the past, Mot. 9–12, Dr. Abowd's declaration explains in detail why those methods are not feasible for the 2020 Census.  *See* Abowd Decl. ¶¶ 41–43, 50–51.  Absent a feasible alternative, Plaintiffs cannot contend that any alleged inaccuracy is, in fact, "caused" by differential privacy.

**2.      Plaintiffs' Alleged Injuries Cannot Be Traced to Defendants' Delay in Producing Redistricting Data**

Plaintiffs also fail to establish traceability for their purported injuries allegedly arising out of the Bureau's delay in producing redistricting data.  Again, because redistricting is ultimately the responsibility of the State, Plaintiffs cannot show that their purported injuries are traceable to the challenged actions of Defendants, as opposed to the State's independent decisions.  For this reason, the *Ohio* court recently dismissed Ohio's delay claim on traceability grounds, 2021 WL 1118049, at *8, and because the same analysis applies here, this Court should do the same.

Plaintiffs also cannot establish traceability because they identify no feasible alternative to producing redistricting data by September 30, 2021.  Plaintiffs suggest in passing that the Bureau could have "attempted to deliver apportionment and redistricting numbers to different States 'on a flow basis,'" "prioritizing the States whose laws rely on timely receipt of census data."  Mot. 47.  But that would place Alabama last in line as its constitution affords the State an alternative path.  *See* Ala. Const. § 201; *see generally* Part I.A.1.b.  In all events, as the Whitehorne declaration explains, even if the Census Bureau prioritized Alabama's redistricting data to the detriment of the other 49 States, "it would not be able to deliver the data more than a few weeks earlier than a single national release"; "[t]he resulting data may have uncaught errors from [having] been rushed through review without the benefit of review of all States at once"; and it would "delay the release of data for the other 49 states."  Whitehorne Decl. ¶¶ 29–30.  Because there is no feasible alternative, Plaintiffs cannot contend that their alleged injuries are "caused" by any action by the Bureau.

**C.      Plaintiffs' Purported Injuries Are Not Redressable**

An injury is redressable only if "a decision in a plaintiff's favor would 'significantly increase the likelihood' that [plaintiff] would obtain relief that directly redresses the injury that [plaintiff] claims to have suffered."  *Lewis v. Governor of Ala.*, 944 F.3d 1287,

1301 (11th Cir. 2019) (en banc).  Plaintiffs must demonstrate not only that they have suf-
fered an injury that is traceable to Defendants, but also that "redress is likely 'as a practi-
cal matter.'"  *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1255 (11th Cir. 2020) (quoting
*Utah v. Evans*, 536 U.S. 452, 461 (2002)).  Here, Plaintiffs cannot demonstrate that any of
their alleged injuries would be redressed by an order enjoining Defendants from using
differential privacy or requiring Defendants to produce redistricting data sooner than is
possible.

        **1.**       **Enjoining Differential Privacy Would Not Redress Plain-
tiffs' Alleged Injuries**

An order enjoining the Census Bureau from using differential privacy for the 2020
Census would not "significantly increase the likelihood" that Plaintiffs' alleged injuries
would be redressed.  To the contrary, there is a significant likelihood that an order en-
joining differential privacy would only make any alleged injuries worse.  If the Court
were to enjoin differential privacy, the Census Bureau would still need to comply with
sections 8 and 9 of the Census Act, which prohibit Defendants from "disclos[ing] the in-
formation reported by, or on behalf of, any particular respondent," or "mak[ing] any
publication whereby the data furnished by any particular establishment or individual . . .
can be identified."  13 U.S.C. §§ 8(b), 9(a)(2).  But the Census Bureau cannot rely solely on
the disclosure avoidance methods used in the 2010 Census, which would also allow in-
dividual respondents' data to be identified.  *See* Abowd Decl. ¶¶ 38–39.

To comply with sections 8 and 9 of the Census Act, the Census Bureau would in-
stead have to "swap" or "suppress" data at the census block level.  *Id.* ¶¶ 40–43.  This
would *exacerbate* Plaintiffs' alleged injuries, not redress them, because "[b]oth choices
would delay results and diminish accuracy."  *Id.* ¶ 84.  For example, Plaintiffs allege that
differential privacy "impede[s] the State's sovereign interest in drawing fair districts."
Mot. 33.  As explained above, differential privacy will not cause any such injury to Ala-
bama's sovereign interests.  *See supra*, Part I.A.1.b.  By contrast, swapping or suppression

at the levels necessary to protect the census data could very well impede Alabama's ability to draw fair districts. *See* Abowd Decl. ¶¶ 42, 43, 87. Thus, "as a practical matter," an order enjoining differential privacy is not likely to redress Plaintiffs' claimed injuries resulting from allegedly inaccurate data. *Jacobson*, 974 F.3d at 1255.

An order enjoining the use of differential privacy would also only extend the Bureau's delay in providing redistricting data. As Dr. Abowd explains, it would take the Bureau "multiple months" to develop, test, and implement any alternative disclosure-avoidance methodology. Abowd Decl. ¶ 85. Accordingly, the relief that Plaintiffs seek — an order enjoining differential privacy — would hinder, rather than help, the Bureau's ability to produce redistricting data to the States as soon as possible.

### 2. Requiring the Census Bureau to Produce Redistricting Data Sooner Would Not Redress Plaintiffs' Alleged Injuries

Nor can Plaintiffs demonstrate redressability as to their delay claim. As Judge Rose observed in holding that the State of Ohio had not demonstrated redressability in its similar challenge to the Census Bureau's delay, "a judicial decree is only the means to an end: 'At the end of the rainbow lies not a judgment, but some action (or cessation of action) by the defendant that the judgment produces.'" *Ohio*, 2021 WL 1118049, at *5 (quoting *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018)). "In other words, '[r]edress is sought *through* the court, but *from* the defendant,' and '[t]he real value of the judicial pronouncement — what makes it a proper judicial resolution of a case or controversy rather than an advisory opinion — is in the settling of some dispute which affects the behavior of the defendant towards the plaintiff.'" *Id.* (quoting *Doe*, 910 F.3d at 850) (emphasis added).

Here, as in *Ohio*, "[Alabama] seeks an advisory opinion that cannot redress their claimed injury." *Id.*; *see also Jacobson*, 974 F.3d at 1255 (redress must be likely "as a practical matter"); *Brown v. Berhndt*, 12–cv–24–KGB, 2013 WL 1497784, at *5 (E.D. Ark. Apr. 10, 2013) (no standing where "injunctive relief [wa]s impossible"). That's because it is

"not possible under any scenario for the Census Bureau to produce these data at this time or at any time in the immediate future, and the Census Bureau would be unable to comply with any such order from the Court." Whitehorne Decl. ¶ 14. "[T]he Census Bureau must complete a series of interim steps prior to delivering the redistricting data," and "[e]ach of these interim steps, in order, is required to move to the next." *Id.* ¶¶ 15–16. Those steps will likely not be completed until September 30, 2021, though the Bureau expects to be able to make a "legacy" format of the redistricting data file available to States in mid-to-late August. *Id.* ¶¶ 14–16, 27–28. Although the 2020 Census Operational Plan provided for only three months from the planned release of apportionment data on December 31, 2020, *see* Mot. 28, 49, the Bureau now requires five months because of operational changes that the Bureau made to expedite the release of the constitutionally required apportionment counts, including "decoupling" certain processes that the Bureau would have normally completed at the same time. Thieme Decl. ¶¶ 84–86.

Alabama's purported injury is "also unredressable when it comes to redistricting for congressional (as opposed to state) elections." *Ohio*, 2021 WL 1118049, at *5. In order to draw congressional districts, Alabama must first know the number of Representatives it will have in Congress to know how many districts to draw. 2 U.S.C. § 2c. But the Census Bureau has not yet finished, and neither the Secretary nor the President have yet reported, the apportionment of Representatives. Once the President reports the appointment numbers to Congress, apportionment will be entirely in Congress's hands to accept or reject. *See* 2 U.S.C. § 2a(b) (commanding that apportionment only occurs "under [2 U.S.C. § 2a] or subsequent statute"). So even if the Court ordered the Census Bureau to produce redistricting data immediately, Alabama would be no closer to drawing congressional districts until Congress has determined the number of Representatives to which Alabama is entitled. In such circumstances, redressability (and standing) are lacking. *See Leifert v. Strach*, 404 F. Supp. 3d 973, 982 (M.D.N.C. 2019) (no redressability where

"[i]t is not merely speculative, but rather impossible, for the requested relief to remedy the alleged injury").

Put simply, Alabama seeks the impossible. But "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017). Indeed, "[i]t has long been settled that a federal court has no authority . . . to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992). The Court should therefore reject Alabama's request for an advisory opinion based on the hypothetical world in which it were possible for the Census Bureau to comply with Alabama's requested relief. The Court cannot "order a party to jump higher, run faster, or lift more than she is physically capable." *Am. Hosp. Ass'n*, 867 F.3d at 168; Whitehorne Decl. ¶ 14 (explaining that "it would be a physical impossibility" to provide redistricting data at this time).

## II. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Its "chief function . . . is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). But Plaintiffs are not asking the Court to preserve the status quo. Entering Plaintiffs' proposed injunction would *upend* the status quo and would effectively constitute final relief in Plaintiffs' favor by forcing the Census Bureau to completely overhaul its existing disclosure-avoidance methodology and to make wholesale, untested operational changes to produce redistricting data as quickly as possible.

