**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| THE STATE OF ALABAMA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE, et al., <br><br> Defendants. | Case No. 3:21-CV-00211-RAH-ECM-KCN |

**BRIEF OF AMICUS CURIAE THE NATIONAL REDISTRICTING FOUNDATION
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTERESTS OF AMICUS CURIAE ........................................................................................... 1

ARGUMENT .................................................................................................................... 1

I.    The reporting of census redistricting data is a critical and complex undertaking that should not be disrupted. ........................................................................... 2

II.    An order requiring the Bureau to deliver redistricting data more quickly would undermine the public's interest in ensuring an equitable redistricting process. ................. 4

III.    The doctrine of laches bars Plaintiffs' eleventh-hour attempt to block the use of differential privacy. ........................................................................................ 7

    A.    Plaintiffs could have raised their concerns with differential privacy in time for the Bureau to address them. ............................................................... 8

    B.    Plaintiffs' delay was not excusable. ................................................................. 12

    C.    Plaintiffs' delay was prejudicial. ....................................................................... 13

CONCLUSION ................................................................................................................. 14

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ............................................................................................................... 8

*Dep't of Com. v. U.S. House of Representatives*,
    525 U.S. 316 (1999) ............................................................................................................... 3

*Fouts v. Harris*,
    88 F. Supp. 2d 1351 (S.D. Fla. 1999) .................................................................................. 13

*Ohio v. Raimondo*,
    No. 3:21-CV-064, 2021 WL 1118049 (S.D. Ohio Mar. 24, 2021) ......................................... 3

*Reynolds v. Alabama Dept. of Transp.*,
    No. 2:85-CV-665, 2014 WL 3517773 (M.D. Ala. July 16, 2014) ....................................... 13

*Sierra Club v. U.S. Army Corps of Engineers*,
    295 F.3d 1209 (11th Cir. 2002) ............................................................................................. 8

*Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*,
    234 F.3d 1225 (11th Cir. 2000) ............................................................................................. 8

**Statutes**

Census Act ................................................................................................................................... 12

*Judiciary, and Related Agencies Appropriations Act*, 1998, Pub. L. No. 105–119, §
    209(a)(8), 111 Stat. 2440, 2481 (1997) ................................................................................. 2

111 Stat. § 209(a)(5) ...................................................................................................................... 2

**Other Authorities**

National Congress of American Indians, *Research Policy Update* (Sept. 2019),
    https://www.ncai.org/prc/2020_Census_and_AIAN_data_FINAL_9_11_2019.pdf .......... 13

Black's Law Dictionary 875 (6th ed. 1990) ................................................................................... 8

Colorado General Assembly, Letter to Steven Dillingham, Director, U.S. Census Bureau
    (June 1, 2020),
    https://www.ncsl.org/Portals/1/Documents/Elections/CO_State_Legislative_Leadersh
    ip ........................................................................................................................................... 10

National Redistricting Foundation, Letter to Steven Dillingham, Director, U.S. Census
    Bureau (Apr. 24, 2020),
    https://www.ncsl.org/Portals/1/Documents/standcomm/scnri/NRF_Comment _to_ .......... 10

National Conference of State Legislatures, *Action Alert – Differential Privacy and the Census* (Mar. 2, 2020),
https://www.ncsl.org/documents/statefed/Differential_Privacy_Action_Alert_March2020.pdf ............................................................................................................... 13

National Conference of State Legislatures, *Differential Privacy for Census Data Explained* (Mar. 15, 2021), https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-explained.aspx ................................................................................. 10

National Conference of State Legislatures, *Redistricting and Use of Census Data* (Apr. 1, 2021), https://www.ncsl.org/research/redistricting/redistricting-and-use-of-census-data.aspx .................................................................................................................. 3

State of Washington, Letter to Steven Dillingham, Director, U.S. Census Bureau (Feb. 6, 2020),
https://www.ncsl.org/Portals/1/Documents/Redistricting/WA_OFM_DAS_Response_ ............................................................................................................................... 10

Utah State Legislature, Letter to Steven Dillingham, Director, U.S. Census Bureau (Feb. 13, 2020),
https://www.ncsl.org/Portals/1/Documents/Redistricting/UT_Differential_Privacy_% ...................... 10

## INTEREST OF AMICUS CURIAE

The National Redistricting Foundation ("NRF") is a nationwide, non-profit organization founded in 2017, whose mission is to prevent and reverse invidious gerrymandering, by promoting the public's awareness of reapportionment and redistricting processes and engaging in legal action as appropriate to ensure that states' redistricting and electoral processes result in fair representation.  NRF has supported a variety of litigation related to redistricting, election administration, and the census, including as amicus curiae.  Bringing national attention to the importance of a fair redistricting process in 2021 is central to NRF's mission, and elevating the need for a fair and accurate census in 2020 is a foundational piece of NRF's work.  Ensuring a deliberate, well-ordered process for the Bureau's release of redistricting data is of great importance to NRF.

