# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ALABAMA; ROBERT ADERHOLT, Representative for Alabama's 4th Congressional District, in his official and individual capacities; WILLIAM GREEN and CAMARAN WILLIAMS,<br><br>   Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF COMMERCE, GINA RAIMONDO, in her official capacity as Secretary of Commerce; UNITED STATES BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau,<br><br>   Defendants. | Civil Action No.: 3:21-CV-211 |

## BRIEF OF AMICI CURIAE THE STATE GOVERNMENT LEADERSHIP FOUNDATION, LOUISIANA SENATE MAJORITY LEADER SHARON HEWITT, MINNESOTA HOUSE OF REPRESENTATIVES MINORITY LEADER KURT DAUDT, SPEAKER OF THE MISSISSIPPI HOUSE OF REPRESENTATIVES PHILIP GUNN, NEVADA SENATOR BEN KIECKHEFER, OKLAHOMA SENATE PRESIDENT PRO TEMPORE GREG TREAT, AND VERMONT HOUSE OF REPRESENTATIVES ASSISTANT MINORITY LEADER ROBERT LACLAIR IN SUPPORT OF PLAINTIFFS STATE OF ALABAMA, *ET AL*.

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................................................. ii

AMICUS CURIAE STATEMENT OF INTEREST ....................................................................1

BACKGROUND ........................................................................................................................3

THE USE OF DIFFERENTIAL PRIVACY SOWS THE SEEDS OF LEGAL CHALLENGES TO REDISTRICTING PLANS.........................................................................................................6

CONCLUSION AND RECOMMENDED RELIEF ..................................................................10

# INDEX OF AUTHORITIES

**Cases**

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ................................................................................. 8

*Brown v. Thomson*, 462 U.S. 835 (1983).................................................................................. 8

*Evenwel v. Abbott*, 577 U.S. 937, 136 S. Ct. 1120 (2016)............................................................. 7

*Karcher v. Daggett*, 462 U.S. 725 (1983)................................................................................. 7

*Wesberry v. Sanders*, 376 U.S. 1 (1964).................................................................................. 7

**Statutes**

13 U.S.C. § 9................................................................................................................. 3

13 U.S.C. § 9(a)(2).......................................................................................................... 3

**Miscellaneous**

Amy Lauger et al., U.S. Census Bureau, *Disclosure Avoidance Techniques at the U.S. Census Bureau: Current Practices and Research 2* (Sept. 26, 2014), https://perma.cc/2UXQ-SAFL ................................................................................. 4

*Garbage In Garbage Out (GIGO)*, <u>Dictionary of Computer Science</u> (7th ed. 2016)..................... 9

Laura McKenna, U.S. Census Bureau, *Research & Methodology Directorate: Disclosure Avoidance Techniques Used for the 1960 Through 2010 Decennial Census of Population and Housing Public Use Microdata Samples* (Apr. 2019), https://perma.cc/9LBN-5BWV ................................................................................. 4

Nat'l Conf of State Legislatures, *Differential Privacy for Census Data Explained* (Feb. 1, 2021), https://perma.cc/DA93-36GA................................................................... 5

Nat'l Conf of State Legislatures, *Redistricting and Use of Census Data* (Apr. 1, 2021), https://www.ncsl.org/research/redistricting/redistricting-and-use-of-census-data.aspx ........... 3

Nat'l Conf of State Legislatures, *Redistricting Plan Success Rates* (Nov. 24, 2020), https://www.ncsl.org/Portals/1/Documents/Redistricting/Redistricting_plan_success_rates_1970thru2010s.pdf .......................................................................................... 7

Nat'l Redistricting Foundation, Letter to Steven Dillingham, Director, U.S. Census Bureau (Apr. ................................................................................................................ 6

Simson L. Garfinkel, U.S. Census Bureau, *Modernizing Disclosure Avoidance: Report on the 2020 Disclosure Avoidance Subsystem as Implemented for the 2018 End-to-End Test* (Sept. 15, 2017), https://perma.cc/4J8B-ZEXM ................................................................ 4

Steven Ruggles et al., *Differential Privacy and Census Data: Implications for Social and Economic Research*, 109 AEA Papers and Proceedings 404 (May 2019), https://perma.cc/GW29-GNAV ................................................................................................ 4

