# Exhibit 1

**To:** John Maron Abowd (CENSUS/ADRM FED)[john.maron.abowd@census.gov]; Victoria Velkoff (CENSUS/ADDP FED)[Victoria.A.Velkoff@census.gov]; Cynthia Davis Hollingsworth (CENSUS/EWD FED)[cynthia.davis.hollingsworth@census.gov]
**From:** James Whitehorne (CENSUS/ADDC FED)[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=010B27ED5B5944CDA73EB75917D5A0DD-WHITEHORNE,]
**Sent:** Wed 9/30/2020 2:54:22 PM (UTC)
**Subject:** Re: GQ population and the DAS

James Whitehorne (CENSUS/ADDC FED) has shared a OneDrive for Business file with you. To view it, click the link below.

VTD_Key_2010Census.zip

---

Good morning John -
I apologize for the delay in responding. I am struggling with how to respond because I am worried about our eventual release of the P.L. 94-171 data and its fitness for use as judged by external parties. The role of my office, in addition to managing the Redistricting Data Program, is to represent the interests of the states in regards to redistricting when I am engaged in internal discussions at the Census Bureau.  The feedback that I receive from the redistricting community indicates a need for accuracy for the limited set of characteristics contained in the PL dataset, primarily total pop, major race group, ethnicity, voting age, and group quarters counts. I would not be representing the states and the redistricting community well if I did not pass along and stress these concerns.  The example I provided was not intended as a "cherry picked anecdote".  As a federal agency that provides the data that underpins every American's rights and how those American's are served by their government, I was trying to illustrate the extremes to which we need to cater. We are not a think tank, a university, or a for profit business chasing after deep pocketed clients, we are a service to the country.  This is much like the Postal Service who must provide service to every address, regardless of its profitability. We must ensure we are providing data that can be used for the needs of all communities. I will still promote and defend what we end up producing. However, I am trying to underscore the point that we have all heard and that you and I have heard directly from our nation's voting rights enforcement agents in the Voting Section at DoJ, that accurate data is critical especially for small areas. The data must reflect what is seen in the real world because it is used to change how the real world interacts with itself and with its government.  This does not mean I do not understand our obligation to protect the public's data, it just appears that in our zeal to protect the data we are harming the very same people we are protecting.  This will be my last emotional response but I had to state my thoughts on this at least once.  I am willing and happy to continue to work with you and your team in good faith to make DP at Census a success, as I have done since the beginning.


In response to your specific requests/recommendations,  I worked with GEO to generate a national VTD key that can be plugged into the 2010 Census P.L. Data and the PPMFs to generate data summaries for the VTD geography for the nation. I only have an office of four people (two geographers, a program manager, and myself) from which to draw support so unfortunately I do not have an analyst to assign to this but I will help personally however I can.

The files in the attached zip file contain the same information but are in two formats: pipe delimited text and SQLlite database
The fields are:
BLOCKID = 15 digit unique within nation block code
STATEFP = State FIPS
COUNTYFP = County FIPS
TRACTCE = Tract code
BLOCKCE = Block code
VTDST = VTD Code
VTDID = Unique within nation VTD code (please note in 2010 this is a variable length code)
  NOTES:
  1) The VTDs in California should be disregarded. They would skew any results because they are not actual VTDs.  The Director allowed an experiment for CA in 2010 where the state submitted an amalgam of multiple district types as pieces that could be reaggregated.  Based on the results, we did not allow this for the 2020 Census.
  2) It would be wise to keep track of the number of blocks in a VTD when doing the analysis. In some states there can be "island" VTDs. An example of how these occur are situations where a piece of land is surrounded but not part of an

incorporated place. If the state has a contiguity requirement for their VTDs, that space has to become a stand alone VTD. These would usually only be a few blocks at most so isolating them from an analysis seems wise.

3) For those counties without VTDs (none submitted to the Bureau) the VTDST code in the key file has been set to ###### and the VTDID code is STATEFP++COUNTYFP++######

Respectfully,
James

P.S. Thank you for the good news on the GQ spillover problem in this morning's privacy meeting.

****************************
**James Whitehorne, Chief**
Redistricting & Voting Rights Data Office/ADDC/HQ
U.S. Census Bureau
O: 301-763-4039 | M: 202-263-9144
census.gov  |  census.gov/rdo  |  @uscensusbureau
**Shape your future. START HERE >** 2020census.gov

---

**From:** John Maron Abowd (CENSUS/ADRM FED) <john.maron.abowd@census.gov>
**Sent:** Monday, September 28, 2020 9:51 AM
**To:** James Whitehorne (CENSUS/ADDC FED) <James.Whitehorne@census.gov>; Victoria Velkoff (CENSUS/ADDP FED) <Victoria.A.Velkoff@census.gov>; Cynthia Davis Hollingsworth (CENSUS/EWD FED) <cynthia.davis.hollingsworth@census.gov>
**Subject:** Re: GQ population and the DAS

James,

I appreciate the communications problem that transparency about the DA process for the 2020 Census has created for you. I do think we need to put this in proper perspective, and that requires comprehensive statistical summaries, not cherry-picked anecdotes.

