# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA EASTERN DIVISION

| | |
|---|---|
| THE STATE OF ALABAMA; ROBERT ADERHOLT, Representative for Alabama's 4th Congressional District, in his official and individual capacities; WILLIAM GREEN; and CAMARAN WILLIAMS, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE; GINA RAIMONDO, in her official capacity as Secretary of Commerce; UNITED STATES BUREAU OF THE CENSUS, an agency within the United States Department of Commerce; and RON JARMIN, in his official capacity as Acting Director of the U.S. Census Bureau, <br><br> Defendants. | CIVIL ACTION NO. 3:21-CV-00211-RAH-ECM-KCN |

## BRIEF OF AMICUS CURIAE PROFESSOR MARGO ANDERSON IN SUPPORT OF PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**Bryan M. Taylor**
BACHUS BROM & TAYLOR, LLC
3536 Independence Drive
Birmingham, AL 35209
Phone: (334) 596-9650
btaylor@bachusbrom.com

*Counsel for Amicus Curiae Professor Margo Anderson*

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES.......................................................................................... ii

INTEREST OF AMICUS CURIAE...............................................................................1

BRIEF OF AMICUS CURIAE MARGO ANDERSON.......................................................2

ARGUMENT.................................................................................................................2

   I.  The History of the Census and the Origins of PL 94-171 Underscore the
   Importance of State-Federal Collaboration to Achieve Constitutional
   Reapportionment...................................................................................................3

      A.  Origins of Public Law 94-171 and the Data Needs of the Reapportionment
      Revolution and the Voting Rights Act ........................................................3

      B.  Passage of PL 94-171 and Implementation for 1980.............................................8

      C.  PL 94-171 Collaborations and Data Files, 1990 and Beyond.............................10

   II.  Collaboration Should Be Reopened Because the Differential Privacy Initiative
   Did Not Coordinate with the P.L. 94-171 Collaboration Program for the 2020
   Census ...................................................................................................................15

CONCLUSION ...........................................................................................................18

CERTIFICATE OF SERVICE ....................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Baker v. Carr
  369 U.S. 186 (1962), <u>on remand</u>, 206 F. Supp. 341 (M.D. Tenn. 1962)....................3

Gray v. Sanders,
  372 U.S. 368, 381 (1963) .........................................................................................3


**CONSTITUTIONAL PROVISIONS**

  U.S. Const. amend. XV, § 1 .....................................................................................4


**STATUTES**

  13 U.S.C. §§ 1–79 (2006)........................................................................................9

  13 U.S.C. § 9(a)(2) ................................................................................................12

  13 U.S.C. § 141(c)...................................................................................................2

  Voting Rights Act of 1965,
    52 U.S.C. §§ 10301-314, 10501-508, and 10701-702 (2018)....................................3


**LEGISLATIVE HISTORY**

  Tabulation of Population for Purposes of Apportionment of State Legislative Bodies:
  Hearing on H.R. 1753 Before the Subcomm. on Census and Population,
    94th Cong. 1 (1975)...............................................................................................8

  Tabulation of Population for Purposes of Apportionment of State Legislative Bodies:
  Hearing on H.R. 9290 Before the Subcomm. on Census and Statistics,
    93d Cong. 1–2 (1973)............................................................................................8


**OTHER AUTHORITIES**

  79 Fed. Reg. 41258-59 (July 15, 2014)....................................................................15

  83 Fed. Reg. 19042 (May 1, 2018) ..........................................................................15

  83 Fed. Reg. 34111 (July 19, 2018)..........................................................................16

John Abowd, The Challenge of Scientific Reproducibility and Privacy Protection for Statistical Agencies, Presentation Before the CSAC,
   https://www2.census.gov/cac/sac/meetings/2016-09/2016-abowd.pdf ................... 15

Margo Anderson, <u>Baker v. Carr, the Census, and the Political and Statistical Geography of the United States: The Origin and Impact of Public Law 94-171</u>,
   62 Case W. Res. L. Rev. 1153 (2012) ....................................................................... 3

Margo Anderson, <u>The American Census: A Social History</u> (2d ed., 2015) ................. 5

