IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| THE STATE OF ALABAMA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:21-cv-211-RAH-ECM-KCN |
| | ) | (WO) |
| UNITED STATES DEPARTMENT | ) | |
| OF COMMERCE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.    INTRODUCTION

On March 10, 2021, the State of Alabama ("the State"), Congressman Robert Aderholt, and two Alabama voters (collectively, "Plaintiffs") brought this suit against the U.S. Department of Commerce ("the Department"), the U.S. Bureau of the Census ("the Bureau"), and certain federal officials (collectively, "Defendants"). Plaintiffs requested a preliminary injunction against the Bureau's plan to use "differential privacy," a method of disclosure avoidance, in the processing of 2020 Census data, on the grounds that it violates the Census Act, *see* 13 U.S.C. § 1 et seq., the Administrative Procedure Act ("APA"), *see* 5 U.S.C. § 706, and the Individual Plaintiffs' due process and equal protection rights under the Fifth Amendment.  Plaintiffs also sought a writ of mandamus from this court directing Defendants to provide census data to the State of Alabama by March 31, 2021 or as soon as equitably possible thereafter.

After the benefit of oral argument, the court concludes that Plaintiffs' motion for a preliminary injunction and petition for writ of mandamus are due to be DENIED.

## II.   LEGAL STANDARD

"A preliminary injunction may be issued to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974);[1] *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))).

A party seeking preliminary injunctive relief must establish four elements: "(1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (citing *Parker v. State Bd. of Pardons & Paroles,* 275 F.3d 1032, 1034–35 (11th Cir. 2001)). Additionally, a preliminary injunction requires a showing of "imminent irreparable harm," and "a delay in seeking a preliminary injunction of even

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit Court of Appeals adopted all decisions of the Fifth Circuit Court of Appeals that were rendered prior to September 30, 1981.

only a few months—though not necessarily fatal—militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

When ruling on a preliminary injunction, "all of the well-pleaded allegations [in a movant's] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976). The court may also consider supplemental evidence, even hearsay evidence, submitted by the parties. *See Levi Strauss & Co. v. Sunrise Intern. Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

## III.   BACKGROUND

### A.   The Decennial Census

The Constitution requires an "actual Enumeration" of the population every ten years and vests Congress with the authority to conduct that census "in such Manner as they shall by Law direct." *Wisconsin v. City of New York*, 517 U.S. 1, 5 (1996) (quoting 1 Art. I, § 2, cl. 3). The Enumeration Clause of the Constitution "vests Congress with virtually unlimited discretion in conducting the decennial 'actual Enumeration,'" and Congress "has delegated its broad authority over the census to the Secretary" with its passage of the Census Act, 13 U.S.C. § 1 *et seq. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (citing *Wisconsin*, 517 U.S. at 19). Accordingly, the Secretary has substantial discretion to take "a decennial census of [the] population . . . in such form and content as [she] may determine . . . ." 13 U.S.C. § 141(a). The Secretary is assisted in the performance of that responsibility by the Bureau of the Census and its head, the Director of the Census. *See id.* at § 2; § 21.

3

"The Constitution provides that the results of the census shall be used to apportion the Members of the House of Representatives among the States." *Wisconsin*, 517 U.S. at 5 (citing Art. I, § 2, cl. 3 ("Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers . . . ."); Amdt. 14, § 2 ("Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State . . . .")). And relevant here, the Census Act also requires the Secretary to work with each State to develop and approve plans "identifying the geographic areas for which specific tabulations of population are desired" for use in redistricting and other non-apportionment-related matters. 13 U.S.C. § 141(c). After completing the decennial census, the Secretary must report "[t]abulations of population for the areas identified" "to the Governor of the State involved and to the officers or public bodies having responsibility for legislative apportionment or districting of such State." *Id.*

## B.  Implementation of Differential Privacy for the 2020 Decennial Census

To encourage public cooperation with each decennial census, "Congress has provided assurances that information furnished to the Secretary by individuals is to be treated as confidential." *Baldridge v. Shapiro*, 455 U.S. 345, 354 (1982) (citing 13 U.S.C. §§ 8(b), 9(a)). This mandate was incorporated into the Census Act, which provides in Sections 8 and 9, respectively, that first, "the Secretary may furnish copies of tabulations and other statistical materials which do not disclose the information reported by, or on behalf of, any particular respondent," 13 U.S.C. § 8(b), and second, there should be no "publication whereby data furnished by any particular establishment or individual under this title can be identified," *id.* at § 9(a), (a)(2). These provisions have been read in tandem

4

to "embody explicit congressional intent to preclude *all* disclosure of raw census data reported by or on behalf of individuals." *Baldrige*, 455 U.S. at 361.

Given these guardrails, the Bureau has implemented various disclosure avoidance methods over the years with the goal of protecting the privacy of census respondents. For example, prior to 1990, the Bureau relied on the "suppression" of data to protect respondents. (Doc. 41-1 at 10.) Under this method of disclosure avoidance, the Bureau withheld publication of tables "that did not meet certain household, population, or demographic characteristic thresholds." (*Id.*) And in the 2000 and 2010 censuses, the Bureau primarily used "data swapping," meaning it swapped certain characteristic data between households that were most vulnerable to re-identification. (*Id.* at 12.) The data swapping methodology thus infused some "noise" into the redistricting data but kept each state's total population and total voting-age population constant at the census block level—the smallest geographic area for which the Bureau collects and tabulates census data. (*Id.*)

Citing the need to counter advancements in computational power and the threat of sophisticated re-identification and reconstruction attacks, the Bureau announced in September 2017 that it would employ a new and more proactive method of disclosure avoidance for the 2020 Census—"differential privacy." (Doc. 3 at 23; Doc. 41 at 73.) Differential privacy, the Bureau concluded, is the most efficient method by which it can accomplish both of its goals: adequately protecting respondent information while also preserving the utility of census data. (Doc. 41-1 at 26.) Therefore, the Bureau formally adopted differential privacy in the latest version of its 2020 Census Operational Plan, published in December 2018. (*See* Doc. 3-4.)