Even assuming that Plaintiffs' proposed relief could be characterized as a preliminary injunction, Plaintiffs do not satisfy any of the preliminary-injunction standards. "In order to obtain [a preliminary injunction], a party must establish four separate require-

ments—namely, that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).  And the latter two factors "merge when, as here, the Government is the opposing party."  *Id.* at 1293.

Plaintiffs "bear[] the burden of persuasion to clearly establish all . . . of these prerequisites."  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).  "[F]ailure to meet even one dooms" Plaintiffs' bid for a preliminary injunction.  *Id.* at 1248.

### A.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Differential Privacy Claims.

### 1.   Plaintiffs' Census Act Claim Is Not Likely to Succeed

Plaintiffs are not likely to prevail on their § 141(c) claim.  *See* Compl. ¶¶ 198–202. As explained above, Defendants' use of differential privacy will comply with § 141(c). *See supra* Part I.A.1.a.

Moreover, Alabama lacks a private right of action to assert a claim under § 141(c). "Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  "Where Congress has not created a private right of action, courts may not do so, 'no matter how desirable that might be as a policy matter, or how compatible with the statute.'"  *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) (quoting *Sandoval*, 532 U.S. at 287).

The only private right of action to enforce § 141(c) flows through § 209(b) of the 1998 Appropriations Act.[4]  Section 209(b) provides a private right of action to "[a]ny person aggrieved by the use of any statistical method in violation of the Constitution or any

---

[4]      In their motion, Plaintiffs seem to suggest that § 209(b) provides them with a separate substantive claim.  *See, e.g.*, Mot. 37–38 ("Defendants have violated Plaintiffs'

provision of law . . . in connection with the 2000 or any later decennial census, to deter-
mine the population for purposes of the apportionment or redistricting of Members in
Congress."  Even assuming *arguendo* that differential privacy constitutes a "statistical
method" as defined in § 209, Alabama is not a "person aggrieved."

Section 209 states that "an aggrieved person . . . includes— (1) any resident of a
State whose congressional representation or district could be changed as a result of the
use of a statistical method challenged in the civil action; (2) any Representative or Senator
in Congress; and (3) either House of Congress."  1998 Appropriations Act § 209(d).  Ab-
sent from this list of "aggrieved person[s]" are "States."  Plaintiffs nonetheless argue that
the Court should infer that "Alabama is an 'aggrieved person,' too."  Mot. 37.  But Con-
gress did not include "States" in its list of "aggrieved persons," and for this Court to do
so would run counter to the "longstanding interpretive presumption that 'person' does
not include the sovereign."  *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1861–62
(2019).  For this reason, there is a "background presumption that States are not 'persons.'"
*Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 133 n.10 (2003); *see Vt. Agency of
Nat Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780–88 (2000) (State is not a "person"
for False Claims Act purposes).  And "although the presumption is not a hard and fast
rule of exclusion . . . it may be disregarded only upon some affirmative showing of stat-
utory intent to the contrary."  *Return Mail, Inc.*, 139 S. Ct. at 1862.

If anything, the statutory text reflects Congress's intent to *exclude* States from the
definition of aggrieved persons.  After all, this is not a situation where Congress left the
term "person" undefined.  Rather, Congress enacted a specific definition of "aggrieved

---

rights under Public Law No. 105–119, § 209(b).").  But Plaintiffs do not assert a claim for
violation of § 209(b).  *See generally* Compl. ¶¶ 198–241.  And for good reason:  Section
209(b) simply creates a private right of action.  *See Common Cause v. Trump*, No. 1:20–cv–
02023, -- F. Supp. 3d --, 2020 WL 8839889, at *12 (D.D.C. Nov. 25, 2020) (three-judge court);
*Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998) (three-judge court), *aff'd sub nom.*,
*Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316 (1999).

person" in § 209(d). That definition even included "either House of Congress"—hardly within the usual definition of "person." But despite the Supreme Court's "background presumption that States are not 'persons,'" *Cook Cnty.*, 538 U.S. at 133 n.10, Congress—which is presumed to "legislate[] with knowledge of [the Supreme Court's] basic rules of statutory construction," *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991)—declined to include "States" in its definition of "aggrieved person."

Plaintiffs acknowledge that States are "not expressly named in the statute," but nonetheless have argued that "[t]he statute's natural reading includes the States alongside Section 209(d)'s enumerated parties." Pls. Mot., Doc. 2, at 5–7. Hardly. Given (i) the background presumption that "persons" do not include States, and (ii) Congress expressly included its Houses in defining "aggrieved person[s]" yet did not "expressly" include States, the "statute's natural reading" is that "aggrieved person[s]" do not include "States." Plaintiffs also argue that "a contrary interpretation would contravene the statute's purpose." Pls. Mot., Doc. 2, at 6. Even assuming Plaintiffs could be considered the arbiters of congressional purpose, "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

Nor can Plaintiffs rely on the fact that the "aggrieved person" is defined as "includ[ing]" various persons and entities. 1998 Appropriations Act § 209(d). After all, the Dictionary Act defines "person" as "*includ[ing]* corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals," 1 U.S.C. § 1 (emphasis added)—yet the Supreme Court held that "[t]he absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 275 (1947).

In sum, Alabama cannot take advantage of § 209's narrow right of action to enforce § 141(c), and in any event, none of the Plaintiffs are likely to succeed on their § 141(c) claims.  *See supra* Part I.A.1.a.

### 2. The Individual Plaintiffs' Equal Protection Claim Is Not Likely to Succeed

The individual plaintiffs are not likely to succeed on their one-person-one-vote equal-protection claim.  *See* Mot. 35–36.  Only individuals residing in under-represented voting districts may bring one-person-one-vote claims.  *Wright*, 358 F.3d at 1355.  And "over-represented voting district members are barred from bringing suit on behalf of persons who reside in under-represented voting districts."  *Id.*  Even assuming *arguendo* that census operational decisions could be susceptible to vote-dilution challenges, Plaintiffs have made clear that they do not know—"and, in fact, may never know"—whether their votes will be diluted.  Williams Decl., Doc. 3–9, ¶ 12; Green Decl., Doc. 3–10, ¶ 16; Aderholt Decl., Doc. 3–11, ¶ 26.  Plaintiffs concede that they cannot demonstrate any actual or impending vote dilution, and are thus unlikely to succeed on their vote-dilution claims.

Plaintiffs also have not pointed the Court to any case where census operations were enjoined on the grounds that resulting census data might lead States to redistrict in a manner that violated the one-person-one-vote principle.  And, in fact, the Supreme Court has rejected such a bid.  *See Wisconsin v. New York*, 517 U.S. 1, 16–17 (1996) ("[T]he 'good-faith effort to achieve population equality' required of a State conducting intrastate redistricting does not translate into a requirement that the Federal Government conduct a census that is as accurate as possible.").  This is not surprising.  As explained above, "the Equal Protection Clause does not require the States to use total population figures derived from the federal census as the standard by which this substantial population equivalency is to be measured."  *Burns*, 384 U.S. at 91.  Indeed, Alabama's own constitution empowers the State to conduct its own census if it is dissatisfied with the decennial census.  Ala. Const. § 201.  So to the extent that the application of differential privacy

could be said to cause any "vote dilution," the decision to use federal census data is Alabama's alone, and no equal-protection claim may lie against the Defendants.

### 3.    Plaintiffs' APA Challenges to Differential Privacy Are Not Likely To Succeed

Plaintiffs' APA claims face a fundamental problem: the Census Bureau has not yet finalized critical details on how it will use differential privacy.  Plaintiffs acknowledge this.  *See, e.g.*, Mot. 1 (describing differential privacy as a "still developing confidential algorithm"); Bryan Rep., Doc. 3–6, at 7 (claiming that "[t]he Census Bureau . . . will make a final decision about how DP will be implemented in the redistricting data by early May 2021").  The "in-progress" nature of differential privacy dooms Plaintiffs' APA claim because this Court lacks jurisdiction when there is no final agency action.  *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).

Plaintiffs try to get around this problem by styling their legal theory as a facial challenge to differential privacy, basing their claim on the 2018 Operational Plan that announced the Census Bureau intended to use differential privacy but that left the critical details to be filled in later.  *See* Mot. 40.  But the core of Plaintiffs' concerns relate to the Census Bureau's later and still ongoing choices like setting the specific privacy-loss budget.  And in any event, even if Plaintiffs' claims (APA or otherwise) were proper and could be characterized as a facial challenge to the 2018 Operational Plan, they would run headlong into the doctrine of laches.  *See infra* Part II.A.4.

### a.  The Differential Privacy Announcement Was Not Final Agency Action

*No "agency action" as defined by the APA.*  A cognizable APA claim must challenge a "circumscribed, discrete agency action[]" and it cannot advance a "broad programmatic attack" on an agency's operations.  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004) ("SUWA"); *see also* 5 U.S.C. § 551; 5 U.S.C. § 701(b)(2) (agency action includes "an agency rule, order, license, sanction, relief, or the equivalent or denial thereof").  Put differently, the APA does not permit a plaintiff to attack an agency program "consisting

of . . . many individual actions" simply by characterizing it as "agency action" under the APA. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 893 (1990). While "[c]ourts are well-suited to reviewing specific agency decisions," they are "woefully ill-suited [ ] to adjudicate generalized grievances asking [them] to improve an agency's performance or operations." *City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019).