## ARGUMENT

The Court should deny the extraordinary injunctive relief requested by Plaintiffs.  The redistricting data that the Census Bureau releases this year will have critical implications over the next decade, both for the fairness of legislative districts and for questions of federal funding. Compelling the Bureau to rush out data would disrupt the Bureau's operations and undermine the processes that are intended to ensure the release of redistricting data as soon as possible—not just for Alabama but for all 50 states.  Indeed, compromising the Bureau's process by judicial imposition of an artificial timetable on the agency, at this late date in the process, would actually harm the very public interests that Plaintiffs purport to be vindicating.  The Court should not enter an injunction setting a date by which the Bureau must release redistricting data, or otherwise interfering with the Bureau's ongoing work to release the data as quickly and responsibly as it can.

Nor should the Court intervene at this late juncture on account of Plaintiffs' concerns with the Bureau's plan to implement the disclosure avoidance method known as differential privacy. Plaintiffs do not and cannot explain why they waited so long—over three years after what they allege to be the final agency action at issue—to bring this claim. During that period, NRF and other stakeholders, including other states, engaged with the agency to raise concerns and ensure that the accuracy of census data would be protected. Enjoining the use of the Bureau's long-ago-chosen differential privacy approach at this exceedingly late stage—after more than three years of preparation and modification, and only a few months before the anticipated release of redistricting data—would be enormously disruptive to the redistricting process, prejudicing those who have actually provided feedback, introducing further uncertainty into the results, and increasing pressure on the Bureau at a time when it has already had to overcome the unprecedented challenges presented by the Covid-19 pandemic.

To be clear, NRF strongly supports the goal of delivering redistricting data that is as accurate as possible, and takes no position in this litigation on the Bureau's decision three years ago to adopt differential privacy. The narrow purpose of this brief is to emphasize the dangers—including to the interest in accuracy that Plaintiffs purport to vindicate—of allowing a lawsuit to disrupt the conclusion of the 2020 census process.

I.   **The reporting of census redistricting data is a critical and complex undertaking that should not be disrupted.**

"[T]he decennial enumeration of the population is a complex and vast undertaking." *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act*, 1998, Pub. L. No. 105–119, § 209(a)(8), 111 Stat. 2440, 2481 (1997). In fact, this effort has been described as "one of the most critical constitutional functions our Federal Government performs." *Id.*, § 209(a)(5), 111 Stat. at 2481. As recently described by one district court, "[t]he

2020 Census was the culmination of an estimated $15.6 billion and over a decade of 'planning, research, design, development, and execution' by thousands of Census Bureau employees to count approximately 330 million people[, a] 'massive undertaking' [that] consisted of '35 operations using 52 separate systems' and a 'master schedule [with] over 27,000 separate lines of census activities.'" *Ohio v. Raimondo*, No. 3:21-CV-064, 2021 WL 1118049, at *1 (S.D. Ohio Mar. 24, 2021).

An accurate census is critical to the congressional and state legislative redistricting process, because states generally rely on census data for redistricting. Although no federal law requires states to use census data for redistricting, most state and local jurisdictions do, because this data is also used by states and the Department of Justice when enforcing the Voting Rights Act. *See id.*, 2021 WL 1118049, at *3; *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 332–334 (1999).[1] As a result, states, researchers, members of the public, and advocacy organizations like NRF advocated before the Bureau over many years to ensure that the data would be reported in a manner that is both accurate and usable for the redistricting process.