Terry Ao Minnis et al., *Preliminary Report: Impact of Differential Privacy & the 2020 Census on Latinos, Asian Americans and Redistricting* (Apr. 2021), https://www.maldef.org/wp-content/uploads/2021/04/FINAL-MALDEF-AAJC-Differential-Privacy-Preliminary-Report-4.5.2021-1.pdf .......................................................... 4

U.S. Census Bureau, 2010 Demonstration Data Products (rev. Apr. 16, 2020), https://perma.cc/KK5M-KLRL; U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), https://perma.cc/D6VJ-N5Z3 ............................................... 6

U.S. Census Bureau, *2020 Census State Redistricting Data (Public Law 94-171) Summary File* 7-3 (Feb. 2021), https://perma.cc/9HWC-492T ................................................................ 5

**AMICUS CURIAE STATEMENT OF INTEREST**

Amicus Curiae State Government Leadership Foundation (the "State Government Leadership Foundation" or "SGLF") is a non-profit corporation that believes in good government and conservative policies, and supports principled state leadership to tackle America's ever-changing challenges. Among the principles prioritized by SGLF, the organization believes that the judicial branch plays a vital role at both the national and state levels of government, balancing out the executive and legislative branches to ensure no one body abuses its power. Indeed, in a nation founded on freedom and the rule of law, SGLF champions a judicial system that prioritizes individual liberty, sovereignty of states, and Constitutional rights.

Consistent with that mission, SGLF is committed to ensuring that any government activity impacting redistricting is conducted impartially and within the bounds of state and federal law and the Constitution. Few government actions have more potential to effect the redistricting process than the decennial census, which essentially provides the foundation on which many states set their congressional and legislative districts. It is for that reason—the fact that states depend on *accurate* census data when the time for redistricting arises in advance of the elections that follow and that without such accuracy, state legislatures are blocked from performing their statutory duties—that SGLF has a significant interest in monitoring the conduct of the Census Bureau and ensuring that the tabulation is performed fairly and legally.

Amici Curiae Louisiana Senate Majority Leader Sharon Hewitt, Minnesota House of Representatives Minority Leader Kurt Daudt, Speaker of the Mississippi House of Representatives Philip Gunn, Nevada Senator Ben Kieckhefer, Oklahoma Senate President Pro Tempore Greg Treat, and Vermont House of Representatives Assistant Minority Leader Robert LaClair (collectively, the "Amici Legislators") likewise have a strong interest in the Court's consideration

of the issues presented here. As legislative leaders in states that are either required to use census data in their respective redistricting processes, or likewise rely on census data in their respective redistricting processes despite the lack of an express legal mandate, each of the Amici Legislators have a significant interest in the Census Bureau's modification of census data, and also in ensuring that the tabulation is performed fairly and legally.

The Defendants' unprecedented decision, under severe time constraints, to employ the "differential privacy" statistical method to create purposefully flawed census data will force states throughout the country to base their redistricting plans on incorrect data in violation of the Constitution. Allowing the Defendants to move forward with their use of differential privacy on census data will likely cause additional litigation challenging the legality and constitutionality of redistricting plans throughout the country based on incorrect population numbers. Furthermore, the implementation of differential privacy is entirely unnecessary considering the extensive privacy protection methods that have been utilized by the Census Bureau for many years—methods that already provide effective privacy protection while also ensuring the accuracy of the population tabulation.

Amici seek enforcement of federal law and the Constitution, and object to the implementation of any statistical method that will, in all likelihood, result in inaccurate census data, thereby thrusting the redistricting processes of the various states into a state of uncertainty by subjecting them to legal challenges solely on the basis of predictably flawed calculations. Accordingly, the unique, direct interests and perspective of SGLF and the Legislators as amici will assist this Court in its deliberation of this matter.

## BACKGROUND

Every ten years, the United States Census Bureau (the "Census Bureau") embarks upon the immense undertaking of counting the number of people residing in each state throughout the country. The results of the decennial census tabulation are used and relied upon throughout federal, state, and local government. Perhaps most critically, the population totals from the census are used by state governments in the apportionment and redistricting process. Indeed, 21 states are expressly required to use census data for legislative and/or congressional redistricting, and many of the remaining 29 states likewise rely on census data in their respective redistricting processes despite the lack of an express legal mandate to do so.[1] As a result, maintaining the accuracy of the census is critical to ensure that districts are drawn properly and legally within each state. Without accurate districts that abide by the one-person-one-vote principal of the Constitution, state governments throughout the nation would face exposure to a wide range of legal challenges to their respective redistricting plans.