We do have the data to produce a summary of the size of every political entity for which we collected district boundary information. If you assign an analyst, I will assign a SME, and together we can get these data produced. Once we have the empirical distribution of voting district sizes, we can use The Wright and Irimata framework to construct fitness for use summaries by expected size of the voting district. This will vary by size of the voting district and PLB assigned to hispanic + cenrace. That has to be the basis for DSEP's decision-making here.

Thanks,

   **John M. Abowd, PhD**, Associate Director and Chief Scientist
Research and Methodology
U.S. Census Bureau
O: 301-763-5880 M: simulring on cell
census.gov  |  @uscensusbureau
**Shape your future. START HERE >** 2020census.gov

---

**From:** James Whitehorne (CENSUS/ADDC FED) <James.Whitehorne@census.gov>
**Sent:** Sunday, September 27, 2020 12:06 PM
**To:** John Maron Abowd (CENSUS/ADRM FED) <john.maron.abowd@census.gov>; Victoria Velkoff (CENSUS/ADDP FED) <Victoria.A.Velkoff@census.gov>; Cynthia Davis Hollingsworth (CENSUS/EWD FED) <cynthia.davis.hollingsworth@census.gov>
**Subject:** Re: GQ population and the DAS

John -
Thank you for the quick and detailed reply.  I want to make sure there is no confusion coming from my forwarded email.  I

am not requesting that GQ populations become invariant. My goal with this message was to make you and Tori aware that the GQ population and accuracy around the GQ population is also an important factor for redistricting. This is especially true this decade due to the focus on GQ populations in the process by several state legislatures. The "spillover" becomes important due to the divergence of the prison population characteristics and the non-prison populations that surround them. This is compounded in many cases where the non-prison populations are often sparse themselves (rural areas). My hope is that this can be considered and provided the appropriate level of PLB to not only provide fit for use data but also that on its face appears fit for use by casual data users.

You substantive point is very difficult to address. It would require cataloging the size of all electoral districts in the country, which are all user defined areas the majority of which the Bureau doe not collect. This drives the need for block level data. To tray and get a sense of this problem. if we look at the extremes on the county level we have (pop estimates from 2017):

Loving County, TX  POP = 134 people; County Judge Commissioner Districts = 4; Average district size = 33.5 people
King County, TX  POP = 296; County Judge Commissioner Districts = 4; Average district size = 74 people
Kenedy County, TX  POP = 417; County Judge Commissioner Districts = 4; Average district size = 104.25 people
Arthur County, NE POP = 457; County Commissioner Districts = 3; Average district size = 152.33 people
Blaine County, NE POP = 482; County Commissioner Districts = 3; Average district size = 160.66 people
McPherson County, NE POP = 499; County Commissioner Districts = 3; Average district size = 166.33 people
Petroluem County, MT  POP = 523; County Commissioner Districts = 3; Average district size = 174.33 people
Yakutat Borough, AK POP = 605; Assembly members = 5 (plus mayor and mayor pro tem for 7 total); Average district size = 121 people (could not confirm that Boroughs elect from districts rather than at large).
Loup County, NE POP = 609; County Commissioner Districts = 3; Average district size = 203 people

These are just the smallest counties in the country. We also have to consider the smallest places that conduct district based elections. If we are to make the claim that the data is fit for use, and we have defined that use as redistricting under the applicable federal statutes covering voting rights, then we must find a way to provide plausibly accurate data for both the total population and for the underlying relevant characteristics. I am not suggesting breaking the DAS, I am suggesting that the accuracy versus privacy trade-off is farther to the accuracy end-point than you are likely comfortable in recommending and that the tuning of the characteristics should be a continuing focus for the DAS.

Thank you
James


***************************
**James Whitehorne, Chief**
Redistricting & Voting Rights Data Office/ADDC/HQ
U.S. Census Bureau
O: 301-763-4039 | M: 202-263-9144
census.gov  |  census.gov/rdo  |  @uscensusbureau
**Shape your future. START HERE >** 2020census.gov

---

**From:** John Maron Abowd (CENSUS/ADRM FED) <john.maron.abowd@census.gov>
**Sent:** Friday, September 25, 2020 12:36 PM
**To:** James Whitehorne (CENSUS/ADDC FED) <James.Whitehorne@census.gov>; Victoria Velkoff (CENSUS/ADDP FED) <Victoria.A.Velkoff@census.gov>; Cynthia Davis Hollingsworth (CENSUS/EWD FED) <cynthia.davis.hollingsworth@census.gov>
**Subject:** Re: GQ population and the DAS

I clarified the distinction between unit count and population count invariants multiple times until Cynthia finally said she

understood it. I had no idea that you did not. It is not possible to make the GQ populations invariant. That is non-starter regardless of DSEP's decisions in October. It will break the DAS. As you know, the fact that the prisons know their populations does not excuse the Census Bureau from protecting the number reported to GQE under Title 13, Section 9. That's not the same as the public knowledge that that living quarter is prison, not a dormitory.