<u>Changes to Census Data Products,</u> Integrated Public Use Microdata Series (IPUMS),
   https://ipums.org/changes-to-census-bureau-data-products ..................................... 16

Committee on National Statistics, Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations,
   https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-
   data-products-data-needs-and-privacy-considerations ............................................ 17

Simson L. Garfinkel, Modernizing Disclosure Avoidance: Report on the 2020 Disclosure Avoidance Subsystem as Implemented for the 2018 End-to-End Test (Continued), slide 8,
   https://perma.cc/4J8B-ZEXM ................................................................................ 15

V. Joseph Hotz and Joseph Salvo, <u>Assessing the Use of Differential Privacy for the 2020 Census: Summary of What We Learned from the CNSTAT Workshop</u> (Feb. 25, 2020),
   https://www.amstat.org/asa/files/pdfs/POLCNSTAT_CensusDP_WorkshopLessons
   LearnedSummary.pdf ............................................................................................. 17

Catherine McCully, U.S. Census Bureau, <u>Designing P.L. 94-171 Redistricting Data for the Year 2020 Census</u> 11 (2014) ................................................................................ 14

National Council of State Legislatures, <u>Differential Privacy for Census Data Explained</u> (March 15, 2021),
   https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-
   explained.aspx ...................................................................................................... 17

U.S. Dep't of Commerce, Census Bureau <u>Designing P.L. 94-171 Redistricting Data for the Year 2010 Census:  The View from the States</u> 9-11 (2004) ................................. 12

U.S. Dep't of Commerce, Census Bureau, <u>History: 2000 Census of Population and Housing</u> 414, Vol. 2 (2009) ....................................................................................... 12

U.S. Dep't of Commerce, Census Bureau, <u>Designing P.L. 94–171 Redistricting Data for the Year 2010 Census</u> 5–8 (2004),
   http://www.census.gov/rdo/pdf/DesignPL94-171.pdf ............................................. 8

U.S. Dep't of Commerce, Bureau of the Census, <u>CPH–R–2C, 1990 Census of Population and Housing, History</u>, Part C ................................................................6, 10

U.S. Dep't of Commerce, Bureau of the Census, <u>PHC80-R-2A, 1980 Census of Population and Housing, History,</u> Part A, 13–1–3–39 (1986), http://www2.census.gov/prod2/decennial/documents/1980/1980censusofpop802 unse_bw.pdf) ............................................................................................................6

U.S. Dep't of Commerce, Census Bureau, <u>Geographic Areas Reference Manual </u>14–3 (1994), http://www.census.gov/geo/www/GARM/GARMcont.pdf)..............................7

U.S. Dep't of Commerce, Census Bureau, <u>PHC80–R–2D, 1980 Census of Population and Housing, History</u>, Part D, 8–29 (1989), http://www2.census.gov/prod2/.............................................................................10

## **INTEREST OF AMICUS CURIAE**

Amicus Curiae Margo Anderson is a leading historian of the census and Distinguished Professor Emerita in History and Urban Studies at the University of Wisconsin, Milwaukee. Among her relevant publications are: Margo Anderson, The American Census: A Social History (2d ed., 2015); Margo Anderson, Constance F. Citro and Joseph J. Salvo, Encyclopedia of the U.S. Census: From the Constitution to the American Community Survey (ACS) (2d ed., 2011), and Margo Anderson and Stephen E. Fienberg, Who Counts? The Politics of Census-Taking in Contemporary America (revised ed. 2001). Among other activities, she has received funding from the National Endowment for the Humanities, the Donner Foundation, and the Russell Sage Foundation.  She served as a resident fellow at the Woodrow Wilson International Center for Scholars (1998-1999) and an ASA/NSF/Census Bureau Fellow (2012-2013). Further publications are available at http://margoanderson.org.

**BRIEF OF AMICUS CURIAE MARGO ANDERSON**

**ARGUMENT**

In 1975, Congress amended the census law to provide for a formal collaboration process between the states and the federal government for the preparation of the tabulations for redistricting after each census. Act of Dec. 23,1975, Pub. L. No. 94-171, 89 Stat. 1023 (codified as amended at 13 U.S.C. § 141(c)) (hereinafter "PL 94-171"). PL 94-171 marked a new departure in the development of census data products.  The amended statute requires the Secretary of Commerce to solicit plans from the relevant "officer or public body having responsibility for legislative apportionment or districting of the State being tabulated" and to develop "criteria" for the submission of an acceptable plan, including "requirements which assure that such plan shall be developed in a nonpartisan manner." Id.