Although the parties voice contrasting views of exactly what differential privacy does, they seem to agree that differential privacy injects a calibrated amount of noise into the raw census data to control the privacy risk of any calculation or statistic. The amount of noise—or as Plaintiffs would say, error—actually injected depends on a pre-determined "privacy-loss budget," also referred to as the "epsilon," which allows the Bureau to "dial up and down" the degree of privacy in a given dataset. (Doc. 3-5 at 11–12.) "Setting epsilon to zero would result in perfect privacy but useless data, and setting the epsilon to infinity would result in perfect accuracy, but would result in releasing data in fully identifiable form." (Doc. 3-5 at 10–11; *see also* Doc. 41 at 14.)

Broadly speaking, the application of differential privacy is a process that occurs in two steps: "First, parameters are chosen to calibrate the variance of the chosen distribution, and then random draws from these distributions are taken and applied to the observations to 'perturb' or 'alter' values in the database up or down by adding the value of the random draw . . . ." (Doc. 3-5 at 12.) To put it more simply, among the computationally intense tasks folded into each of these steps, the Bureau's principal responsibilities are to determine the "invariants"—or unaltered numbers—and then to set the global privacy-loss budget. The goal, as the Census Bureau would argue, is highly accurate census data that can also withstand database reconstruction attacks more effectively than, say, the data that suppression or enhanced data swapping methods could produce. (Doc. 41-1 at 20–30.)

Moving ahead with its differential privacy plan, the Census Bureau announced on November 24, 2020, that the states will receive three invariants for the purposes of redistricting: (1) the total population of each state, (2) the total housing units at the census

block level, and (3) the number of group quarters facilities by type at the census block level. (*See* Doc. 3-6 at 13.)  Implicit in its announcement identifying these invariants, the Bureau indicated that the other redistricting data it plans to release to the states, including counts of population by race, ethnicity, voting age, housing occupancy status, and group quarters population, *will* be subject to the application of differential privacy at the census block level. (Doc. 3 at 13; Doc. 3-7 at 2.)

Throughout the development of the Bureau's differential privacy plan, the Bureau has released a series of "demonstration data" to its stakeholders to assist in the fine tuning of the disclosure avoidance system using differential privacy. (Doc. 3 at 29.) The Bureau released the first set of demonstration data products in October 2019, and, over the subsequent year, additional sets of demonstration data were released in May 2020, September 2020, November 2020, and April 2021. (*Id.*) The State of Alabama was among the recipients of these demonstration data products, which the Bureau has explained had "more noise (error) than should be expected in the final 2020 Census data products." (*Id.*) And on June 9, 2021, the Bureau finalized the epsilon for the 2020 Census data and filed notice with this court to confirm that the privacy-loss budget will be much higher than what was allocated for the demonstration data products. (Doc. 137.) In practice, this means that the redistricting data ultimately delivered to the states will be more accurate, at least when compared to the demonstration data, and, according to the Bureau, will be adequate for states to comply with the Voting Rights Act. *See* Voting Rights Act of 1965, Pub.L. 89–110, 79 Stat. 437, 52 U.S.C.A. § 10301 *et seq*. (Doc. 137.)

C.    **Delayed Delivery of Redistricting Data**

As is true for most every government entity and private business or organization over the past year, the COVID-19 pandemic placed onerous and novel burdens on government agencies to carry out their work in a timely and efficient manner. The Bureau, and its thousands of field representatives, had the bad luck of having to carry out the decennial census during this pandemic, which significantly delayed its field operations and processing of the census data. *See generally Nat'l Urb. League v. Ross*, No. 20-CV-05799-LHK, 2020 WL 7643237, at *1–10 (N.D. Cal. Dec. 22, 2020).

By statutory directive, the Bureau was required to report the census results to the President by December 31, 2020, so that he could officially submit the results to Congress for reapportionment of the House. *See* 13 U.S.C. § 141(b); 2 U.S.C. § 2a. Despite the Bureau's efforts to obtain an extension, Congress did not extend the deadline. And following litigation in California, the Census Bureau ended its field operations in mid-October 2020. *See Ross v. Nat'l Urban League*, 141 S. Ct. 18 (2020). All told, this resulted in the Bureau reporting results of the 2020 Census on April 26, 2021, almost four months after it was statutorily required to do so.

Similarly, the Bureau missed the March 31, 2021, statutory deadline to submit census-based redistricting data to the states. The Bureau issued a press release on February 12, 2021, stating its intent to release redistricting data to all fifty states on September 30, 2021. (*See* Doc. 1 at 37.) As a result, Ohio raised a challenge to the Bureau's delay, as Plaintiffs do here. *See* Complaint, Counts V–VIII (Doc. 1 at 48–51); *see also Ohio v. Raimondo*, 848 F. App'x 187 (6th Cir. 2021) (reversing the district court's holding that the

State of Ohio lacked standing to oppose the Census Bureau's delayed release of redistricting data).

But, as the oft-repeated adage goes, time brings all things to pass, *see* AESCHYLUS, LIBATION BEARERS 81 (Evan Hayes et al. eds., Ian Johnston trans., Faenum Publishing 2017), and in a more recent April 26, 2021, press release, the Bureau advanced the release date to August 16, 2021. *See Press Release,* U.S. Census Bureau, *2020 Census Apportionment Results Delivered to the President* (April 26, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-apportionment-results.html (the "April 26 Press Release"). As to this newly announced August 16, 2021, deadline, Plaintiffs have expressed dissatisfied resignation. In oral argument, Plaintiffs' counsel admitted that "if we could get [the redistricting data] in mid-August, I think we could still work with that, but pushing it beyond that is going to cause serious harm to us." (Doc. 128 at 28.) Regardless, the Census Bureau maintains that it would be impossible to deliver redistricting data to the states any earlier than August 16, 2021. (*Id*. at 88–89.)