The Census's data-processing operations, including disclosure avoidance, "expressly are tied to one another," so altering any of these operations "would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations." *NAACP v. Bureau of the Census*, 945 F.3d 183, 191 (4th Cir. 2019) (citing *SUWA*, 542 U.S. at 66–67), *aff'g in part and rev'g in part*, 399 F. Supp. 3d 406 (D. Md. 2019); *see, e.g.*, Whitehorne Decl. ¶¶ 15–16, 21; Abowd Decl. ¶¶ 84–89. In *NAACP*, plaintiffs challenged certain "design choices" within the Census Bureau's December 2018 Operational Plan—the same Plan that Plaintiffs here claim was the "final agency action" by announcing that the Bureau intended to use differential privacy. *Compare NAACP*, 945 F.3d at 187–88 n.1 *with* Compl. ¶ 79 n.6. The *NAACP* district court found that the design choices within the Operational Plan were not agency action, explaining that "if the Court were to interject itself into the Bureau's process during the critical final preparations, requiring—as Plaintiffs request—its monitoring and approval of the plans along the way, it is hard to imagine that this oversight would not hinder the process as opposed to facilitate it." *NAACP v. Bureau of the Census*, 382 F. Supp. 3d 349, 372 (D. Md. 2019).

Plaintiffs' differential privacy challenge fails this same threshold agency-action inquiry because it is a "broad programmatic attack" on the Census Bureau's disclosure avoidance operations, not a challenge to "circumscribed, discrete agency action[]." *SUWA*, 542 U.S. at 61–62. While Plaintiffs style their legal theory as a facial challenge to differential privacy, a close read of their complaint, motion, and expert reports shows

50

they ask the Court to scrutinize highly technical policy decisions related to how the Census Bureau *might* implement differential privacy.  For example, Plaintiffs take issue with what data will remain untouched during the disclosure-avoidance operations—data sets known as "invariants."  Compl. ¶ 89; Mot. 14.  They complain that the planned 2020 invariants include "(1) the total population of each State, (2) the total housing units at the census block level, and (3) the number of group quarters facilities by type at the census block level."  Mot. 14 & n.30 (citing a February 2021 summary file).  But the 2020 invariants were not finalized in the 2018 Operational Plan and thus are beyond the scope of Plaintiffs' current APA claims.

The Census Bureau's policy choices for what data to hold constant when applying differential privacy could have dominoing impacts on both the disclosure avoidance process and the interrelated data-processing steps.  *See* Abowd Decl. ¶ 88.  So any Court order commanding the Bureau to set particular invariants—or an order changing to a different disclosure-avoidance method altogether—would require "a sweeping overhaul to the [processing operations], which exceeds the scope of reviewable 'agency action.'" *NAACP*, 399 F. Supp. at 422.  Plaintiffs' requested relief shows the challenged action is not the type of circumscribed agency action that the APA makes reviewable.

*No jurisdiction because no <u>final</u> agency action.*  Even if the 2018 decision to use differential privacy constitutes agency action, this Court still lacks jurisdiction over Plaintiffs' APA claims because that decision was not *final* agency action.  *See In re MDL–1824 Tri-State Water Rights Litig.*, 644 F.3d 1160, 1181, 1185 (11th Cir. 2011).  To demonstrate subject-matter jurisdiction, Plaintiffs must show that "the administrative action in question is [] 'final' within the meaning of 5 U.S.C. § 704."  *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d at 1236.  To be final agency action, the challenged action must "mark the 'consummation' of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature" and the challenged action "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997); *Tri-State Water Rights*, 644 F.3d at 1181.  Plaintiffs fail on both counts.

*First*, the Supreme Court has held that interim decisions about Census data processing are not complete until the final decision-maker delivers the data.  In *Franklin*, Massachusetts challenged a particular method to assign home states for military personnel stationed abroad.  *Franklin*, 505 U.S. at 790.  The Supreme Court rejected Massachusetts' challenge, explaining that there was no final agency action until the President delivered the final apportionment count to Congress pursuant to Section 141(b).  505 U.S. at 800.  The interim steps taken by the Secretary of Commerce and the Census Bureau prior to the delivery of the final apportionment numbers under § 141(b) were tentative and not final agency action.  *Id.*; *see id.* at 799 ("The President, not the Secretary, takes the final action that affects the States.").  The same analysis applies to the redistricting under § 141(c); the interim steps taken by the Census Bureau before the Secretary delivers the redistricting data to the states cannot constitute final action.  *See City of Detroit*, 4 F.3d at 1377 n.6.  Final action will occur only when the Secretary delivers the final data to the States, which has not yet occurred.  Plaintiffs' contrary position—that the Census Bureau's operational plan can somehow bind the Secretary of Commerce—has no merit. "There is no authority for the proposition that a lower component of a government agency may bind the decision making of the highest level." *Cmty. Care Found. v. Thompson*, 318 F.3d 219, 227 (D.C. Cir. 2003).

Even setting aside *Franklin*, the factual issues that Plaintiffs flag in their motion and declarations underscore why there is no final agency action.  Plaintiffs and their declarants flag potential issues in non-final, *demonstration* data products—not the final redistricting data.  *See generally* Mot. 20–24; Bryan Rep., Doc. 3–6.  The entire point of releasing the demonstration products was to identify issues like the ones flagged by Plaintiffs.  *See* Abowd Decl. ¶¶ 58–61.  Census Bureau officials have explained that they are still working to resolve issues like those identified in the motion and declarations.  *See*

52

*id.* ¶¶ 68–71. In these circumstances where the agency is actively working to resolve known issues, this court should follow the instruction of the Eleventh Circuit, "exercise restraint," and let the Census Bureau use "its own institutional expertise" to address potential issues before releasing its final product. *LabMD, Inc. v. FTC*, 776 F.3d 1275, 1278 (11th Cir. 2015) (no final agency action when "agency proceeding is ongoing").

Critical details of how the Census Bureau will implement differential privacy have not yet been finalized. In particular, the privacy-loss budget will not be set until June. Abowd Decl. ¶ 71. Plaintiffs acknowledge that the eventual privacy-loss budget will affect the ultimate redistricting data: "Dialing the [privacy-loss budget] up to infinity results in perfect accuracy but theoretically imperfect privacy, whereas setting the [privacy-loss budget] at zero results in perfect privacy but useless data." Mot. 13. And Plaintiffs recognize that the Census Bureau has not reached a final decision on this critical matter. *See* Mot. 40 ("To be sure, the Bureau has yet to set the privacy loss budget it will use— *that decision is still in the works*.") (emphasis added); *id.* at 1 ("the Bureau intends to provide numbers produced by a *still developing* confidential algorithm") (emphasis added); *id.* at 17 (the Bureau "seeks to impose a *still-developing theory of privacy* onto the decennial census") (emphasis added). Plaintiffs' expert, Mr. Bryan, was even more blunt: "The Census Bureau . . . *will make a final decision* about how DP will be implemented in the redistricting data by early May 2021." Bryan Rep., Doc. 3–6, at 7 (emphasis added). The 2018 Operational Plan was not the consummation of decision-making; in many ways, it was just the beginning of a iterative process that is still in progress.

*Second*, even if the 2018 Operational Plan could somehow be considered the consummation of an agency's decision-making, it is still not "final" under the APA because it does not "determine any rights or obligations and imposes no legal consequences." *Clayton Cnty. v. FAA*, 887 F.3d 1262, 1266–67 (11th Cir. 2018). The Operational Plan's announcement that the Census Bureau would use differential privacy was "purely infor-

mational," "[c]ompell[ed] no one to do anything," and "had no binding effect whatso-ever—not on the agency and not on" the general public.  *See Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004).

The decision to use differential privacy, standing alone, does not cause the pur-ported "legal consequences" claimed by Plaintiffs.  Citing no case law, Plaintiffs claim that the 2018 decision to use differential privacy causes legal consequences by supposedly impeding Alabama's ability to redistrict and creating a "substantial risk" that individual plaintiffs' constitutional rights will be abridged.  Mot. 40.  But those purported "legal consequences" do not inherently flow from the use of differential privacy; those pur-ported consequences flow from third-party decisions regarding redistricting—such as Alabama's decision not to conduct the census for which its own constitution allows.  And even if legal consequences flow from the final redistricting data, that final product will depend on the Census Bureau's ultimate methodology and  privacy-loss budget—not the 2018 decision to use differential privacy.

Nor do the supposed accuracy issues flagged by Plaintiffs somehow demonstrate that the decision to use differential privacy had legal consequences. Plaintiffs' analysis was based on preliminary demonstration data.  As Plaintiffs acknowledge, "the Bureau has stated that it intends to set a less conservative privacy loss budget for the final tabu-lations of population than it did for the demonstration products."  Mot. 35.  And thus the final redistricting "numbers will be less skewed than they are in the demonstration data." *Id.*  Until the Census Bureau sets the final privacy-loss budget and releases the final num-bers, Plaintiffs have not shown that there will be *any* legal consequences from differential privacy.  The mere announcement that the Census Bureau would use differential privacy lacks legal consequence and is not reviewable final agency action under the APA.