An injunction or writ of mandamus requiring the immediate release of redistricting data would introduce uncertainty and confusion into a process that has already faced historic challenges, with no discernible resulting benefit. After all, "a court may not require an agency to render performance that is impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167–68 (D.C. Cir. 2017). The March 31 date that Plaintiffs previously requested has passed, and they do not articulate a new date certain by which they demand release of the data. (*See* ECF No. 3, at 58–59.) Meanwhile, the Bureau has indicated that September 30 is the earliest possible date by which

---

[1] *See also* Nat'l Conf. of State Legislatures, *Redistricting and Use of Census Data* (Apr. 1, 2021), https://www.ncsl.org/research/redistricting/redistricting-and-use-of-census-data.aspx.

it will be able to release the data (and it has committed to releasing the data in a legacy format earlier), and in fact the Bureau recently "reviewed [its] timeline to identify any opportunities to shorten the processing schedule."[2] Given these circumstances, an injunction would not achieve anything other than requiring the Bureau to do what it says it is already doing, while injecting unnecessary complexity and the potential for further delay into an already challenging process.

Likewise, to categorically enjoin the use of differential privacy now would run roughshod over the agency's process, force the Bureau to start from scratch at the last minute, and lead to greater—not lesser—concerns about accuracy. This is particularly concerning because it is not clear what disclosure avoidance method the Bureau could feasibly use to replace differential privacy at this late date. If the Bureau were to be enjoined from applying differential privacy, it would have to identify an alternative disclosure avoidance method that satisfies the privacy requirements of 13 U.S.C. § 9, and it is unlikely there would be sufficient time for NRF or others to participate in that decision making process, even assuming such a process would be possible at all. In short, while the purported basis of this lawsuit is the need for accurate census data, Plaintiffs' decision to wait years before raising this challenge to the Bureau's chosen privacy methodology threatens to sow chaos and inaccuracy as the census process winds down.

II.     **An order requiring the Bureau to deliver redistricting data more quickly would undermine the public's interest in ensuring an equitable redistricting process.**

If the Court were to enter an order forcing the Bureau to rush out redistricting data, the public would be greatly harmed. Accurate, state-level population data, such as the data sourced from the Bureau, is necessary to draw state and local legislative districts that comply with the

---

[2] Press Release, U.S. Census Bureau, *Statement on Release of Legacy Format Summary Redistricting Data File* (Mar. 15, 2021), https://www.census.gov/newsroom/press-releases/2021/statement-legacy-format-redistricting.html.

constitutional principle of "one person, one vote" and safeguard the right to equal representation. *Wesberry v. Sanders*, 376 U.S. 1, 18 (1964) (citation omitted); *Reynolds v. Sims*, 377 U.S. 533, 558 (1964); *see Karcher v. Daggett*, 462 U.S. 725, 738 (1983) (explaining use of census data "to achieve population equality" in drawing legislative districts). In addition, census data directly affects the ability to enforce the Voting Rights Act. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2574–75 (2019). And multiple sources of federal funding to local governments are distributed based on census data. *See id.* at 2565. Given these weighty public interests, Congress has codified the Bureau's "duty to conduct a census that is accurate and that fairly accounts for the crucial representational rights that depend on the census and the apportionment." *Id*. at 2568–69 (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 819–20 (1992) (Stevens, J., concurring in part and concurring in judgment)).

Plaintiffs make much of the statutory deadline for the release of redistricting data, which—as a consequence of the need to complete the census in the middle of a pandemic—all agree has not been met. But "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). It is "an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S.Ct. 2080, 2087 (2017). And the Court "must . . . 'conside[r] … the overall public interest[,]'" *id.*, paying "particular regard for the public consequences in employing the extraordinary remedy of injunction," *Winter*, 555 U.S. at 24 (citations omitted).

The Bureau has represented that its current schedule reflects the minimum amount of time it needs to complete processing and verifying the data to prepare it for release to the states. As explained by the Assistant Director for Decennial Census Systems and Contracts, Michael Thieme,

the Bureau must complete a series of post-data collection processing and review steps prior to delivering the redistricting data. *See Ohio v. Coggins*, No. 3:21-CV-00064, Affidavit of Michael Thieme, ECF No. 11-1, Page ID ## 132–143 (S.D. Ohio Mar. 12, 2021); *see also id.*, Affidavit of James Whitehorne, ECF No. 11-2, Page ID # 151 (S.D. Ohio Mar. 12, 2021).[3] Plaintiffs surmise that "the application of differential privacy is likely contributing to the delay" (ECF No. 3, at 57); however, Plaintiffs certainly have not put forward evidence *establishing* that the Bureau can in fact go faster than it is going simply by abandoning differential privacy. *Cf. Am. Hosp. Ass'n*, 867 F.3d at 169 (court cannot order agency to take action it claims is impossible without making a "finding of possibility"). To the contrary, requiring the agency to start from scratch with respect to privacy issues at this date would likely cause more delay and confusion.