Due to the sensitive and personal nature of the information obtained by the government during the census process, the Census Bureau is required to protect the private information of those who participate in that process. *See* 13 U.S.C. § 9. To that end, the Census Bureau cannot "make any publication whereby the data furnished by any particular establishment or individual . . . can be identified. *Id.* at § 9(a)(2). In order to meet its privacy obligations, the Census Bureau has implemented a number of disclosure avoidance methods over the past few decades to prevent the misuse of personal information. These methods, which the Census Bureau implements before releasing the census data, include (a) the removal of direct identifiers such as name, address and

---

[1] *See* Nat'l Conf of State Legislatures, *Redistricting and Use of Census Data* (Apr. 1, 2021), https://www.ncsl.org/research/redistricting/redistricting-and-use-of-census-data.aspx

telephone number; (b) top-coding and bottom-coding—a process that eliminates outliers from the data; (c) recoding and rounding certain variables like those involving dollar amounts; (d) setting population thresholds; and (e) data-swapping between households to protect the identity of records with a high risk of disclosure.[2] Each of these methods has proven not only to protect the privacy of individuals, but also to maintain the integrity of the underlying population numbers.[3] By all accounts, these protections work extremely well, and there is not a single documented case of the responses of a particular individual being revealed through the public use of decennial census data.[4]

In September 2017, and in response to rapid growth of computer power and the availability of other online databases, the Census Bureau—without offering any opportunity for commentary or feedback—announced it would be adopting a new disclosure avoidance method for the 2020 census known as "differential privacy."[5] Differential privacy is a mathematical method that manufactures and then adds so-called "statistical noise" to published tables in a way intended to protect each respondent's identity.[6] Put another way, differential privacy introduces false

---

[2] *See generally* Laura McKenna, U.S. Census Bureau, *Research & Methodology Directorate: Disclosure Avoidance Techniques Used for the 1960 Through 2010 Decennial Census of Population and Housing Public Use Microdata Samples* (Apr. 2019), https://perma.cc/9LBN-5BWV; Amy Lauger et al., U.S. Census Bureau, *Disclosure Avoidance Techniques at the U.S. Census Bureau: Current Practices and Research 2* (Sept. 26, 2014), https://perma.cc/2UXQ-SAFL.
[3] *Id.*
[4] Steven Ruggles et al., *Differential Privacy and Census Data: Implications for Social and Economic Research*, 109 AEA Papers and Proceedings 404 (May 2019), https://perma.cc/GW29-GNAV.
[5] *See* Simson L. Garfinkel, U.S. Census Bureau, *Modernizing Disclosure Avoidance: Report on the 2020 Disclosure Avoidance Subsystem as Implemented for the 2018 End-to-End Test* (Sept. 15, 2017), https://perma.cc/4J8B-ZEXM.
[6] Terry Ao Minnis et al., *Preliminary Report: Impact of Differential Privacy & the 2020 Census on Latinos, Asian Americans and Redistricting* (Apr. 2021), https://www.maldef.org/wp-content/uploads/2021/04/FINAL-MALDEF-AAJC-Differential-Privacy-Preliminary-Report-4.5.2021-1.pdf

information to alter certain data in order to obscure the link between the data and any specific person. The goal of differential privacy, like other disclosure avoidance methods, is to obscure the presence or absence of any individual from the corresponding dataset.

Unlike the other disclosure avoidance methods previously used by the Census Bureau, however, differential privacy will unquestionably alter the underlying population numbers of census blocks throughout the nation. Indeed, the Census Bureau has already stated the only numbers that will remain unchanged by the use of differential privacy are (1) the total population of each state, (2) the total housing units at the census block level, and (3) the number of group quarters facilities by type at the census block level.[7] All other tabulations, including the total population of each census block, will be directly and purposefully altered by the use of differential privacy.[8] What's more, the impact of differential privacy will vary across the country as it is applied to different locations, populations, and overall demographics. Rural areas, for example, will see higher variance than urban areas, and smaller subpopulations—such as specific racial groups—will be affected more than larger groups.[9]

The intentional alteration of population numbers at the census block level renders the census data unusable and unreliable for redistricting purposes. Over the past 18 months, the Census Bureau has released four sets of demonstration data that applied differential privacy to information from the 2010 census as a means of testing differential privacy as a new disclosure