That said, I immediately opened two issues with the DAS science team following the FSCPE meeting: single-sex GQs, and "characteristic spillover." Correct me if I am wrong, but single-sex does not affect redistricting, so I have given that one a lower priority. Characteristic spillover is a feature of top-down, not a bug, but the team understands that characteristics in a GQ like prison are not similar to the characteristics in surrounding blocks. We have a fix under investigation (grouping GQs into their own special block-groups).

I note for the record that household racial composition is not a characteristic in PL94-171, so I do not understand that argument.

Now for the most substantive point. We know how to get the populations very, very accurate without imposing invariants (+/- < 1 person at the block level MAE). The DAS team will engineer the PLB allocations as instructed; so, this can be implemented. The problem with doing this is that it destroys the confidentiality protection on residential location, which was the biggest factor making re-identification in the 2010 data so high. I am very uncomfortable recommending a PLB allocation to population that removes all of the location protection. What we need is proper guidance on the correct use case: minimum population in a voting district. My view is that the data do not support voting districts the size of 10 persons, or even 100, and never did. But I can be persuaded by data.

Once the PLB on population is pumped up, the race/ethnicity data will be more noisy than if they had gotten more of the PLB, but Tommy and Kyle's analysis suggests that for the DoJ use cases, once the global PLB is above 3 on the PL94-171 data, this variability does not make much difference. So, there's my data, and we will certainly repeat that whole analysis to confirm that the conclusions still hold once the 2020 DAS for redistricting data is locked algorithmically.

Hope this addresses your concerns (but guessing that there will be more discussion),

**John M. Abowd, PhD**, Associate Director and Chief Scientist
Research and Methodology
U.S. Census Bureau
O: 301-763-5880 M: simulring on cell
census.gov   |   @uscensusbureau
**Shape your future. START HERE >** 2020census.gov

---

**From:** James Whitehorne (CENSUS/ADDC FED) <James.Whitehorne@census.gov>
**Sent:** Friday, September 25, 2020 12:14 PM
**To:** John Maron Abowd (CENSUS/ADRM FED) <john.maron.abowd@census.gov>; Victoria Velkoff (CENSUS/ADDP FED) <Victoria.A.Velkoff@census.gov>; Cynthia Davis Hollingsworth (CENSUS/EWD FED) <cynthia.davis.hollingsworth@census.gov>
**Subject:** GQ population and the DAS

Hello John, Cynthia, and Tori,
I am starting to get repeated questions regarding the treatment of GQ population by the TDA. Some of this is coming from the issues pointed out at the FSCPE meeting and some are coming from review of the latest PPMF. NCSL followed up with the following regarding GQ populations:

> What's new, as I understand it, is that DAS means that the population characteristics are more mixed than ever— that the households look far more racially diverse than they otherwise would, at the least.
> I've just heard that the new PPMF shows that not only are the characteristics farther from the actual enumeration, but that the actual population count is also treated with DAS and therefore not accurate. (The accurate population count in the prisons can be known by asking the prison officials—in fact, that's how the bureau gets it in the first place.)

I believe you've been saying all along that the # of GQ and the type of GQ will be as-enumerated. I didn't quite grasp when you've said that the implication: the population count for GQs will not be as-enumerated.

First, do I have the issue understood correctly enough? Second, what's a good approach for us to ensure that the DAS team knows that these #s are going to matter a lot to redistricters in 9 states at the very least, and that as they continue fixing the post-processing and set the epsilon, this is a significant concern on the redistricting side? My purpose is two-fold. One is to make sure you are aware that this is a concern for the redistricting use case.  Two, to suggest that a comprehensive write up on how GQs are being treated in the TDA and what people should be aware of who need to use the GQ data would be useful.  Would this be a good topic for an upcoming newsletter after the invariants are set? Maybe as part of a newsletter on the invariants?

Finally, will there be a public response to the FSCPE questions regarding this topic?
Thanks
James


****************************furniture
**James Whitehorne, Chief**
Redistricting & Voting Rights Data Office/ADDC/HQ
U.S. Census Bureau
O: 301-763-4039 | M: 202-263-9144
census.gov  | census.gov/rdo | @uscensusbureau
**Shape your future. START HERE >** 2020census.gov