The legislative history of this provision of census law and its implementation over the past four decennial censuses reveal an ambitious, complex, robust program of collaboration between the states and the federal government which has served the needs of the nation well.  Each decade, Americans have responded to the census, and legislative bodies, from Congress to the state and local level, have used the resulting population counts to reapportion and redistrict seats in those bodies on the basis of population change.

A review of that legislative history and administrative practice provides context for the claims in the current litigation.  It reveals that the 2020 collaboration has departed in a significant way from the practices employed from 1980 to 2010.  This time, the Secretary did not integrate consideration of the change in the Census Bureau's chosen disclosure avoidance procedures, the differential privacy initiative, into the pre-census planning and testing collaboration with the states for the redistricting files, commonly called the PL-94-

2

171 files.  There has not been a formal opportunity for the states to evaluate, challenge, or recommend improvement in disclosure avoidance procedures or assess their impact on the redistricting responsibilities within the states.

**I.   The History of the Census and the Origins of PL 94-171 Underscore the Importance of State-Federal Collaboration to Achieve Constitutional Reapportionment**

### A.   Origins of Public Law 94-171 and the Data Needs of the Reapportionment Revolution and the Voting Rights Act

The roots of PL 94-171 date to the 1960s when the Supreme Court ruled that malapportioned state legislatures were unconstitutional and opened the way for the decade of lawsuits that came to be called the "Reapportionment Revolution." In 1962, the Supreme Court ruled in Baker v. Carr that equal-protection challenges to state legislative reapportionment were justiciable in the federal courts, and, as a result, the Tennessee legislature was ordered to be reapportioned. 369 U.S. 186 (1962), on remand, 206 F. Supp. 341 (M.D. Tenn. 1962).

A series of cases followed which overthrew apportionments in other legislatures and in Congress. By 1964 the phrase "one person, one vote" had entered the nation's political vocabulary to define the new principle of legislative apportionment and districting. Gray v. Sanders, 372 U.S. 368, 381 (1963).[1]

Relatedly, the Voting Rights Act of 1965, Pub. L. No. 89–110, 79 Stat. 437 (codified as amended at 52 U.S.C. §§ 10301-314, 10501-508, and 10701-702 (2018)), enforced the mandate in the Fifteenth Amendment to the Constitution requiring that the

---

[1] For more detail on this history, see Margo Anderson, Baker v. Carr, the Census, and the Political and Statistical Geography of the United States: The Origin and Impact of Public Law 94-171, 62 Case W. Res. L. Rev. 1153 (2012).

"right . . . to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1. Congress created clear numerical tests of compliance with the constitutional goals of voting rights. As written in the original 1965 provision, for example, if a state used a literacy test for voter registration, and if voter registration or turnout was less than fifty percent of the voting age population of a jurisdiction, then the law presumed a violation of the Fifteenth Amendment. In such a case, the literacy tests were suspended, and the Justice Department could send federal registrars and election observers to monitor elections. Such jurisdictions also had to "preclear" any new voting qualifications with the Attorney General of the United States. At the time, six southern states came under these rules; counties in several other states were also affected.

The Court's decisions and the language of the Voting Rights Act left much of the implementation of the electoral changes to be worked out in practice. There were myriad issues to be resolved from the sweeping mandates of the 1960s. And one of those issues was a new requirement for good quality census data.

It is fairly clear that in the 1960s, neither Congress nor the courts had spent much time considering the data issues of implementation of the reapportionment decisions. At the time, census data seemed to be as reliable as an old shoe, simply there for use, an uncontroversial and ordinary resource for all parties to use. In fact, however, census data are themselves the products of enormous administrative, scientific, and political decision making. Neither the leadership in the Census Bureau, nor their existing data tabulation programs, were prepared to address the data requirements of the reapportionment revolution.