## IV.    PLAINTIFFS' DIFFERENTIAL PRIVACY CHALLENGE

The Bureau's adoption of differential privacy as the disclosure avoidance method of choice for the 2020 Census has prompted Plaintiffs' first set of challenges (Counts I through IV), which are brought pursuant to both 13 U.S.C. § 141(c) and the APA. The crux of Plaintiffs' differential privacy claims is that the Bureau's method will generate intentionally skewed and untrustworthy census data. As to each Plaintiff, the court first will discuss several jurisdictional and prudential prerequisites, the results of which merit a denial of Plaintiffs' motion for a preliminary injunction and dismissal of several of these

claims. Indeed, "the Court must determine whether it has jurisdiction before it can proceed to the merits of the case." *Smith v. Ivey*, 501 F. Supp. 3d 1248, 1260 (M.D. Ala. 2020) (citing *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020)).  The court must do so *sua sponte*, *Sierra v. Hallandale Beach*, 996 F.3d 1110, 1138 (11th Cir. 2021) (Newsom, J., concurring), and where it concludes that jurisdiction is lacking, a court must dismiss the case or cause of action. *See Barnett v. Bailey*, 956 F.2d 1036, 1039–41 (11th Cir. 1992) (holding that a federal court may inquire into its jurisdiction at any time and may dismiss an action *sua sponte* for lack of subject matter jurisdiction).

### A.     The § 141 Claim (Count I)

#### 1.     The State of Alabama has no cause of action under Section 209.

In Count I, Plaintiffs challenge Defendants' use of differential privacy as an impermissible method of tabulation of the state's population under 13 U.S.C. § 141(c) of the Census Act ("Section 141"), via Pub. L. No. 105-119 § 209(b), codified as 13 U.S.C. § 141 Note. ("Section 209"). Plaintiffs contend that Section 141, which unquestionably entitles them to "tabulations of population" for redistricting purposes, *see* 13 U.S.C. § 141(c), also entitles them to "tabulations free from manipulation by unlawful statistical methods that affect districting decisions." (Doc. 3 at 38.)

In raising this challenge, Plaintiffs do not argue that Section 141 itself provides a cause of action. *Compare* (Doc. 1 at 5) ("Plaintiffs bring claims under Section 141 of the Census Act, 13 U.S.C. § 141; Section 209 of Public Law No. 105-119, which is codified in a note to 13 U.S.C. § 141; and 28 U.S.C. § 2284(a), as this case involves a challenge to

a statistical method used to provide '[t]abulations of population' for states to use in drawing congressional districts. *See* 13 U.S.C. § 141(c).") *with Ohio v. Raimondo*, No. 3:21-CV-064, 2021 WL 1118049, at *4 (S.D. Ohio Mar. 24, 2021), *rev'd and remanded*, 848 F. App'x 187 (6th Cir. 2021) (bringing claims solely under Section 141). On the contrary, they have chosen to travel under Section 209.[2] That route, though—for the State, anyway— hits a roadblock in Section 209's definitions section, which identifies all sorts of other persons and entities as "person[s] aggrieved," but notably excludes states themselves. As Defendants contend, of the four plaintiffs, the State of Alabama is not "a person aggrieved" within the meaning of Section 209 and therefore has no cause of action for a violation of the Bureau's mandates.

On this issue, we begin "where courts should always begin the process of legislative interpretation . . . which is with the words of the statutory provision." *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) (citing *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc)).

Section 209 provides that "[a]ny *person aggrieved* by the use of any statistical method in violation of the Constitution or any provision of law . . . , to determine the population for purposes of the apportionment or redistricting of Members of Congress," may bring a civil action. Pub. L. No. 105-119 § 209(b) (emphasis added). Section 209(d)

---

[2] Plaintiffs also relied exclusively on their invocation of Section 209(e) to request a three-judge court, (*see* Doc. 2), which the court granted over objection, (Doc. 27). When fashioning such a request, Plaintiffs submitted that each of their claims "fall squarely within Section 209" and that Section 209 "provides a cause of action" to each Plaintiff. (Doc. 2 at 4–5.)

in turn defines an "aggrieved person" as including: "(1) any resident of a State whose congressional representation or district could be changed as a result of the use of a statistical method challenged in the civil action; (2) any Representative or Senator in Congress; and (3) either House of Congress." *Id.* at § 209(d)(1)–(3).   Conspicuously missing from this section is any express mention of states, such as the State of Alabama or, for that matter, any other sovereign. "Definition sections . . . are to be carefully followed." *Hastie*, 854 F.3d at 1303 (citing Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 225 (2012)); *Fox v. Standard Oil Co*., 294 U.S. 87, 96 (1935) (quotation marks omitted)).

The background presumption, of course, is that the word "person" does *not* include the sovereign. *See Return Mail, Inc. v. United States Postal Serv*., 139 S. Ct. 1853, 1861–62 (2019) ("In the absence of an express statutory definition, the court applies a longstanding interpretive presumption that 'person' does not include the sovereign."); *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 782 (2000) (the presumption is that states are not covered by the term "person."); *United States v. United Mine Workers of Am*., 330 U.S. 258, 275 (1947) (exclusion of comparable provision extending the term "person" to include sovereign governments indicates Congress's intent not to include states). And here, the court can find nothing to rebut that presumption.

The State attempts to explain that, despite the omission of any sovereign from the text of the statute, its cause of action is safeguarded by the principle that the word "includes" should be understood to be nonexclusive. (*See* Doc. 94 at 50.) *E.g*., Scalia & Garner, at 132 ("the word *include* does not ordinarily introduce an exhaustive list")

12

(emphasis in original). True, the definitions section in Section 209(d) reads, "[f]or purposes of this section, an aggrieved person (described in subsection (b)) *includes*," before listing the various entities previously described. But in applying the interpretive canon of *expressio unius est exclusio alterius*, which stands for the proposition that "expressing one item of [an] associated group or series excludes another left unmentioned," *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (citation omitted), it becomes clear that there is no path around the textual barrier here; that is, the court has no basis for construing the word "person" in Section 209 as including any sovereign. Notably, of the three potential aggrieved persons," the statute does confer a cause of action on one inanimate entity–either House of Congress. Had Congress intended to include other inanimate bodies in its definition of "aggrieved person[s]," such as states, it would have done so expressly.