          **b.**     **Even Assuming the Differential Privacy Announce-
ment Constituted Final Agency Action, It Did Not
Violate the APA**

Plaintiffs argue that "[t]he Census Bureau's decision to adopt differential privacy is contrary to law, contrary to constitutional right, and in excess of statutory authority." Mot. 40. They premise this argument on the notion that "the *application* of differential privacy to the population tabulations given to the States" is somehow inconsistent with 13 U.S.C. § 141(c) or that it would supposedly "create a substantial risk that individual Plaintiffs will have their equal protection rights violated." Mot. 40 (emphasis added).

But Plaintiffs cannot challenge the eventual *application* of differential privacy through an APA challenge to the decision to ultimately implement *some form* of differential privacy. Indeed, Plaintiffs' § 141(c) and equal-protection challenges are premised on the notion that the Census Bureau's eventual application of differential privacy will not hold sub-state population counts invariant. But, as explained above, the invariants were not finalized in the 2018 Operational Plan and thus are beyond the scope of Plaintiffs' current APA challenges to the 2018 Operational Plan. And even assuming *arguendo* that the 2018 Operational Plan had finalized invariants for the eventual application of differential privacy, Plaintiffs' facial APA challenge to that supposed decision still would fail, as Plaintiffs are not likely to succeed on their § 141(c) or equal-protection claims. *See generally supra* Parts I.A.1.a, I.A.1.d, II.A.1, II.A.2.

For similar reasons, Plaintiffs cannot demonstrate that the *decision* to adopt differential privacy is arbitrary and capricious. Plaintiffs hinge their arbitrary-and-capricious APA claim on the notion that the application of differential privacy will supposedly preclude the Secretary from meeting her obligations "to report accurate tabulations of population under subsection 141(c)," Mot. 42—that is, Plaintiffs' complaint is again about invariants, and not the disclosure-avoidance methodology in the abstract. And as the 2018 Operational Plan did not declare that sub-state population counts would be made variant, any such decision cannot be challenged in Plaintiffs' APA claim.

And in all events where (unlike here) there is final agency action, the arbitrary and capricious standard is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). The Court is "not authorized to substitute [its] judgment for the agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). "A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). And the Eleventh Circuit "believe[s] it appropriate to give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Nat'l Mining Ass'n v. Sec'y, U.S. Dep't of Labor*, 812 F.3d 843, 866 (11th Cir. 2016).

As explained *supra*, Background Parts C & D, the Census Bureau determined that the disclosure-avoidance methodologies it previously used to protect census data were no longer sufficient given the rise in computing power, and that differential privacy was "[t]he best disclosure avoidance option that offers a solution capable of addressing the new risks of reconstruction-abetted re-identification attacks, while preserving the fitness-for-use of the resulting data for the important governmental and societal uses of census data." Abowd Decl. ¶ 47. The Census Bureau's decision-making process is not arbitrary or capricious.

Plaintiffs' arbitrary-and-capricious claim is premised on a number of false notions. For starters, Plaintiffs argue that "the Bureau has not shown that traditional disclosure avoidance methods like data swapping are insufficient to meet" the Census Act's confidentiality requirements. Mot. 41–42. But that position is easily rebutted by the JASON report that Plaintiffs repeatedly cited in their opening brief. *E.g.*, JASON, *Formal Privacy Methods for the 2020 Census* (Apr. 2020) at 6, available here ("Approaches to disclosure avoidance such as swapping and top and bottom coding applied at the level used in the

2010 census are insufficient to prevent re-identification given the ability to perform database reconstruction and the availability of external data."); *accord, e.g.*, Abowd Decl. ¶¶ 38–39, 41–43, 50.

Plaintiffs further argue that the Census Bureau "misinterpreted the confidentiality requirements of § 9," contending that "[c]onfidentiality is only implicated—in theory— when a recipient of census data uses the information published by the Bureau *together with* other datasets" to re-identify respondents.  Mot. 43 (emphasis in original).  But it is Plaintiffs that misconstrue the Census Act's confidentiality requirements.  Initially, Plaintiffs' argument fails the plain text of the statute.  Section 9(a) provides that Bureau staff, among others, generally may not "make any publication whereby the data furnished by any particular establishment or individual under this title can be identified."  13 U.S.C. §§ 9(a), (a)(2).  And the Census Bureau demonstrated, as corroborated by JASON, that the 2010 disclosure-avoidance methodology resulted—given recent advances in computing power—in publications that allowed respondent data to be identified.  Indeed, under Plaintiffs' atextual reading of § 9, the Census Bureau need not apply *any* disclosure-avoidance mechanism at all—not even to protect the sole, easily-identifiable Filipino American in the 20-person census block in the data-swapping example they provide, *see* Mot. 10– 11—because, in their view, the Census Bureau would only violate § 9 if the *Bureau* publishes respondents' names and addresses.

In all events, Plaintiffs conspicuously ignore § 9's companion, 13 U.S.C. § 8, as well as on-point Supreme Court precedent.  In *Baldrige v. Shapiro*, 455 U.S. 345 (1982), the Supreme Court expressly rejected the argument that the Census Act's "confidentiality provisions protect raw data only if the individual respondent can be identified."  *Id.* at 355. Rather, "Congress plainly contemplated that raw data reported by or on behalf of individuals was to be held confidential and not available for disclosure."  *Id.*; *see also id.* at 361 ("§ 8(b) and § 9(a) of the Census Act embody explicit congressional intent to preclude *all*

57

disclosure of raw census data reported by or on behalf of individuals") (emphasis in original).  So while re-identification may not be possible without the use of other sources of data, the Census Bureau's database-reconstruction experiment demonstrated that its 2010 census publications could be reverse-engineered, and thus resulted in an unfortunate "disclosure of raw census data reported by or on behalf of individuals."  *Id.* at 361.

Nor did Defendants ignore their end-users' reliance interests.  The 2018 Operational Plan itself made clear that the application of differential-privacy constitutes "a delicate balancing act":  "enough noise must be added to protect confidentiality, but too much noise could damage the statistic's fitness-for-use."  2018 Operational Plan, Doc. 3–4, at 140.  "The Census Bureau decided that differential privacy was the best tool after analyzing the various options through the lens of economics."  Abowd Decl. ¶ 41.  "Efficiently protecting privacy can be viewed as an economic problem because it involves the allocation of a scarce re-source—confidential information—between two competing uses: public data products and privacy protection."  *Id.*  The Bureau's "empirical analysis showed that differential privacy offered the most efficient trade-off between privacy and accuracy—our calculations showed that the efficiency of differential privacy dominated traditional methods."  *Id.*  "In other words, regardless of the level of desired confidentiality, differential privacy will always produce more accurate data than the alternative traditional methods considered by the Census Bureau."  *Id.*

The ultimate accuracy of the redistricting data will also be much greater than the demonstration data released to date.  By April 30, 2021, the Census Bureau will release a further set of demonstration data that employs a higher privacy-loss budget, tuned for accuracy, and which "better approximates the final privacy-loss budget that will likely be selected for the redistricting data product."  Abowd Decl. ¶ 69.  Plaintiffs and their experts will have at least four weeks to review the next set of demonstration data, perform their analyses, and submit feedback before DSEP sets the final privacy-loss budget

and production parameters in June.  *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here.

Finally, even assuming that the 2018 Operational Plan could be said to violate the APA § 706(2), *see* Compl. ¶¶ 210–218, the only remedy would be to "set [it] aside" and "remand [it] to the agency for additional investigation." 5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  Indeed, under APA § 706(2), "it is not a court's role to direct the agency how to act.  Rather, a court's role is to review the agency's decision and, if it cannot be sustained, remand to the agency." *Neto v. Thompson*, -- F. Supp. 3d --, 2020 WL 7310636, at *11 (D.N.J. Dec. 10, 2020) (citing *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1907–08 (2020)).  And any such remand would add "multiple months" of further delay.  Abowd Decl. ¶ 85; *see generally supra*, Background Part D.

### 4.   The Doctrine of Laches Bars Plaintiffs' Differential Privacy Claims

Assuming the Court concludes that Plaintiffs are bringing a facial challenge to the 2018 Operational Plan (as opposed to a challenge to the application of differential privacy, which would be premature), such a challenge is barred by the doctrine of laches.  The doctrine of laches "protect[s] defendants against unreasonable, prejudicial delay in commencing suit." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 960 (2017).   The doctrine provides defendants with an equitable defense that warrants consideration "separate from a statute of limitations [defense]." *Grayson v. Allen*, 499 F. Supp. 2d 1228, 1236 (M.D. Ala.), *aff'd*, 491 F.3d 1318 (11th Cir. 2007).  The doctrine "will bar a claim when three elements are present: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000); *see also Wood v. Raffensperger*, No. 1:20–CV–04651–

SDG, -- F. Supp. 3d --, 2020 WL 6817513, at *7 (N.D. Ga. Nov. 20, 2020), *aff'd*, 981 F.3d 1307 (11th Cir. 2020).  All three elements are easily satisfied here.