Disrupting the Bureau's process for ensuring overall accuracy and reliability of redistricting data poses serious threats to fair redistricting and our underlying system of political representation. Failure to deliver accurate, high-quality census data threatens to subject voters to unconstitutional vote dilution, the very risk that Plaintiffs complain of, despite their attempt to upend the process. (*See* ECF No. 3, at 36.) *See Dep't of Com.*, 525 U.S. at 334 (describing how the use of inaccurate census data in intrastate redistricting causes vote dilution); *New York v. U.S. Dep't of Com.*, 351 F. Supp. 3d 502, 675–76 (S.D.N.Y. 2019) (noting that "the loss of political representation and the degradation of information" would constitute irreparable harm and that fair apportionment based on accurate census figures is in the public interest), *aff'd in part, rev'd in part and remanded*, 139 S.Ct. 2551 (2019). It would also risk depriving localities of their fair share of federal funding. *See Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir. 1980) ("[I]t is in the

---

[3] NRF has included citations to record material from *Ohio v. Coggins*, No. 3:21-CV-00064, (S.D. Ohio). NRF assumes that Defendants will include these declarations or similar ones in the record here as well.

public interest that the federal government distribute its funds, where the grant statute is keyed to population, on the basis of accurate census data."). Furthermore, because census data affects the redistricting process and resulting elections, as well as the distribution of federal funds, for the next ten years, the harm to the public cannot be remedied until at least 2031. And the representational harms and loss of federal funding that some voters and localities may suffer over the next decade would be irreversible.

While Plaintiffs insist that enjoining the use of differential privacy would serve the public interest, they do not address the impact to the public of forcing the Bureau to rush the release of redistricting data sooner than the Bureau maintains is possible. (*See* ECF No. 3, at 57–58.) There is certainly a public interest in compliance with the law, and in some cases that interest can support injunctive relief. But here, where the Bureau has represented that it is *impossible* to release high-quality data any faster than it is currently doing, and Plaintiffs have made no evidentiary showing that an earlier release is *possible*, the public interest cannot support compelling the rushed delivery of what would likely become an inferior product. In short, Plaintiffs have failed to carry their burden to show why they are entitled to "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).

### III. The doctrine of laches bars Plaintiffs' eleventh-hour attempt to block the use of differential privacy.

Plaintiffs would also have the Court take the extraordinary step of enjoining final agency action that Plaintiffs allege occurred more than three years ago,[4] but to which they have never before objected. In fact, were it not for delays related to the Covid-19 pandemic, this issue would

---

[4] It is unclear whether Plaintiffs view the final agency action at issue as occurring in 2017 or 2018, *see* Compl. ¶¶ 79–80, but the laches analysis is the same in either case.

now be moot: the Bureau would have already applied the differential privacy method and released redistricting data to the states by March 31, 2021.

Plaintiffs' attempt to throw a last-minute wrench into the works is squarely foreclosed by the doctrine of laches. "The equitable doctrine of laches will bar a claim when three elements are present: '(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.'" *Venus Lines Agency, Inc. v. CVG Int'l Am., Inc.*, 234 F.3d 1225, 1230 (11th Cir. 2000) (citations omitted). *See also* Black's Law Dictionary 875 (6th ed. 1990) ("'Doctrine of laches,' is based upon maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to [the] adverse party, operates as bar in court of equity."). This principle applies in APA actions, and in that context the Eleventh Circuit has rejected a preliminary injunction "on the grounds that the doctrine of laches precluded that extreme relief." *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1219 (11th Cir. 2002); *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967) (recognizing laches as a defense to APA claims).

Plaintiffs' inexcusable delay in seeking to enjoin the use of differential privacy causes prejudice not just to the Bureau but to stakeholders like NRF that support accurate census data and a fair redistricting process. This delay is reason enough for the Court to reject Plaintiffs' request for an injunction, especially when the stakes for the public are so great.