---

[7] *See* U.S. Census Bureau, *2020 Census State Redistricting Data (Public Law 94-171) Summary File* 7-3 (Feb. 2021), https://perma.cc/9HWC-492T.
[8] Minnis et al., *supra*, at 7.
[9] *See* Nat'l Conf of State Legislatures, *Differential Privacy for Census Data Explained* (Feb. 1, 2021), https://perma.cc/DA93-36GA.

avoidance method.[10] That demonstration data has repeatedly shown that implementing differential privacy will render state governments unable to lawfully implement redistricting plans.[11] For instance, analysis of the data applied to 42 lower-house state redistricting plans showed that 12 states with deviation ranges that were previously under 10% *without the use of differential privacy* would now have malapportioned plans exceeding that same threshold *with the use of differential privacy*.[12] As stated by the National Redistricting Foundation, "initial analyses suggests that the [Census] Bureau's differential privacy proposal can produce inaccurate counts for minority communities by reallocating population from larger minority groups to smaller ones and by geographically dispersing concentrated minority populations—precisely the kind of inaccuracies that would work against the viability of majority-minority districts."[13] All of this is to say that, if the Census Bureau applies differential privacy, then the data relied upon by the states for redistricting will be inaccurate, it will disproportionality impact smaller, minority, and rural communities, and, as further explained below, any states using census data will be prone to additional legal attacks under long-standing legal theories that rely on the one thing differential privacy affects the most: the numbers.

### THE USE OF DIFFERENTIAL PRIVACY SOWS THE SEEDS OF LEGAL CHALLENGES TO REDISTRICTING PLANS

No matter who draws the lines—while the legislature in most states is charged with the task, some states delegate redistricting responsibilities to commissions—the redistricting process

---

[10] U.S. Census Bureau, 2010 Demonstration Data Products (rev. Apr. 16, 2020), https://perma.cc/KK5M-KLRL; U.S. Census Bureau, *2020 Disclosure Avoidance System Updates* (Feb. 23, 2021), https://perma.cc/D6VJ-N5Z3.
[11] Minnis et al., *supra*, at 6-9
[12] Minnis et al., *supra*, at 8.
[13] Nat'l Redistricting Foundation, Letter to Steven Dillingham, Director, U.S. Census Bureau (Apr. 24, 2020), https://perrna.cc/3QK8-65VN.

often leads to court challenges. Indeed, dating back to the 1970's, the "success rate," meaning the percentage of those redistricting plans either not challenged in court or, if challenged, upheld by a court without change, has fluctuated between 57% and 91% depending on the year, type of plan (legislative vs commission), and type of political boundaries at issue (state house vs state senate vs congress).[14] Simply put, no redistricting plan is a sure thing, and often time while the lines have been drawn and the plan approved, the game has just begun as the lawyers turn to sharpening their clients' arguments to commence challenges to those plans.

While legal challenges to redistricting plans may come in various forms, two particular legal theories are directly related to the problems associated with the Census Bureau's use of differential privacy: the "one person, one vote" requirement under the Constitution, and claims under Section 2 of the Voting Rights Act.

Under the one-person, one-vote principle, the Constitution requires that each congressional district within a state contain approximately an equal number of persons. In simple terms, one person's vote in a congressional district must be worth as much as the vote of another. To that end, Congressional districts must "be apportioned to achieve population equality as nearly as practicable." *Karcher v. Daggett*, 462 U.S. 725, 730 (1983) (quoting *Wesberry v. Sanders*, 376 U.S. 1, 7-8 (1964)); *see also Evenwel v. Abbott*, 577 U.S. 937, 136 S. Ct. 1120, 1124 (2016) ("States must draw congressional districts with populations as close to perfect equality as possible"). And that principle applies to state legislative districts, too. While state legislative districts need not meet the "as nearly as practicable standard," those districts generally must be

---

[14] *See* Nat'l Conf of State Legislatures, *Redistricting Plan Success Rates* (Nov. 24, 2020), https://www.ncsl.org/Portals/1/Documents/Redistricting/Redistricting_plan_success_rates_1970thru2010s.pdf

drawn within a total population variation of +/- 5% to be presumptively constitutional. *See, e.g., Brown v. Thomson*, 462 U.S. 835, 842 (1983).