There had been significant innovation in census processes in the previous 40 years, particularly starting with the 1940 census. The Sixteenth Census of 1940, for example, included a probability sample for the first time, a housing census, and evaluation studies to measure systematically the level of accuracy of the enumeration, the tabulation and coding procedures, coding bias, and sampling error. Margo Anderson, <u>The American Census: A Social History</u> (Yale University Press, 2d ed., 2015).

During the post World War II years, the research work measuring unemployment produced the ongoing Current Population Survey. Computerization and data automation followed with the UNIVAC and FOSDIC technologies in the 1950s and 1960s. Between 1960 and 1970, the Bureau began the mail census, replacing the time-honored method of using in-person enumerators for the decennial count. In conjunction with local jurisdictions, mostly large cities, the Bureau instituted programs in producing "small area data," initially census tracts and, in some areas, using "blocks" or the new "zip code" as tabulation areas.

Nevertheless, the apportionment decisions presented challenges that the innovations of the previous forty years did not address. The first problem was geographic. Many states had simply stopped redistricting altogether, or used existing civil divisions as geographic building blocks, regardless of population size and change. Meanwhile, the Census Bureau advanced its geography program primarily to serve the administration of the census. From the Bureau's perspective, definitions were required for two different types of geography, what came to be called enumeration or collection geography and tabulation geography. Enumeration geography was defined to facilitate the census count. Enumeration districts were districts where an enumerator could walk from house to house

and were roughly defined to be of sufficiently equal size to facilitate the enumeration. Until the 1980s, the Census Bureau also recreated the entire geographic mapping process each decade, using prior geography as a guide.

Tabulation geography is quite a different system. This is the spatial definition of reporting places, e.g., the regions, states, counties, town, cities, minor civil divisions and so on, for which the Census Bureau tabulates the results of the census. Some, such as state boundaries, are fairly fixed. But most tabulation geography can change, as local jurisdictions annex, consolidate, split, or generally refigure their jurisdictions. During the data tabulation process after the census information is collected, person and household information collected by enumeration geography is aggregated up or transferred to the tabulation geography codes for data publication. See U.S. Dep't of Commerce, Bureau of the Census, PHC80-R-2A, 1980 Census of Population and Housing, History, Part A, 13–1–3–39 (1986), http://www2.census.gov/prod2/decennial/documents/1980/1980censusof pop802unse_bw.pdf; U.S. Dep't of Commerce, Bureau of the Census, CPH–R–2C, 1990 Census of Population and Housing, History, Part C, 3–17 (1995).

Thus as the Census Bureau and the state and local government officials charged with redistricting confronted the data issues presented by the new mandates for one person, one vote, they found themselves scrambling for solutions. During the planning phase for the 1970 Census, the issues came into sharp focus. First, officials discovered that comprehensive liaison arrangements between states, local jurisdictions, and the Census Bureau that might address the data issues presented by the new mandates for one person, one vote, did not exist. Whose responsibility was it to set standards for fifty different states?

Who provided training in data use? How did one ask for more or different data? Who paid for it?

Second, what data did the Census Bureau have at hand that could be used immediately for the redistricting required after the 1970 Census? The redistricters very quickly began to define what they wanted from the Census Bureau, and four criteria for "good data" emerged. First, the data would have to be reported at very low levels of geography to serve as building blocks for legislative districts. Second, such data should be accessible and easy for the redistricters to use. Third, it needed to be timely, e.g., available in the year after the census so the redistricters could meet the deadlines for the next Congressional election cycle. And fourth, it needed to be disaggregated by race for Voting Rights Act enforcement.

It quickly became clear that the Census Bureau did not have an existing data tabulation program that would serve these purposes for the nation as a whole. For some states and jurisdictions, tract or block level data tabulations existed, developed over the previous half century in conjunction with cities and states for urbanized and metropolitan areas. While that geography captured the majority of the population, it captured only very small proportions of land area.