That, at the outset of this case, Plaintiffs deliberately utilized Section 209 as the mechanism for their challenge to the Census Bureau's use of differential privacy cannot be sidestepped. And while true that Section 209 does create an express cause of action to challenge violations of Section 141, *see Common Cause v. Trump*, No. 120CV02023CRCGGKDLF, 2020 WL 8839889, at *12 (D. D.C. Nov. 25, 2020), its precise language makes clear that the power to enforce the duties and obligations imposed by Section 141 does not extend to the State. *See* § 209(d)(1)–(3); *Nat'l R. R. Passenger Corp. v. Nat'l Ass'n of R. R. Passengers*, 414 U.S. 453, 458 (1974) ("Since the Act creates a public cause of action for the enforcement of its provisions and a private cause of action only under very limited circumstances, this maxim would clearly compel the conclusion

that the remedies created in § 307(a) are the exclusive means to enforce the duties and obligations imposed by the Act.").

Accordingly, the State is not entitled to relief—injunctive or otherwise—because it has no cause of action under Section 209 under which its differential privacy challenge would have a likelihood of success.[3] *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) ("[A]ny motion or suit for a traditional injunction must be predicated

---

[3] The court further doubts that the State has demonstrated the requisite standing to sue. Alabama's Constitution expressly contemplates the difficulty the State now claims to be facing—that is, an instance in which the decennial census is not "full and satisfactory." Specifically, Section 201 of the Alabama Constitution provides:

> Should any decennial census of the United States not be taken, or if when taken, the same, as to this state, be not full and satisfactory, the legislature shall have the power at its first session after the time shall have elapsed for the taking of said census, to provide for an enumeration of all the inhabitants of this state, upon which it shall be the duty of the legislature to make the apportionment of representatives and senators as provided for in this article.

Ala. Const. § 201. But rather than carry out its own statewide census, the State asserts that it has a reliance interest on the Bureau's forthcoming redistricting numbers and cannot now be expected to expend the resources necessary to conduct its own head count. (Doc. 94 at 26.) Any insinuation to the contrary, it insists, is "silly." (*Id.*)

Section 201 complicates Alabama's ability to demonstrate traceability for Article III standing purposes. Standing consists of three elements, and in addition to having suffered an "injury in fact" that is "likely to be redressed by a favorable judicial decision," Article III requires a plaintiff to show his or her harms were "fairly traceable to the challenged conduct of the defendant." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). By discounting its prescribed alternatives to using the Bureau's redistricting data, the State has assumed some liability for its stated injury, i.e., that it will not have tabulations of the population in its chosen form. After all, "[r]edistricting is primarily the duty and responsibility of the State," *Abbot v. Perez*, 138 S. Ct. 2305, 2324 (2018), and the State's independent decision not to resort to its own constitutional provisions is a primary causal factor allegedly harming its "sovereign interest in drawing fair districts," (Doc. 3 at 44.) *See Burns v. Richardson*, 384 U.S. 73, 91 (1966) ("[T]he Equal Protection Clause does not require the states to use total population figures derived from the federal census . . . ."). Put simply, even if the State had a cause of action under Section 209, we doubt that it could establish that any injury suffered was fairly traceable to the Bureau's chosen method of disclosure avoidance.

14

upon a cause of action . . . regarding which a plaintiff must show a likelihood or actuality of success on the merits."). As such, the State of Alabama's motion for a preliminary injunction as to Count I must be denied, and with no cognizable basis for relief, Count I as asserted by the State warrants dismissal with prejudice.[4]

> 2.    The Individual Plaintiffs' claims are not justiciable and therefore improperly before this court.

Unlike the State, Representative Aderholt, Mr. Green, and Mr. Williams (collectively, "Individual Plaintiffs") are clearly "aggrieved persons" and have properly invoked Section 209 to bring their differential privacy challenge (Count I). As we will explain, though, their challenge to the Bureau's adoption of differential privacy likewise encounters a number of foundational roadblocks that bar this court from providing injunctive relief or otherwise hearing their challenge advanced in Count I on the merits. Here, those roadblocks are jurisdictional in nature.

> i.    *The Individual Plaintiffs lack Article III standing.*

Defendants contend that the Individual Plaintiffs lack Article III standing. In particular, Defendants argue that the census data provided will be reliable enough for redistricting and, in any event, that the Individual Plaintiffs' claimed injuries are based on

---

[4] Because the State has no cause of action under Section 209, there is no other allegation of fact that could cure the State's challenge brought in Count I. A district court need not allow an amendment to a complaint where amendment would be futile, *see Foman v. Davis*, 371 U.S. 178, 182 (1962), as it would be here, and dismissal with prejudice is thus the only suitable course of action as to this particular claim, *cf. Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001).

future events—most notably, the disclosure of the actual census data—and speculation about the effect of those events.

To satisfy Article III's well-established "case or controversy" requirement, Plaintiffs must demonstrate that they have "standing" to sue; that is, they must show that they (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of Defendants, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Flat Creek Transp., LLC v. Fed. Motor Carrier Safety Admin.*, 923 F.3d 1295, 1300 (11th Cir. 2019).

Each of the Plaintiffs "assert[] a number of injuries—diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources—all of which turn on [their] expectation that [differential privacy] will . . . lead to an inaccurate population count." *Dep't of Com. v. New York,* 139 S. Ct. 2551, 2565 (2019). And the Individual Plaintiffs, specifically, assert that the use of differential privacy will degrade the redistricting data provided to the State, which will subsequently affect the State's ability to draw accurate federal, state, and local legislative districts. As their presumptive theory goes, the skewed data risks a misallocation of federal funding among Alabama's communities and citizens and dilution of their individual voting power.

An "injury in fact" is "an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical . . . ." *Corbett v. Transportation Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019). And where, as here, a voter rests his or her legal challenge on the one-person one-vote

16

principle, "injury results only to those persons domiciled in under-represented voting districts," *Wright v. Dougherty Cty., Ga.*, 358 F.3d 1352, 1355 (11th Cir. 2004) (citations omitted), meaning that individuals who "have not suffered any harm or injury by the malapportioned voting districts" lack standing, *id*.