*First*, Plaintiffs have delayed considerably in asserting their claims.  Plaintiffs acknowledge that the Bureau announced its decision to use differential privacy for the 2020 Census "in September 2017" and added differential privacy to the 2020 Census Operational Plan "in December 2018."  Mot. 39.  Under this theory, Plaintiffs knew or should have known the facts giving rise to their claims by December 2018 at the latest.  Rather than timely bringing their claims once Plaintiffs became aware of the Bureau's plans, however, Plaintiffs waited years to bring their lawsuit, until after the Bureau had already begun processing data and is now on the verge of releasing data in a matter of months.  This years-long wait undoubtedly counts as a "delay."  *See, e.g.*, *Wood*, 2020 WL 6817513, at *7 (laches barred challenge to November 2020 election where plaintiff was aware of basis for claim as early as March 2020); *Stone v. U.S. Postal Serv.*, 383 F. App'x 873, 875 (11th Cir. 2010) (laches barred claim due to plaintiffs' three-year delay).

*Second*, Plaintiffs' delay is inexcusable.  Plaintiffs take the position that the Census Bureau's December 2018 operational plan constitutes final agency action that is "ripe for review."  Mot. 39–40.  Given that position, there is no excuse for waiting more than two years to challenge that decision.  To be sure, the Bureau continues to refine its differential-privacy algorithm, and has not yet set the privacy-loss budget.  But in Plaintiffs' view, that decision is "immaterial" to their claims because "by definition, *any* application of differential privacy will produce erroneous numbers."  *Id.* at 35, 40 (emphasis added).  Plaintiffs identify no reason in either their complaint or their motion why they waited until the eleventh hour to file suit.  Indeed, Alabama *did* file suit against the Census Bureau in 2018 over the Bureau's "Residence Rule"—a suit that remains pending in the Northern District of Alabama.  *See* Compl., *Alabama v. Dep't of Commerce*, No. 18–cv–772 (N.D. Ala. May 21, 2018).  But Alabama waited until March 2021 to bring any challenge

to the Bureau's plan to use differential privacy, despite their claim that "any" application of differential privacy would be unlawful.

*Third*, Plaintiffs' delay has unduly prejudiced Defendants.  If Plaintiffs had brought their challenge when the Census Bureau announced it would be using differential privacy, the Bureau would have had ample time to implement any operational consequences of an adverse decision before releasing redistricting data to the states.  Now, with post-processing operations well underway and the release of data fast approaching, an adverse decision would significantly disrupt the Bureau's completion of the census.  As Dr. Abowd explains, it would take "multiple months" to develop, test, and implement an alternative disclosure methodology.  Abowd Decl. ¶ 85.  Changing course at the last minute also poses significant risks to the accuracy of the data.  *See* Thieme Decl. ¶ 74.  Moreover, by bringing suit now during what is the busiest time of the decade for the Census Bureau, Plaintiffs have subjected the Bureau to the significant and unnecessary burden of having to defend against a federal lawsuit seeking to upend its entire framework for ensuring privacy while simultaneously working to complete the actual census itself.  All of this could have been avoided if Plaintiffs had not delayed in bringing their claims.

### B.    Plaintiffs' Challenge to the February 12 Press Release Is Not Likely to Succeed.

Plaintiffs bring two statutory challenges to the Bureau's February 12 Press Release announcing that it would release redistricting data by September 30, 2021: (i) a claim that the press release "violates the Census Act," Mot. 44–45; Compl. ¶¶ 219–22, and (ii) a claim that the press release violates the APA, Mot. 46–50; Compl. ¶¶ 223–27.  Neither challenge is likely to succeed.

#### 1.    Plaintiffs' Claim that the Press Release "Violates the Census Act" Is Not Likely to Succeed

Plaintiffs are unlikely to succeed on their claim that the February 12 Press Release violates § 141(c) of the Census Act.  As an initial matter, Plaintiffs lack a private right of

action to bring this claim.  As noted, the only private right of action to enforce § 141(c) flows through § 209(b) of the 1998 Appropriations Act.  But that section provides a private right of action only to certain statutorily defined "aggrieved persons" to challenge "the use of any statistical method in violation of the Constitution or any provision of law . . . to determine the population for purposes of the apportionment or redistricting of Members in Congress."  And none of the Plaintiffs can use § 209 to challenge the February 12 Press Release because § 209 allows for challenges only to "statistical methods," and the press release is obviously not a "statistical method."[5]  Plaintiffs argue that the February 12, 2021 Press Release was "likely" a "byproduct of its . . . decision to implement differential privacy," which Plaintiffs contend is a "statistical method."  *See* Pls. Mem., Doc. 2, at 4–5.  But Plaintiffs are wrong as a factual matter—as the Thieme declaration explains, the "creation of the [Microdata Detail File] is not the reason that the Census Bureau will be unable to meet the statutory deadline."  *See* Thieme Decl. ¶ 71.  Indeed, the Bureau has allotted approximately three weeks to apply differential privacy, while the disclosure-avoidance procedures used in the 2010 census took nearly four weeks.  *Id.*  And, more fundamentally, § 209 does not allow for challenges to press releases that are alleged "byproduct[s]" of a statistical method—whatever that means.  It allows only for challenges to statistical methods themselves.

Plaintiffs thus have no cause of action under the Census Act or § 209 to pursue an alleged violation of the statutory deadline in § 141(c).  Nor is there any other basis for Plaintiffs to pursue this claim.  While federal courts may "in some circumstances" grant injunctive relief against officials who are alleged to have violated federal law, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320,

---

[5]   Additionally, as explained above, Alabama is not an "aggrieved person" under the statute, and so Alabama could not take advantage of § 209(b)'s narrow cause of action to enforce § 141(c) in any event.  *See supra* Part II.A.1.

326–27 (2015).  By expressly authorizing a cause of action for "aggrieved persons" to bring claims challenging "statistical methods"—but *only* statistical methods—Congress impliedly limited plaintiffs' ability to challenge other alleged violations of the Census Act. *See id.* at 328 (holding that Medicaid Act foreclosed equitable relief because "sole remedy" Congress provided for in statute was for Secretary to withhold funds).

Nor is review available under the "*ultra vires*" doctrine or any other purported nonstatutory basis for review.  Review under the *ultra vires* doctrine "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."  *Nyunt v. Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.).  Among other requirements, a plaintiff must show that the agency's error is "so extreme that one may view it as jurisdictional or nearly so."  *Id.* (quoting *Griffith v. Fed. Labor Relations Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)); *see also Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 728 (7th Cir. 2020) (plaintiffs must show that defendants acted "beyond their legal authority").  Plaintiffs have not even attempted to make that showing here.  Plaintiffs do not argue that the Census Bureau lacks the statutory authority to report tabulations of population after the deadline has passed, so *ultra vires* review does not even apply.  And even if it did, Plaintiffs cannot show that the agency's error was "so extreme" as to be "jurisdictional or nearly so," where the Bureau could not meet the statutory deadline due to extraordinary events outside its control.

Finally, even if Alabama had a cause of action under the statute or otherwise, injunctive relief would be inappropriate because, as noted, it is physically impossible for the Bureau to produce redistricting data at this time or any time in the immediate future. A court may not exercise its equitable powers to "require an agency to render performance that is impossible."  *Am. Hosp. Ass'n*, 867 F.3d at 167.

63

> ## 2. Alabama's APA Challenge to the February 12 Press Release Is Not Likely to Succeed

Alabama is likewise unlikely to succeed under the APA because its claim does not challenge any final agency action.  Alabama's claim focuses exclusively on the Bureau's February 12 Press Release and related blog post.  Mot. 44–45 (citing Mot. Exs. 7 & 8).  But, as explained above, final agency action occurs when the Secretary reports the final redistricting numbers.  *See* Part II.A.3.a.; *Franklin*, 505 U.S. at 790; *City of Detroit*, 4 F.3d at 1377 n.6.  So the Press Release is not final agency action reviewable under the APA.

> ### a. The February 12 Press Release Was Not Final Agency Action

As explained above, final agency action "must mark the consummation of the agency's decision–making process—it must not be of a merely tentative or interlocutory nature" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 177–78.  A cognizable APA claim must also challenge a "circumscribed, discrete agency action[]"; it cannot advance a "broad programmatic attack" on an agency's operations.  *SUWA*, 542 U.S. at 61–62.  Alabama's challenge to the February 12 Press Release satisfies none of the requirements for final agency action.

*No Consummation of the Decisionmaking Process*.  To determine whether an agency action is final, "[t]he core question is whether the agency has completed its decisionmaking process."  *Franklin*, 505 U.S. at 797.  The APA does not allow a party to challenge "preliminary, procedural, or intermediate agency action" until the agency completes its action.  *See Nat'l Parks Conservation Ass'n*, 324 F.3d at 1236 (quoting 5 U.S.C. § 704).

As explained above, the Supreme Court has held that there is no final agency action until the President delivers the final apportionment count to Congress.  *See Franklin*, 505 U.S. at 797.  The interim steps taken by the Secretary of Commerce and the Census Bureau prior to the delivery of the final apportionment numbers are tentative and not final agency action.  *Id.*  Although *Franklin* dealt with apportionment, the same analysis

applies to the redistricting context. *See City of Detroit*, 4 F.3d at 1377 n.6 (relying on *Franklin*'s reasoning to conclude that "the Secretary's reporting of the [redistricting] counts for these purposes is a final agency action").  Since reporting of final redistricting data is reviewable final agency action, the tentative actions and decisions leading up to the delivery of the redistricting data are not reviewable under the APA.