**A.      Plaintiffs could have raised their concerns with differential privacy in time for the Bureau to address them.**

Plaintiffs' belated complaints about the Bureau's decision to use differential privacy are precisely what the doctrine of laches aims to prevent. Plaintiffs had more than three years and plenty of opportunities either to raise these concerns directly with the Bureau—as other

-8-

stakeholders did—or to challenge in court the final agency action they claim occurred in 2017. Instead, they waited until the final months of the census process, long after the Bureau had solicited feedback and just weeks before the release of the next round of demonstration data, to demand that the Bureau revert back to disclosure avoidance methods that were retired years ago.

As pled in Plaintiffs' Complaint, the "final agency action" they are now challenging occurred more than three years ago, in September 2017, when the Bureau "announced at its Scientific Advisory Committee meeting that it would be using a disclosure avoidance method called 'differential privacy' for the 2020 census." Compl. ¶¶ 79, 80. This decision was publicly announced again a year later by the Bureau's Chief Scientist and Associate Director for Research Methodology, and differential privacy was added to the fourth version of the Bureau's 2020 Census Operational Plan in December 2018. *Id.* ¶ 79. Since then, multiple stakeholders—including NRF—have sought to engage in good faith with the Bureau's implementation process to ensure that concerns about accuracy and usability are addressed before the release of redistricting data.

As Plaintiffs note in their Complaint, NRF sent a letter to the Bureau on April 24, 2020, following the Bureau's first release of demonstration data, expressing concerns about how the proposed application of differential privacy would affect accuracy of the results for purposes of redistricting. *See* Compl. ¶ 113. In that letter, NRF asked the Bureau to "make the necessary changes in your planning [for applying differential privacy] to maximize the extent to which the

resulting data reflects the actual population counts, including with respect to racial groups, that are enumerated for all geographic units within a state."[5]

NRF was not alone in expressing concerns to the Bureau about the application of differential privacy based on analysis of the demonstration data. States also provided feedback on how the data might affect redistricting in their own districts. According to documents compiled by the National Conference of State Legislatures ("NCSL"),[6] several state governments submitted letters to the Bureau over the course of 2020, outlining specific concerns identified from the demonstration data and suggesting areas for improvement, including Washington,[7] Utah,[8] Maine,[9] and Colorado.[10] As far as NRF is aware, Plaintiffs did not participate in this process. In fact, while Plaintiffs cite letters by NRF and other states, *see* Compl. ¶¶ 113, 120, 121, Plaintiffs have

---

[5] Letter from Marina Jenkins, Nat'l Redistricting Found., to Steven Dillingham, Director, U.S. Bureau of the Census 2-3 (Apr. 24, 2020), https://www.ncsl.org/Portals/1/Documents/standcomm/scnri/NRF_Comment_to_CensusBureau_Differential%20Privacy_42420.pdf?ver=2020-05-04-130625-803&timestamp=1588619250638.

[6] *See* Nat'l Conf. of State Legislatures, *Differential Privacy for Census Data Explained* (Mar. 15, 2021), https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-explained.aspx.

[7] Letter from Mike Mohrman, Off. of Fin. Mgmt., State of Washington, to Steven Dillingham, Director, U.S. Census Bureau (Feb. 6, 2020), https://www.ncsl.org/Portals/1/Documents/Redistricting/WA_OFM_DAS_Response_Letter.pdf.

[8] Letter from Brad R. Wilson, Speaker of the House, & J. Stuart Adams, Senate President, Utah State Legislature, to Steven Dillingham, Director, U.S. Census Bureau (Feb. 13, 2020), https://www.ncsl.org/Portals/1/Documents/Redistricting/UT_Differential_Privacy_%28Signed%29.pdf.

[9] Letter from Angela Hallowell & Amanda Rector, Dep't of Admin. & Fin. Servs., State of Maine, to Steven Dillingham, Director, U.S. Census Bureau (Feb. 20, 2020), https://www.ncsl.org/Portals/1/Documents/Redistricting/ME_Letter_to_Census_on_differential_privacy_concerns_Maine_SDC.pdf.