Meanwhile, compliance with Section 2 of the Voting Rights Act also relies heavily on the data used to draw the lines and the resulting population numbers. In certain circumstances, Section 2 of the Act requires states to draw one or more "majority-minority" districts in which a racial or language minority group comprises a voting majority. Specifically, a majority-minority district is a district where one racial minority group equals 50 percent or more of the citizen voting-age population (or, in the case of some jurisdictions, some percentage threshold of the voting age population). *Bartlett v. Strickland*, 556 U.S. 1, 13 (2009).

Both of the above-described legal principles rely heavily on population numbers, which in most instances stem from the underlying census data. As Plaintiffs articulated in their motion for preliminary injunction, the Congressional districts drawn in reliance on the demonstration data here would likely violate the one-person, one-vote requirement, and minority populations were so misreported that, had the Alabama Legislature drawn districts based on that demonstration data, it likely would have violated voters' rights under Section 2 of the Voting Rights Act. *See* ECF No. 3, at 34. Implementing differential privacy will skew the voting-age population of minority groups in districts throughout the country, which may create the illusion of a majority-minority district where it does not exist, or vice versa[15]. As a result, differential privacy will inevitably cause states to draw district lines in a way that falls out of compliance with the Voting Rights Act, leading to further legal challenges to state redistricting plans.

While the numbers analyzed in Plaintiffs' brief are tailored to Alabama, the problems associated with the use of that data will cross state lines. The Census Bureau's application of

---

[15] Minnis et al., *supra*, at 9-10

differential privacy will force states to rely on inaccurate population data when drawing new political districts. As a result, it is a statistical certainty that voters residing in particular geographic areas will either have the power of their votes artificially strengthened or diluted depending on the demographics of that area. Therefore, just as the Census Bureau's decision to apply differential privacy and, as a result, supply admittedly false redistricting data to Alabama creates a substantial risk of vote dilution in local, state, and federal elections here in Alabama, it also increases the likelihood that redistricting plans in other states will be subject to legal challenges by their citizens contesting the legality of redistricting plans under the one-person, one-vote requirement and the Voting Rights Act.

It has long been accepted that if a human being does not input correct information, the output from a computer means nothing. That maxim is often attributed to Charles Babbage, who wrote: "On two occasions I have been asked,—'Pray Mr. Babbage, if you put into the machine wrong figures, will the right answers come out?' . . . I am not able rightly to apprehend the kind of confusion of ideas that could provoke such a question." Charles Babbage, Passages from the Life of a Philosopher 67 (1864). A century and a half later, the maxim is now commonly used by those responsible for the technology at our fingertips. Now known as GIGO, or "garbage in garbage out," its meaning has changed little, standing now for the "important computing principle that all input, however absurd, will be processed according to a program's algorithms and appropriate output generated. If the input is garbage, then the output will inevitably also be garbage." *Garbage In Garbage Out (GIGO)*, Dictionary of Computer Science (7th ed. 2016). The definition continues, acknowledging that "[t]his truth is often not recognized, especially by non-computer specialists, who tend to blame 'the computer' for incorrect results when the fault actually lies with mistakes in the input."

Of course, as it pertains to the Census Bureau's utilization of differential privacy in the context of census data and any subsequent litigation challenging redistricting plans, it will be of little significance that the fault actually lies with the mistakes in the input (that input being the census data subjected to differential privacy). Rather, the only thing that will matter to voters are any "incorrect results" abridging their constitutional rights, and the states—not the Defendants—will be left to fix it.

## CONCLUSION AND RECOMMENDED RELIEF

For the foregoing reasons, Amici respectfully requests that the Court rule in favor of Plaintiffs' by enjoining the Defendants' implementation of differential privacy disclosure avoidance for the 2020 census, or, in the alternative, issue a writ of mandamus.

Respectfully submitted,

/s/ Charles R. Spies
Charles R. Spies, Bar ID: 989020*
1825 Eye Street, N.W., Suite 900
Washington, D.C. 20006
Telephone: (202) 466-5964
Facsimile: (844) 670-6009
cspies@dickinsonwright.com

Robert L. Avers*
350 S. Main Street, Ste 300
Ann Arbor, MI 48104
(734) 623-1672
ravers@dickinsonwright.com

Bill D. Bensinger
1800 Financial Center
505 North 20th Street
Birmingham, Alabama 35203
(205) 250-6626
bdbensinger@csattorneys.com

**Attorneys for Amici**
*Pending Admission Pro Hac Vice*

Dated: April 15, 2021