The Census Bureau's solution to the immediate problem after the 1970 Census was to provide redistricters with the "Master Enumeration District List (MEDList) and census maps," in other words, with data aggregated by enumeration or collection geography, not tabulation geography. These lists and maps contained population and housing counts with comprehensive coverage of the geography of the state for all jurisdictions, as well as census tract and blocks where applicable. But as the Census Bureau acknowledged, "Many States

experienced problems in using the MEDList and maps in relation to their election or legislative areas because the boundaries of the census entities often did not coincide with the State or local voting district boundaries." U.S. Dep't of Commerce, Census Bureau, Geographic Areas Reference Manual 14–3 (1994), http://www.census.gov/geo/www/GARM/GARMcont.pdf); see generally Tabulation of Population for Purposes of Apportionment of State Legislative Bodies: Hearing on H.R. 1753 Before the Subcomm. on Census and Population, 94th Cong. 1 (1975) (noting that states have faced a number of problems in attempting to work with the data presently available from the Bureau; for example, the enumerated districts are too large to be effectively used by officials in their legislative redistricting and there are difficulties in defining boundaries of enumerated districts); Tabulation of Population for Purposes of Apportionment of State Legislative Bodies: Hearing on H.R. 9290 Before the Subcomm. on Census and Statistics, 93d Cong. 1–2 (1973) (noting that states have difficulty in using the Bureau's census figures in states' apportionment of legislative bodies); U. S. Dep't of Commerce, Census Bureau, Designing P.L. 94–171 Redistricting Data for the Year 2010 Census 5–8 (2004), http://www.census.gov/rdo/pdf/DesignPL94-171.pdf (discussing state and local official use of the 1970 census data).

**B.  Passage of PL 94-171 and Implementation for 1980**

Between 1972 and 1975, therefore, Congress, the Census Bureau, and state and local officials began a dialog about what to do after the 1980 Census. The Reapportionment Task Force of the National Conference of State Legislatures (NCSL) and the Census Bureau began working on data improvements. NCSL conducted surveys. Congress and local government organizations held public hearings and began to draft legislation to

amend title XIII, 13 U.S.C. §§ 1–79 (2006), to address the new mandates. By 1974, solutions began to emerge in legislative language. The House passed bills in 1973 and 1974. The Census Bureau expressed concern about elements of the language, particularly that the proposed eight-month time frame for reporting the data was too stringent. In late 1975, Congress passed HR1753, which was signed into law in December as PL 94-171. The law authorized a process for states to work with the Census Bureau in defining the geographic areas for which they would receive small area population counts for redistricting. The law set a deadline of one year after the census date, that is, April 1 of the year after the census, for the Bureau to provide the tabulations to the states. The law itself did not specify a particular level of geographic detail, but stakeholders clearly preferred the smallest possible tabulation area, such as the block, because larger geographies were harder to map to existing local jurisdictions. It was generally possible to aggregate blocks up to wards, for example, but it was not easy to figure out how to split population in an enumeration district that crossed two or more wards. At the time, block-level geography was defined for about 2.5 million entities in urban and metropolitan areas, covering approximately 60 percent of the population but only 2 percent of the country's land area. The new law raised the question about how and whether to map the remaining land area and population into small area entities.

The goals of PL 94-171 were partially achieved for the 1980 Census round. All or part of 23 states worked with the Census Bureau to customize their data requirements for voting or election district data. The states received block level data where available and enumeration district data where finer tabulations were not designated. Given the technological capacities of the time, the data and maps were delivered on paper, computer

tape, and microfiche. The variables available on the 1980 file for each geographic unit were total population broken into five race groupings and Hispanic/Latino.  See U.S. Dep't of Commerce, Census Bureau, PHC80–R–2D, 1980 Census of Population and Housing, History, Part D, 8–29 (1989), http://www2.census.gov/prod2/decennial/documents/1980/1980censusofpopu802uns_bw.pdf.

### C.  PL 94-171 Collaborations and Data Files, 1990 and Beyond

After the 1980 Census round, the Bureau and the stakeholders from states and local governments committed to improving the program for the next census. The Bureau also committed during the 1980s to building the TIGER/MAF system, a national digitized map linked to all addresses in the nation. Computerized geographic information system technologies were also developed during the 1980s, making it possible to move the data distribution process from paper and microfiche to electronic media. These new technologies in conjunction with continued collaboration with state and local governments on small area and block-level mapping, permitted the 1990 Census PL 94-171 data to provide comprehensive small area data for redistricting in the entire nation.