In this regard, the Bureau has not yet delivered its redistricting data with differential privacy "in a concrete manner that will predictably change the count." 141 S. Ct. at 536 (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019); *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 331, 331–32 (1999)). "The Government's eventual action will reflect both legal and practical constraints, making any prediction about future injury just that—*a prediction*." *Id.* (emphasis added). More, the Bureau insists that the final epsilon, as set on June 9, 2021, will preserve the value and accuracy of census data once compiled in its final form. (Doc. 41-1 at 27–28; Doc. 137.)

As to the Individual Plaintiffs' speculative fears of under-representation in their voting districts, their claims amount to "primarily future injuries," which at this point, have not materialized. *Dep't of Com. v. New York*, 139 S. Ct. at 2565 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). Indeed, it is not presently known whether the Individual Plaintiffs' votes will be diluted (or enhanced, or affected at all) by differential privacy,[5] and the Bureau has committed to conducting quality checks of the data

---

[5] Even Plaintiffs' own expert Michael Barber explains that with the application of differential privacy, "[p]laces with fewer people (rural locations) are more likely to be impacted." (Doc. 3-5 at 18.) As a result, "small populations [have grown] larger" in the demonstration data products that have been released thus far. (*Id.* at 20.) This demonstrates that, depending on specific population characteristics, differential privacy may preserve individual voting power rather than dilute it.

17

throughout the application of differential privacy before it is released to the states. (Doc. 137 at 2.)

And to the federal funding argument, the Individual Plaintiffs' assertion that federal funding variables "will be affected by differential privacy," which will, in turn, "directly affect the amount of federal funding Alabama and its citizens receive," likewise rests on speculation. (Doc. 1 at 34–35.) For starters, the State has not yet received any redistricting data from the Bureau, meaning that the Individual Plaintiffs have no basis for believing they were, or will be, under-counted. Moreover, there is no indication that differential privacy will, in practice, skew redistricting data to the extent that federal funds will be misallocated. All told, any finding of a "substantial risk of reduced representation and federal resources" "involves a significant degree of guesswork." *Trump v. New York*, 141 S. Ct. 530, 535–36 (2020).

Because the Individual Plaintiffs' fears are "riddled with contingencies and speculation that impede judicial review," *id*. at 535, the court can discern no injury-in-fact sufficient to confer Article III standing on them at this point. *See also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 133 S. Ct. 1138, 1141 (2013) ("'[A]llegations of possible future injury' are not sufficient."). Accordingly, this court lacks jurisdiction to hear Count I in its entirety, and Count I is due to be dismissed without prejudice as to the Individual Plaintiffs.[6]

---

[6] Pursuant to Fed. R. Civ. P. 12(h)(3), the court has an ongoing obligation to dismiss an action on its own motion "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter." *See also Lipofsky v. New York State Workers Comp. Bd.*, 861 F.2d 1257, 1258 (11th Cir. 1988). "Because standing is jurisdictional, a dismissal for lack of

ii.      *The Individual Plaintiffs' claims are unripe.*

In addition to the Individual Plaintiffs' failure to demonstrate that they have standing, their claims falter upon another jurisdictional hurdle: ripeness.

Consistent with the judiciary's obligation to exercise power only in last resort, suits must be ripe for court review in order to be justiciable. *See, e.g., Common Cause*, 2020 WL 8839889, at *4 (D.D.C. Nov. 25, 2020). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998). "If an action for prospective relief" does "not contain a concrete injury requisite for standing" because the injury alleged has not fully materialized, it generally will not be ripe for review. *Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006). Thus, for the same reasons that the Individual Plaintiffs here are unable to demonstrate any cognizable injury-in-fact, they are likewise unable to demonstrate the requisite ripeness for further consideration of their differential privacy claims. *New York C.L. Union v. Grandeau*, 528 F.3d 122, 130 (2d Cir. 2008) ("Standing and ripeness are closely related doctrines that overlap 'most notably in the shared requirement that [Plaintiffs'] injury be imminent rather than conjectural or hypothetical.'").

\* \* \*

It may very well be that the Individual Plaintiffs will return here once the final redistricting data are actually delivered to the states. But we cannot know whether

---

standing has the same effect as a dismissal for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1)." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008).

differential privacy will inflict the harm alleged by the Individual Plaintiffs until the Bureau releases a final set of redistricting data. "Letting the Executive Branch's decision-making process run its course not only brings more manageable proportions to the scope of the parties' dispute, but also ensures that we act as judges, and do not engage in policymaking properly left to elected representatives." *Trump*, 141 S. Ct. at 536 (citations omitted); *see also Utah v. Evans*, 536 U.S. 452, 463 (2002) ("Nor . . . if a lawsuit is brought soon enough after completion of the census and heard quickly enough is relief necessarily impracticable.") (internal quotation marks omitted).

For each of these reasons, the Individual Plaintiffs' (and, if one were to assume it could maintain a cause of action, the State's) challenge under Count I is non-justiciable at present and is therefore due to be dismissed without prejudice.

### B.     The APA Claims (Counts III and IV)

Plaintiffs bring two further challenges to the implementation of differential privacy, these under the APA. The first (Count III) seeks to have the court hold unlawful and set aside the use of differential privacy as an agency action that is "not in accordance with law," "contrary to constitutional right," "in excess of statutory jurisdiction [or] authority," or which was implemented "without observance of procedure required by law." (Doc. 1 at 46–47 (citing 5 U.S.C. §§ 706(2)(A)–(D)).) The second (Count IV) challenges the decision as arbitrary, capricious, or an abuse of discretion, and is based entirely on the Bureau's alleged failure to follow proper administrative procedures. (*Id*. at 47 (citing 5 U.S.C. § 706(2)(A)).)

Pertinent to Count III, which challenges the Bureau's adoption of differential privacy as being "not in accordance with [Section 141]," Plaintiffs do not differentiate the injury they have suffered from the injury alleged under Section 209—that consequences *may* flow from the Bureau's decision to deliver "skewed" redistricting data to the State. As already discussed, this alleged injury is simply too speculative to pass muster as an "injury-in-fact." On these grounds, Plaintiffs, including the State, lack standing to challenge Section 141 by and through the APA, just as they lacked standing to challenge Section 141 by and through Section 209. Injunctive relief thus cannot exist as to Count III, and Count III will accordingly be dismissed without prejudice.