Even setting aside this Supreme Court precedent, a press release explaining that the Census expects to deliver redistricting data by a certain date did not consummate anything; it simply provided a snapshot in time of the expected delivery date that had shifted over the past year due to many factors, including disruptions from COVID, wildfires, hurricanes, court orders, and issues in data processing.  *See supra* Background Part E.  The February 12 Press Release simply updated Census's estimated timeline, and of course, estimates can still change as data processing continues.  *See* Whitehorne Decl. ¶ 17.  The Press Release thus does not reflect any definitive decision at all.

*No Legal Consequences*.  The February 12 Press Release is also not final agency action because it did not change any legal rights or have any legal consequences.  *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) (no final agency action where "no direct and appreciable legal consequences" and no party "can rely on it as independently authoritative in any proceeding").  The February 12 Press Release did not change any rights or obligations: the Secretary will deliver redistricting data to the States, including Alabama, when the data becomes available.  Like the 2018 Operational Plan, the Press Release was also "purely informational"; "[c]ompelling no one to do anything," the Press Release "had no binding effect whatsoever—not on the agency and not on" the general public.  *Indep. Equip. Dealers Ass'n*, 372 F.3d at 427.  And, as discussed above, Alabama faces no legal consequences if it does not receive redistricting data by the statutory deadline.  *See generally supra* Part I.A.1.b.  In fact, Alabama faces no legal consequences at all,

regardless of timing, because its own law fully contemplates how to accomplish apportionment and redistricting in the absence of what it considers to be "full and satisfactory" census data. *See* Ala. Const. § 201; *Ohio*, 2021 WL 1118049, at *6.

*Improper Programmatic Attack*.   Finally, Alabama's challenge to the February 12 Press Release fails the final-agency-action inquiry because it is a "broad programmatic attack" on the Census Bureau's operations, not a "circumscribed, discrete agency action[]." *SUWA*, 542 U.S. at 61–62.   While "[c]ourts are well-suited to reviewing specific agency decisions," they are "woefully ill-suited [ ] to adjudicate generalized grievances asking [them] to improve an agency's performance or operations." *City of New York*, 913 F.3d at 431.   But that is exactly what Alabama seeks here.   Because the Census Bureau's data-processing operations are all interdependent and interrelated, *see, e.g.*, Thieme Decl. ¶ 5; Whitehorne Decl. ¶¶ 15–16, 21, producing redistricting data on a different timeline would require "a sweeping overhaul to the [processing operations], which exceeds the scope of reviewable 'agency action.'" *NAACP*, 399 F. Supp. 3d at 422.   Indeed, like the Census Bureau's field operations, its data-processing operations "expressly are tied to one another," so altering any of these operations "would impact the efficacy of the others, and inevitably would lead to court involvement in 'hands-on' management of the Census Bureau's operations." *NAACP*, 945 F.3d at 191 (citing *SUWA*, 542 U.S. at 66–67).   That is "precisely the result that the 'discreteness' requirement of the APA is designed to avoid." *Id.* (citing *SUWA*, 542 U.S. at 67).

### b.   The February 12 Press Release is Not Arbitrary or Capricious

Nor can Alabama demonstrate that the February 12 Press Release is arbitrary or capricious in violation of the APA.   Where (unlike here) there is final agency action, the arbitrary and capricious standard is "exceedingly deferential." *Sierra Club*, 526 F.3d at 1360.   The Court is "not authorized to substitute [its] judgment for the agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264.   And

this Court should "give an extreme degree of deference to the agency when it is evaluating scientific data within its technical expertise." *Nat'l Mining Ass'n*, 812 F.3d at 866; *see also Ranchers Cattlemen Action Legal Fund v. Dep't of Agric.*, 415 F.3d 1078, 1093 (9th Cir. 2005) ("Deference to the informed discretion of the responsible federal agencies is especially appropriate, where, as here, the agency's decision involves a high level of technical expertise.").

Here, there is a reasoned explanation for the Secretary's inability to transmit redistricting data by the statutory deadline: "[I]t is not possible under any scenario for the Census Bureau to produce these data at this time or any time in the immediate future." Whitehorne Decl. ¶ 14. Nor can the Bureau's delivery of redistricting data for all States at once be considered arbitrary or capricious. *Contra* Mot. 47. Even if the Census Bureau prioritized Plaintiff's redistricting data to the detriment of the other 49 States, "it would not be able to deliver the data more than a few weeks earlier than a single national release"; "[t]he resulting data may have uncaught errors from [having] been rushed through review without the benefit of review of all States at once"; and it would "delay the release of data for the other 49 states." Whitehorne Decl. ¶¶ 29–30.

Finally, even assuming that the February 12 Press Release could be considered "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the only remedy would be to "set [it] aside" and "remand [it] to the agency for additional investigation." 5 U.S.C. § 706(2); *Fla. Power & Light Co.*, 470 U.S. at 744. Indeed, under the APA § 706(2), "it is not a court's role to direct the agency how to act. Rather, a court's role is to review the agency's decision and, if it cannot be sustained, remand to the agency." *Neto*, 2020 WL 7310636, at *11 (citing *Regents of the Univ. of California*, 140 S. Ct. at 1907–08). And while the Census Bureau would take any such remand seriously, it

would not change the fact that "it is not possible under any scenario for the Census Bureau to produce these data at this time or any time in the immediate future."  Whitehorne Decl. ¶ 14.[6]

### C.     Plaintiffs Will Suffer No Harm, Much Less Irreparable Harm.

"A showing of irreparable injury is the sine qua non of injunctive relief."  *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).  And "the asserted irreparable injury must be neither remote nor speculative, but actual and imminent."  *Id.*  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  Here, Plaintiffs cannot establish that they will likely suffer irreparable harm as a result of either the Bureau's use of differential privacy or its February 12 Press Release.

### 1.     Plaintiffs Have Not Established Irreparable Harm Due to Differential Privacy

As a threshold matter, and assuming that the Court concludes that Plaintiffs are bringing a facial challenge to the 2018 Operational Plan (because any challenge to the application of differential privacy is premature), Plaintiffs' unexplained delay in bringing their differential privacy claim undercuts their claim of irreparable injury.  "[T]he very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits."  *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (emphasis in original).  "For this reason" federal courts "have found that a party's failure to act with speed or urgency in

---

[6]     Contrary to Alabama's protestations, Mot. 47, the Census Bureau *did* consider States' self-imposed reliance on census-based redistricting data.  As the Whitehorne declaration explains, however, "[w]ith the delay in the delivery of the redistricting data, there are now too many states (at least 27) to prioritize, in a fair, logical, and data-driven manner."  Whitehorne Decl. ¶ 26.

moving for a preliminary injunction necessarily undermines a finding of irreparable harm." *Id.* Thus in *Wreal*, the Eleventh Circuit stated that "[a] delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Id.*

The record here reflects Plaintiffs' unexplained delay of at least two years. Plaintiffs represent in their motion that the Census Bureau announced its decision to use differential privacy in September 2017, and that the Census Bureau added differential privacy to its "fourth (and latest) version of the Bureau's 2020 Census Operational Plan," which was released in December 2018. Mot. 12. They reference demonstration data that the Census Bureau released in October 2019 and in May, September, and November of 2020 that, in their view, "have shown that differential privacy . . . inhibits a State's right to draw fair lines." *Id.* at 18. And though the Census Bureau continues to refine its differential-privacy algorithm and its various inputs, Plaintiffs' position is that "by definition, *any* application of differential privacy will produce erroneous numbers." *Id.* at 35 (emphasis added).

But Plaintiffs do not explain why they failed to bring a challenge shortly after the Census Bureau added differential privacy to its December 2018 operational plan. Nor do they explain why they didn't bring such a challenge after the Census Bureau started releasing demonstration data in October 2019. Instead, for reasons they do not explain, Plaintiffs waited until March 2021 to file this suit and move for a preliminary injunction. "[A] party cannot delay . . . and then use an 'emergency' created by its own decisions concerning timing to support a motion for a preliminary injunction." *Mortensen v. Mortg. Elec. Registration Sys., Inc.*, No. CV 09-0787-WS-N, 2010 WL 11425328, at *8 (S.D. Ala. Dec. 23, 2010). "[B]ecause the instant motion for preliminary injunction was filed not just months, but years, after the factual basis of the Plaintiffs' claims were known to them, the Plaintiffs have not shown they will suffer imminent, irreparable harm." *Thompson v. Merrill*, No. 2:16–cv–783–ECM, 2020 WL 3513497, at *3 (M.D. Ala. June 29, 2020) (Marks, C.J.).