[10] Letter from K.C. Becker, Speaker et al., Exec. Comm. of the Legis. Council, Colo. Gen. Assembly, to Steven Dillingham, Director, U.S. Census Bureau (June 1, 2020), https://www.ncsl.org/Portals/1/Documents/Elections/CO_State_Legislative_Leadership_Letter.pdf?ver=2020-08-04-132435-780&timestamp=1596569177678.

not alleged that *they* made any effort over the past three years to raise concerns about differential privacy or prevent its implementation prior to filing their Complaint.[11]

This engagement between the Bureau and stakeholders has been particularly important for the Bureau's planned implementation of differential privacy. After some expressed concerns in 2019 and early 2020 about the usability of census data treated with the differential privacy method, the Bureau released four packages of demonstration data products to enable researchers and redistricters to analyze the impact of differential privacy on their states' redistricting data and provide feedback.[12] The Bureau has stated that it relies on stakeholders to help identify issues and opportunities for improvement in the differential privacy system, and it has incorporated this feedback into its ongoing efforts to improve the data.[13] The Bureau plans to release additional data products by the end of this month, and stakeholders like NRF intend to analyze this data and provide further feedback.

---

[11] Utah and Maine are among the states that have filed an amicus brief in support of Plaintiffs' motion. (*See* ECF No. 33.) Yet those states did not file a last-minute lawsuit against the Bureau, but rather engaged with the Bureau to improve the implementation of differential privacy. Moreover, in their letters to the Bureau, Utah and Maine focused on errors in the demonstration data, which the Bureau has acknowledged it is working to fix. They did not argue then, as Plaintiffs do now, that the adoption of differential privacy was illegal.

[12] *See* U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (last access Apr. 11, 2021), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2020-das-updates.html.

[13] *See, e.g.*, U.S. Census Bureau, *2010 Demonstration Data Products* (last accessed Apr. 8, 2021), https://www.census.gov/programs-surveys/decennial-census/2020-census/planning-management/2020-census-data-products/2010-demonstration-data-products.html ("We greatly appreciate our partners from across the country who used those products to help us identify where [differential privacy] needs to be improved. Some of the issues we had already identified, and some were identified through that crowdsourcing process."); U.S. Census Bureau, *Census Bureau Works With Data Users to Protect 2020 Census Data Products* (Feb. 12, 2020), https://www.census.gov/newsroom/blogs/research-matters/2020/02/census_bureau_works.html ("[W]e have always relied heavily on the advice, feedback and recommendations of our data users.").

Although NRF and others have identified potential issues with the Bureau's preliminary planned implementation of differential privacy, the expectation has been clear that differential privacy in some form would be applied to the 2020 census data. NRF has therefore sought to emphasize the need for the Bureau to apply differential privacy as carefully and thoughtfully as possible, and to ensure the highest level of accuracy with respect to the enumeration of racial and ethnic groups. Plaintiffs, by contrast, have not participated in that process and are not challenging specific decisions made by the Bureau in implementing differential privacy. Rather, as the Complaint makes clear, this 2021 lawsuit challenges the 2017 decision on whether to use differential privacy at all. *See* Compl. ¶ 79; *id.* ¶ 80 ("This represents final agency action in the implementation of differential privacy.").

### B. Plaintiffs' delay was not excusable.

Nowhere in Plaintiffs' Complaint is there any explanation for why Plaintiffs waited more than three years to challenge the Bureau's decision to adopt differential privacy. Plaintiffs have long had access to the information they would have needed to raise the concerns outlined in their Complaint or to seek judicial review of the alleged 2017 final agency action to adopt differential privacy. Plaintiffs' principal argument is a legal one—that differential privacy however implemented is incompatible with the Census Act. Plaintiffs are not challenging some particular element of the Bureau's methodology, the particulars of which they concede have not even been finalized. *See* Compl. ¶ 87 (noting that the "Bureau is expected to set the global privacy-loss budget in early June 2021"). As Plaintiffs themselves have defined the issue, they were on notice that the Bureau was breaking the law (on Plaintiffs' view of things) the day in September 2017 that it announced its decision to adopt differential privacy.

Moreover, as early as September 2019, the National Congress of American Indians published a research brief analyzing the impact of differential privacy on the accuracy and usability

of census data.[14]  Washington, Utah, and Maine all submitted letters to the Bureau in February 2020, and NRF sent its own letter in April 2020.  And on March 2, 2020, the NCSL published an "Action Alert" on differential privacy, urging states "to determine how the U.S. Census Bureau's use of differential privacy will affect your state's census data."[15]  Plaintiffs have not alleged that they were unaware of these developments, and it is not apparent what other excuse they might have for their delay.  *See Reynolds v. Ala. Dep't of Transp.*, No. 2:85-CV-665, 2014 WL 3517773, at *12 (M.D. Ala. July 16, 2014) (finding laches a "strong conceptual fit" where "[c]learly, there has been delay, and no compelling excuse is apparent").