At the 1990 Census, the Bureau expanded the variables to be published in the PL 94-171 files to include a breakdown of the population of an area by total and voting age population, e.g., 18 and over, and it produced block-level data for the entire nation, some seven million blocks. See U.S. Dep't of Commerce, Bureau of the Census, CPH–R–2C, 1990 Census of Population and Housing, History, Part C, 3–1–3–10 (1996).[2]

---

[2] With the expansion of the program in 1990 and the new GIS technology, which permitted digital mapping of these data, not only did the data facilitate ever more elaborate mapmaking for legislative districts, it also facilitated the visualization of detailed race and ethnic distributions for every place in the nation. Newspaper accounts of changes in the white, black, etc. population for a local area, which up to 1980 had to be

Evidence of the impact of the PL 94-171 program on more general small-area data products was also clear. The discussion of the impact of the PL 94-171 program in the 1990 census procedural history documents the new relationships:

> <u>In response to users' requests</u>, the Population Division released diskettes and a special computer-tape file, STF-S-1, that contained total housing units, vacant housing units, total population, and group quarters population, coincident with the P.L. files, but did not identify or include election precincts or voting districts.

<u>Id.</u> at Part B, Chap. 10, 15 (emphasis added).

The collaboration deepened for the Census 2000, as new issues arose for the PL 94-171 tabulations.  In particular, in 1997 the Office of Management and Budget (OMB) revised the Race and Ethnicity Statistical Directive to allow respondents to federal surveys to report more than one race.  The PL 94-171 tabulations up to that point had reported counts in census blocks mono racially.  The OMB revision prompted a technical debate about how to tabulate and report counts that identified the number of people who self reported more than one race in each census block. Should there be separate variables listed for such situations so that, for example, a redistricter would see a count for each block that listed the number of people who said they were both White and Black, or Black and American Indian, or Asian and White, and so on.

---

hand drawn by a cartographer, usually using census tract data (where it existed), were suddenly possible with block level distinctions for the nation as a whole and began to appear in every local newspaper, book or magazine with access to reasonably powerful desktop software.

Such reporting changes faced several issues.  The first was a dramatic increase in the size of the data file, if variables were added for all the possible combinations of the race categories.  The second issue involved how to collapse the multiple race responses for an area for voting rights enforcement.  If a block contained people who reported White and Black, for example, would it be proper to count them as Black or White for evaluating racially polarized voting patterns?

The third issue was disclosure avoidance.  Since multiple race identification was a relatively rare phenomenon, the vast majority of the actual cells in the PL 94-171 file for the multiple race variables would report a count of zero, namely that there were no reported people who said they were White and Black, etc., for that block.  But if a block reported a small number, for example that there was one person in a block of voting age who was Non Hispanic White and Black, the tabulation could run afoul of section 9 of title 13, which enjoins census officials from "mak[ing] any publication whereby the data furnished by any particular establishment or individual under this title can be identified." 13 U.S.C. § 9(a)(2).

The resolution of the tabulation for the race and ethnic categories which would meet the requirements of confidentiality is particularly instructive.

The 2000 Census procedural history and the reports of the PL 94-171 program administration demonstrate the extensive consultation that took place with the states on these matters. See U. S. Census Bureau, History: 2000 Census of Population and Housing 414, Vol. 2 (2009); U. S. Census Bureau, Designing P.L. 94-171 Redistricting Data for the Year 2010 Census:  The View from the States 9-11 (2004). There were proposals to limit

the numbers of variables in the PL 94-171 file, and the Bureau prepared a test file, called

the P.L. 20 Matrix:

> The P.L. 20 Matrix would give redistricting officials and others single-race totals, as well as the all-inclusive totals of those persons who report one or more racial categories (i.e., alone or in combination with one or more other races). The Voting Rights Section reviewed this smaller P.L. 20 Matrix and informed the Census Bureau that this product would meet the census information needs associated with Sections 2 and 5 of the Voting Rights Act. The P.L. 20 Matrix was presented to the NCSL Redistricting Task Force, as well as the Census 2000 Redistricting Data Program liaisons appointed by each state. The Task Force and the states felt that this matrix would meet their needs.