In contrast, where Count IV is concerned, the injury alleged is not speculative—the Plaintiffs allege a concrete and particularized injury caused by the Bureau's failure to follow the APA's procedural requirements in 2017 and 2018. *See Spokeo*, 136 S.Ct. at 1549–50. As such, the court must scrutinize the actions taken by the Bureau in its adoption of differential privacy, which began in September 2017 with the Census Bureau's initial announcement of its intent to use differential privacy for its 2020 Census data. (Doc. 3 at 12.) The second challenged action was the Bureau's December 2018 publication of its 2020 Census Operational Plan. (Doc. 1 at 18.)

"The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court,' § 704, and applies universally 'except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law,' § 701(a)." *Bennett v. Spear*, 520 U.S. 154, 175 (1997). The APA "embodies a 'basic presumption of judicial review,'" and instructs

reviewing courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Com. v. New York*, 139 S. Ct. at 2567 (citing *Abbott Laboratories*, 387 U.S. at 140; 5 U.S.C. § 706(2)(A)).

For an agency action to be considered final, "[f]irst, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016) (quotation marks and citation omitted).

With this framework in mind, the larger question here remains: are Plaintiffs in the instant case entitled to injunctive relief under Count IV? Operating under the assumption that the Bureau's September 2017 and December 2018 announcements constituted final agency actions,[7] *cf. Glavin v. Clinton*, 19 F. Supp. 2d 543, 547 (E.D. Va. 1998) ("As read in the Appropriations Act of 1998 § 209(c)(2), the Census 2000 Operational Plan 'shall be deemed to constitute final agency action regarding the use of statistical methods in the 2000 decennial census,' thus making the question of use ripe for adjudication."), *aff'd sub nom. Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316 (1999), Plaintiffs' delay in

---

[7] Of course, even if the September 2017 and December 2018 announcements ultimately were not final agency actions, injunctive relief should nevertheless be denied. Under this scenario, Plaintiffs' APA claims would be unripe and any judicial review of the challenged actions would be improper. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

bringing their differential privacy challenge has undercut their request for an injunction by impeding any showing of imminent irreparable harm.[8]

"A preliminary injunction requires showing 'imminent' irreparable harm." *Wreal, LLC*, 840 F.3d at 1248; *Siegel v. LePore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (affirming the district court's denial of injunctive relief based solely on plaintiff's inability to demonstrate substantial likelihood of irreparable injury). "Indeed, the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits." *Wreal*, 840 F.3d at 1248 (five-month delay in bringing claim doomed any finding of imminent irreparable harm) (emphasis in original). The preliminary injunction standard's focus on *imminent* harm also places an onus on a plaintiff to demonstrate some sense of "urgency or necessity," and by sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief. *Menudo Int'l, LLC v. In Miami Prod., LLC*, No. 17-21559-CIV, 2017 WL 4919222, at *3 (S.D. Fla. Oct. 31, 2017). *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[A] party requesting a preliminary injunction must

---

[8] The preliminary injunction standard's focus on *imminent* harm also implicates the doctrine of laches, which Defendants have raised as an affirmative defense in their response brief. "Under the defense of laches, [the] Defendant must show (1) a delay in [Plaintiffs'] assertion of a right or claim; (2) that the delay was not excusable; (3) and that the delay caused undue prejudice." *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, 1546 (11th Cir. 1984). By all accounts, and for reasons explained in text, Plaintiffs' delay here is likely inexcusable. *Cf. Wood v. Raffensperger*, 501 F. Supp. 3d 1310 (N.D. Ga.), *aff'd*, 981 F.3d 1307 (11th Cir. 2020), *cert. denied*, 141 S. Ct. 1379 (2021) (equal protection election law claims brought by voter who sat on his rights for approximately eight months were barred by laches). We find, though, that we need not definitively address Defendants' laches argument at the preliminary injunction stage, as the same delay that underpins that defense undermines Plaintiffs' contention that they have suffered (or are suffering) "imminent" irreparable harm.

generally show reasonable diligence."); *Pals Grp., Inc. v. Quiskeya Trading Corp.*, No. 16-23905-CIV, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9, 2017) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.") (internal quotation and citation omitted).

Here, Plaintiffs waited approximately forty-two months as to the September 2017 announcement, and twenty-seven months as to the December 2018 publication, respectively, to bring their claims before this court. And despite their outright assertion that "the privacy loss budget—the epsilon—is immaterial" and "that the application of differential privacy itself—no matter the epsilon—is unlawful," (Doc. 3 at 40), Plaintiffs explain that they were not aware of the extent to which differential privacy would abridge their rights until November 2020.[9] But that does not change the underlying fact that they knew about the implementation of differential privacy, which they have challenged as a per se matter, as early as September 2017, at which point they proceeded to sit on their hands. Such a delay surely indicates "an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).

---

[9] Plaintiffs also challenged an additional agency action in oral argument, though the action does not appear on the face of either the Complaint or the motion. That action is the Bureau's November 2020 announcement that the invariant data elements would be (1) total population at state level; (2) total housing units at census block level; and (3) number of group quarters facilities by type at census block level. (Doc. 3-6 at 13.) But because Plaintiffs' motion and Complaint are silent as to the November 2020 announcement, and because the issue was raised for the first time in Plaintiffs' reply brief, the matter is not properly before the court. *See United States v. Coy*, 19 F.3d 629, 632 n.7 (11th Cir. 1994) ("Arguments raised for the first time in a reply brief are not properly before a reviewing court.").

While the challenge to the procedure followed in adopting differential privacy under the APA (Count IV) is within the court's jurisdictional reach, the request for preliminary injunctive relief will be denied. Count III will be dismissed for lack of standing.