Setting aside Plaintiffs' unexplained delay in bringing their claim, Plaintiffs also cannot demonstrate an irreparable injury because they have not demonstrated any injury at all. *See supra* Part I.A. Plaintiffs contend that they will suffer an irreparable injury because differential privacy will supposedly "make lawful redistricting difficult." Mot. 50. But, as explained above, the redistricting data that the Secretary produces will be perfectly suitable for redistricting. *See* Abowd Decl. ¶¶ 54–56, 65–66, 69. As Dr. Abowd explains, the latest demonstration data product that will be released by April 30 is "extremely accurate." *Id.* ¶ 54. For example, "[t]otal populations for counties have an average error of +/- 5 persons" (an error rate of about 0.04% of the counties' population), whereas "the average county-level estimation uncertainty of the census is +/- 960 persons (averaging 1.6% of the county census counts)." *Id.* "In the April 2021 Demonstration Data Product, Congressional districts as drawn in 2010 have a mean absolute percentage error of 0.06%." *Id.* ¶ 56. And the average state legislative district has an average error of 0.16% or less. *See id.* Such miniscule error cannot possibly interfere with Alabama's ability to "lawful[ly] redistrict[]" or "subject the State to the risk of litigation and liability." Mot. 50. And even if Alabama believed that it did, Alabama's constitution does not require it to use census data in drawing its districts. *See supra* Part I.A.1.b.

Nor have Plaintiffs demonstrated that differential privacy will impose irreparable "financial harm" on Alabama. *See* Mot. 52–55. Again, as explained above, Plaintiffs do not allege that Alabama is likely to suffer a *loss* of federal funds as a result of differential privacy, and make no effort to show that the level of noise that the differential-privacy algorithm will inject will affect any aspect of Alabama's federal funding. *See supra* Part I.A.1.c. To the contrary, Plaintiffs' own expert suggests that to the extent Alabama's funding would be affected by differential privacy at all, it would result in a windfall to the State because, he predicts, rural areas would tend to gain population. *Id.*

Moreover, even if Plaintiffs could establish some potential future injury, they cannot show that they are likely to suffer the kind of "imminent" irreparable harm that

would justify the extraordinary remedy of a preliminary injunction. *Wreal*, 840 F.3d at 1248. As explained above, the Census Bureau is still in the process of finalizing the differential privacy algorithm, and has not, for example, set the privacy-loss budget. *See supra* Background Part D. Until it does so, Plaintiffs cannot demonstrate that the amount of noise that differential privacy adds could possibly be so great as to cause the kinds of irreparable harms that Plaintiffs allege. *See* Mot. 50.

### 2.   Plaintiffs Have Not Established Irreparable Harm on Their Delay Claim

Nor have Plaintiffs demonstrated that they will suffer irreparable harm if the Census Bureau releases redistricting data by September 30, 2021. *See* Mot. 55–56. Again, Plaintiffs have not demonstrated any harm at all, let alone irreparable harm. Plaintiffs' claim to harm rests entirely on an assertion that Alabama will be unable to comply with its constitution but, as explained above, Alabama's constitution does not require using decennial census data for redistricting where, as here, the State does not believe that data to be "full and satisfactory." *See supra* Part I.A.1.b; Ala. Const. § 201. This case is therefore unlike *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), where a portion of state law was enjoined, precluding the state from enforcing its provisions. *Id.* at 1303 (noting that inability to "employ a duly enacted statute" constitutes irreparable harm). Here, by contrast, Alabama's constitution expressly contemplates a situation where census data would not be "full and satisfactory" to the State and affords its legislature an opportunity to conduct its own census. *See* Ala. Const. § 201. The realization of a circumstance expressly accounted for in a state's law is not a frustration of that text or its purpose. *See Conn. Nat'l Bank*, 503 U.S. at 253–54 (courts "must presume that [the] legislature says in a statute what it means and means in a statute what is says there.").

Alabama may well prefer to use census data for redistricting, but a frustration of an alleged preference, without a factual showing of likely real-world effects, is insufficient to constitute an irreparable injury. *Cf. Judicial Watch, Inc. v. U.S. Dep't of Homeland*

*Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007) ("Although plaintiff's desire to have its case de-cided in an expedited fashion is understandable, that desire, without more, is insufficient to constitute the irreparable harm[.]").  Were it otherwise, anyone that came to court with a preference for different census operations could obtain an injunction as a matter of course.  That is not—and cannot be—the standard.  *Siegel*, 234 F.3d at 1179 ("[P]roof of irreparable injury is an indispensable prerequisite to a preliminary injunction.").  And even assuming that Alabama would sustain likely real-world effects, the State has not explained why, unlike other States, *see supra* Background Part E, it cannot find a workable solution other than through this lawsuit.

Likewise, Plaintiffs cannot establish imminent irreparable harm based on the ar-gument that delivering redistricting data by September 30 would leave Alabama's Boards of Registrars with "only" four months to reassign voters to their correct precincts and districts.  Mot. 56.  Plaintiffs assert that four months will "likely" not be enough, *id.*, but the declaration that Plaintiffs cite does not support that assertion.  *See* Helms Decl., Doc. 3–3, ¶¶ 5–15.  The declaration states merely that in those counties that assign voters man-ually, the process "can" take "up to [six] months."  *Id.* ¶ 7.  This statement appears to be based on one prior reassignment process in 2017 when local officials allegedly struggled to assign voters in six months.  *Id.* ¶ 8.  From this fact, the declarant infers that requiring officials to complete the reassignment process in four months instead of six "could" lead to increased costs, the "potential[]" for mistaken reassignments, and the "potential[]" for confusion.  *Id.* ¶ 12.  But such "remote [and] speculative" potential harms are insufficient to establish the "actual and imminent" harm necessary to justify a preliminary injunction. *Siegel*, 234 F.3d at 1176.  Moreover, Plaintiffs' declarant acknowledges that Alabama could simply move its 2022 primary election seven weeks to July 12, 2022, Helms Decl., Doc. 3–3, ¶¶ 14–15, which would give Alabama the six months that it says it needs to complete the reassignment process.

Finally, Representative Aderholt cannot establish irreparable harm based on the fact that the Bureau's delay "effectively reduc[es] by at least four months the amount of time [he] can spend campaigning and fundraising."  Mot. 56.  As explained above, delayed redistricting affects all candidates, and, as the incumbent, Representative Aderholt is perhaps even more likely to benefit from a shorter campaign cycle.  *See supra* Part I.A.2.  Thus, Representative Aderholt cannot demonstrate any injury at all, let alone an injury that is "actual and imminent."

> ### D.   Defendants and the Public Would Be Harmed by an Injunction.

*Differential Privacy Is In The Public Interest.*  The harm to the government and the public would be severe if the Census Bureau were forced to abandon differential privacy.  *See Swain*, 961 F.3d at 1293 (harm to opposing party and the public interest "merge" when relief is sought against the government).

Forcing the Census Bureau to develop a different disclosure-avoidance method would have cascading affects, including significant delay in releasing the redistricting data and decreased quality of the data ultimately released.  The Census Bureau is in the final stages of planning how it will deploy differential privacy, which will be the culmination of a process that has been ongoing since at least 2017.  Forcing the Bureau to change methods at this late hour would upend the schedule and cause significant delays—indeed, changing methods "would add significant additional time (at least several months) to the schedule for delivering redistricting data."  Thieme Decl. ¶ 74.  Since the Bureau announced that it would use differential privacy in 2017, States and other data users have provided "extensive actionable feedback" that "has informed ongoing [disclosure-avoidance] system improvements and design changes."  U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), available here.  Only one State—Alabama—has filed a lawsuit over the use of differential privacy.  The other States deserve to get the data they expect without additional, undue delay caused by a preliminary injunction.

73

There is a strong public interest in protecting the confidentiality of census responses. The Supreme Court has recognized that "an accurate census depends in large part on public cooperation" and "[t]o stimulate that cooperation Congress has provided assurances that information furnished to the Secretary by individuals is to be treated as confidential." *Baldrige*, 455 U.S. at 354. And a federal statute provides that that Census Bureau staff that publish information protected by 13 U.S.C. § 9 "shall be" subject to fines "or imprisoned not more than 5 years, or both." 13 U.S.C. § 214.

The Census Bureau chose to use differential privacy because it is the best way to protect confidentiality while still providing quality, accurate redistricting data to the public. Other available disclosure-avoidance methods, including suppression or swapping, do not provide similarly powerful confidentiality protections, and "to achieve the necessary level of privacy protection, both enhanced data swapping and suppression [would have] severely deleterious effects on data quality and availability." Abowd Decl. ¶ 51. And if the Bureau were nonetheless forced to provide detailed data at small geographic levels, it would expose the confidential information of millions of Americans who trusted the Bureau to keep their data secure.

*The Census Bureau Cannot Provide Redistricting Data By March 31, 2021.* It is now April, so it would be impossible for the Bureau to comply with any order requiring it to release redistricting data by March 31, 2021. Even an order requiring the Census Bureau to speed up the release of redistricting data faster than what Census Bureau officials have already announced would be difficult, if not impossible, to implement. Whitehorne Decl. ¶¶ 14–17, 21; *see supra* Part I.C. The Census Bureau's current schedule reflects the realistic amount of time the Bureau has concluded it needs to complete the complex steps required to finish processing the various sources of data it received; verifying the quality of its tabulations; and preparing usable, accurate outputs that comply with statutory requirements for respondent confidentiality protection. Whitehorne Decl. ¶¶ 20–21, 28–30; Thieme Decl. ¶¶ 60–83 (detailing the steps that still need to be accomplished to deliver

redistricting data).  An order requiring the Census Bureau to deliver data faster would yet again disrupt census operations, reduce the time for data quality checks, and make it even *more* difficult for the Census Bureau to complete its work.  Whitehorne Decl. ¶¶ 28–30; Thieme Decl. ¶¶ 69, 73–74.