### C. Plaintiffs' delay was prejudicial.

Plaintiffs' requested relief would prejudice the Bureau and the public.  Plaintiffs do not dispute that the Bureau is legally required to use some kind of disclosure avoidance method for privacy purposes.  Compl. ¶¶ 50–51.  The disclosure avoidance methods that the Bureau has used in the past are not simply software programs that can be pulled off the shelf and applied at a moment's notice.  *Cf. id.* ¶ 185.  Therefore, contrary to Plaintiffs' purported goal of accelerating the delivery of census data, the disruption caused by enjoining the application of differential privacy, at this exceedingly late stage, may threaten the Bureau's ability to finalize the data in a timely and accurate manner.  This, in turn, would undermine the ability of states across the country to draw accurate and constitutional maps—harming the interests of those, like NRF, who advocate for fair districts.  *See Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (holding that laches barred a challenge to redistricting plans, where relief would have resulted in "voter

---

[14] Pol'y Rsch. Ctr., Nat'l Cong. of Am. Indians, *Research Policy Update* (Sept. 2019), https://www.ncai.org/prc/2020_Census_and_AIAN_data_FINAL_9_11_2019.pdf.
[15] Nat'l Conf. of State Legislatures, *Action Alert – Differential Privacy and the Census* (Mar. 2, 2020),
https://www.ncsl.org/documents/statefed/Differential_Privacy_Action_Alert_March2020.pdf.

-13-

confusion, instability . . . and financial and logistical burden on the state") (citing *White v. Daniel*, 909 F.2d 99, 104 (4th Cir. 1990)).

Furthermore, the Bureau is still in the process of finalizing the methodological details, and intends to solicit input from stakeholders like NRF in the coming weeks. Plaintiffs' requested relief would short-circuit that process, jettisoning the differential privacy method altogether and preventing other interested parties and the Bureau from engaging in any further efforts to refine its implementation. The Court should not order the agency to discard a plan more than three years in the making that incorporates feedback from states and advocacy organizations, based on a legal argument never advanced over those three years, with little offered in the way of an alternative.

## CONCLUSION

The 2020 census was conducted in the midst of extraordinary disruption caused by a global pandemic. After significant delay and uncertainty, the U.S. Census Bureau has committed to delivering redistricting data to all states by September 30, 2021. It is critical to the redistricting process in all 50 states that this plan be accomplished without further disruption. An injunction compelling the Bureau to rush the release of redistricting data by some unspecified date—in the face of the agency's representations that doing so would be impossible, and no showing by Plaintiffs of some earlier date that would be possible—would add unnecessary complication to the process and increase the risk of inaccurate data, at great harm to the public. Likewise, an eleventh-hour injunction against the use of differential privacy—which the Bureau decided more than three years ago to adopt—would undermine this process, increase the potential for further delay, and introduce additional uncertainty regarding the accuracy of the results. For these reasons, the Court should deny Plaintiffs' request for injunctive relief.

| | | |
|---|---|---|
| Dated: | April 13, 2021<br>Birmingham, AL | Respectfully submitted,<br><br>*/s/ Richard Rouco*<br>Richard Rouco<br>QUINN, CONNOR, WEAVER, DAVIES & ROUCO, LLP<br>2-20th Street North, Suite 930<br>Birmingham, AL 35203<br>rrouco@qcwdr.com<br><br>Shankar Duraiswamy*<br>David M. Zionts*<br>COVINGTON & BURLING LLP<br>One CityCenter<br>850 10th Street, NW<br>Washington, DC<br>202-662-6000<br>sduraiswamy@cov.com; dzionts@cov.com<br><br>John F. Nelson*<br>COVINGTON & BURLING LLP<br>620 Eighth Avenue<br>New York, NY<br>202-841-1107<br>jnelson@cov.com<br><br>*Counsel for Amicus Curiae,*<br>*National Redistricting Foundation*<br><br>*\*Pro hac vice motions forthcoming* |

## **CERTIFICATE OF SERVICE**

      I hereby certify that on April 13, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I certify that a copy of the foregoing has been served by ordinary U.S. Mail upon all parties for whom counsel has not yet entered an appearance electronically: None.

Dated:  April 13, 2021  
            Birmingham, AL

*/s/ Richard Rouco*  
Richard Rouco  
*Counsel for Amicus Curiae,*  
*National Redistricting Foundation*