> One year after the dress rehearsal census, the Redistricting Data Office issued the CD-ROM prototype containing the P.L. 20 Matrix that presented the "single-race" tallies (for those respondents who chose only one of the six race categories) and an "all-inclusive" tally that represented counts for each of the same six races marked alone or in combination. Copies of the CD-ROM were sent to legislative officials and the redistricting community, and they were asked to provide feedback on how such data might be used in the redistricting process.

Id. at 11 (emphasis added).

In the end, the P.L. 20 Matrix was deemed inadequate to satisfy the needs of the

redistricting community or the Department of Justice and was replaced by the P.L. 63

Matrix, with full detail on the race and ethnic category combinations.  In response,

> [the Bureau's] Redistricting Data Office immediately notified the state legislative officials and the NCSL Task Force. A new disclosure avoidance procedure was implemented to protect individual data responses while preserving the actual responses to the race question. The Census Bureau retabulated the dress rehearsal data using the P.L. 63 Matrix and distributed it to the states and to the NCSL so that data users most interested in redistricting data would be aware of the proliferation in the race tabulations and resulting larger data files.

Id.  In other words, the states and the NCSL Redistricting Task Force participated in the debates and resolution of the issues about how to tabulate the required PL 94-171 files in light of the changes in the official U.S. race and ethnic classification.

The 2020 call for participation in the PL 94-171 consultation process also demonstrates the depth of the now four-decades-old collaboration process. Reviewing the 2010 program, the Bureau acknowledged that the program had benefited the Bureau's administration of the enumeration as well:

> Beginning in the fall of 2005, states voluntarily provided their state legislative districts to the Census Bureau (100 percent participation). In January 2007, the Census Bureau disseminated the retabulated 2000 Census data by the new districts and continues to provide annual updates via the American Community Survey 5-year estimates. In addition, staff from the Census Redistricting Data Office, Census Field Regional Offices, and the Census Bureau's Geography Division, visited 46 state capitols to discuss with state leadership the plans for the 2010 Redistricting Data Program and the 2010 Census. Discussion included updates on Geographic and Partnership Support activities such as the Local Update of Census Addresses (LUCA), the Boundary and Annexation Survey (BAS), and the Census in Schools Program, as well as our communication strategy. States requested that they receive information on all census planning and expectations of their resources. In this way the states could make the appropriate budget decisions best suited for their states. These meetings, hosted by our state liaisons, assisted the Census Bureau in making final decisions, such as adding school district summaries to the 2010 Redistricting Data (P.L. 94-171) data summaries.

Catherine McCully, U.S. Census Bureau, Designing P.L. 94-171 Redistricting Data for the Year 2020 Census 11 (2014) (emphasis added).

14

II. **Collaboration Should Be Reopened Because the Differential Privacy Initiative Did Not Coordinate with the P.L. 94-171 Collaboration Program for the 2020 Census**

In 2014, the Bureau announced the establishment of the "2020 Redistricting Data Program." 79 Fed. Reg. 41258-59 (July 15, 2014). The notice did not mention proposed changes in disclosure avoidance methods.

The Bureau announced its intentions to introduce differential privacy as its new disclosure avoidance methodology in 2016 and 2017.  At the September 2016 meeting of the Census Scientific Advisory Committee (CSAC), John Abowd, the Bureau's Associate Director for Research and Methodology and Chief Scientist, reported on the theoretical and technical challenges for introducing the new system. See John Abowd, The Challenge of Scientific Reproducibility and Privacy Protection for Statistical Agencies, Presentation Before the CSAC, https://www2.census.gov/cac/sac/meetings/2016-09/2016-abowd.pdf. In September 2017, Simson L. Garfinkel, Chief, Center for Disclosure Avoidance Research, updated CSAC and reported that "[t]he 2020 Census disclosure avoidance system will use differential privacy to defend against a reconstruction attack." Simson L. Garfinkel, Modernizing Disclosure Avoidance: Report on the 2020 Disclosure Avoidance Subsystem as Implemented for the 2018 End-to-End Test (Continued), slide 8, https://perma.cc/4J8B-ZEXM.