### C.    Fifth Amendment Claim (Count II)

The Individual Plaintiffs bring a separate Equal Protection claim under the Due Process Clause of the Fifth Amendment, alleging that differential privacy is a violation of the one-person, one-vote principle and will result in the dilution of their votes. (Doc. 1 at 45–45) (Count II). For the same reasons these specific plaintiffs lack standing and ripeness to challenge differential privacy under Section 141(c), *see* section IV.A.2, *supra*, their purely constitutional claim regarding alleged vote dilution is likewise not justiciable at this point in time. As the court discussed as to Count I, their claims are far too speculative at present to meet either the injury-in-fact or ripeness conditions. The Individual Plaintiffs therefore are not entitled to injunctive relief, and Count II will likewise be dismissed without prejudice.

## V.    PLAINTIFFS' DELAY CHALLENGE

Plaintiffs' next set of challenges, which are similarly brought pursuant to both § 141(c) and the APA, concern the Bureau's delayed delivery of redistricting data to the states, which the Bureau announced on February 12, 2021. The statutory release date should have been March 31, 2021, but that deadline has now come and gone, with announced deadlines extending to September 30, 2021, and, most recently, August 16, 2021. Defendants submit that Plaintiffs lack standing, their claims are largely moot since

the March 31, 2021, deadline has passed without an amended complaint, and the requested relief is impossible to provide.

Here, as with its differential privacy challenge, the State of Alabama brings its first challenge to the Bureau's delay (Count V) pursuant to Section 141, by and through Section 209. For the same reasons already set forth, these claims are not properly before this Court. That is, Section 209 affords the State no cause of action to bring its delay claim under Section 141, *see* section IV.A.1, *supra*. Injunctive relief as to Count V, as asserted by the State, will thus be denied and the claim dismissed with prejudice.

The Individual Plaintiffs' claims asserted under Section 141 (Count V) and all of Plaintiffs' claims asserted under the APA (Counts VI and VII), however, do not face any similar preliminary barriers to consideration and thus warrant a more thorough discussion.

### A.    § 141 Claim (Count V) and APA Claims (Counts VI and VII)

In what remains for discussion under Count V, the Individual Plaintiffs contend that the Bureau's delay does not comport with Section 141(c), which requires that redistricting data be sent to the states no later than March 31, 2021. (Doc. 1 at 48.) And in Counts VI and VII, each of the Plaintiffs seeks relief under the APA for the February 12, 2021, decision, in which the Bureau announced its intent to release redistricting data to all fifty states on September 30, 2021. (*See id.* at 37.) In Plaintiffs' view, the announcement was "not in accordance with law" "because it contradicts . . . the congressionally imposed deadline of March 31" (Count VI). (*Id.* at 48.) They further argue that the delay announcement was "arbitrary and capricious" (Count VII). (*Id.* at 49.)

To no one's surprise, following Plaintiffs' filing of the Complaint in the case, the Bureau missed its March 31, 2021, statutory deadline to deliver redistricting data to the states. But on April 26, 2021, the Bureau announced that it will instead deliver redistricting data to the states by August 16, 2021, an earlier date than originally announced. This date was initially unsatisfactory for Plaintiffs who, for the first time in their reply brief, requested a July 31, 2021, deadline for the release of the data. (*See* Doc. 94 at 14.) But at oral argument, counsel for Plaintiffs and Defendants stated that the new August 16 date was satisfactory to both parties: "[I]f we could get [the redistricting data] in mid-August, I think we could still work with that, but pushing it beyond that is going to cause serious harm to us." (Doc. 128 at 28.) Naturally, this statement brings into question whether Plaintiffs' stated injuries necessitate preliminary injunctive relief at the present moment.

"A showing of irreparable harm is 'the *sine qua non* of injunctive relief,'" or in other words, the indispensable requirement. *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)). "The injury must be neither remote nor speculative, but actual and imminent," *City of Jacksonville, Fla.*, 896 F.2d at 1285 (quotation omitted), and "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction]" do not reach the actual and imminent standard, *Sampson v. Murray,* 415 U.S. 61, 90 (1974). "Although [Plaintiffs'] desire to have [their] case decided in an expedited fashion is understandable, that desire, without more, is insufficient to constitute the irreparable harm necessary to justify the

extraordinary relief requested here." *Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007).

Here, an issue arises as to the imminent irreparability of Plaintiffs' alleged injury. While the Bureau announced a delay of the redistricting data release date, the Bureau has since advanced that timeline. Furthermore, at oral argument, counsel for the Bureau described the precise next steps that the Bureau will take to complete the delivery of the data by August 16, a date which, barring unforeseen "undiscovered, unexpected anomalies," the State "can have confidence in." (Doc. 128 at 89.)   Given the State's admission that a mid-August release date would be workable, (*id*. at 28), there is very little record evidence from which the court can glean that Plaintiffs will "suffer irreparable injury *absent an injunction*." *Swain v. Junior*, 961 F.3d 1276, 1292 (11th Cir. 2020) (emphasis in original).

The problem at this point for Plaintiffs "is that the federal courts exist to resolve real disputes, *not to rule on a plaintiff's entitlement to relief already there for the taking*." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 175 (2016), *as revised* (Feb. 9, 2016) (Roberts, C.J., dissenting) (emphasis added). For Plaintiffs to quibble with the already expedited timeline by asking for an order from this court directing the Bureau to speed things up even more, but only by two weeks or so, demonstrates that there is just not a whole lot to their argument; or, at least, not enough to demonstrate the continued necessity of preliminary injunctive relief. *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 n.10 (11th Cir. 2007) ("Even though a case is not moot, that does not mean that injunctive relief follows automatically; undoubtedly, injunctive relief requires something

more than the mere possibility which serves to keep the case alive." (quotation marks omitted)).

And although no one disagrees that the Bureau failed to act by the March 31, 2021, deadline contained in the Census Act, Plaintiffs did not subsequently make a request to amend their complaint seeking a new deadline of July 31, 2021, for the Bureau to release the redistricting data; instead, they first suggested the July 31 deadline in their reply brief. But arguments raised for the first time in a reply brief are not properly before the reviewing court. *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) (citing *United States v. Benz*, 740 F.2d 903 (11th Cir. 1984)).