The harm from such a disruption would reverberate to other States and the public at large.  If the Census Bureau were required to prioritize Alabama's data, it may well have to delay delivery of other States' data until past September 30, 2021.  Whitehorne Decl. ¶¶ 30, 31.  Such a delay would disrupt those other States' redistricting plans—presumably leading those States to suffer the same kinds of harms Alabama alleges in this lawsuit.  Already, at least one other state has brought a lawsuit like Alabama's, requesting that its data be prioritized over those of other states.  *See Ohio v. Raimondo*, No. 3:21–cv–064, 2021 WL 1118049 (S.D. Ohio Mar. 24, 2021), *appeal filed*, No. 21–3294 (6th Cir. docketed Mar. 25, 2021).  Meanwhile, plaintiffs in California continue to assert that any shortening of data-processing operations would be unlawful.  *See Nat'l Urban League v. Raimondo*, No. 20–cv–05799, ECF Nos. 465 & 467 (N.D. Cal. Feb. 3, 2021).  The more courts intrude on census operations, the more entities will want to seek judicial intervention on their behalf, and the longer it will ultimately take to receive the results.

## III.   MANDAMUS RELIEF IS UNAVAILABLE.

In three short paragraphs, Plaintiffs argue that Alabama is entitled to "partial relief through a writ of mandamus requiring the Secretary to meet the statutory deadline of March 31 to deliver the tabulations of populations for redistricting to the States."  Mot. 58–59.  "Mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases."  *Cash v. Barnhart*, 327 F.3d 1252, 1257 (11th Cir. 2003).  This is not that case.  Plaintiffs' bid to invoke the Mandamus Act, 28 U.S.C. § 1361, should be rejected.

"Under 28 U.S.C. § 1361, otherwise known as The Mandamus Act, the district court has original jurisdiction over a mandamus action to compel an officer or employee

of the United States or any agency thereof to perform a duty owed to the plaintiff." *Cash*, 327 F.3d at 1257. "Mandamus relief is appropriate only when: (1) there is no other adequate remedy and (2) the plaintiff has a clear right to the relief requested (in other words, the defendant must have a clear duty to act)." *United States v. Salmona*, 810 F.3d 806, 811 (11th Cir. 2016). "Put another way, a writ of mandamus is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty." *Id.* And "[a]lthough the issuance of a writ of mandamus is a legal remedy, it is largely controlled by equitable principles and its issuance is a matter of judicial discretion." *Cash*, 327 F.3d at 1257–58; *see also, e.g., Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) ("Even when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds."); Mot. 58 (acknowledging that "issuance of the writ" must be "'appropriate under the circumstances'") (quoting *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 381 (2004)). Alabama is not entitled to mandamus relief for two independent reasons.

For starters, Alabama has not demonstrated a clear, mandatory duty that would afford it with a clear right to relief because "it is anything but clear that Congress intended the deadline[] at issue to be mandatory rather than directory." *Friends of Aquifer, Inc. v. Mineta*, 150 F. Supp. 2d 1297, 1300 (N.D. Fla. 2001). Again, mandamus relief presupposes, *inter alia*, that "the defendant owes [the plaintiff] a clear nondiscretionary duty." *Salmona*, 810 F.3d at 811. And "[f]or there to be a 'duty owed to the plaintiff' within the meaning of section 1361, there must be a mandatory or ministerial obligation. If the alleged duty is discretionary or directory, the duty is not 'owed.'" *Maczko v. Joyce*, 814 F.2d 308, 310 (6th Cir. 1987). To be sure, as Plaintiffs point out, *see* Mot. 44–45, "the word 'shall' *usually* connotes a requirement." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020) (emphasis added). But, as the Supreme Court expressly noted, that is not always the case, and it is not the case here.

The *Friends of Aquifer* case is directly on point.  That case concerned the Pipeline Safety Act, which provided in part that the Secretary of Transportation "'shall prescribe standards'" relating to certain hazardous liquid pipeline facilities by various dates certain.  150 F. Supp. 2d at 1298–99 (quoting Pipeline Safety Act, 49 U.S.C. § 60109).  The Secretary allegedly did not discharge his statutory duties in that regard, and the plaintiff sought mandamus relief.  *See id.* at 1298.  Citing several cases, the court explained that "in a variety of contexts, courts have concluded that Congress's use of the word 'shall' in directing the discharge of a specified duty does not require that the statute be construed as mandatory rather than directory."  *Id.* at 1300.  The court noted that, like § 141(c) here, the Pipeline Safety Act neither imposed any "penalty or sanction for the Secretary's failure to prescribe the requisite standards by the specified dates," nor did it include any provision affording jurisdiction to plaintiffs "to compel the Secretary to prescribe certain standards required under the Act."  *Id.* at 1299–1300.  Finding no "clear mandate from Congress that it intended the statutory deadlines at issue to be something other than directory, and absent a showing that Congress intended a clear right in Plaintiff to the relief sought," the court declined to "exercise its equitable powers to order the Secretary to issue standards that are dependent upon technological complexities and developments that are peculiarly within the agency's—not th[at] court's—expertise."  *Id.* at 1301.

The same analysis applies here.  Plaintiffs have not demonstrated any "clear mandate from Congress," *id.*, that it intended the § 141(c) deadline to be mandatory rather than directory.  To the contrary, there are no statutory consequences for missing the deadline, and historical practice supports the conclusion that census deadlines are directory in nature.  And, like the *Friends of Aquifer* court, this Court should decline to "exercise its equitable powers" to order Defendants to rush the processing of the data Alabama seeks, which work is similarly "dependent upon technological complexities and developments that are peculiarly within" the Census Bureau's expertise.  *See Friends of Aquifer*, 150 F. Supp. 2d at 1301; *see also, e.g., Robertson v. Attorney General of U.S.*, 957 F. Supp. 1035, 1037

(N.D. Ill. 1997) (finding statutory deadline to be directory and declining to issue mandamus relief; "In order to achieve the goals of the statute, the Attorney General and INS may have to engage in lengthy investigations to determine the validity of a given marriage.").[7]

Moreover, Alabama is not entitled to mandamus relief because, as explained above, the relief it seeks is impossible to provide. "[T]he writ of mandamus will not issue to compel the performance of that which cannot be legally accomplished." *Am. Hosp. Ass'n*, 867 F.3d at 167. "[P]ossibility is a necessary and antecedent condition for the writ's issuance." *Id.* at 169 (collecting sources); *see* 52 Am. Jur. 2d § 24 ("Mandamus will not issue if the performance of the requested action is impossible"); 55 C.J.S. Mandamus § 19 ("The writ of mandamus will not lie where performance of the duty is impossible."). Simply put, this Court "may not require" the Census Bureau "to render performance that is impossible." *Am. Hosp. Ass'n*, 867 F.3d at 167.

This action plainly does not constitute the "the clearest and most compelling of cases" in which to invoke relief under the Mandamus Act. *Cash*, 327 F.3d at 1257. So Plaintiffs' request for a writ of mandamus must be denied.

## CONCLUSION

For the reasons explained above, Plaintiffs' motion and petition should be denied.

---

[7]     Historical practice demonstrates that Congress considers census deadlines as directory. From the very first census, deadlines were missed for various reasons, but Congress either retroactively revised the statute to accommodate the late submission, or simply ignored that a deadline was missed. *See* An Act granting further Time for making Return of the Enumeration of the Inhabitants in the District of South Carolina, 1 Stat. 226 (1791). Congress likewise extended census deadlines throughout the 1800s whenever they were missed. *See* An Act to Extend the Time for Completing the Third Census, 2 Stat. 658 (1811); An Act to Amend the Act Entitled "An Act to Provide for Taking the Fourth Census," 3 Stat. 643 (1821), An Act to Amend the Act for Taking the Fifth Census, 4 Stat. 439 (1831), An Act to Amend the Act Entitled "An Act to Provide for Taking the Sixth Census," 5 Stat. 452 (1841), An Act Supplementary to the Act Entitled "An Act Providing for the Taking of the Seventh and Subsequent Censuses," 9 Stat. 445 (1850).

DATED: April 13, 2021                         Respectfully submitted,

                                              BRIAN M. BOYNTON
                                              Acting Assistant Attorney General

                                              ALEXANDER K. HAAS
                                              Director, Federal Programs Branch

                                              BRAD P. ROSENBERG
                                              Assistant Director, Federal Programs Branch

                                              */s/ Elliott M. Davis*
                                              ZACHARY A. AVALLONE
                                              ELLIOTT M. DAVIS (N.Y. Reg. No. 4596755)
                                              JOHN ROBINSON
                                              Trial Attorneys
                                              Civil Division, Federal Programs Branch
                                              U.S. Department of Justice
                                              1100 L St. NW
                                              Washington, DC  20005
                                              Phone:  (202) 514-5336
                                              E-mail:  elliott.m.davis@usdoj.gov

                                              *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 13, 2021, I filed with the Court and served on opposing counsel through the CM/ECF system the foregoing document.


DATED: April 13, 2021

/s/ Elliott M. Davis
ELLIOTT M. DAVIS
(N.Y. Reg. No. 4596755)
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L St. NW
Phone:  (202) 514-4336
Fax:      (202) 616-8470
E-mail:  elliott.m.davis@usdoj.gov

*Counsel for Defendants*