On May 1, 2018, the Bureau filed a "Final Content Design for the Prototype 2020 Census Redistricting Data File" in the Federal Register. 83 Fed. Reg. 19042. The notice did not mention the change in disclosure avoidance methodology, though it did note other changes, beyond mapping, for the 2020 product, for example:  "Thus, the final design of

the Prototype 2020 Census Redistricting Data File will be the same design as that used for

the 2010 Census Redistricting Data File, with the addition of a group quarters table." Id.

In the summer of 2018, the Bureau issued a Federal Register notice "Soliciting

Feedback From Users on 2020 Census Data Products." 83 Fed. Reg. 34111 (July 19, 2018).

The notice reported:

> Given the need for improved confidentiality protection, we may reduce the
> amount of detailed data that we release to the public. Public feedback is
> essential for a complete review of the decennial census data products will
> [sic] assist the Census Bureau in prioritizing products for the 2020 Census.
> The Census Bureau is not seeking feedback on apportionment counts and
> redistricting data products, which are constitutionally mandated.

Id. (emphasis added).

The notice did not reference the previously announced decision to employ

differential privacy for 2020 census tabulations, including for the PL 94-171 files.  It did

not propose to reopen the PL 94-171 collaboration to address confidentiality issues for

2020 products, nor did it formally notify the states of the Bureau's concern that it "may

reduce the amount of detailed data" released. Id.

Starting in the fall of 2018, outside data users, primarily from the research

community, identified substantial technical and policy issues with the differential privacy

initiative.[3]  In 2019, census users requested demonstration products to compare to the

published 2010 files to assess the impact of the new methods.  In December 2019, the

---

[3] For a compilation of materials, see Changes to Census Data Products, Integrated Public
Use Microdata Series (IPUMS), https://ipums.org/changes-to-census-bureau-data-
products.

Committee on National Statistics of the National Academy of Sciences sponsored a two-day workshop comparing the "differentially private" demonstration tabulations with the 2010 files and found them wanting for significant numbers of census use cases, particularly for redistricting, and for small populations by characteristics or geography. <u>See</u> National Academy of Sciences, Committee on National Statistics, Workshop on 2020 Census Data Products: Data Needs and Privacy Considerations, https://www.nationalacademies.org/event/12-11-2019/workshop-on-2020-census-data-products-data-needs-and-privacy-considerations; Andrew Beveridge, Impacts on Redistricting: The Case of New Rochelle, NY, https://sites.nationalacademies.org/cs/groups/dbassesite/documents/webpage/dbasse_197 494.pdf.

Still, the bureau did not reopen the PL 94-171 collaboration with the states alerting them to their technical challenges and requesting further consultation on the PL 94-171 file structures. By 2020, the National Council of State Legislatures redistricting task force was signaling its concerns to the Bureau and asking to be involved in the planning of the redistricting files. <u>See</u> National Council of State Legislatures, <u>Differential Privacy for Census Data Explained</u> (March 15, 2021), https://www.ncsl.org/research/redistricting/differential-privacy-for-census-data-explained.aspx; <u>see also</u> V. Joseph Hotz and Joseph Salvo, <u>Assessing the Use of Differential Privacy for the 2020 Census: Summary of What We Learned from the CNSTAT Workshop</u> (Feb. 25, 2020), https://www.amstat.org/asa/files/pdfs/POL-CNSTAT_CensusDP_WorkshopLessonsLearnedSummary.pdf.

## **CONCLUSION**

To date, the federal government has missed the opportunity to involve the states in addressing this most recent disclosure avoidance problems, both the ones derived from the Bureau's concern that their tabulations could be reconstructed and re-identified contrary to law, and the inability of their chosen solution, differential privacy, to perform effectively in a census environment. There is an existing statutory process to address these issues. Current law provides for both protecting individual level census responses and robust small area data for the decennial redistricting round.  The historical record indicates that the collaboration that Congress envisioned in PL 94-171 in 1975 has produced benefits for both the states and the federal government. Congress envisioned the states as responsible partners in the preparation of small area tabulations for redistricting. The collaboration should be reopened.

## **CERTIFICATE OF SERVICE**

      This is to certify that on the 28th day of April, 2021, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will electronically send a copy of the same to all counsel of record electronically registered with the Clerk.

_s/Bryan M. Taylor._

Bryan M. Taylor (ASB-0390-Y81T)

_Counsel for Amicus Curiae Margo Anderson_