The Bureau has made clear the data will be available for use on August 16, 2021, a date that Plaintiffs have acknowledged will allow them to complete redistricting without causing them cognizable injury. Of course, should the Bureau not abide by its assurances that Plaintiffs can have confidence in the August 16 date, Plaintiffs may continue to litigate the claims that remain for trial, not to mention their right to avail themselves of other legal pathways available to them. *See, e.g.*, 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."). But as far as this court can discern at this juncture, Plaintiffs are not entitled to a preliminary injunction as it pertains to the Individual Plaintiffs' Section 141 claims or each Plaintiff's APA delay claims, and the request for preliminary injunctive relief as to Counts V, VI, and VII will be denied.

## B.   Mandamus Request (Count VIII)

In Count VIII, Plaintiffs ask for "a writ of mandamus requiring the Secretary to comply with the March 31 deadline imposed by § 141(c)." (Doc. 1 at 51; *see also* Doc. 3 at 69.)

The Mandamus Act, codified at 28 U.S.C. § 1361, grants district courts original jurisdiction over mandamus actions brought "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Even so, "mandamus is an extraordinary remedy which should be utilized only in the clearest and most compelling of cases." *Cash v. Barnhart*, 327 F.3d 1252, 1257–58 (11th Cir. 2003) (citing *Carter v. Seamans,* 411 F.2d 767, 773 (5th Cir.1969)).

"Mandamus relief is only appropriate when: (1) the plaintiff has a clear right to the relief requested; (2) the defendant has a clear duty to act; and (3) 'no other adequate remedy [is] available.'" *Id*. But "the writ of mandamus *will not issue to compel the performance of that which cannot be legally accomplished*," or, in other words, that which is "impossible." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017) (emphasis added).

Here, the Bureau has made it quite clear that a delay was unavoidable due in no small part to the COVID-19 pandemic. True, the COVID-19 pandemic is not carte blanche for the Bureau to ignore the law, and "judicial deference in an emergency or a crisis does not mean wholesale judicial abdication" of the federal judiciary's role to say what the law is. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74 (2020) (Kavanaugh, J., concurring). But "[t]here is nothing mystical or punctilious about the judiciary giving due consideration to an executive agency's central argument—made repeatedly and emphatically . . . , not solely with allegations but with proffers of evidence—before issuing

extraordinary relief." *Am. Hosp. Ass'n*, 867 F.3d at 169. "[I]t is not appropriate for a court—contemplating the equities—to order a party to jump higher, run faster, or lift more than [he or she] is physically capable." *Id.*, at 167–168.

Yet, even as the March 31, 2021, deadline approached and then passed, Plaintiffs chose not to amend their complaint to request alternative relief from this court. The court cannot force the Bureau to do the impossible—that is, comply with an already-lapsed deadline. As a result of this impossibility, Plaintiffs' request for mandamus relief is due to be denied. *Id.* at 169; *cf. United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018) ("[S]upervisory mandamus cases require live controversies.").

Furthermore, the Bureau has made quite clear that it will be able to deliver the redistricting data to the State by August 16, 2021. Again, Plaintiffs have acknowledged that date suffices for them to be able to complete redistricting without injury. We see no prejudice to Plaintiffs in denying a writ of mandamus requiring the Bureau to issue the data any earlier. *See Telecommunications Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984).

Therefore, Plaintiffs' request for a writ of mandamus is due to be denied, and Count VIII is dismissed with prejudice.

## VI.   CONCLUSION

Based upon the foregoing, it is ORDERED[10] as follows:

---

[10] Mindful that whether this matter is properly heard by a three-judge panel is somewhat unclear and is jurisdictional, *see, e.g., Kalson v. Paterson*, 542 F.3d 281, 286–87 (2d Cir. 2008), and out of an abundance of caution, we follow the lead of prior three-judge panels by certifying that Judge Huffaker, to whom this case was originally assigned, individually arrived at the same conclusions

1) Plaintiffs' Motion for a Preliminary Injunction (Doc. 3) is DENIED;

2) Plaintiffs' Petition for a Writ of Mandamus (Doc. 3) is DENIED;

3) Count I of the Complaint (Doc. 1) as asserted by the State of Alabama is DISMISSED with prejudice;

4) Count I of the Complaint (Doc. 1) as asserted by Robert Aderholt, William Green, and Camaran Williams is DISMISSED without prejudice;

5) Counts II and III of the Complaint (Doc. 1) are DISMISSED without prejudice;

6) Count V of the Complaint (Doc. 1) as asserted by the State of Alabama is DISMISSED with prejudice;

7) Count VIII of the Complaint (Doc. 1) is DISMISSED with prejudice;

8) Counts IV, VI, and VII of the Complaint (Doc. 1) will proceed; and

9) Count V of the Complaint (Doc. 1) as asserted by Robert Aderholt, William Green, and Camaran Williams will proceed.

DONE, on this the 29th day of June, 2021.


_____/s/ Kevin C. Newsom_____
KEVIN C. NEWSOM
UNITED STATES CIRCUIT JUDGE

---

that we have reached collectively, so that an appeal can still be expeditiously taken in an appropriate forum. *See Swift & Co. v. Wickham,* 382 U.S. 111, 114 n.4 (1965) (noting with approval that "[t]his procedure for minimizing prejudice to litigants when the jurisdiction of a three-judge court is unclear has been used before" (citing *Query v. United States*, 316 U.S. 486 (1942))); *FAIR v. Klutznick*, 486 F.Supp. 564, 578 (D. D.C. 1980); *cf. Massachusetts v. Mosbacher*, 785 F.Supp. 230, 238 n.6 (D. Mass. 1992) (three-judge court) ("Because the author of this opinion is the single district judge to whom this case was initially assigned, this opinion stands as certification that the author has individually arrived at the conclusions expressed collectively in the opinion and the judgment of this three-judge court."), *rev'd on other grounds sub nom. Franklin v. Massachusetts,* 505 U.S. 788 (1992).

_____/s/ Emily C. Marks_____
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE


_____/s/ R. Austin Huffaker, Jr._____
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE